**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL PENSION FUND,** | ) | |
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL WELFARE FUND,** | ) | |
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL RETIREE HEALTH** | ) | |
| **AND WELFARE FUND, and CATHERINE** | ) | |
| **WENSKUS, not individually but as** | ) | |
| **Administrator of the Funds,** | ) | **Case No. 25 C 4665** |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Honorable John F. Kness** |
| | ) | |
| **T CAT ENTERPRISE, INC.,** | ) | **Magistrate Judge McShain** |
| **an Illinois corporate entity,** | ) | |
| **Defendant.** | ) | |

**<u>PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT DAMAGES</u>**

NOW COME Plaintiffs, Chicago & Vicinity Laborers' District Council Pension Fund, Welfare Fund, Retiree Health and Welfare Fund and Catherine Wenskus, (collectively referred to herein as the "Funds"), by and through their attorney, Sara S. Schumann, hereby move for Judgment against Defendant T CAT Enterprise, Inc. ("Company"), an Illinois corporation. In support of this Motion, the Funds state as follows:

1. The Funds filed a three count Complaint on April 29, 2025 against the Company. Count I sought to collect delinquent fringe benefit contributions owed per the independent auditing firm of Richard J. Wolf and Company for the period May 5, 2021 through March 31, 2022 (the "Wolf Audit"), plus interest, liquidated damages ("LD"), accumulated LD, audit costs and the Funds' attorneys' fees and costs, as well as sought Company provide proof it is in compliance with its bond obligations. Count II sought to collect union dues contributions owed per the Wolf Audit, plus LD. Count III sought the amounts owed to the Funds based on Defendant's own submitted, but as yet unpaid, monthly benefit contribution reports for months outside of the Wolf Audit period

1

to present and for the accumulated LD for Company's untimely payments.

2.     Company was served with Summons and Complaint on June 2, 2025, and the deadline to file a responsive pleading was June 23, 2025 (Docket No. 11).

3.     Company did not respond, nor defend this action and the Court granted Plaintiffs' motion for an order directing the clerk to enter the default, on September 3, 2025 (Docket No. 15).

4.     Company and the Construction and General Laborers' District Council of Chicago & Vicinity (the "Union") are parties to an Independent Construction Industry Collective Bargaining Agreement ("Memorandum"), which was also attached to Plaintiffs' Complaint, and is attached hereto as Exhibit A-1.  The Memorandum incorporates and adopts the Joint Agreements between the Union and various employer associations (Exh. A-1 at ¶2).  The Joint Agreements at all times relevant govern the terms and conditions of employment of Company's employees in the bargaining unit represented by the Union. A copy of one of the Joint Agreements ("CAICA") is attached as Exhibit A-2.

5.     Pursuant to Sections 502(e)(1) and (2) and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§1132 (e)(1) and (2) and 1145, Section 301(a) of the Labor Management Relations Act ("LMRA") of 1947 as amended, 29 U.S.C. §185(a), 28 U.S.C. §1331, and the Agreements and Declarations of Trust, the Funds are entitled to judgment damages in sum certain against Defendant, pursuant to its obligations, arising from the Joint Agreements and the Memorandum (collectively referred to as the "Agreement" or "CBA"), as well as from the also incorporated respective Funds' Agreements and Declarations of Trust, which are attached hereto with the Affidavit of Funds' Field Department Representative Joseph Gilleran (See Exh. A Gilleran Affidavit, Exh.A-1 Memorandum, Exh.A-2 CAICA, Exh.A-3 Pension Fund, Exh.A-4 Welfare Fund, Exh.A-5 Retiree Welfare Fund, Exh.A-6 Training Fund,

Exh.A-7 LECET, and Exh.A-8 LDCLMCC).

6.     As explained by Mr. Gilleran, the Agreement and the Funds' respective Agreements and Declarations of Trust to which Company is bound require it to submit benefit reports and contribution payments by the tenth (10th) day of the following month.  Payments not received within thirty (30) days of this date are assessed LD in the amount of twenty (20) percent of the unpaid or late contributions to the Welfare, Retiree Welfare, Pension and Training funds, and in the amount of ten (10) percent of the unpaid or late contributions to the LDCLMCC, CAICA and LECET funds (referred to as "Industry Funds"), and for Union dues, plus interest on all such amounts at the rate of twelve (12) percent from the date of the delinquency forward (See Exh. A, ¶¶ 2-4 Gilleran Affidavit, and Exhs. A1-10).

7.     The Agreement and the Funds' respective Agreements and Declarations of Trust further obligate Company to submit its books and records to the Funds for periodic audits to determine benefit contribution compliance, and when there are findings or litigation is necessary to gain compliance with the auditing process the company is obligated to pay the audit costs, as well as obligated to obtain and maintain a bond (See, Exh. A, Gilleran Affidavit at ¶¶5-6 and 8).

8.     Additionally, per agreement the Funds have been duly authorized to act as collection agents on behalf of the Union for the collection of union dues owed (See, Exh. A, Gilleran Affidavit at ¶3).

9.     On September 28, 2023, the Funds' selected independent auditing firm of Richard J. Wolf and Company, Inc., issued an initial report based on its audit of Company's books and records for compliance with the CBA and Trust Agreements, covering the period from May 5, 2021 through March 31, 2022 ("Wolf Audit").  Plaintiffs sent copies of the initial Wolf Audit report to Company, with a deadline to raise any objections or to pay the amounts owed. Company

did raise objections, and based on Company's evidence the Wolf Audit was revised and reissued on January 14, 2025. A redacted copy of that revised Wolf Audit and Summary Report is attached to Mr. Gilleran's Affidavit as Exhibit A-9. The revised Wolf Audit reflects the amount of $9,822.09 in unpaid principal contributions and dues owed to Funds for the audit period, covering May 5, 2021 through March 31, 2022, and the total amount owed for that period per the Wolf Audit Summary Report is $37,471.66 (See Exh. B-9 Wolf Audit and Summary).

10.    As established by Mr. Gilleran, Funds are entitled to judgment damages against Company per the revised Wolf Audit in the amount of $36,038.86 consisting of the following:

| | |
|---|---|
| $  9,822.09 | Principal contributions and dues |
| $  1,885.90 | Liquidated damages ("LD") per Wolf Audit |
| $ 19,895.97 | Accumulated LD for untimely benefit payments |
| $  4,292.70 | Accumulated interest on the audit findings |
| $  1,575.00 | Wolf Audit cost |
| **$ 37,471.66** | Amount owed to Funds per the Wolf Audit and Summary |
| ($ 1,432.80) | Credit for Company's payment toward Wolf Audit principal to date |
| **$ 36,038.86** | **Balance Owed for Wolf Audit** |

 (Exh.A Gilleran Affidavit ¶¶2-6; Exh. A-9 Wolf Audit and Summary).

11.    Plaintiffs are also entitled to its attorneys' fees and costs under ERISA, 29 U.S.C. § 1132(g)(2)(B), as well as per the Agreement. As established by the undersigned, the Funds incurred **$12,044.00** in attorneys' fees and costs in this action (See, Exh. B, Schumann Affidavit, Exh. B1 Fee Report, Exh. A, Gilleran Affidavit at ¶7).

12     Additionally, Company submitted but failed to pay its June, July and August 2025 monthly benefit reports, reflecting that the amount of **$20,686.40** in principal contributions is also owed at this time for those months outside of the Wolf Audit period, and for which Funds do not waive its right to audit in the future those amounts reported by the Company for compliance. Further, the Company owes the Funds **$19,895.97** in accumulated liquidated damages for its untimely monthly report payments outside of the Wolf Audit period. A Statement of Account that

details the accumulated LD assessed to date, and redacted copies of the Company's unpaid June, July and August 2025 Reports are attached to Mr. Gilleran's affidavit as Exhibit A-10 (See, Exh. A Gilleran Affidavit at ¶6).

13.     Pursuant to the Agreement, Defendant must also obtain and maintain a bond (See Exh. A, Gilleran Affidavit at ¶8).

14.     Pursuant to Rule 55(b) of the Fed. R. of Civil P, Plaintiffs respectfully move the Court to enter an award for judgment damages in the total amount of **$68,769.26** in favor of the Funds and against Defendant, T CAT Enterprise, Inc., and request that the Court set the motion for hearing at a date sufficiently in the future to allow time for the motion and draft order to be served upon the Defendant's President and Registered Agent by certified mail.

15.     Plaintiffs will provide, as stated in the Certificate of Service below, a copy of this motion and the proposed order to Defendant, as well as inform as to the date the Court subsequently sets this motion for hearing.

WHEREFORE Plaintiffs respectfully request this Court enter an order for judgment damages in sum certain in favor of Plaintiffs and pursuant to Rule 55(b) of the Fed R. Civ. P., awarding the total amount of $68,769.26 against Defendant T CAT Enterprise, Inc.

Respectfully submitted,

LABORERS' PENSION AND WELFARE FUNDS,

September 15, 2025          By: _____ /s/ Sara S. Schumann
                                Associate Fund Counsel

Sara S. Schumann
Laborers' Pension and Welfare Funds
11465 W. Cermak Rd.
Westchester, IL 60154
SaraS@Chilpwf.com
W: (312) 692-1497
C: (773) 255-9878

**CERTIFICATE OF SERVICE**

The undersigned certifies that she caused a copy of the foregoing Motion for Entry of Judgment Damages to be served upon the following entity via certified mail to the address below and to the email addresses, sent on the 16th day of September, 2025.

> T CAT Enterprise, Inc.
> c/o James Trumbull, President
> 997 Reading Drive
> Bartlett, IL 60103
> Jtrumbull@tcatinc.com
> jtrumbull@hhintermodal.com
> sgore@lanermuchin.com

/s/ Sara S. Schumann

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL PENSION FUND,** | ) | |
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL WELFARE FUND,** | ) | |
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL RETIREE HEALTH** | ) | |
| **AND WELFARE FUND, and CATHERINE** | ) | |
| **WENSKUS, not individually, but as** | ) | |
| **Administrator of the Funds,** | ) | **Case No. 25 C 4665** |
| Plaintiffs, | ) | |
| **v.** | ) | **Honorable John F. Kness** |
| | ) | |
| **T CAT ENTERPRISE, INC.,** | ) | **Magistrate Judge McShain** |
| **an Illinois corporate entity,** | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF JOSEPH GILLERAN

**Joseph Gilleran, being first duly sworn on oath, deposes and states as follows:**

1.     I am a Field Representative employed by the Chicago & Vicinity Laborers' District Council Pension Fund. Welfare Fund and Retiree Welfare Fund (herein collectively referred to as the "Funds"), Plaintiffs in the above-referenced action.  My responsibilities include oversight of the collection of amounts owed by Defendant  T CAT Enterprise, Inc. ("Company").  This Affidavit is submitted in support of the Funds' Motion for Judgment Damages.  I have personal knowledge regarding the statements contained herein and am competent to testify to the matters stated.

2.     On May 5, 2021, Company signed an Independent Construction Industry Collective Bargaining Agreement ("Memorandum") with the Construction and General Laborers' District Council of Chicago & Vicinity (the "District Council" or "Union") and Laborers' Local 152.  Pursuant to the Memorandum, Company is bound to the terms of

**Exhibit A**

the Joint Agreements, which are incorporated by reference in the Memorandum (the Memorandum and the Joint Agreements are collectively referred to as the "Agreement" or the "CBA"), and the Funds' respective Agreements and Declarations of Trust. True and accurate copies of the Memorandum and the CAICA Joint Agreement is attached hereto as Exhibit A-1 and Exhibit A-2 respectively.

3.    Pursuant to agreement, the Funds have been duly authorized to act as collection agents on behalf of the District Council for union dues owed to the Union. The Company is required to submit dues reports and dues payments by the 10th day of the following month. Payments which are not received by that date are assessed liquidated damages ("LD") in the amount of 10% of the principal amount of the delinquent report.

4.    The Agreement and the Funds' Declarations of Trust to which the Company is bound require that Company submit benefit reports and contribution payments by the tenth (10th) day of the following month. Payments not received within thirty (30) days of this date are assessed LD at the rate of twenty (20) percent as to the Pension, Welfare, Retiree Welfare and Training Funds, and at the rate of ten (10) percent as to the other industry funds (LECET, LDCLMCC and CAICA), plus accumulated interest at a rate of twelve (12) percent is assessed from the date of the delinquency until paid.  See Exhibit A-2 CAICA Joint Agreement ("CAICA"), as well as the Amended Agreement and Declaration of Trust creating the Laborers' Pension Fund is attached as Exhibit A-3; a copy of the Amended Declaration of Trust of the Health and Welfare Department of the Construction and General Laborers' District Council ("Welfare Fund") is attached as Exhibit A-4; a copy of the relevant portions of the Agreement and Declaration of Trust of the Chicago Laborers' District Council Retiree Health and

2

Welfare Fund is attached as Exhibit A-5 ("Retiree Welfare Fund"); a copy of the relevant portions of the Trust Agreement Establishing the Construction and General Laborers' District Council of Chicago & Vicinity Training Trust Fund ("Training Fund") is attached hereto as Exhibit A-6; a copy of the Trust Agreement for the Laborers-Employers Cooperation and Education Trust ("LECET") is attached hereto as Exhibit A-7, and a copy of the Trust Agreement for the Laborers' District Council Labor-Management Cooperation Committee ("LDCLMCC") is attached hereto as Exhibit A-8.

5.    Prior to the lawsuit being filed, Company submitted its books and records for a compliance audit conducted by Richard J. Wolf and Company, Inc., covering the time period of May 5, 2021 through March 31, 2022 ("Wolf Audit"). In September 2023, Wolf issued an initial report. The Company, Funds and Union met to review that initial report and a corresponding wage audit in efforts to resolve those audits. Company presented evidence, warranting some revisions. On January 14, 2025 the revised Wolf Audit was issued with a copy and updated demand sent to Company. Company failed to pay the amounts owed to the Funds and Funds' counsel then filed this lawsuit. The revised Wolf Audit reflects the following amounts owed to the Funds with the amount the Company has paid toward the principal to date as credited from the total below:

| | |
|---|---|
| Welfare Fund Principal | $3,175.30 |
| Liquidated Damages | $ 635.06 |
| Interest | $1,497.62 |
| | |
| Retiree Welfare Fund Principal | $1,475.25 |
| Liquidated Damages | $ 295.05 |
| Interest | $ 695.80 |
| | |
| Pension Fund Principal | $4,133.51 |
| Liquidated Damages | $ 826.70 |
| Interest | $1,949.56 |

| Training Fund Principal | $252.90 |
| Liquidated Damages | $ 50.58 |
| Interest | $119.28 |

| Dues Fund | $721.13 |
| Liquidated Damages | $ 72.11 |

| LDCLMCC | $ 34.00 |
| Liquidated Damages | $ 3.40 |
| Interest | $ 16.17 |

| CAICA | $ 16.00 |
| Liquidated Damages | $ 1.60 |
| Interest | $ 7.61 |

| LECET | $64.58 |
| Liquidated Damages | $6.46 |
| Interest | $14.15 |

| Accumulated LD for untimely paid benefit contribution reports | $19,895.97 |

| Audit costs | $ 1,575.00 |

| **TOTAL** | **$37,471.66** |
| | - $1,432.80 Total paid to date toward audit |
| | **$36,038.86 Audit & Summary Balance** |

A true and accurate copy of the revised Wolf Audit report, covering May 5, 2021 through March 31, 2022 and Summary is attached hereto as Exhibit B-9.

6.      Additionally, I referred this matter to the Funds' legal department in October 2024 for a lawsuit, due to Company's failure to respond to the Wolf Audit, but also due to Company's delinquency in paying its monthly obligations from July 2023 forward. Company continued to be delinquent on its reports, and untimely paying most of them. To date, Company remains delinquent on its submitted reports owing $20,686.40 in total principal benefit contributions per its unpaid June, July and August 2025 reports. True and accurate copies of Company's redacted June, July and August 2025 reports are

4

attached hereto as Exhibit B-10, which also includes a copy of the most recent Statement of Account that details the accumulated LD owed by Company for its untimely payments of its monthly reports (See attached hereto Exhibit B-10). Thus, in addition to the amounts owed per the Wolf Audit, Company owes this $20,686.40 for submitted but as yet unpaid benefit reports, and the $19,895.97 for accumulated LD for untimely payment of its monthly reports.

7.     Per the Agreement, Funds are also entitled to the amounts it has incurred in attorneys' fees and court costs for enforcing the Agreement.

8.     Additionally, Company is also obligated by the Agreement to show proof it has obtained and is maintaining a bond in compliance with the Agreement.

FURTHER AFFIANT SAYETH NAUGHT.


Joseph Gilleran
Joseph Gilleran

Subscribed and sworn to before me
this 15th day of September 2025.

Notary Public

OFFICIAL SEAL
SAUNDRA LUSK REED
NOTARY PUBLIC, STATE OF ILLINOIS
COMMISSION NO. 995708
MY COMMISSION EXPIRES August 22, 2028

5



# CONSTRUCTION & GENERAL LABORERS'
## DISTRICT COUNCIL OF CHICAGO AND VICINITY
### AFFILIATED WITH THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA
999 McCLINTOCK DRIVE • SUITE 300 • BURR RIDGE, IL 60527 • PHONE: 630.655.0209 • FAX: 630.655.0215

## INDEPENDENT CONSTRUCTION INDUSTRY COLLECTIVE BARGAINING AGREEMENT

It is hereby stipulated and agreed by and between __T-CAT Enterprise Inc.__ ("Employer") and the Construction and General Laborers' District Council of Chicago and Vicinity, Laborers' International Union of North America, AFL-CIO ("Union"), representing and encompassing its affiliated Local Unions, including Local Nos. 1, 2, 4, 5, 6, 25, 75, 76, 152, 225, 582, 681, 1001, 1035, 1092, together with any other Local Unions that may come within its jurisdiction ("Local Unions"), and encompassing the geographic areas of Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone counties, Illinois, that:

1. Recognition. In response to the Union's request for recognition as the majority representative of the unit employees, the Employer recognizes the Union as the sole and exclusive collective bargaining representative under Section 9(a) of the NLRA for the employees now and hereinafter employed under this Agreement with respect to wages, hours and other terms and conditions of employment. This recognition is based on the Union having shown, or having offered to show, evidence of its majority support. The Employer has not obligated its bargaining rights to any entity for purposes of multi-employer bargaining, and it hereby revokes its prior assignment of bargaining rights, if any. The Employer further voluntarily elects not to assign such bargaining rights to any person, entity or association for purposes of multi-employer bargaining without prior written approval from the Union. Notwithstanding the number of persons employed under this Agreement, the Employer shall abide by this Agreement and all extensions thereof, and it waives any right or defenses it may have to terminate this agreement or rescind its recognition of the Union based on the number of persons employed, and it consents to enforcement of this commitment directly through any tribunal or court of competent jurisdiction.

2. Labor Contract. The Employer affirms and adopts the applicable Collective Bargaining Agreement(s) as designated by the Union in its sole discretion between the Union and the Builders Association, the Chicago Area Independent Construction Association, the Chicago Area Rail Contractors Association, the Chicago Area Scaffolding Association, the Chicago Demolition Contractors' Association, the Concrete Contractors Association of Greater Chicago, the Contractors Association of Will and Grundy Counties, the Fox Valley Associated General Contractors, the Great Lakes Contractors Association, the Illinois Road and Transportation Builders Association, the Illinois Small Pavers Association, the Mason Contractors Association of Greater Chicago, the Underground Contractors Association, and all other employer associations with whom the Union or its affiliated Local Unions have an agreement. If the applicable Collective Bargaining Agreement(s) expire during the term of this Agreement, any limitation on the right to strike shall not expire until a successor labor agreement has been established, which shall be incorporated into this Agreement. This Agreement supersedes all contrary terms in the applicable Collective Bargaining Agreement(s).

If local economic increases, the Employer shall pay its employees a total economic increase of $2.11 per hour effective June 1, 2017; $2.24 per hour effective June 1, 2018; $2.37 per hour effective June 1, 2019, and $2.35 per hour effective June 1, 2020, said amounts to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion. Effective June 1, 2017, the minimum wage rate shall be $41.20 per hour.

3. Checkoff Deductions and Remittances. The Employer shall deduct from the wages of employees uniform initiation fees, assessments, membership dues, and working dues in such amounts as the Union shall from time to time establish, and shall remit monthly to the designated Union office the sums so deducted, together with an accurate list showing the employees from whom dues were deducted, the employees' individual hours, gross wages and deducted dues amounts for the monthly period, not later than the tenth (10th) day of the month following the month for which said deductions were made. If the Employer fails to timely remit any amounts to the Union as this affidavit league bonds funds that are required under this Agreement, it shall be obligated to the Union for all costs of collection, including attorney fees.

The Employer shall further deduct an amount designated by the Union for such hour that an employee receives wages under the terms of this Agreement on the basis of individually signed voluntary authorized deduction forms and shall pay over the amount so deducted to the Laborers' Political League ("LPL") or to a designated appointee, not later than the tenth (10th) day of the month next following the month for which such deductions were made. LPL remittances shall include a report of the hours worked by each Laborer for whom deductions are made. Remittances shall be made by a separate check payable to the Laborers' Political League. The Employer shall remit a processing fee each month from the total amount to be transmitted to the LPL to be calculated at the Illinois Department of Revenue or other applicable standard.

5. Work Jurisdiction. This Agreement covers all work within the applicable Collective Bargaining Agreements and all work within the Union's trade and geographic jurisdiction as set forth in the Union's Statement of Jurisdiction, which are incorporated by reference into this Agreement. The Employer shall assign all work covered by a collective bargaining agreement with the Union-represented Laborer employees and acknowledges the appropriateness of such assignment. Neither the Employer nor its work assignments as required under this Agreement shall be stipulated or otherwise subject to adjustment by any jurisdictional disputes board or mechanism except upon written notice by and direction of the Union.

6. Subcontracting. The Employer, whether acting as a contractor, general manager or developer, shall not contract or subcontract any work on the site of construction, alteration, painting or repair of a building, structure or other work to any person, firm or entity engaged in the construction industry unless such subcontractor agrees to be bound by this Agreement. This obligation applies to all tiers of subcontractors performing work at the site of construction. The Employer shall further assume the obligations of all tiers of its subcontractors for unpaid wages and other benefits incurred under this Agreement, including reasonable attorneys' fees incurred in enforcing the provisions hereof.

7. Fringe Benefits. The Employer agrees to pay the amounts that it is bound to pay under said Collective Bargaining Agreements to the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, the Laborers' Pension Fund (including Laborers' Excess Benefit Funds), the Fox Valley Benefit Funds, the Construction and General Laborers' District Council of Chicago and Vicinity Apprentice and Training Trust Fund, the Chicago Area Laborers-Employers Cooperation Education Trust, the CAID-LMCC, and to all other designated Union-affiliated benefit and labor management funds (the "Funds"), and to become bound by and to be considered a party to the agreements and declarations of trust creating the Funds. The Employer further affirms that all prior contributions paid to the Welfare, Pension, Training and other Funds were made by its duly authorized agents at all proper rates, and evidence the Employer's intent to be bound by the trust agreements and Collective Bargaining Agreements in effect when the contributions were made, and acknowledging the report form to be a sufficient instrument in writing to bind the Employer to the applicable collective bargaining agreements.

8. Contract Enforcement. All grievances filed by either party arising hereunder shall, at the Union's discretion, be submitted to the Chicago District Council Grievance Committee for final and binding disposition in lieu of another grievance committee, provided that the disputed grievances shall be submitted to such final and binding arbitration upon timely demand. Should the Employer fail to comply within ten (10) days with any binding grievance award, whether by grievance committee or arbitration, it shall be liable for all costs and legal fees incurred by the Union to enforce the award. Notwithstanding anything to the contrary, nothing herein shall limit the Union's right to strike or withdraw its members because of non-payment of wages and/or fringe benefit contributions, which by the Employer to timely remit them to the Union, or for such other legal and economic action, including but not limited to all remedies at law or equity. It is expressly understood and agreed that the Union's right to take economic action is in addition to, and not in lieu of, its rights under the grievance procedures. Where necessary to correct contract violations, or where no acceptable steward is currently employed, the Union may appoint and place a steward from outside the workforce at all job sites.

9. Successors. In the event of any change in the ownership, management or operation of the Employer's business or substantially all of its assets, by sale or otherwise, it is agreed that as a condition of such sale or transfer that the new owner or manager, whether corporate or individual, shall be fully bound by the terms and conditions of this Agreement. The Employer shall provide no less than ten (10) days' prior written notice to the Union of the sale or transfer and shall be obligated for all expenses incurred by the Union to enforce the terms of this paragraph.

10. Termination. This Agreement shall remain in full force and effect from June 1, 2017 (unless dated differently below) through May 31, 2021, and shall continue in effect unless there has been given written notice, by certified mail by either party hereto, received no less than sixty (60) but no more than ninety (90) days prior to the expiration date, of the desire to modify or amend this Agreement through negotiations. In the absence of such timely and proper notice the Employer and the Union agree to be bound by the new applicable association agreement(s), incorporating them into this Agreement and providing this Agreement for the life of the newly negotiated agreements, and thereafter for the duration of successive agreements, unless and until timely notice of termination is given not less than sixty (60) nor more than ninety (90) days prior to the expiration of each successive Collective Bargaining Agreement. Notwithstanding the foregoing, the Union in its sole discretion may terminate this Agreement at any time upon written notice should the Employer fail to comply with its bonding obligations or if the Employer is a joint employer with or other sign of another entity with an outstanding delinquency to the Union's affiliated fringe benefit funds.

11. Execution. The signatory below warrants his or her receipt of the applicable Collective Bargaining Agreement(s) and authorization from the Employer to execute this Agreement, whether bound or direct, and with full knowledge of the obligations and undertakings contained herein. The parties acknowledge and accept facsimile and electronic signatures on this Agreement as if they were the original signatures.

Dated: __May 5__ , 20 _21_

ACCEPTED:
Laborers' Local Union No. __152__

By: _____

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY

By: _____
John P. Connolly, Business Manager

By: _____
Charles LoVerde, Secretary-Treasurer

For Office Use Only __KCAICA__

Effective June 1 2017

__T-CAT Enterprise, Inc.__
(Firm Name)

By: __Jimmy Trumbull - President__
(Print Name and Title)

__997 Reading Dr.__
(Address)

__Bartlett, IL 60103__
(City, State and Zip Code)

__630 330 6800__
(Telephone Number)

__jtrumbull@tcatinc.com__
(Email Address)

WHITE - LOCAL UNION • CANARY - TRUST FUND • PINK - DISTRICT COUNCIL • GOLD - EMPLOYER

**Exhibit A-1**

**JUNE 1, 2021 TO MAY 31, 2026**

# AGREEMENT

between the

**CHICAGO AREA INDEPENDENT
CONSTRUCTION ASSOCIATION**

and the

**CONSTRUCTION AND GENERAL
LABORERS' DISTRICT COUNCIL
OF CHICAGO AND VICINITY**

1

**Exhibit A-2**

**INDEX**

| Article | | Page |
|---|---|---|
| TERM OF CONTRACT . . . . . . . . . . . . . . . . . . . . . | | 5 |
| I | EQUAL OPPORTUNITY . . . . . . . . . . . . . | 5 |
| II | UNION SECURITY . . . . . . . . . . . . . . . . . | 6 |
| III | CHECK-OFF & DUES DEDUCTIONS . . . | 6 |
| IV | SUBCONTRACTING . . . . . . . . . . . . . . . . | 8 |
| V | WAGES . . . . . . . . . . . . . . . . . . . . . . . . . . | 9 |
| VI | BONDING . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| VII | INDUSTRY FUND . . . . . . . . . . . . . . . . . | 18 |
| VIII | PARTICULAR WORK RULES AND CLARIFICATION OF CONDITIONS . . . | 19 |
| IX | STEWARDS. . . . . . . . . . . . . . . . . . . . . . . | 25 |
| X | TRAINING AND APPRENTICE PROGRAM . . . . . . . . . . . | 26 |
| XI | SETTLEMENT OF DISPUTES . . . . . . . . . | 28 |
| XII | BRANCHES OF WORK . . . . . . . . . . . . . . | 31 |
| XIII | ALCOHOL AND SUBSTANCE ABUSE . . | 47 |
| XIV | SUCCESSORS AND ASSIGNS . . . . . . . . . | 47 |
| XV | HOURS AND OVERTIME. . . . . . . . . . . . | 48 |
| XVI | MULTIPLE SHIFTS. . . . . . . . . . . . . . . . . | 50 |
| XVII | SUNDAYS, HOLIDAYS AND ELECTION DAYS . . . . . . . . . . . . . . | 51 |
| XVIII | PARTICULAR WORK RULES AND CLARIFICATION OF CONDITIONS . . . | 52 |

2

XIX     REPORTING FOR WORK. . . . . . . . . . . 56

XX     PAYDAY . . . . . . . . . . . . . . . . . . . . . . . . 57

XXI     WAGES . . . . . . . . . . . . . . . . . . . . . . . . . 58

**ROAD BUILDING:**

XXII     HOURS AND OVERTIME. . . . . . . . . . . 59

XXIII     HOLIDAYS . . . . . . . . . . . . . . . . . . . . . . . 60

XIV     SHIFT WORK. . . . . . . . . . . . . . . . . . . . . 61

XXV     PAYDAY . . . . . . . . . . . . . . . . . . . . . . . . 62

XXVI     REPORTING FOR WORK. . . . . . . . . . . 63

XXVII     WAGES . . . . . . . . . . . . . . . . . . . . . . . . . 63

**SEWER, TUNNEL AND RELATED UNDERGROUND:**

XXVIII     JOB NOTIFICATION AND PRE-JOB CONFERENCE NOTIFICATION . . . . . . 65

XXIX     WAGES . . . . . . . . . . . . . . . . . . . . . . . . . 66

XXX     WORK HOUR, OVERTIME HOLIDAYS AND ELECTION DAYS . . . . 67

XXXI     SHIFT WORK. . . . . . . . . . . . . . . . . . . . . 69

XXXII     WORK RULES AND CONDITIONS . . . . 70

**KANE, KENDALL, McHENRY AND BOONE:**

XXXIII     WORKING CONDITIONS . . . . . . . . . . . 73

XXXIV     WAGES . . . . . . . . . . . . . . . . . . . . . . . . . 73

**WILL AND GRUNDY:**

XXXV     STEWARDS. . . . . . . . . . . . . . . . . . . . . . 77

3

| XXXVI | WAGES | 77 |
| XXXVII | FOREMAN AND GENERAL FOREMAN | 80 |
| XXXVIII | SHIFT WORK | 81 |
| XXXIX | OTHER PAY RATES BUILDING CONSTRUCTION AND HEAVY AND HIGHWAY | 81 |

**LAKE:**

| XL | SHIFT WORK | 84 |

SIDE LETTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

ADDENDUMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

UNIFORM DRUG/ALCOHOL ABUSE PROGRAM . 89

**TERM OF CONTRACT**

This AGREEMENT entered into this 1st day of June, 2021, for Cook, DuPage, Lake, Will, Grundy, Kendall, Kane, McHenry and Boone Counties by and between the CHICAGO AREA INDEPENDENT CONSTRUCTION ASSOCIATION, hereinafter referred to as EMPLOYER, and CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, for and on behalf of its affiliated Local Unions, hereinafter referred to as the UNION, shall remain in full force and effect until 11:59 p.m. on May 31, 2026.

If either party wishes to modify this Agreement, it shall serve written notice by certified or registered mail, upon the other party not less than sixty days prior to May 31, 2026 of its intent to begin negotiations for a new Agreement. In the absence of the service of such notice, this Agreement shall automatically renew itself, together with all amendments and improvements as negotiated after said initial expiration date, by and between the parties in area-wide bargaining, from year to year thereafter.

### Article 1
### EQUAL OPPORTUNITY

The parties agree that Employees will not be discriminated against because of race, creed, religion, color, age, sex or national origin.

The masculine gender has been used in this Agreement to facilitate ease of writing and editing and therefore the masculine gender shall include the feminine gender. Whenever the words "he", "him", "his", or "man" is used, they shall be read and construed as "he or she", "him or her", "his or hers", and "man or woman", respectively.

## Article 2
## UNION SECURITY

All new Employees shall be required to join the Union after the expiration of seven (7) days of employment or seven (7) days after the execution date of this Agreement, whichever is later, and shall remain members of the Union in good standing as a condition of continued employment.

Good standing shall mean payment of the initiation fees and both working and non-working dues uniformly required as a condition of acquiring or retaining membership in a Local Union.

Employees covered by this Agreement at the time it is signed, and who are members of the Union at that time, shall be required as a condition of continued employment, to continue membership in the Union for the duration of this Agreement.

Employees covered by this Agreement at the time it has been signed, and who are not members of the Union at that time shall be required to join the Union seven (7) days after the date of execution of this Agreement and remain members of the Union in good standing for the duration of this Agreement.

## Article 3
## CHECK-OFF & DUES DEDUCTIONS

**Paragraph 1.** Employers also agree to deduct from the gross payroll earnings payable to an Employee covered by this Agreement, initiation fees and quarterly Union dues insofar as permitted by state and federal laws upon receipt and in accordance with a duly executed authorization form from the Employee. Said authorization form shall not be revocable for a period of more than one (1) year or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 2.** All Employers covered by this Agreement shall deduct from the gross payroll earnings of Em-

ployees covered by said contract, working dues approved by the Union and shall remit monthly to the Union office the sums so deducted, together with an accurate list of Employees from whose wages said dues were deducted and the amounts applicable to each Employee, not later than the 10th day of the month next following the month for which such deductions were made. Dues remittance reports shall include a report of the hours worked and wages earned by each Laborer. Employers who fail to timely remit Union dues shall be assessed an additional ten percent (10%) liquidated damages. Effective June 1, 2022, the Employer shall submit monthly dues remittance reports to the Union through the District Council web portal.

**Paragraph 3.** It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and that such deductions be made only pursuant to written assignments from each Employee on whose account such deductions are made, which assignment shall not be revocable for a period of more than one (1) year, or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 4.** The Union agrees that it will indemnify and hold harmless the Employer from any and all claims, suits, causes of action, or otherwise, as regards the creation and administration of the dues check-off established by this Article and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys' fees on behalf of the beneficiaries of such indemnity.

**Paragraph 5.** Should any Employer fail to remit dues to the Union as required under this Agreement, the Employer shall be liable for and pay all costs of collection, including reasonable audit expenses and reasonable attorney fees and costs. The Union may file suit, or remove employees that it represents, or both, for non-remittance or underpayment of dues by an Employer.

**Paragraph 6. Laborers' Political League.** The Employer will deduct an amount designated by the Union

for each hour that an employee receives wages under the terms of this Agreement on the basis of individually signed voluntary authorized deduction forms and shall pay over the amount so deducted to the Laborers' Political League ("LPL") or to a designated appointee, not later than the 10th day of the month next following the month for which such deductions were made. LPL remittances shall include a report of the hours worked by each Laborer for whom deductions are made. Remittances shall be made by a separate check payable to the Laborers' Political League. The Employer shall be paid a processing fee each month for the total amount to be transmitted to the LPL to be calculated at the Illinois Department of Revenue standard.

### Article 4
### SUBCONTRACTING

**Paragraph 1.** On work covered by this Agreement, the contractor or subcontractor agrees to see that all sub-contractors on work within the Union's jurisdiction on this job site adhere to the wages and fringes contained in this Agreement when the subcontract is let by the contractor or subcontractor. If, upon the Union's request, the subcontractor chooses to sign a current labor agreement with the Union (although such signing might not be required under Paragraph 1), then the contractor shall be relieved of any liability under this Paragraph 1.

**Paragraph 2.** The Employer agrees that it will not contract or subcontract any work covered by this Agreement to be done at the site of construction, alteration, painting or repair of a building, structure of other work, except to a person, firm or corporation that is party to the applicable collective bargaining agreement with the Union.

**Paragraph 3.** If an Employer, bound to this Agreement, contracts or subcontracts any work covered by this Agreement to be done at the jobsite of the construction, alteration, painting or repair of a building, structure or

8

other work to any person or proprietor who is not signatory to this Agreement, the Employer shall require such subcontractor to be bound by all the provisions of this Agreement, or in addition to any remedies available under this Article, the Employer shall maintain daily records of the subcontractor's or the subcontractor's Employees jobsite hours and be liable for payments to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, the Laborers' Pension Fund, and the Construction and General Laborers' District Council of Chicago and Vicinity Joint Apprentice and Training Trust Fund as provided in Article V of this Agreement.

### Article 5
### WAGES

**Paragraph 1.** The rates of wages exclusive of fringe benefits to be paid in this trade for the period June 1, 2021 to and including May 31, 2026, shall be as set forth below for the respective following classifications as further defined herein.

The wage rates include a total economic increase of $2.45 per hour effective June 1, 2021 to May 31, 2022 to be allocated between wages and fringe benefits by the Union in its sole discretion, which includes the dues deduction; June 1, 2022 to May 31, 2023, $2.50 per hour total economic increase to be allocated between wages and fringe benefits by the Union in its sole discretion; June 1, 2023 to May 31, 2024, $2.55 per hour total economic increase to be allocated between wages and fringe benefits by the Union in its sole discretion; June 1, 2024 to May 31, 2025, $2.60 per hour total economic increase to be allocated between wages and fringe benefits by the Union in its sole discretion; June 1, 2025 to May 31, 2026, $2.65 per hour total economic increase to be allocated between wages and fringe benefits by the Union in its sole discretion. The foregoing allocations may include allocations to LECET and LDC/LMCC.

9

**Dosimeter Use.** A premium of One ($1.00) Dollar per hour shall be paid to any Laborer required to work with a dosimeter used for monitoring nuclear exposure or with any similar instrument or measuring device.

**Power Pac.** When a Laborer uses a power driven piece of equipment he shall be paid the rate of pay of the tool at the end of the power pac.

**Apprentice wages.** Apprentice Laborers shall be paid according to the following schedule:

Apprentices (1st 6 months) . . . . . . . . 60% of base rate:
Apprentices (2nd 6 months) . . . . . . . 70% of base rate:
Apprentices (3rd 6 months) . . . . . . . 80% of base rate:
Apprentices (4th 6 months) . . . . . . . . 90% of base rate:
Apprentices (after 24 months) . . . . . 100% of base rate:

Should the Union enter into an agreement with the Chicagoland Associated General Contractors, the Mason Contractors Association of Greater Chicago, the Illinois Road and Transportation Builders Association, the Underground Contractors Association, the Great Lakes Construction Association, or the Contractors Association of Will and Grundy Counties that provides an annual total economic increase different than the annual total economic increase set forth in this paragraph, then such rates shall be incorporated into the applicable portion(s) of this Agreement that correspond to the trade and geographic scope of such association agreement.

**Paragraph 2. WELFARE:** Beginning the period from June 1, 2021 to May 31, 2022, the Employer agrees to make Health and Welfare contributions of sixteen dollars and fifty-five cents ($16.55) per hour for each hour worked by all Employees who are covered by this Agreement in addition to the wages herein stipulated. This $16.55 per hour shall be paid to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity or a designated appointee at the end of each month.

10

That for the periods; June 1, 2022 to May 31, 2023; June 1, 2023 to May 31, 2024; June 1, 2024 to May 31, 2025; June 1, 2025 to May 31, 2026; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Paragraph 1 above)

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, as well as any amendments thereto.

**Paragraph 3. PENSION:** Beginning June 1, 2021 to May 31, 2022, the Employer agrees to make a pension contribution of fourteen dollars and seventy-one cents ($14.71) per hour for each hour worked by all Employees who are covered by this Agreement in addition to the wages and welfare payments herein stipulated. This $14.71 per hour shall be paid to the Laborers' Pension Fund or to a designated appointee at the end of each month.

That for the periods; June 1, 2022 to May 31, 2023; June 1, 2023 to May 31, 2024; June 1, 2024 to May 31, 2025; June 1, 2025 to May 31, 2026; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Paragraph 1 above)

The total economic increase shall be allocated between wages and fringe benefits and other funds by the Union in its sole discretion, except that the Union agrees that it shall allocate sufficient funds to the pension fund of the Union from the total economic package increases set forth above in each year of this agreement such that the pension fund remains in green status as defined by the Pension Protection Act of 2006, or any successor legislation.

11

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' Pension Fund, as well as any amendments thereto.

The parties agree that the Employer shall make lump sum contributions to employee fringe benefit accounts, administered by the Trustees on behalf of each employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

Contributions to all fringe benefit funds under this Agreement shall be made in increments of no less than one-half hour for each half-hour or portion thereof an employee performs covered work.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer

12

acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

Further, in the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement, including the obligation to remit Union Dues under Article 3.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

**Paragraph 4.** Appointment of Trustees to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund. The parties agree that the Employer-appointed trustees of the Health and Welfare Department of Construction and General Laborers'

13

District Council of Chicago and Vicinity and the Laborers' Pension Fund and training and apprentice funds to which Employers are required to contribute shall be appointed solely by Employer associations that enter into collective bargaining agreements with the Union requiring contributions to such funds ("Signatory Associations"). It is further agreed that the Trust Agreements establishing such funds shall be amended to replace any Employer association that appoints a trustee and does not have a labor agreement with the Union, replacing it with a Signatory Association. The union and Signatory Associations shall meet within 30 days of the effective dates of agreements covering a majority of Fund participants to review the appointment of Employer Trustees of the funds. It is agreed that the numbers of hours contributed by Employers represented by Signatory Associations compared to contributions by other Signatory Associations during the preceding year shall be the basis for assigning the number of trustee appointments. If such parties are unable to agree on the Signatory Associations to be responsible for appointments and the number of appointments to be made by each Signatory Association the dispute shall be submitted to expedited arbitration under Subpart D of the Policies and Procedures of the Federal Mediation and Conciliation Service.

**Paragraph 5.** Article III Section 2 of the trust agreements of the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund shall be amended to include the following: "Association-appointed Trustees must be full-time employees of Contributing Employers within the Association's membership. A Contributing Employer shall be defined as an Employer that has employed an average of five (5) or more Laborers performing bargaining unit work for whom contributions have been made per month in each of the previous three (3) calendar years."

**Paragraph 6.** Section 415 Excess Benefit Fund. A Section 415 Excess Benefit Fund shall be established for

14

the purpose of providing alternative benefit to any employees of the Employer who become unable to receive the entire amount of the accrued pension benefits to which they would be entitled under one or more of the pension plans sponsored by their Employer because of limitations established by Section 415 of the Internal Revenue Code. The Employer may be required and directed by the Board of Trustees of the Excess Benefit Fund to contribute a portion of its agreed-upon "pension" contribution to the Section 415 Excess Benefit Fund and shall not increase the Employer's cost beyond the amount that the Employer is obligated to contribute to the Laborers' Pension Fund and that the funding of the Section 415 Excess Benefit Fund shall be fully tax deductible to the Employer for Federal Income Tax purposes. The Employer hereby agrees that the Board of Trustees of any such Section 415 Excess Benefit Fund shall be authorized to determine each year the amount that will be contributed by the Employer and the amount to be credited to the account of any eligible retiree for payment in lieu of accrued benefits that would exceed the limits set by Section 415 of the Internal Revenue Code.

**Paragraph 7.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Vacation Fund, a jointly-trusteed vacation plan established for the purpose of providing income to members during their winter layoffs. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Paragraph 8.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Annuity Fund, a jointly-trusteed defined contribution plan providing a supplemental retirement benefit. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Paragraph 9. SUPERVISORS:** To the extent permissible by the Internal Revenue Service or any Federal Act,

15

and for the purposes of Paragraphs 2 and 3 of this Article for this Agreement only, the bargaining unit shall also include those persons in the employ of an Employer who are supervisors, as defined in the Labor Management Relations Act, as amended; and who at one time were Employee members of the bargaining unit herein on whose behalf contributions were required to be made to the trust funds described in the aforesaid Paragraph 2 and 3 of this Article.

**Paragraph 10. Special Rules for Bonding.** An employer that is owned or managed, in whole or part, by an individual who currently has or previously had in the last ten (10) years ownership or principal managerial responsibility for another contributing employer that currently is or ceased doing business when delinquent to the Funds shall be required to post for the benefit of the Funds an additional cash bond or obtain a surety bond from a Fund-approved insurer in an amount equal to twice the amount of the other contributing employer's delinquency. This amount may be adjusted by the Benefit Fund Trustees for each individual employer. This bond shall be in addition to and separate from the bond required elsewhere in this Agreement.

**Paragraph 11. Withdrawal of Employees.** If the Employees are withdrawn from any job in order to collect contributions to the Laborers' Health and Welfare, Pension and/or Apprenticeship and Training Funds, the Employees who are affected by such stoppage of work shall be paid for lost time up to sixteen (16) hours, provided that two (2) days' written notice of intention to remove employees from the job is given to the Employer by the Union. These lost time amounts may be collected only from the contractor with whom the Union has a dispute and the Union shall not pursue collection efforts from any other entity. This lost time liability shall not apply if the Employer has made payment on behalf of the affected employees to another fringe benefit fund under a MARBA labor agreement or a labor agreement of a union affiliated with the Building and Construction Trades Department, AFL-CIO.

16

### Article 6
### BONDING

**Paragraph 1.** All Employers shall procure, carry and maintain a surety bond in form and amount satisfactory to the Union, but not less than in the principal sum of $5,000.00, to guarantee payment of wages, Pension and Welfare Trust contributions, during the term of this Agreement. The bond shall be placed in the custody of the Pension and Welfare Funds.

**Paragraph 2.** If the Employer employs between seven (7) and ten (10) Laborers, the surety bond shall be increased to $15,000. If the Employer employs between eleven (11) and twenty (20) Laborers, the surety bond shall be increased to $25,000. If the Employer employs twenty-one (21) to forty (40) Laborers, the surety bond shall be increased to $35,000. If the Employer employs forty-one (41) or more Laborers, the surety bond shall be increased to $45,000.

**Paragraph 3**. The Employer shall be required to obtain an appropriate bond upon contract execution, which bond may also be posted in cash. The trustees of the benefit funds, based on established guidelines or a contractor's payment history, shall have the discretion to adopt a policy that increases, reduces or eliminates the bonding requirements of this Article for those contractors the trustees deem appropriate for such increase, reduction or elimination. Should the Employer fail to comply with the provisions of this Article, the Union may withdraw its Employees or strike until such compliance occurs, and the Employer shall further be liable for all costs, including attorneys' fees, incurred in enforcing these provisions.

**Paragraph 4.** The Employer shall give notice to the Union and the appropriate Fund Office in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(a) Formation of Partnerships;

17

(b) Termination of business;

(c) Change of name commonly used in business operation;

(d) Change in form of business organization;

(e) Incorporation of business;

(f) Dissolution of corporation;

(g) Name and business organization of successor; and

(h) Admission to or withdrawal from any association operating as a multi-employer bargaining unit.

**Paragraph 5. Withdrawal of Employees.** If the Employees are withdrawn from any job in order to ensure compliance with the provisions of this Article, the Employees who are affected by such stoppage of work shall be paid for lost time up to sixteen (16) hours, provided that two (2) days' written notice of intention to remove employees from the job is given to the Employer by the Union. These lost time amounts may be collected only from the contractor with whom the Union has a dispute and the Union shall not pursue collection efforts from any other entity. This lost time liability shall not apply if the Employer produces the required bond before expiration of the 2-day notice period.

## Article 7
### INDUSTRY FUND

**Paragraph 1.** Each Employer shall pay into an industry advancement fund the amount of eight cents ($.08) for each hour worked for the Employer by those of his Employees who are covered by this Agreement. This payment shall be collected for and remitted only to funds as provided under written agreements between an employer association and the Union.

Each Employer shall pay into the Chicago-Area Laborers-Employers Cooperation and Education Trust ("LECET"), the amount of seven cents ($.07) for each hour worked for the Employer by those of his Employees

18

who are covered by this Agreement, or such additional amounts as the Union may in its sole discretion allocate from the annual total economic increase.

Each Employer shall pay into the Laborers' District Council Labor Management Cooperation Committee ("LDC/LMCC"), the amount of seventeen cents (\$.17) for each hour worked for the Employer by those of his Employees who are covered by this Agreement, or such additional amounts as the Union may in its sole discretion allocate from the annual total economic increase.

**Paragraph 2.** The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Industry Fund, as well as any amendments thereto, and agrees to be bound by all actions taken by the Trustees of said Industry Fund pursuant to said Agreement and Declaration of Trust and amendments thereto. The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the LECET and LDC/LMCC, as well as any amendments thereto.

**Paragraph 3.** Inasmuch as the existence and utilization of this Industry Fund should result in increased construction and, therefore, in increased construction job opportunities for Employees, the Union agrees to cooperate in assuring that the contributions required by this Article are in fact made by Employers bound by this Agreement.

### Article 8
### PARTICULAR WORK RULES AND
### CLARIFICATION OF CONDITIONS

**Paragraph 1.** Except as provided under paragraph 2 below, wages must be paid by payroll check and shall include a stub or statement showing the number of straight time and overtime hours worked and rate of pay. Failure on the part of the Employer to have sufficient funds at the bank to meet pay checks issued workers, shall deprive such Employers henceforth from the right to pay by checks and Joint Grievance Committee shall assess

19

such Employer a sum equal to not less than the expense incurred in the collection of the amounts due because of such insufficient funds to meet checks so issued.

**Paragraph 2. Direct Deposit.** In lieu of paying wages by payroll check, the Employer may make payment by electronic bank draft if the employee voluntarily accepts such alternate method of payment. The Employer shall not mandate electronic banking as a condition of employment. Electronic wage payments must be transferred to the employee's bank account no later than the employee's regular pay day and at no cost to the employee. If payment is made by electronic bank draft, the Employee must also be provided a record of hours worked, rates of pay, and deductions made, at the same time and containing the same information as if wages were paid by payroll check.

If full wages are not timely transferred to the employee's account, the Employer shall pay the employee an additional four (4) hours pay for each day or portion thereof until full wages are received. Employers who violate the provisions of these paragraphs shall be denied the use of electronic banking for wage payments.

**Paragraph 3.** The Union agrees that the Employees whom it represents will accept and demand the wages and fringe benefit payments set forth in this Agreement, and the employer agrees to pay the wages and fringe benefit payments herein stipulated.

Claims for Shortages: Claims by Employees for shortages must be made within three (3) weeks after shortage is discovered.

**Paragraph 4**. Payment by the Employer and acceptance by the Employee of less than the wage herein stipulated shall be a violation of this Agreement upon the part of each. Upon conclusive proof to the Joint Grievance Committee of such violation, the Employer shall immediately pay the unpaid balance due in accordance with the wage herein stipulated; and in addition thereto, shall pay the Joint Grievance Committee an amount equal to the

20

penalties provided in the appropriate Article of General Conditions of this Agreement, but under no circumstances shall such penalties be less than fifty (50) percent of the amount of such pay shortage as just and liquidated damages because of such violation.

Upon conclusive proof that the Employer is guilty of paying less than the wages herein stipulated, then nothing in this Agreement shall be construed to take from the Union the right to remove workers it represents from the job, and henceforth to deny such Employer further right to the employment of its members.

Members of the Union who are found guilty of violation of this Agreement shall be dealt with by the Employer.

**Paragraph 5.** The Union reserves and shall have the right to remove its employees from any job upon the failure of the Employer to pay the wages due any of its Employees or fringe benefits which may be due by reason of the hours of employment.

**Paragraph 6.** The Employer hereby agrees to maintain proper temporary toilet and drinking facilities accessible to all Employees on the job. The Employer shall furnish a suitable place, properly heated when reasonably necessary, where Laborers may eat and change their clothes. The Employer also agrees that it will ice the water at the start of each shift.

**Paragraph 7.** Where services are performed by Laborers as watchmen, and such Laborers shall not be engaged in the performance of any other branches of work covered by this Agreement, they shall be paid not less than $1.50 below the Building Laborers' rate.

**Paragraph 8. HIRING HALL:** No agreement on the request of the Union for the establishment of an exclusive Hiring Hall has been consummated. Therefore, the question of establishing a Hiring Hall is hereby reserved for the future consideration of the parties. Upon service of sixty (60) days' notice in writing upon Employer from

21

Union, such question shall be taken up for discussion and further negotiation by the parties hereto.

**Paragraph 9. Foremen.** There shall be a Laborer appointed as Labor Foreman when five (5) or more Laborers are employed on any one job or project; there shall be sub-foreman after the first ten (10) Laborers, and for each multiple of five (5) Laborers employed thereafter to properly supervise the various phases of the work. A Sub-Foreman shall receive \$.45 premium wages above the regular wages paid those Laborers under his supervision, plus established overtime rates. When a Labor Foreman is needed to supervise Laborers such Labor Foreman shall receive \$.75 or more premium wages above top labor scale, as mutually agreed between said Labor Foreman and his Employer.

The above and foregoing shall not be so construed as to restrict the Employer's right to pay higher premium wages or appoint a greater percentage of foremen and/or sub-foremen.

**Paragraph 10.** The Employer shall not engage his labor on a piece-work basis.

**Paragraph 11.** The Employer shall furnish all tools and shovels required for the work, also boots and rain equipment required for the protection of the workers in the trade and the worker shall be held responsible for them.

**Paragraph 12.** The Employer shall furnish any necessary protective medication, such as petroleum jelly, to prevent burns from creosote or chemicals which may prove injurious to the skin.

**Paragraph 13.** On a job site requiring a Tool Shanty, said Tool Shanty shall be tended by a Laborer if Employer determines tending is required.

**Paragraph 14.** Portable Water Pumps shall be tended by Laborers if Employer determines tending is required.

22

**Paragraph 15.** In any instance where a Machine replaces only the work of Laborers, said Machine shall be operated by a Laborer if so determined by the Employer.

**Paragraph 16.** The Employer shall furnish a suitable place, properly heated when reasonably necessary, where Laborers may eat and change their clothes.

**Paragraph 17.** The Employer shall not discriminate against any Employee who may be an officer, steward or member of the Union serving on any committee authorized by the Union.

**Paragraph 18. PRE-JOB CONFERENCES.** If the Union elects, a pre-job conference prior to commencement of work shall be held or if need is for additional men after the job has started, then the conference shall be held before the additional hiring commences if the Union elects. At the pre-job conference, the Employer shall advise the Union of its requirements as to workmen required in the respective classifications, the probably starting date, duration of the job, subcontractors, and working schedules.

If the Employer refuses to conduct a requested pre-job conference, the Employer shall pay, as directed by the Joint Grievance Committee, an amount no less than $1,000 and no greater than $5,000 per violation.

**Paragraph 19. Out of Town Work.** When Laborers who reside or work in the nine-county geographic area covered by this Agreement are voluntarily requested to work at locations outside these nine counties, the Employer shall continue to report and pay benefits for all hours worked outside the nine counties. If the work performed is covered under a labor agreement with the Laborers' International Union of North America or its affiliates, the Employer shall report and pay the benefit contributions to the fringe benefit fund identified, and the contribution rates specified, under that labor agreement. If the work performed is not covered under a labor agreement with the Laborers' International Union of North

23

America or its affiliates, then the Employer shall report and pay the benefit contributions to the fringe benefit funds identified, and the contributions rates specified, under this Agreement. No employee shall be obligated to accept out of town employment or be subject to retaliation for refusing such work.

Where out of town work requires an overnight stay, the Laborer shall receive paid lodging plus $55 per night for meals and incidental expenses or the equivalent in accordance with an Employer's policy. Nothing herein shall restrict an Employer's ability to require compliance with its applicable travel related policies. This provision will take effect only for projects bid on or after June 1, 2021.

**Paragraph 20. Access to Premises.** Authorized representatives of the Union shall have access to all construction projects, provided that they first notify the employer of their arrival, that they do not stop the progress of the project (except to the extent as may be authorized in this Agreement), and provided further that such representatives fully comply with the visitor and security rules established for the construction project by the general contractor and the owner. It shall be the duty of the Employer to provide adequate passes, as requested by the Union, provided the Employer is able to do so.

If the Employer refuses to provide the Union access to the construction project, the Employer shall pay, as directed by the Joint Grievance Committee, an amount no less than $1,000 and no greater than $5,000 per violation.

**Paragraph 21. Key Man.** The Employer may utilize no more than one (1) Laborer at a job site as its key man who resides outside the geographic area covered by this Agreement. This limitation shall not apply to any Laborer who works regularly and continuously within the geographic area covered by this Agreement. Exceptions can be made with the parties' mutual agreement in order to obtain reciprocal arrangements with other jurisdictions.

**Paragraph 22. Public Health Emergencies.** In any county or portion thereof covered by this Agreement, if

24

the Illinois Governor declares a public health emergency, and for the duration thereof, the Employer shall abide by recommendations from the Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public Health (IDPH), and all applicable laws and regulations, for construction worker health and safety. If the Employer fails to timely comply with such requirements after notice from and discussion with the Union (including the District Council if requested), the Union may withdraw employees from any worksite not in compliance herewith.

## Article 9
### STEWARDS

**Paragraph 1.** The parties agree that the following basic principles apply to the selection of a Job Steward:

(1) The Union requires that a Steward must fully protect the interest of the Union.

(2) The Employer requires that the Steward be a Laborer who can efficiently perform his duties as a Laborer and will not disrupt the job unnecessarily in discharging his duties as a steward.

(3) To meet the two basic principles agreed to by the parties, it is further agreed:

(a) The Job Steward shall be a working Laborer;

(b) The Steward shall be selected by the Business Manager of the Union with jurisdiction over the job;

(c) In selecting a Steward preference shall be given to Union members presently employed in the bargaining unit of the Employer on the specific site, provided, however, that if, in the judgment of the Business Manager, no presently employed Union member is competent to act as Steward, the Steward shall be selected from outside the bargaining unit. A reason shall be given by the Business Manager why no member is competent. However, the reason shall not infringe upon the right of the Business Representative to select the Steward; and

25

(d) The Union shall have the right to replace any steward at any time.

**Paragraph 2.** The Steward shall be subject to the same terms of employment as any other Employee, but taking into consideration that the Steward should be present during all working hours, all possible overtime work shall be assigned to all Stewards, if the Stewards do not replace another Laborer from that other Laborers' previously assigned duties.

**Paragraph 3.** The duties of the Steward shall include the checking of terms and conditions of work, safety conditions, starting dates of employment for new Laborers, whether Union or Non-Union, and report same to the Business Representative who appointed him. All Laborers employed on a job or project shall report to the Steward any differences or disputes which may arise in connection with the work or any part of it, and the Steward shall report same to the office of the Union. If it becomes necessary to discharge or lay off any Laborers because of completion of the work or otherwise, the Laborer appointed and acting as Steward shall not be discharged or laid off while other Laborers remain employed on the job or project as long as he is competent to perform the work. Nothing herein contained shall in any way restrict the right of any Employer to discharge a Steward for cause, upon notification to the Business Manager of the Local Union who appointed the Laborer to act as Steward.

**Paragraph 4.** Whenever one or more Laborers are required to work overtime, one of these Laborers shall be the regular designated Steward if he is competent to do the work required or if he cannot work, he will call the Business Manager; and the Business Manager will designate someone on this job to act as Steward.

### Article 10
### TRAINING AND APPRENTICE PROGRAM

**Paragraph 1. APPRENTICE COMMITTEE:** The Employer hereby adopts and shall be bound by the agreement and declaration of trust established by the Joint

26

Apprenticeship Training Committee ("JATC") for the apprentice program, together with any amendments thereto, which are incorporated by reference herein. The JATC shall have authority to set and enforce penalties for violations of the apprenticeship rules.

**Paragraph 2. APPRENTICESHIP AND TRAINING FUND:** The Employer shall contribute ninety cents (\$.90) per hour for each hour worked from June 1, 2021 to May 31, 2022 for all Employees who are covered under this Agreement to the Construction and General Laborers' District Council of Chicago and Vicinity Apprenticeship and Training Fund payable to the Training Fund or a designated appointee at the end of each month and such additional sums as the Union may designate in its sole discretion from its total economic package on June 1, 2022, June 1, 2023, June 1, 2024, and June 1, 2025 under this Agreement. The terms of the trust establishing the Fund are incorporated by reference herein and all terms regarding auditing, assessment, non-payments and grace periods as set out in the Collective Bargaining Agreement regarding payment of Welfare and Pension Fund contributions shall apply as if fully set forth herein for the Construction and General Laborers' District Council of Chicago and Vicinity Apprenticeship and Training Fund.

**Paragraph 3.** The term of apprenticeship shall be 2,400 hours, or two years, whichever occurs later, or such other duration as is mutually agreed by the Training and Apprenticeship Fund trustees. All Health and Welfare, Pension, Training Fund, Industry Advancement and other contributions required under this Agreement will commence immediately upon employment of an apprentice. Union affiliation will be required after seven (7) days of employment.

**Paragraph 4.** The wages per hour paid to apprentices shall be as follows:

1st six (6) months: . . 60% of journeyman (base) wages
2nd six (6) months: . . 70% of journeyman (base) wages
3rd six (6) months: . . 80% of journeyman (base) wages

27

4th six (6) months: . . 90% of journeyman (base) wages

After twenty-four

  (24) months: . . . . . 100% of journeyman (base) wages

**Paragraph 5.** The ratio of journeymen to Apprentices shall be six (6) Laborer journeymen to one (1) Laborer apprentice on a company-wide basis, with no more than twenty percent (20%) of Laborers being apprentices on any one job site of the Employer. Employers who employ a maximum of between one (1) and five (5) Laborer journeymen shall be entitled to one (1) Laborer apprentice, who may be assigned to job sites irrespective of the twenty percent (20%) job site maximum specified in this provision.

**Paragraph 6.** Referral of apprentices will be through the Local Union with jurisdiction over the job site. Employers requesting apprentices will be assigned an apprentice by the JATC from the available apprentice pool. The JATC can limit the number of apprentices to that which is adequate for current needs and which can be properly trained by the program. Employers may recall their laid off apprentices to work, provided that the Employer complies with the ratios set forth in Paragraph 6. All apprentices must report their hours weekly to the JATC. All apprentices will be required to undergo testing by the JATC for the presence of illegal substances at the time they enter the apprentice program.

**Paragraph 7. Mandatory Apprenticeship.** The Employer shall comply with all requirements of a mandatory apprenticeship program on such terms and at such time as directed by the Joint Apprenticeship Training Committee.

### Article 11
### SETTLEMENT OF DISPUTES

**Paragraph 1.** Any dispute concerning the interpretation or application of this Agreement between an Employer and the Union shall be adjusted by the particular Employer and Union, in the first instance. Jurisdictional disputes (that is, competing claims for the

28

assignment of work) are not subject to being processed through this grievance procedure.

**Paragraph 2.** In the event that the matter is not settled, the Union may file a written grievance, which shall be submitted to a Joint Grievance Committee (hereinafter the "JGC") comprised of three (3) Employer representatives selected by the Chicago Area Independent Construction Association and three (3) Union representatives selected by the Construction and General Laborers' District Council of Chicago and Vicinity, which shall convene monthly. The JGC shall adopt its own rules of procedure. The Union must file the grievance within forty-five (45) days of the date of the occurrence giving rise to the grievance or when the affected employee knew or reasonably should have known of the existence of the grievance. Grievances not filed within the forty-five (45) day period are deemed waived and are not subject to being processed through this procedure. The determination of the JGC shall be governed by majority vote, provided that the Employer representatives and Union representatives shall have equal voting power. If decided by majority vote, the grievance determination and any relief determined to be appropriate shall be final and binding upon all parties.

Laborers who prevail in their grievances shall be compensated for two (2) hours lost time to attend the JGC Grievance hearing. Grievances shall be dismissed if the grievant fails to appear at the scheduled hearing and no continuance is granted by the JGC.

**Paragraph 3.** In the event that the JGC is deadlocked upon the disposition of a grievance, then the Union or the Employer may refer the matter to arbitration by so notifying the other within thirty (30) days of the date of the JGC decision. The moving party shall obtain a list of seven (7) arbitrators from the Federal Mediation and Conciliation Service, provided that all arbitrators maintain their principal office in the Chicago area. The party selected by lot shall strike the first name from the list, then parties shall alternately strike names from the list until one arbitrator remains.

**Paragraph 4**. The decision of the arbitrator shall be final and binding upon all parties. The arbitrator shall not be empowered to amend, alter or add to this Agreement. The arbitrator's expenses shall be jointly paid by the Employer and the Local Union between whom the grievance exists.

**Paragraph 5.** Any party who fails to comply with an award within seven (7) days' notice of an arbitrator's award or the JGC determination shall be responsible for an additional ten percent (10%) liquidated damages on any monetary award and all court costs and reasonable attorney fees actually incurred by the party enforcing the award.

**Paragraph 6.** With regard to this Article, the Union reserves its right, and it shall not be a violation of this Agreement, for the Union to strike, picket and/or withdraw its employees from any Employer who fails to pay wages or fringe benefits as required under this Agreement. Except as provided in this Article, there shall be no strike, slowdown, withdrawal of men or other concerted refusal to work by the Union or the employees during the term of this Agreement. Further, there shall be no lockout by the Employer. The Employer further agrees that no punitive action shall be taken against its employees if said employees refuse to cross a picket line that may be placed on the job or project of their employer.

**Paragraph 7. Liquidated Damages.** Payment by the Employer and acceptance by the Employee of less than the wage herein stipulated shall be a violation of this Agreement upon the part of each. Upon conclusive proof to the Joint Grievance Committee of such violation, the Employer shall immediately pay the unpaid balance due in accordance with the wage herein stipulated; and in addition thereto, shall pay as directed by the Joint Grievance Committee an amount no less than fifty percent (50%) of the amount of such pay shortage as just and liquidated damages because of such violation. In cases where an employee was knowingly complicit in the underpayment

30

of wages, none of the liquidated damages assessed against the Employer shall be awarded to that employee.

**Paragraph 8. Wage Audits.** Where the grievance concerns wages that are reflected in a wage audit showing a pattern or practice of wage underpayment, the grievance must be filed within forty-five (45) days after the Union's receipt of the audit. The recovery of any wages shall be limited to the two-year period preceding the grievance filing date (or 3 years if so determined for cause by the Joint Grievance Committee). In cases where an employee was knowingly complicit in the underpayment of wages, that employee shall be limited to receiving unpaid wages from the last 45 days and the additional amounts assessed against the employer shall first be paid to defray the audit costs and thereafter as directed by the Joint Grievance Committee.

### Article 12
### BRANCHES OF WORK

**Paragraph 1. RECOGNITION OF BARGAINING REPRESENTATIVE:** Employer hereby agrees to recognize the Union as the exclusive representative of all its employees performing work within the jurisdiction of the Union for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, and also confirms the jurisdiction of this Union over the branches of work covered herein, and agrees not to enter into any agreement with other labor organizations covering such branches of work.

In the event of a jurisdictional dispute over any of the work covered under this Agreement that cannot be adjusted by both parties to this Agreement and the contending party, and if a binding authority recognized by the Union determines the work to be definitely the jurisdiction of some other union, then the parties shall jointly abide by such determination; provided that in the event the decision is appealed by the Union, this provision shall not be applicable until such time as the final decision issues.

31

**Paragraph 2. BRANCHES OF WORK COVERED HEREIN:** The building of all scaffolding, runways and windbreaks for concrete and mason work, rigging for caissons and concrete chutes and hoppers, digging, lagging, sheeting and dewatering of foundation piers and caissons; concrete work within the walls of any building or jobs; the rubbing and grinding of concrete installations where no patching is involved; boxing for concrete footing, raising, moving, shoring of all buildings, back fillings and gradings; also all laboring work in connection with cement sidewalks, curbs or gutters, stone curbs, streets, alleys, driveways, viaducts, retaining walls, slate, tile and asbestos roofing; also all laboring work connected with composition floor work, rock asphalt, whether done by hand or by any other process, wrecking and stripping of concrete forms and false work, tending to carpenters, tending to salamanders; removal, clearing and cleaning of all debris, signalman and handling of such materials for construction as directed by the Employer; also building in centering for fire proofing; gunite work in handling of cement gun nozzle, when gunite is applied of a thickness of one and one-half (1½) inches or more, all laboring work in connection with original installation of landscaping in connection with new construction of all types, also all laboring work in connection with boiler setting, including the installation of plastic or other non-solid refractory materials. The coverage of this agreement, in referring to the type of work hereunder, includes in addition to all other types of construction, the construction and alteration of all track work and the construction, alteration and maintenance over track work on property on which a railroad company does not have a property right; in short, all unskilled labor connected with work undertaken by members of the Employer and the handling of all materials, or appliances in any trade where it will be more economical to have the work done by Laborers as may be decided by the Employer, subject to appeal to the decision of the Joint Grievance Committee.

32

**Tenders:** Tending masons, plasterers, carpenters and other building and construction crafts.

Tending shall consist of preparation of materials and handling and conveying of materials to be used by mechanics or other crafts, whether such preparation is by hand or any other process. After the material has been prepared, tending shall include the supplying and conveying of said material, and all other materials to such mechanic, whether by silo mixer, bucket, hod, wheelbarrow, buggy, or any motorized unit used for such purpose, bobcats, and uniloaders for cement masons and concrete contractors, forklifts for brick masons and/or any other machine which replaces the wheelbarrow or buggy.

Unloading, handling, and distributing of all materials, fixtures, furnishings, furniture, and appliances whether crated or uncrated from point of delivery to stockpiles and from stockpiles to approximate point of installation.

Drying of plaster, concrete, mortar or other aggregate when done by salamander heat or any other drying process.

Cleaning and clearing of all debris, including recycled material, wire brushing of windows, scraping of floors, removal of surplus material from all fixtures within confines of structures and clearing of all debris in building and construction area. The general cleanup, including sweeping, cleaning, washdown and wiping of construction facility, equipment and furnishings and removal and loading or burning of all debris including crates, boxes, packagings, and packaging waste materials. Washing or cleaning of walls, partitions, ceilings, windows, bathrooms, kitchens, laboratory, and all fixtures and facilities therein. Cleanup, mopping, washing, waxing and polishing or dusting of all floors or areas.

Washing or cleaning of walls, partitions, ceilings, windows, bathrooms, kitchens, laboratory, and all fixtures and facilities therein. Decontamination, cleanup, mopping, washing, waxing and polishing or dusting of all floors or areas. The cleanup and decontamination from

33

the deposit of blood, pathogens, radiation, particles or other hazardous waste.

The aging and curing of concrete, mortar and other materials applied to walls, floors, ceilings and foundations of buildings and structures, highways, airports, overpasses, tunnels, bridges, approaches, viaducts, ramps, or other similar surfaces by any mode or method.

Fire Stopping, fireproofing beams, ceilings, walls and floors with all forms of fire prevention materials.

All fire watch, hole watch, and confined space entry watch for the above-mentioned craft. All fire watch attendants when multi-craft personnel are used, and all general area firewatch. Attendants for all confined space entry when multi-craft personnel are used. All attendants for foreign material exclusion when single or multi-craft are used.

Safety and deck monitoring.

**Scaffolds:** Erection, planking, maintenance and removal of all scaffolds and windbreaks for lathers, plasterers, bricklayers, masons and other construction trade crafts. Building planking or installation and removal of all staging, swinging, tubular and hanging scaffolds, including maintenance thereof.

**Excavations and Foundation-Site Preparation and Clearance For Transportation and Transmission Lines: Construction of sewers, shafts, tunnels, subways, caissons,** cofferdams, dikes, dams, aqueducts, culverts, flood controls, airports, laying underground steel pipe, transite, clay, concrete, fiber, and plastic, including telephone, telegraph, television and other similar underground duct.

Excavation for building and all other construction; digging of trenches, piers, foundations and holes; digging, lagging, sheeting, cribbing, bracing and propping of foundations, holes, caissons, cofferdams, dams, dikes and irrigation trenches, canals and all handling, filling and placing of sand bags connected therewith. All drilling, blasting and scaling on the site or along the right of way, as well as access roads, reservoirs, including areas adjacent or pertinent to construction site; installation of temporary lines.

34

Preparation and compacting of roadbeds for railroad track laying, highway construction and the preparation of trenches, footings, etc., for cross-country transmission by pipelines or electric transmission or underground lines or cables.

On-site preparation and right-of-way clearance for construction of any structures or the installation of traffic and transportation facilities such as highways, pipelines, electrical transmission lines, dam sites and reservoir areas, access roads, etc. The setting up, alignment and operating of the laser beam shall be the work of the laborers. The setting up and operation of any other similar type beam shall be the work of the laborers. The Union and the Employers agree to comply with any and all state laws governing operation of such laser-type equipment. All GPS equipment, lasers, and grade checking. Clearing and slashing of brush or trees by hand or with mechanical cutting methods. Blasting for all purposes such as stumps, rocks, general demolition. Falling, bucking, yarding, loading or burning of all trees or timber on construction areas. Choker setters, off-bearers, lumber handlers and all Laborers connected with on-site portable sawmill operations connected with clearing. Erection, dismantling and/or reinstallation of all fences. Cleanup of right-of-way, including tying on, signaling, stacking of brush, trees or other debris, and burning where required. All soil tests, operations of semi and unskilled labor, such as filing of sand bags, handling timber and loading and unloading of same.

**Concrete, Bituminous Concrete and Aggregates:** (a) Concrete, bituminous, concrete or aggregate for walls, footings, foundations, floors or for any other construction. Mixing, handling, conveying, pouring, vibrating, guniting and otherwise placing concrete or aggregate, whether done by hand or any other process. Wrecking, stripping, dismantling and handling concrete forms and false work. Building of centers for fire proofing purposes. Operation of motorized wheelbarrows or buggies or machines of similar character, whether run by gas, diesel or electric power. When concrete or aggregates are con-

35

veyed by crane or derrick, or similar methods, the hooking on, signaling, dumping and unhooking the bucket. Placing of concrete or aggregates, whether poured, pumped, gunited, or placed by any other process. The assembly, uncoupling of all connections and/or parts of, to equipment used in mixing or conveying concrete, aggregate, or mortar, and the cleaning of such equipment, parts and/or connections. All vibrating, grinding, spreading, flowing, rodding, leveling and strike-off of concrete or aggregates by floating, puddling or screening by hand or mechanical means prior to finishing. Where pre-stressed or pre-cast concrete slabs, walls, or sections are used, all loading, unloading, stockpiling, hooking on, signaling, unhooking, setting and barring in place of such slabs, walls or sections. All mixing, handling, conveying, placing and spreading of grout for any purpose. Green cutting of concrete or aggregate in any form, by hand, mechanical means, grindstones or air or water.

(b) The filling and patching of voids, crevices, etc., to correct defects in concrete caused by leakage, bulging, sagging, etc.

(c) The loading, unloading, carrying, distributing and handling of all rods, mesh and material for use in reinforcing concrete construction. The hoisting of rods, mesh and other material for use in reinforcing concrete construction. The hoisting of rods, mesh and other materials except when a derrick or outrigger by other than hand power is used.

(d) All work on interior concrete columns, foundations or engine and machinery beds.

(e) The stripping of forms, other than panel forms which are to be re-used in their original form, and the stripping of forms on all flat arch work.

The moving, cleaning, oiling and carrying of all forms to the next point of erection.

The snapping of wall ties and removal of tie rods. Handling, placing and operation of the hoses and pots or

36

hoppers on sand blasting or other abrasive cleaning. The jacking of slip forms, and all semi and unskilled work connected therewith.

**Streets, Ways and Bridges:** Work, in the excavation, preparation, concreting, asphalt, bituminous concrete and mastic paving, ramming, curbing, flagging and surfacing of streets, striping, street markings and other pavement markings, Laborers engaged in layout work, cleanup and helping painters involved in any pavement markings, ways, courts, underpasses, overpasses, bridges, approaches and slope walls and the grading and landscaping thereof and all other labor connected therewith. Cleaning, grading, fence or guard rail installation and/or removal for streets, highways, roadways, aprons, runways, sidewalks, parking areas, airports, approaches and other similar installations. Preparation, construction and maintenance of roadbeds and sub-grade for all paving, including excavation, dumping and spreading of sub-grade material, ramming, or otherwise compacting. Setting, leveling and securing or bracing of metal or other road forms and expansion joints, including placing of reinforcing mats, or wire mesh, for the above work. Loading, unloading, placing, handling and spreading of concrete aggregate or paving material, including leveling of the surface. Strike-off of concrete, when used as paving material by hand and floating or mechanical screening for strike-off. Cutting of concrete for expansion joints and other purposes. Setting of curb forms and the mixing, pouring, cutting, flowing, and strike-off of concrete used therefor. The setting, leveling and grouting of all pre-cast concrete or stone curb sections. Installation of all joints, removal of forms and cleaning, stacking, loading, oiling and handling. Grading and landscaping in connection with paving work. All work in connection with loading, unloading, handling, signaling, slinging and setting of all paving blocks, riprap or retaining walls such as stone, wood, metal, concrete or other material and the preparation of surfaces to receive same.

37

**Concrete Coring, Testing and Quality Control.** All work in connection with quality assurance/quality control and the collection and testing of construction materials, including asphalt, and soil samples for the purposes of quality control/quality assurance. (Concrete Coring, Testing and Quality Control shall not be subject to subcontracting restrictions in Article 4.)

**Trenches, Manholes, Handling and Distribution of Pipe, Etc.:** Cutting of streets and ways for laying of pipe, cables or conduits for all purposes; digging of trenches, manholes, etc., handling and conveying all materials; concreting, back-filling, grading and resurfacing and all other labor connected therewith. Clearing and site preparation as described herein. Cutting or jackhammering of streets, roads, sidewalks or aprons by hand or the use of air or other tools. Digging of trenches, ditches and manholes and the leveling, grading and other preparation prior to laying pipe or conduit for any purpose. Loading, unloading, sorting, stockpiling, wrapping, coating, treating, handling and distribution of water mains, gas mains, and all pipe, including placing, setting and removal of skids. Cribbing, driving or sheet piling, lagging and shoring of all ditches, trenches and manholes. Handling, mixing or pouring concrete and handling and placing of other materials for saddles, beds or foundations for the protection of pipes, wires, conduits, etc. Backfilling and compacting of all ditches, resurfacing of roads, streets, etc. and/or restoration of lawns and landscaping.

**Shafts and Tunnels, Subways and Sewers:** Construction of sewers, shafts, tunnels, subways, caissons, cofferdams, dikes, dams, levies, aqueducts, culverts, flood control projects and airports. All underground work involved in mines, underground chambers for storage or other purposes, tunnels or shafts for any purpose, whether in free or compressed air. Drilling and blasting, mucking and removal of material from the tunnels or shafts. The cutting, drilling and installation of material used for timbering, or retimbering, lagging, bracing, propping or shoring the tunnel or shaft. Assembly and installation of multi-

38

plate, liner plate, rings, mesh, mats or forms for any tunnel or shaft including the setting or rods for same. Pouring, pumps-creting or guniting of concrete in any tunnel or shaft operation, manual or hydraulic jacking of shields and the use of such other mechanical equipment as may be necessary.

Excavation or digging and grading of footings and foundations for bridges, overpasses, underpasses, aqueducts, etc., and their approaches. All concrete work as described above and in addition, the hooking on, signaling and dumping of concrete for treme work over water on caissons, pilings, abutments, etc. Excavation, grading, grade preparation and landscaping of approaches. Installation of pipe, gratings and grill work for drains or other purposes. Installation of well points or any other dewatering system.

**Compressed Air:** In compressed air all work underground or in compressed chambers, including tending of the outer air lock. All work in compressed air construction including, but not limited to, groutmen, trackmen, blasters, shield drivers, miners, brakemen, miner's helpers, lock tenders, mucking machine operators, mortar men, gauge tenders, rodmen, compressed air electricians, setting of line plate and ring sets, drill runners, powermen or blasters, air hoist operators; form men; concrete blower operators, cement (invert) operators, power knife operators, erector operators, keyboard operators, pebble placer operators, car pushers, grout machine operators, steel setters, cage tenders, skinner track layers, dumpmen, diamond drillers, timbermen and re-timbermen, cherry pickmen, nippers, chucktenders and cable tenders, vibratormen, jetgunmen, gunite, nozzlemen, gunmen, reboundmen and all other work connected therewith.

**Sewer, Drains, Culverts and Multiplate:** Unloading, sorting, stockpiling, wrapping, coating, treating, handling, distribution and lowering or raising of all pipe or multiplate. All digging, driving of sheet piling, lagging, bracing, shoring and cribbing, breaking of concrete, backfilling, tamping, resurfacing and paving of all ditches

in preparation for the laying of pipe. Pipe laying, leveling, and making of the joint of any pipe used for main or side sewers and storm sewers. All of the laying of clay, terra cotta, iron-stone, vitrified concrete or other pipe and the making of joints for main or side sewers and storm sewers and all pipe for drainage. Unloading, handling, distribution, assembly in place, bolting and lining up of sectional metal or other pipe including corrugated pipe. Laying of lateral sewer pipe from main sewer or side sewer to building or structure, except that Employer may direct that this work be done under proper supervision. Laying, leveling and making of the joint of all multi-cell conduit or multi-purpose pipe. Cutting of holes in walls, fittings, piers or other obstructions for the passage of pipe or conduit for any purpose and the pouring of concrete to secure said holes. Digging under streets, roadways, aprons or other paved surfaces for the passage of pipe, by hand, earth auger or any other method and manual and hydraulic jacking of pipe under said surfaces. Installation of septic tanks, cesspools and drain fields.

**Underpinning, Lagging, Bracing, Propping and Shoring.** Underpinning, lagging, bracing, propping and shoring, raising and moving of all structures; raising of structure by manual or hydraulic jacks or other methods. All work on house moving, shoring and underpinning of structures, loading, signaling, right- of-way clearing along the route of movement. Resetting of structure in new location to include all site clearing, excavation for foundation and concrete work. Cleanup and backfilling, landscaping old and new site.

**Drilling and Blasting.** All work of drilling jackhammering and blasting. Operation of all rock and concrete drills, including handling, carrying laying out of hoses, steel handling, installation of all temporary lines and handling and laying of all blasting mats. All work in connection with blasting, handling and storage of explosives carrying to point of blasting, loading holes, setting fuses, making primers and exploding charges. All securing of surfaces with wire mesh and any other material and set-

40

ting of necessary bolts and rods and anchor same. All high scaling and other rock breaking and removal after blast. Handling and laying of nets and other safety devices and signaling, flagging, road guarding.

**Stringline and Pegs on Slip Form Machines:** It shall be the work of the laborers to set all lines, and leveling for slip form machines (such as the Miller Formless, Curb Master of Iowa, Go-Mo-Co., and other similar slip form machines). It also shall be the work of the laborers to set the plastic line for the C.M.I. Auto Grader, asphalt machines, and other similar graders. The cleaning of the Auto Graders and slip form machines will be the work of the laborers.

**Underground work.** (a) The digging and excavation for all sewers, catch basins, manholes, test holes, shafts and subways; the excavation for bridges and viaduct abutments; the excavation or the digging of trenches for, and the laying of, drain pipes, concrete pipes, water pipe extensions, water main taps, water main fusing, water mains from whatever source and beyond the first point of connection from building, conduits in which wire or cables are carried or run, all underground pipe transportation lines for gas, oil, gasoline, fluids and liquids, water aqueducts, and water lines and utilities, including temporary, of every description, including excavations or digging to uncover such utilities, drain pipes, concrete pipes, water pipes, water mains, sewer pipes, conduits and gas pipe lines for the purpose of relocation, removal, repair or alterations of such pipes, conduits or pipe lines, and all temporary piping of every description in connection with excavating and underground construction; the handling, placing and bracing in position of all sheeting forms and steel reinforcing, including the driving thereof, and the welding and burning of same, putting on grout mortar on bottom of sewers about pumping stations, including the erection, alteration and remodeling of same; all common labor performed in connection with the erection, alteration, remodeling, or demolition of bridges and viaducts, all installations of repairs to and removal of

41

temporary ventilation pipes or water lines in underground work, sewer work or tunnels; the laying and connecting of all non-metallic and metallic pipes; the rodding of all sewer, drain and conduit pipes or systems; and all common labor performed on or about, or in connection with the mixing or handling of materials on any of the work above set forth.

(b) All work performed in free or compressed air in shafts and tunnels for piping, sewers, water, subways (mass transportation systems of all kinds), transporting, diversion, storage, shelters, aquifers and all other types of reservoirs, related to water pollution projects, and all other types of reservoirs, caissons, cofferdams, dikes, dams, levees, culverts, flood control projects, pilings, soil test borings, ground water well test holes, seismograph testing of subsurface, geology, excavation for subsurface installations of industrial, manufacturing, commercial, military, federal, state, county and municipal governmental facilities of every type and description, missile and anti-missile silo shafts, and underground construction for the preparation of the installation of atomic smashing accelerations and appurtenances; and all other underground structures of every type, nature and description in free or compressed air.

(c) The work covered by this Agreement shall be classified as follows: All preparatory work, including the excavating, bracing, drilling and blasting (handling of all powder, including splitting and making of primers), mucking and removal or material from the tunnels and shafts; the cutting, drilling and installations of materials used for timbering or re-timbering, lagging bracing, propping or shoring the shaft or tunnel, and all welding incidental thereto; assembly and installation of multiplate, liner plate, rings, mesh, mats or forms for any tunnel or shaft, including the setting of rods for same; pouring, pumpcreting and guniting of concrete in any tunnel or shaft; the operation, manual or hydraulic jacking of shields and the use of such other mechanical equipment as may be necessary; all concrete work described as above,

42

and in addition thereto, the hooking on, signaling and dumping of concrete for work over on caissons, pilings, abutments, etc.; the installation of pipe, gratings and grill work for drains or other subsurface purposes; the installation of well points or any other dewatering systems; and also all alterations, maintenance and demolition work on all underground projects; and all other work covered by classifications hereinafter enumerated in herein.

(d) **Compressed Air:** In compressed air, all work underground or in compression chambers, including tending of the outer air lock, shall be covered by this agreement; all construction work in compressed air including, but not limited to, grout men, track men, drillers, shield drivers, miners, lock tenders, muckers, and mucking machine, motor men, rod men, laser beams, compressed air electricians, liner plate setters, ring setters, dynamite men or blasters, air hoist, form men, concrete blower, concrete laborers, power knives, erectors, key boards, agitator car, car pushers, grout machines, steel setters, cage tenders, skinners, track layers, dump men, timber men or bracers, cherry pick men, nippers, chuck tenders and cable tenders, vibrator men, jet gunmen, gunmen, gunite nozzle men, and all other types of work connected therewith shall be covered by this Agreement.

## PERIOD AND INTERVALS OF WORK
## FOR EACH TWENTY-FOUR HOUR PERIOD

| Pressure | | Periods | Compression and Decompression |
|---|---|---|---|
| More than minimum number of pounds | Not more than maximum number of pounds | Maximum total hours | See Current OSHA Regulations |
| Column 1 | Column 2 | Column 3 | |
| Normal | 15 | 8 | |
| 16 | 26 | 6 | |
| 27 | 33 | 4 | |
| 34 | 38 | 3 | |
| 39 | 43 | 2 | |
| 44 | | 1 | |

43

The Employer may determine the time of each period when the pressure is not more than fifteen pounds per square inch, provided that the total for the periods does not exceed eight hours and does not conflict with OSHA regulations. The limits or hours as specified in said table shall apply accordingly to the maximum pressure attained at any time during the period.

(e) Inspection, Maintenance and Repair of Underground Utilities, and Sewers. All underground and preparatory work, which includes televised inspections, telegrouting, root cutting, herbicide application, lining, vacuuming, vacuum excavation, and jetting, in new or existing utilities, water mains, structures, shafts, tunnels, sewers, drains, pipes and related structures of every character and description; all work performed on the ground when excavating with a vac-truck.

**Signalmen:** Signalmen on all construction work defined herein, including traffic control signalmen at construction site.

**General Excavation and Grading:** The clearing, excavating, filling, backfilling, grading and landscaping of all sites for all purposes and all labor connected therewith, including chairmen, rodmen, grade markers, etc.

**Factories:** All work in factories, mills, power stations, oil refineries, chemical plants, and industrial plants performed now or as may be acquired hereafter, including packers, cutters, loaders, raw material unloaders, checkers, stuffers, production line personnel and stenciling of materials. Handling of raw pigment; vessel cleaners and/or dryers; washing or cleaning laboratory glassware; stocking of materials in laboratories; the cleaning and/or scrubbing, washing, polishing of all floors, glasses, windows, walls, rest rooms and furniture. The erection, set-up, and dismantlement of all step off pads in contaminated work areas. The shielding of all radioactive services. The decontamination of all radioactively contaminated tools, materials, equipment, and work areas.

44

**General:** Material yards, junk yards, asphalt plants, concrete products plants, cemeteries, landscape nurseries and the cleaning or reconditioning of streets, ways, sewers and water lines and all maintenance work and work of an unskilled and semi-skilled nature, including Laborers in shipyards, tank cleaners, ship scalers, shipwright helpers, watchmen, flagmen, guards, security and safety men, tool-room men, park, sports area and all recreational center employees, utilities employees, horticultural and agricultural workers, garbage and debris handlers and cleaner.

**Pits, Yards, Quarries, Etc.:** All drillers, blasters and/or powdermen, nippers, signalmen, laborers in quarries, crushed stone yards and gravel and sand pits and other similar plants, including temporary and portable batching plants.

**Wrecking:** The wrecking or dismantling of buildings and all structures, breaking away roof materials, beams of all kinds, with use of cutting or other wrecking tools as necessary. Burning or otherwise cutting all steel structural beams. Breaking away, cleaning and removal of all masonry and wood or metal fixtures for salvage or scrap. All hooking on and signaling when materials for salvage or scrap are removed by crane or derrick. All loading and unloading of materials carried away from the site of wrecking. All work in salvage or junk yards in connection with cutting, cleaning, storing, stockpiling or handling of materials. All clean-up removal of debris, burning, back-filling and landscaping of the site of wrecked structures.

**Railroad Track Work.** Right-of-way clearance as described above, excavation, grading, subgrading, ballasting and compacting of right-of-way. Loading, unloading, stockpiling, handling and distribution of track and ties and placing of or jacking track and ties at point of installation. All burning or otherwise cutting of track. Setting of tie plates, bolting, leveling, and gauging of rails and all spiking, whether by hand or mechanical means. Placing and tamping of ballast by hand or mechanical means. Construction and/or relocation of main line, shoe flies, sidings, gradings, crossings, relocating of pipes and

45

drainage and culverts and connected with same and removal and replacing of all fences.

**Studio Utility Employees:** All such work as herein described as may be pertinent to and part of the operation of Motion Picture and other related type of studios.

**Use of Tools:** Operation of all hand, pneumatic, electrical, motor, combustion or air-driven tools or equipment necessary for the performance of work described herein. In short, all unskilled labor connected with work undertaken by members of the party of the first part, and the handling of all materials or appliances in any trade where it will be more economical to have the work performed by Laborers as may be decided by the Employer, subject to appeal to and decision of the Joint Grievance Committee.

**Miscellaneous:** All such work and jurisdiction as may have been acquired by reason of amalgamation or merger with former national or international Unions and as may be hereafter acquired; including all such work and jurisdiction as declared by actions of the Executive Council or conventions of the American Federation of Labor.

**Paragraph 5. WORK NOT INCLUDED:** The laboring work not included in this Agreement is general excavating for buildings to the bottom of floor level. If there are any sub-basements or cellars, this general excavation shall be considered to extend to the bottom of the floor, of same. Excavation in basement and sub-basements other than by power equipment shall be done by Laborers at Building Laborers' rate (except where caisson rates apply).

**Paragraph 6. WRECKING:** Where a building is only partially wrecked and parts torn down for the purpose of building additions, alterations, remodeling, or repairing same, such work is covered by this Agreement, and rates as established herein shall apply.

**Paragraph 6(a). WRECKING: COMPLETE DEMOLITION:** Work pertaining to wrecking of buildings and structures in their entirety and removed to the basement floor level is covered by the Agreement between Local

46

No. 225 of the Laborers' District Council and the Labor Committee representing the Chicago Demolition Contractors' Association, and the rates established by said Agreement shall apply.

**Paragraph 7. FLYING FORMS:** Laborers shall tend the Carpenters when prefabricating the Flying Forms on the ground.

When Flying Forms are used on each floor, Laborers shall assist in the placing of Steel Tubular Scaffolding and Flying Forms.

When Concrete Floors are poured and Flying Forms are removed, Laborers will assist.

Laborers will clean and oil Flying Forms after each concrete pour.

After the last concrete pour, when Flying Forms will not be re-used on job site, Laborers will remove, clean and dismantle, oil and place in a stockpile.

### Article 13
### ALCOHOL AND SUBSTANCE ABUSE

The parties incorporate the CISCO Uniform Drug/Alcohol Abuse Program, as modified, attached hereto as Addendum.

It is recognized that some client owners require additional substance abuse procedures to be followed on their projects for all trades, and it shall not be a violation of this agreement for signatory employers to comply with such procedures, provided prior written notification is given to the District Council.

### Article 14
### SUCCESSORS AND ASSIGNS

In the event of any change in the ownership, management or operation of the Employer's business or substantially all of its assets, by sale or otherwise, it is agreed that as a condition of such sale or transfer that the new

47

owner or manager, whether corporate or individual, shall be fully bound by the terms and conditions of this Agreement. The Employer shall provide no less than ten (10) days prior written notice to the Union of the sale or transfer and shall be obligated for all expenses incurred by the Union to enforce the terms of this paragraph.

## WORKING CONDITIONS APPLICABLE TO BUILDING CONSTRUCTION

The following additional rules and conditions shall apply to work performed at the building or site, in connection with masonry, carpentry and such other work to be done at the building or site.

### Article 15
### HOURS AND OVERTIME

**Paragraph 1.** When one shift is used, eight (8) hours per day, between 7:00 a.m. and 3:30 p.m. from Monday through Friday, shall constitute the normal work day and straight time shall be paid. Unless the Employer is delinquent in the payment of fringe benefit fund contributions or working dues, has failed to comply with a JGC or arbitration award, or is in violation of JATC rules, in weeks that have designated holidays, but not more often than six (6) times per year, the Employer may schedule four (4) consecutive ten (10) hour work days at straight time.

The four (4) ten-hour workdays can be nonconsecutive if the other trades working alongside the Laborers are working the same schedule. In order to use this alternate work schedule, the Union and the Employees must have notice no later than four o'clock p.m. on the preceding Friday. The notice to the Union shall be through the District Council's web portal.

**Paragraph 2.** Starting times may be adjusted by the Employer, upon notice to and clearance by the Union, from 6:00 a.m. to 9:00 a.m. at straight time.

Double time will be paid for all hours worked before 6:00 a.m. unless multiple shifts are working.

48

**Paragraph 3.** At the option of the Employer, the starting time for the day, or the first shift can be flexible.

It is the Employer's responsibility to inform the Employee and obtain clearance from the Union of any change in starting time prior to quitting time the day before such change is to be effective. On Monday through Friday, time and one half will be paid for the four (4) hours immediately following the normal 8-hour work day, and double time thereafter.

**Paragraph 4.** When one night shift is used to perform emergency work which cannot be done during the normal work day, such work shall be paid for at time and one-half for the first eight (8) hours, and double time thereafter.

**Paragraph 5.** Overtime rates on single shift work starting at 8:00 a.m. Saturday, shall be time and one-half for the first ten (10) hours, and thereafter double time shall be paid until 8:00 a.m. Monday, unless changed by Paragraph 2 above. On Saturdays, time and one-half will be paid for the first ten (l0) hours worked and double time thereafter until 8:00 a.m. Monday, unless changed by Paragraph 2 above. During the period between April l and November 30, no more than once per calendar month, one designated Saturday may be used as make-up day, due to inclement weather, at straight time while tending masons; provided, however, that after forty (40) hours have been worked, time and one-half will be paid. Contractors utilizing this provision shall notify the Union in writing, by no later than 4:00 pm on the Friday preceding the make-up day, on a form provided by the Union, specifying the date and location of the make-up work to be performed and the employees so working. An Employer who violates this section shall pay as a penalty double time for all hours worked.

**Paragraph 6. Occupied Spaces.** When work to be performed in occupied buildings is of such a nature that it is not appropriate or practical during the regular work day, such as renovation, alteration and modernization,

49

such work may be performed at an adjusted time; provided a pre-job conference takes place between the Business Manager with jurisdiction over the worksite and the Employer, and permission is granted by the Union. Contractors utilizing the provision shall notify the Union by requesting the pre-job conference on the form provided by the Union. By mutual consent of the Employer and the Union, the starting and quitting times of any shift, including day work, may be changed for all or any portion of a particular job. However, the adjusted shift shall run a minimum of three (3) consecutive days. All Employees working under this provision shall receive eight (8) hours pay for seven (7) hours worked. Laborers working through their eating period on this shift shall be compensated one additional hour of pay in addition to pay for all hours worked. Any and all work in excess of seven (7) hours under this provision shall be paid at a rate of double time. An Employer who violates this section shall pay as a penalty double time for all hours worked. Where the adjusted shift runs less than three (3) consecutive days, Laborers shall be paid in accordance with Paragraph 4 (Emergency Work).

**Paragraph 7. Eating Period for Single Shifts.** An employee required to work through his or her eating period shall nevertheless work for at least 8.5 hours (inclusive of one half hour paid at time and one half).

## Article 16
## MULTIPLE SHIFTS

**Paragraph 1.** When it is necessary that the contractor use more than one shift for a period of three (3) or more consecutive days, the Union shall be notified twenty-four (24) hours in advance of the effective date of the starting of such multiple shift operations.

**Paragraph 2.** On Multiple Shift arrangements, the work week shall start at 12 o'clock midnight Sunday, and continue until 11:59 p.m. Friday. In no event shall regular working hours of different shifts overlap.

**Paragraph 3.** When three (3) eight (8) hour shifts are used, the workmen shall receive eight (8) hours' pay for seven and one-half (7½) hours worked; one-half hour being allowed for eating. Employees shall receive eight (8) hours pay under this Section even if they are permitted to leave after seven and one-half (7½) hours, and it shall be a violation of this Agreement if an employee does not receive eight (8) hours pay. Employees who work eight (8) hours on a shift without receiving one-half hour eating period shall receive, in addition to the eight (8) hours pay as provided in this Section, one (1) hour's pay at the applicable premium rate.

**Paragraph 4.** When two (2) twelve (12) hour shifts are used, an eating period of one-half hour shall be allowed each shift without deductions in pay and all time in excess of eight (8) hours shall be paid at the regular overtime rates, that is to say, and two and one-half (2½) hours immediately following the first eight (8) hours shall be paid for at the rate of time and one-half, and double time thereafter. Employees who work one of two twelve (12) hour shifts without receiving a one-half hour eating period shall receive, in addition to the twelve (12) hours pay as provided in this Section, one-half hour's pay at the applicable premium rate.

**Paragraph 5.** When two (2) eight (8) hour or two (2) ten (10) hour shifts are used, an eating period of one-half (½) hour shall be allowed, but not paid for.

**Paragraph 6.** On Saturday, other than single time shift, shift work shall start at 12:01 a.m. and the first eight (8) hours of each shift shall be paid for at the rate of time and one-half, and thereafter double time shall be paid; however, under no conditions shall more than eight (8) hours be worked at the rate of time and one-half on any one shift.

### Article 17
### SUNDAYS, HOLIDAYS AND ELECTION DAYS

**Paragraphs 1.** All work performed on Sundays or on the following holidays: New Year's Day, Memorial Day,

51

Independence Day, Labor Day, Thanksgiving Day and Christmas Day, or on Mondays when such holidays are celebrated, shall be paid for at the double time rate. There shall be no work performed on Labor Day, excepting in case of dire emergency, and with the written consent of the District Council. If a holiday falls on a Sunday, it shall be celebrated on the following Monday. If a holiday falls on a day other than Sunday, it shall be celebrated on that date.

**Paragraph 2.** On Election Days, the individual employed in this trade shall be allowed time not to exceed two (2) hours, without pay, for the purpose of voting, provided that the worker on the job has given notice to the Employer or his agent and has made arrangements no less than twenty-four (24) hours in advance, to receive such time off.

**Paragraph 3.** When a holiday falls on Monday through Friday, make-up days on Saturday shall be paid at time and one-half for the first ten (10) hours and double time thereafter.

**Paragraph 4.** Unless the Employer is delinquent in the payment of fringe benefit fund contributions or working dues, has failed to comply with a JGC or arbitration award, or is in violation of JATC rules, in weeks that have designated holidays but not more often than six (6) times per year, the Employer may schedule four (4) consecutive ten (10) hour work days at straight time. The four (4) ten-hour workdays can be nonconsecutive if the other trades working alongside the Laborers are working the same schedule. In order to use this alternate work schedule, the Union and the Employees must have notice no later than four o'clock pm on the preceding Friday. The notice to the Union shall be through the District Council's web portal.

### Article 18
### PARTICULAR WORK RULES AND
### CLARIFICATION OF CONDITIONS

**Paragraph 1.** (a) Building Laborers' scale shall apply to all work performed by the Laborers except as specifically classified.

(b) Boiler Setter Laborers will include all work of handling solid refractory materials and also fire brick work in boiler setting, open hearth, furnace, blast furnace, soaking pits, tanks, dust catchers, coke oven batteries, furnace chimneys and stacks, including cleanup work on the above services.

(c) Boiler Setter Plastic Laborers applies to work of actually installing plastic, in connection with the boiler work or other non-solid refractory materials. Mortar mixers, lancers, burners, etc., plus all work from point of forty (40) feet above normal ground level in fire brick work and Boiler Setters Laborers' Classifications.

Minimum safety measures for Boiler Setters are that all scaffolding, in and around blast furnaces and hot stoves, etc., shall not exceed five (5) feet per landing and be constructed of solid-type materials, except the large cable-type used in blast furnaces, and at least every fourth scaffold shall be left in place to serve as a safety scaffold with ladders extending to safe distance above each landing. The Employer shall furnish respirators, safety goggles, gloves and other protection materials necessary in and about dusty and hot working conditions during all furnace work.

(d) Caisson Diggers applies to all caisson work and men working in trenches, foundation pits and piers eight (8) feet or more in depth below the level that excavation begins in such trenches, foundation pits or piers.

Where hazardous conditions exist when excavating trenches, foundation pits or piers or where a type of soil, sand or other material being removed creates a hazardous condition for the Employee such trenches, foundation pits or piers must be shored or sheathed, and the Employees performing the work of shoring and sheathing shall be paid the caisson rate.

Where hazardous conditions do not exist, but sheathing or shoring is necessary solely for the purpose of protecting a bank or preserving the work, then caisson rates shall not apply.

When specifications show the depth of such excavation to exceed eight (8) feet, said caisson rate shall apply from the start of excavation when hand dug. For safety reasons, no worker shall be permitted to work alone if excavation exceeds five (5) feet, unless he is working under direct supervision.

(e) Chimney Laborers (over forty (40) feet) applies to all freestanding chimneys in excess of forty (40) feet above the ground level. The Chimney Laborers' rate shall apply for the entire height of the chimney, both erecting or wrecking such chimney.

Free-standing chimneys shall be construed as chimneys built from the ground up, outside the building, for industrial, commercial or institutional purposes. It is understood that this provision does not apply in the erection of ordinary chimneys for apartment buildings, etc., unless the chimneys go forty (40) feet above the roof level.

(f) Jackhammermen: The rate for Jackhammermen herein established shall apply to any mechanically operated tool over thirty-five (35) pounds in weight, used in demolition, concrete breaking, tamping or other similar work. The regular building Laborers' rate shall apply to all lighter mechanical tools.

(g) Scaffold Laborers: Applies to all Laborers engaged in installing, relocating and/or removing all swinging, tubular and other types of scaffolds designed and used for tending to or servicing our allied trades. The raising and lowering of swinging and specifically designed scaffolds by hand, by power, or by any other process, is not included in scaffold Laborers' rates.

(h) Stone Derrickmen and Handlers: Applies to all Laborers engaged in helping the stone setters set and distribute dimensional cut stone, terra cotta, granite or prefabricated materials replacing or substituted for cut stone, etc.

(i) Windlass and Capstan Persons: Applies to all hoisting units attached to mixers or movable equipment

used to raise material where regular hoists cannot be erected or used.

(j) Fireproofing and Fire Shop Laborers: applies to Fireproofing beams, ceilings and walls, etc., in connection with gunite work or any other process, including clean-up work on job site, shops or yards.

(k) Cement Gun Nozzle Laborers: (Gunite) Applies to Laborers handling nozzle in application of gunite.

(l) Cement Gun Laborers: Applies to Laborers handling cement gun on concrete work.

(m) Plasterer Laborers: Applies to all Laborers who perform work as mixermen, hod carriers, plaster machine tenders, and builders of scaffolding, and all work pertaining to lathing and plastering, the application of gunite and the handling of the cement gun nozzle or any work of a thickness of one and one half (1½) inches or more and any work as may be directed by the contractor, his agent or foreman.

(n) Laborers who are engaged in the work of construction or wrecking of silos, etc., for grain elevators, and are required to strip or wreck forms as hazardous heights in this work shall be paid chimney Laborers' rates.

(o) On salamander work or heating for frost prevention work, the building Laborers' rates of wages shall apply for the first eight (8) hours' work regardless of starting time Monday through Friday of each week. All hours worked on Saturday, Sunday or Holidays, and all hours worked after eight (8) hours per day, or forty (40) hours per week Monday through Friday, as above set forth, shall be paid for at one and one-half times the Building Laborers' rate of wages.

(p) Where services are performed by Laborers as watchmen, and such Laborers shall not be engaged in the performance of any other branches of work covered by this Agreement, they shall be paid not less than $1.50 below the Building Laborers' rate.

(q) Any building 125 feet high or more shall require the use of a Man Cage.

## Article 19
## REPORTING FOR WORK

**Paragraph 1.** Any Laborer reporting for work upon order expressed or implied by the Employer or his Agent and not put to work for any reason, except weather conditions, fire, accident or other unavoidable cause, shall receive four (4) hours' pay for lost time. Weather conditions shall be an exception to the requirement for "show up" or reporting pay provided the Employer has notified the Employee by telephone or has required in writing that the Employee call before he departs from home. The Employer must provide a definite and available phone number and must post this provision on each job site. When Laborers are directed to wait during inclement weather by the Employer, his Superintendent or Labor Foreman, they shall be paid for such waiting time.

When placing monolithic concrete, an Employee's eating period can be adjusted, but not beyond one-half (½) hour before or after the regular scheduled time. Double time shall be paid if no eating period is permitted between shifts.

Any person other than a regular Employee who is called for temporary work for just a portion of one day, and who works more than four (4) hours in any one day, shall receive equivalent of not less than eight (8) hours' pay for said day, unless such Employee is prevented from completing a day's work because of inclement weather, in which case the Employee shall be paid for the time actually worked.

**Paragraph 2.** In case of an accident requiring medical attention during working hours, Laborers shall be permitted to go for or be taken for medical attention at once, and shall be paid for lost time that day.

In the event such injured Laborer is permitted to continue working by the doctor, but is required to return

for periodic medical attention during working hours by the insurance physician or company doctor, such injured Laborer shall be paid for lost time, but not to exceed two (2) hours' pay for such visit to the doctor.

**Paragraph 3.** The Employer agrees that no punitive action shall be taken against their Employees, if said Employees refuse to cross a picket line that may be placed on the job or project of their Employer.

### Article 20
### PAYDAY

**Paragraph 1.** It is agreed that Employees shall be paid before quitting time on Wednesday of each week, except when the regular payday is on a Legal Holiday, in which case they shall be paid the day before such holiday at quitting time and except when Monday or Tuesday is a legal holiday, in which event the Employees may be paid on Thursday.

**Paragraph 2.** Wages are to be paid in full up to seventy-five (75) hours preceding payday. An Employee quitting of his own accord shall be paid on the next regular payday. An Employee discharged or laid off shall be paid in check on the job at the time he is laid off or be given a time check calling for four (4) additional hours to cover traveling time. Such additional hours are to be added at the time of giving check and shall be paid on presentation at the office of the Employer. If same is not promptly paid upon arrival at the office, and he is required to remain there during working hours, he shall be paid for such time, Sundays and Holidays excepted.

57

## Article 21
## WAGES

The following premiums in hourly wages shall be paid for work performed in the below-listed classifications:

| | |
|---|---|
| Firebrick Work and Boiler Settler Laborers | .275 |
| Jackhammerman (On Firebrick Work Only) | .275 |
| Boiler Setter Plastic Laborers | .45 |
| Chimney Laborers (Over 40 Feet) | .10 |
| Chimney on Firebrick | .35 |
| Scaffold Laborers | .10 |
| Caisson Diggers | .35 |
| Jackhammerman | .225 |
| Power Driven Concrete Saws, Other Power Equipment | .225 |
| Stone Derrickman and Handlers | .20 |
| Fireproofing and Fire Shop Laborers | .00 |
| Well Point System Men | .35 |
| Pumps for Dewatering, other Unclassified Laborers | .00 |
| Windlass and Capstan Person | .15 |
| Cement Gun Nozzle Laborers (Gunite) | .15 |
| Cement Gun Laborers | .075 |
| Plaster Laborers | .00 |

Sub-Foremen shall receive $.45 premium wages over and above top Laborers' Scale under his supervision.

Building Labor Foremen, General Foremen and Superintendents shall receive $.75 premium wages over and above top Laborers' Scale under his supervision.

58

**WORKING CONDITIONS APPLICABLE TO
ROAD BUILDING AND RELATED CONSTRUCTION**

The following additional rules and conditions shall apply to work performed on roads, bridges and other heavy and highway work

### Article 22
### HOURS AND OVERTIME

When one shift is used, eight (8) hours per day, between 7:00 a.m. and 3:30 p.m. from Monday through Friday, inclusive, shall constitute the normal work day and straight time shall be paid. Unless the Employer is delinquent in the payment of fringe benefit fund contributions or working dues, has failed to comply with a JGC or arbitration award, or is in violation of JATC rules, in weeks that have designated holidays, but not more often than six (6) times per year, the Employer may schedule four (4) consecutive ten (10) hour work days at straight time. The four (4) ten-hour workdays can be nonconsecutive if the other trades working alongside the Laborers are working the same schedule. In order to use this alternate work schedule, the Union and the Employees must have notice no later than four o'clock pm on the preceding Friday. The notice to the Union shall be through the District Council's web portal. There shall be no overtime except for an emergency nature to preserve life or property at the discretion of the Employer.

On emergency work, the four (4) hours immediately following the normal workday, from Monday through Friday, shall be paid for at the rate of time and one-half and thereafter double time will apply.

At the option of the Employer, the starting time for the day, (or the first) shift can be flexible. It is the Employer's responsibility to inform the Employee and obtain clearance from the Union of any change in starting time prior to quitting time the day before such change is to be effective. The first eight (8) hours' work shall be paid at straight time, the next four (4) hours at time and one-half and double time thereafter.

On emergency work performed on Saturdays, rates on single shift work shall be time and one-half for the first ten (10) hours, and thereafter double time shall be paid until 8:00 a.m., Monday; however, under no conditions shall more than ten (10) hours be worked at the rate of time and one-half.

On Saturdays, time and one-half will be paid for the first ten (l0) hours worked and double time thereafter until 8:00 a.m. Monday, unless changed by Paragraph 3 above. During the period between April l and November 30, no more than once per calendar month, one designated Saturday may be used as make-up day, due to inclement weather, at straight time while tending masons; provided, however, that after forty (40) hours have been worked, time and one-half will be paid. Contractors utilizing this provision shall notify the Union in writing, by no later than 4:00pm on the Friday preceding the make-up day, on a form provided by the Union, specifying the date and location of the make-up work to be performed and the employees so working. An Employer who violates this section shall pay as a penalty double time for all hours worked.

An employee required to work through his or her eating period shall nevertheless work for at least 8.5 hours (inclusive of one half hour paid at time and one half).

### Article 23
### HOLIDAYS

Except to protect life or property, there shall be no work performed on Sunday or on the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day, or on days when such holidays are celebrated, and all hours worked shall be paid for at the double time rate.

When a holiday falls on Monday through Friday, make-up day on Saturday shall be paid at time and one-half for the first ten (10) hours and double time thereafter. If a holiday falls on a Sunday, it shall be celebrated on the

60

following Monday. If a holiday falls on a day other than Sunday, it shall be celebrated on that date.

### Article 24
### SHIFT WORK

When necessary from Monday through Friday, the Employer shall have the right to work his Employees in consecutive shifts of eight (8) hours for straight time, with one-half (½) hour for eating period during the shift which must be paid for, and not less than, the established overtime rates for all hours worked over eight (8) hours each day. Employees shall receive eight (8) hours pay under this Section even if they are permitted to leave after seven and one-half (7½) hours, and it shall be a violation of this Agreement if an employee does not receive eight (8) hours pay. Employees who work eight (8) hours on a shift without receiving one-half hour eating period shall receive, in addition to the eight (8) hours pay as provided in this Section, one (1) hour's pay at the applicable premium rate.

Multiple shift work on Saturday shall start after 11:59 p.m. on Friday and not more than eight (8) hours will be worked at the rate of time and one-half during any one shift, and double time shall apply for all hours over and above eight (8) hours worked, until 8:00 a.m. Monday.

All hours worked on Sundays and Holidays, or on days when Holidays are celebrated, shall be paid at the double-time rate.

When less than three (3) shifts are worked, from Monday through Friday, during each day, the eating period must be provided, but not paid for, and all established overtime rates must be complied with.

When it is necessary that the contractor use more than one shift for a period of three (3) or more consecutive days, the Union shall be notified twenty-four (24) hours in advance of the effective date of the starting of such multiple shift operations.

## Article 25
## PAYDAY

It is hereby agreed that the Employee shall be paid on the job and before quitting time on the regular payday of each weekly period. When a Laborer is discharged, he shall be paid in full and also, if he is laid off and demands his pay, except when the layoff is caused by bad weather or lack of material being furnished by others. Such wages due may be paid in person or placed in the mail on the same day of discharge or layoff at the option of Employer.

When a Laborer quits on his own accord, he shall receive his pay at the next regular payday. Payment may be made by check, but in the event the Employer pays by check, he shall provide reasonable facilities for cashing same. Time checks payable by the Employer shall be considered valid, providing the Laborer be allowed two (2) hours traveling time. Such traveling time shall be added to the time check by the person issuing the same. If the Laborer is obliged to remain and wait before receiving his check, he shall be allowed regular wages for such waiting time.

Where the Employer orders Employees to work and said Employees are compelled to wait upon the job, they shall be paid regular wages for such waiting time, provided they remain on the job. Any Employee reporting for work upon order expressed or implied by the Employer and not put to work for any reason except weather conditions, fire or accident, shall receive four (4) hours' pay. When Employer sends Employees from one job to another during working hours, regular wages shall be paid for such travel time. Single time shall be paid for moving equipment, except on Sunday and holidays, when double time rates shall be paid. The Union reserves the right to strike at any time for wages which are overdue or underpaid, as well as for any violation of this Agreement.

On General Election Days, the individual employed in this trade shall be allowed, not to exceed two (2) hours' time, without pay, for the purpose of voting.

### Article 26
### REPORTING FOR WORK

**Paragraph 1.** If any Employee of the Employer shows up in the morning for work and is not put to work for any reason whatsoever, he shall receive at least two (2) hours' pay.

Weather conditions shall be an exception to the requirement for "show up" on reporting pay provided the Employer has notified the Employee by telephone or has required in writing that the Employee call before he departs from home. The Employer must provide a definite and available phone number and must post this provision on each job site.

If any Employee of the Employer works any time in excess of four (4) hours after the starting time of any day, and he does not finish the day at work through no fault of his own, he shall receive eight (8) hours' pay.

The Employer agrees that no punitive action shall be taken against their Employees, if said Employees refuse to cross a picket line that may be placed on the job or project of their Employer.

**Paragraph 2.** In case of an accident requiring medical attention during working hours, Laborers shall be permitted to go for or be taken for medical attention at once, and shall be paid for lost time that day.

In the event such injured Laborer is permitted to continue working by the doctor, but is required to return for periodic medical attention during working hours by the insurance physician or company doctor, such injured Laborer shall be paid for lost time, but not to exceed two (2) hours' pay for such visit to the doctor.

### Article 27
### WAGES

The following premiums in hourly wages shall be paid for work performed in the below-listed classifications:

63

Rakers and Lutemen . . . . . . . . . . . . . .275
Machine-Screwmen . . . . . . . . . . . . . . .275
Asphalt Tampers and Smoothers . . . . .275
Kettlemen . . . . . . . . . . . . . . . . . . . . . .275
Mixermen . . . . . . . . . . . . . . . . . . . . . .275
Drum-Men . . . . . . . . . . . . . . . . . . . . .275
Jackhammermen (Asphalt) . . . . . . . . .275
Paintmen . . . . . . . . . . . . . . . . . . . . . .275
Mitre Box Spreaders . . . . . . . . . . . . .275
Laborers on Birch, Overman and
  Similar Spreader Equipment . . . . . .275
Laborers on Apsco . . . . . . . . . . . . . .275
Laborers on Air Compressors . . . . . .275
Material Expeditor (Asphalt
  Plant Laborers) . . . . . . . . . . . . . . .00
Paving Form Setters. . . . . . . . . . . . . .275
Jackhammerman (Concrete) . . . . . . . .275
Power Drive Concrete Saws,
  Other Power Equipment . . . . . . . . .275
Cement Gun Nozzle (Laborers)
  Gunite. . . . . . . . . . . . . . . . . . . . . .15
Cement Gun Laborers . . . . . . . . . . . .075
Street Paving, Grade Separation,
  Sidewalk Curb and Gutter
  Strippers and all Other
  Laborers . . . . . . . . . . . . . . . . . . . .00
General Foreman of Laborers . . . . . . 1.575
Superintendent . . . . . . . . . . . . . . . . . 1.575
Foremen of Laborers . . . . . . . . . . . . . 1.15
Asphalt Foreman. . . . . . . . . . . . . . . . 1.15
Cut-Out Foreman . . . . . . . . . . . . . . . 1.15
Street Repair Foreman. . . . . . . . . . . . 1.15

**WORKING CONDITIONS APPLICABLE TO**
**SEWER, TUNNEL AND RELATED**
**UNDERGROUND CONSTRUCTION**

The following additional rules and conditions shall apply to work performed on sewer, tunnel and related underground construction.

### Article 28
### JOB NOTIFICATION AND PRE-JOB
### CONFERENCE NOTIFICATION
### (Tunnel Work Only)

1. Immediately upon obtaining a job, the Employer shall notify the Union with jurisdiction over the job, describing the size, location and length of the proposed job and the starting time thereof, at least one (1) week prior to the proposed starting date, for the purpose of arranging a pre-job conference.

2. The Employer or his authorized representatives, the District Council, and the Local Union involved shall hold the aforesaid pre-job conference so that the start and continuation of the work may progress without interruption. It shall be the purpose of the pre-job conference to agree upon such matters as the applicable work week and establish starting time, the number of men to be employed, including the number of key men required by the Employer, the method of referral, whether or not there will be a check-off of Union initiation fees and dues, or Agency fees, the applicable wage rates and other matters, not including the interpretation of this Agreement it being agreed that any interpretation of this Agreement, should be made between the principal parties hereto so that proper application thereof may be made on the jobs.

3. The Union and the Employer Associations agree to send a copy of this Agreement to all of their affiliates so that the work covered by this Agreement may be performed in an effective and peaceful manner and the Union agrees that the terms of this Agreement shall be recognized by its affiliated District Councils and Local Unions.

65

# Article 29
## Wages

The following premiums in hourly wages shall be paid for work performed in the below-listed classifications:

### SEWER WORK

Air Track Drill Operations, Bottom Men, Bracers-Bracing, Bricklayers Tenders, Catch Basin Diggers, Drainlayers, Dynamiters, Form Men, Jackhammermen, Powerpack, Pipelayers, Rodders, Welders and Burners, Well Point System Men . . . . . . . . . . . . . . . . . . . . . . $.35

Cement Carriers, Cement Mixers, Concrete Repairmen, Mortar Men, Scaffold Men, Second Bottom Men. . . . . . . . . . . . . . . . . . . . . . . . . . . . . $.225

Concrete Laborers, Steel Setters . . . . . . . . . . . . . . . $.125

Signal Men, Top Laborers, All Other Laborers . . . $.00

The premium over and above wages and classifications for all Employees working in compressed air should be as follows:

| | |
|---|---|
| 0 - 15 pounds . . . . . . . . . . | $1.00 per hour |
| 16 - 20 pounds . . . . . . . . . . | $1.50 per hour |
| 21 - 26 pounds . . . . . . . . . . | $2.00 per hour |
| 27 - 33 pounds . . . . . . . . . . | $3.00 per hour |
| 34 and over . . . . . . . . . . . . . | $4.00 per hour |

### TUNNEL WORK

Maintenance Technician, Air Track Drill Operators, Miner, Bricklayers Tenders, Concrete Blower Operators, Drillers, Dynamiters, Erector Operators, Form Men, Jackhammermen, Powerpack, Mining Machine Operators, Mucking Machine Operators, Laser Beam Operators, Liner Plate & Ring Setter, Shield Driver, Power Knife Operators, Welders-Burners, Pipe Jacking Machine Operators, Skinners, . . . . . . . . . . . . . . . $.35

Concrete Repairmen, Lock Tender (Pressure Side), Mortar Men, Muckers, Grout Machine, Operators, Track Layers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $.225

Air Hoist Operators, Key Board Operators, Car Pushers, Concrete Laborers, Grout Laborers, Lock Tenders (Free Air Side), Steel Setters, Tuggers, Switchmen. . . . . $.125

Cage Tenders, Dump Men, Flagmen, Signalmen, Top Laborers, Rod Men . . . . . . . . . . . . . . . . . . . . . . . $.00

**Paragraph 2.** Sewer and Caisson foreman shall receive a $1.10 premium, sub-foremen a $.80 premium; Tunnel foremen a $1.60 premium, sub-foremen a $1.10 premium; Underground General Foremen shall receive a $1.60 premium; Underground Superintendents shall receive a $1.60 premium over and above atop Laborers' scale under his supervision.

### Article 30
### WORK HOURS - OVERTIME - HOLIDAYS
### ELECTION DAYS

**HOURS:**

**Paragraph 1.** Eight (8) hours shall constitute a regular workday, from Monday through Friday.

**Paragraph 2.** Forty (40) hours shall constitute a regular workweek, from Monday through Friday.

**OVERTIME:**

The Employer will abide by all overtime requirements below.

**Paragraph 1.** Time and one-half shall be paid for all time worked up to four (4) hours in excess of eight (8) hours in any one regular work day.

**Paragraph 2.** Double time shall be paid for all time worked in excess of twelve (12) hours in any one regular workday.

**Paragraph 3.** Time and one-half shall be paid for all time worked in excess of forty (40) hours in any workweek.

67

**Paragraph 4.** Time and one-half shall be paid for any work done on Saturdays for the first ten (10) hours regardless of the number of hours worked in the regular workweek; and double time shall be paid for all time worked over ten (10) hours.

**Paragraph 5.** Unless the Employer is delinquent in the payment of fringe benefit fund contributions or working dues, has failed to comply with a JGC or arbitration award, or is in violation of JATC rules, in weeks that have designated holidays, but not more often than six (6) times per year, the Employer may schedule four (4) consecutive ten (10) hour work days at straight time. The four (4) ten-hour workdays can be nonconsecutive if the other trades working alongside the Laborers are working the same schedule. In order to use this alternate work schedule, the Union and the Employees must have notice no later than four o'clock pm on the preceding Friday. The notice to the Union shall be through the District Council's web portal.

**Paragraph 6.** An employee required to work through his or her eating period shall nevertheless work for at least 8.5 hours (inclusive of one half hour paid at time and one half).

**HOLIDAYS:**

The following days shall be considered Holidays and shall be paid at double time rates: All Sundays, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Christmas Day. All Sunday and Holiday work shall be cut to a minimum and shall be resorted to only protect life and property. When a Holiday falls on Monday through Friday, make-up day on Saturday shall be paid at time and one-half for the first ten (10) hours and double time thereafter. If a holiday falls on a Sunday, it shall be celebrated on the following Monday. If a holiday falls on a day other than Sunday, it shall be celebrated on that date.

**ELECTION DAYS:**

**Paragraph 1.** On Election Days, the individual employee in this trade shall be allowed not more than two (2) hours' from the job without pay for the purpose of voting.

**Paragraph 2.** The time allowed shall be at the Employer's discretion so as not to interfere with scheduled work, except where such discretion is in conflict with State or Federal laws.

## Article 31
## SHIFT WORK

**Paragraph 1.** No Employee shall work more than one shift of eight (8) hours in twenty-four (24), except as herein provided.

**Paragraph 2.** Eight (8) hours shall constitute a night's work which under normal, usual and ordinary conditions and circumstances shall commence at 4:00 P.M. when two gangs are employed, where three gangs are employed, one shift will follow the other, and in order that work may be continuous, the shifts shall begin at 8:00 A.M.; 4:00 P.M.; and 12:00 o'clock midnight.

**Paragraph 3.** Under other conditions and circumstances, starting time of eight (8) hour shifts shall be optional with the Employer, provided said Employer notifies the Employee of such starting time.

**Paragraph 4.** When three eight (8) hours shifts or two twelve (12) hour shifts are worked, one (1) eating period of one-half hour during each shift shall be allowed without a deduction of pay. Where one or two eight (8) hour shifts are worked, the eating-period pay will not apply. Employees shall receive eight (8) hours pay under this Section even if they are permitted to leave after seven and one-half (7½) hours, and it shall be a violation of this Agreement if an employee does not receive eight (8) hours pay. Employees who work eight (8) hours on a shift without receiving one-half hour eating period shall receive, in addition to the eight (8) hours pay as provided in this

69

Section, one (1) hour's pay at the applicable premium rate.

When it is necessary that the contractor use more than one shift for a period of three (3) or more consecutive days, the Union shall be notified twenty-four (24) hours in advance of the effective date of the starting of such multiple shift operations.

**Paragraph 5.** Where a second 8-hour shift is established, employees working on the second shift shall receive fifty cents ($.50) per hour in addition to their base rate of pay. Where a third shift is established, or where a second 12-hour shift is established, employees working on such shifts shall receive one dollar ($1.00) per hour in addition to their base rate of pay.

### Article 32
### WORK RULES AND CONDITIONS

**Paragraph 1. REPORTING TIME PAY** (a) After a person has been hired and ordered to report for work at the regular starting time and no work is provided for him on the day he has so reported, he shall receive four (4) hours pay at the rate applicable for that day, weather conditions, fire, accident or other unavoidable cause, beyond the Employer's control excepted: however, when an employee is directed to wait before starting work during inclement weather by the Employer, his Superintendent or Foreman, and said employee is not notified within thirty (30) minutes that no work will be done because of such conditions, the employee shall receive two hours pay; further, if Employees perform any work and then are prevented from completing a day's work because of inclement weather, they shall receive a minimum of four (4) hours pay; but if they work over four (4) hours, they shall be paid for eight (8) hours.

b. **WORK DAY** - Once a work day has been established (starting time) it shall not be changed unless agreed upon by the Employer and the Union. (With the exception of emergencies.)

70

c. When notification that work shall not be performed on a particular day, notification of such fact to the Steward shall constitute notice to the men, provided such notification is made during working hours and the Steward is afforded a reasonable opportunity to notify the men.

**Paragraph 2.** When an Employee is discharged or laid off, the Employer shall pay all wages due him on the day of discharge or layoff. Wages due, at the option of the Employer, may be paid in person or placed in the mail that same day.

**Paragraph 3.** An Employee quitting of his own accord shall be paid on the next regular pay day.

Paragraph 4. At the discretion of the Employer or his Foreman, all small tasks customarily performed by Employees covered by this Agreement may be done by others, if:

(a) Such Employees are not on the job;

(b) The tasks to be performed and can be done in not more than one-half hour in any one day.

**Paragraph 5. SAFETY AND SANITATION** Fresh drinking water and suitable shelters for the changing of work clothes shall be provided by the Employer on the job site. In inclement weather, heated shelters shall be provided for such purpose, and all work of the Employee shall be performed under mutually agreed safety and sanitary conditions in conformity with Federal, State and Municipal regulations in effect.

**Paragraph 6. TOOLS AND EQUIPMENT** There shall be no restrictions of the use of any type of machinery, tools or labor-saving devices. Tools, boots, hard hats, rain gear, implements and safety equipment shall be furnished by the Employer and the same shall remain the property of the Employer.

**Paragraph 7. WORKER'S COMPENSATION** The Employer agrees to provide security for the payment of

compensation to Employees injured, in accordance with the provisions of the Illinois Worker's Compensation Act. The Employer shall, upon request of the Union, submit a certificate of compliance evidencing same.

**Paragraph 8. RIGHTS OF PARTIES** Business Representatives of the Union shall be allowed to visit all jobs during working hours to interview the Steward or men working on the job.

In all tunnel work, the Union shall be recognized as the sole Local of the Laborers' International Union of North America to perform the work classified under this Agreement.

**Paragraph 9. PAYMENT DISPUTES** Notwithstanding this Agreement of the parties that, in principle, disputes should never cause work stoppages, the parties consider an Employer's default in payment of wages, and contributions to the Health and Welfare and Pension Funds to be grounds for an exception to this principle, and provisions for enforcement of it hereafter made; and the Union is, therefore, expressly authorized to cause the Employees to stop work immediately on any job on which wages admittedly owed are not paid promptly when due. The authorization to cause immediate work stoppage shall not extend to any case where a dispute in good faith exists between the Employer, Employee or Employees as to the amount due. The Employer agrees that no punitive action shall be taken against their Employees, if said Employees refuse to cross a picket line that may be placed on the job or project of their Employer.

**WORKING CONDITIONS APPLICABLE TO**
**KANE, KENDALL, McHENRY AND BOONE COUNTIES**

The following additional rules and conditions shall apply to work performed in Kane, Kendall, McHenry and Boone Counties, IL.

### Article 33
### WORKING CONDITIONS

**Paragraph 1.** The Employer agrees to a normal workload for the employees. Should a dispute arise over the interpretation of a normal workload, the matter shall be promptly turned over to the grievance and arbitration procedure for settlement.

**Paragraph 2.** If a holiday falls on a Sunday, it shall be celebrated on the following Monday. If a holiday falls on a day other than Sunday, it shall be celebrated on that date.

### Article 34
### WAGES

The following premiums in hourly wages shall be paid for work performed in the below-listed classifications:

**BUILDING**

| | |
|---|---|
| Jackhammer & Air Spade | $ .25 |
| Torch Men (Demolition) | $ .15 |
| Chain Saw Men | $ .25 |
| Power Vibrator | $ .10 |
| Power Tampers | $ .00 |
| Swing Stage & Boatswain | $ .25 |
| Cement Gun Nozzle Men | $ .25 |
| Tile Layer & Bottom Men | $ .35 |
| Hod Carrier & Plasterer Tender | $ .35 |
| Mortar Men | $ .15 |
| Tunnel Men | $ .25 |
| Caisson Laborers | $ .50 |

| | |
|---|---|
| Dynamiters . . . . . . . . . . . . . . . . . . | $ .50 |
| Tree Surgeon-Toppers . . . . . . . . . . | $ .25 |
| Night Watchmen . . . . . . . . . . . . . . | $ .00 |
| Dosimeter Use . . . . . . . . . . . . . . . . | $1.00 |
| Asbestos Laborer. . . . . . . . . . . . . . . | $ .00 |
| Toxic & Hazardous Material Remover . . . . . . . . . . . . . | $1.00 |
| Bobcat. . . . . . . . . . . . . . . . . . . . . . | $ .00 |
| Forklift . . . . . . . . . . . . . . . . . . . . . | $ .00 |

**HEAVY AND HIGHWAY**

| | |
|---|---|
| Asphalt Laborers & Help . . . . . . . . . | $ .00 |
| Asphalt Plant Lab . . . . . . . . . . . . . . | $ .00 |
| Stripping Laborers. . . . . . . . . . . . . . | $ .00 |
| Clipper Type Concrete Saw and Self-Propelled Saws . . . . . . . . . | $ .00 |
| Chain Saw Man (while operating only) . . . . . . . . . . . . . . . | $ .25 |
| Air Tampers and Vibrators . . . . . . . . | $ .05 |
| Mortar and Concrete Mixers . . . . . . | $ .05 |
| Stringline and Form Setters on Concrete Highways, Streets, Alleys, etc . . . . . . . . . . . . . | $ .15 |
| Labor Foreman . . . . . . . . . . . . . . . . | $ .75 |
| General Foreman. . . . . . . . . . . . . . . | $ .75 |
| Superintendent . . . . . . . . . . . . . . . | $ .75 |
| Torch Man (On demolition only) . . . | $ .15 |
| Sheeting and Cribbing Men . . . . . . . | $ .15 |
| Blacktop Rakers and Luteman . . . . . | $ .15 |
| Machine Screwman . . . . . . . . . . . . . | $ .15 |
| Jackhammer Men . . . . . . . . . . . . . . | $ .25 |
| Drillmen, Concrete Breakers and Air Spade . . . . . . . . . . . . . . . . | $ .25 |
| Tunnel Laborers:, Tile Layers and Bottom Men. . . . . . . . . . . . . . | $ .35 |
| Caisson Diggers. . . . . . . . . . . . . . . . | $ .50 |
| Dynamiters . . . . . . . . . . . . . . . . . . | $ .50 |

74

| | |
|---|---|
| Dynamite Handlers (Helpers) . . . . . . | $ .25 |
| Flagman . . . . . . . . . . . . . . . . . . . . . | $ .00 |
| Maintenance Men Work between November 15 and April 1, work done in Shop or Yard Not includ. work performed in construction area . . . . . . . . . . . | $ .00 |
| Day and Night Watchman. . . . . . . . | $ .00 |
| Laser Beam . . . . . . . . . . . . . . . . . . . | $ .00 |
| Bobcat. . . . . . . . . . . . . . . . . . . . . . . | $ .00 |
| Forklift . . . . . . . . . . . . . . . . . . . . . . | $ .00 |
| Asbestos. Laborers . . . . . . . . . . . . . | $ .00 |
| Toxic & Haz.Lab . . . . . . . . . . . . . | $1.00 |
| Dosimeter . . . . . . . . . . . . . . . . . . . | $1.00 |

**Stringline and Pegs on Slip Form Machines:** It shall be the work of the laborers to set all lines, and leveling for slip form machines (such as the Miller Formless, Curb Master of Iowa, Go-Mo-Co., and other similar slip form machines). It also shall be the work of the laborers to set the plastic line for the C.M.I. Auto Grader, asphalt machines, and other similar graders. The cleaning of the Auto Graders and slip form machines will be the work of the laborers. The rate of pay for this classification shall be fifteen cents ($.15) over the common laborer's rate of pay.

**Lutemen and Rakers:** Laborers employed as lutemen and rakers will be paid the specified rate for this classification and will suffer no reduction in pay for the term of their employment.

**Screwman:** The screwman will receive screwman pay only while performing this classification of work, except if starting the day at screwman pay he shall be allowed to complete the day at no reduction in pay.

Where services are performed by Laborers as watchmen, and such Laborers shall not be engaged in the performance of any other branches of work covered by this Agreement, they shall be paid not less than $1.50 below the Building Laborers' rate.

# WORKING CONDITIONS APPLICABLE
## TO WILL AND GRUNDY COUNTIES

The following additional rules and conditions shall apply to work performed in Will and Grundy Counties, IL.

## Article 35
### STEWARDS

The Employer agrees to recognize the right of the Union, in whose jurisdiction a job or a project is located the right to appoint one or more Union employees to act as Stewards on said job or project. Such Stewards shall be subject to the same terms of employment as any other employee, but taking into consideration that the Steward should be present during all working hours and also the last laborer on the job; providing the steward is qualified to perform the work.

The Stewards duties are to hear and attempt to adjust disputes and differences that may arise between members of this Union and the Employer. The Stewards if unable to reconcile a dispute with the Employer shall report same to the office of the Union which will settle or adjust such disputes. The Stewards will also be recognized as the laborers Safety Representative.

In no instance shall the Steward be discriminated against because of his affiliation with the Union or because of his activities on behalf of the Union.

The Union shall have the right to place a steward onto any jobsite of an Employer, in lieu of appointing a steward from among the existing laborers, if the Employer has, during the term of this Agreement, violated the wage or benefit provisions of this Agreement. Violations must be established through the grievance procedure, court order or written settlement agreement.

76

## Article 36
### WAGES

**Paragraph 1.** The following premiums in hourly wages shall be paid for work performed in the below-listed classifications:

a. Tunnel Miners, and all laborers inside tunnel, Air Blow Pipemen, Torchmen (Burners), Mortaring Men on Sewer and drain pipe (the applying of mortar and composition mixes), all bottom men on sewer work all sewer and drain pipe layers Multiple Concrete Duct or any other type of pipe used on Public Utility work 8 feet or more below ground level, and all other sewer and trench laborers 8 feet or more below ground level regardless of excavation area, all labor work inside Cofferdam, the use of a 10 foot or more drill steel for hand held drills, Caisson Laborers ground level down to 15 feet, all air tools 8 feet or more below ground level, all laborers working on swinging suspended or any type or make of scaffolds, 48 feet to 100 feet, all Chimney and Silo Laborers working at a height of 48 feet to 100 feet, all tamping hammers over 150 lbs., all laborers working inside of a sphere or any type of make or tank at a height of 48 feet to 100 feet, all Hydraulic, electric and air tools or any other type 8 feet or more below ground level, Vibrators any type 8 feet or more below ground level: $.25

b. Chimney and Silo Laborers for every additional 50 feet or any part thereof above 100 feet high shall be paid an additional $1.00 per hour above the wage rate beginning at scale plus $.25

c. All Laborers working inside of a sphere or any type of tank for every additional 50 feet or part thereof above 100 feet in height shall be paid an additional $.50 per hour above the wage rate beginning at scale plus $.25

d. Asphalt Rakers, Hod Carriers, Plaster Laborers, Gunnite Laborers, Slab for setters on Roads, Highways, Streets, Airport Runways, and Radii (any type of form) stringline men for all aforementioned work, Wagon &

77

Tower drillers on land and floating plant used on dredging, Asphalt Gunners and Plug Men (Undercoating on road work), Mortar Pump Laborers and Plaster Pump Laborers: $.20

e. Outside Tunnel Miner Helpers, Sewer and drain pipe layers and Multiple Concrete Duct or any other type of pipe used on Public Utility Work, ground level down to 8 feet, Pumpcrete Pipe Handlers, Blasting Men Helpers: $.10

f. Gunnite Nozzle Men, Caisson Laborers and all tamping Hammers from 150 lbs. and over, from 15 feet below ground level down to 50 feet: $.50

g. All Underground Cavern Laborers, Caisson Laborers 50 feet or more below ground level, Laborers working under radioactive conditions (suiting up), Blasting Men (Powdermen): $.85

h. Working Foreman issuing orders to Laborers under section 1 A, B, C, D, E, F, & G shall receive an increase of fifty cents (50¢) per hour above the wages set forth therein. Minimum wage: $.50

i. Non Working Foreman issuing orders to Laborers under section 1 A, B, C, D, E, F, & G shall receive one dollar ($1.00) per hour above the wages set forth therein.

j. General Labor Foreman shall receive two dollars ($2.00) per hour above the wages set forth therein.

A Union Member issuing orders to one or more General Foremen: $2.60

k. Mortar Mixers, handling asphalt shingles, patented scaffolds, sewer and trench ground level down to 8 feet, Catch Basin and Manhole Diggers, mesh handling on road work, Cement and Mineral Filler Handler, Concrete Puddlers, Batch Dumpers, (cement & asphalt), Vibrator Operators, Sand and Stone Wheelers, to Mixer, (Handlers), Concrete Wheelers, Air tamping Hammermen, Concrete and Paving Breakers, Rock Drillers, jackhammermen, Chipping Hammermen, 1 Bag Mixer, Asphalt Laborers, chain and power saws, Pit Men, all

78

fence Laborers, Mason Tenders, (Mortar & Brick Wheeler), Wagon & Tower drill helpers, Kettlemen and Tarmen, Tank Cleaners, Scaffold & Staging Laborers, Pot Firemen, (Tarmen), Heater Tender for any purpose, water pumps, (Portable Water Pumps shall be tended by Laborers if the Employer determines tending is required), rip rap, Electrician, Plumber and Finisher Helpers (minimum), handling of slab steel road forms in any manner, except road form setting, setting center strips, contraction and expansion joints (road work), unloading and handling thereof of the following: Lumber, brick, transite materials, cast iron water pipe, reinforced concrete rods, sewer and drain tile, railroad ties and all other creosoted materials, paving blocks and concrete forms, handling of insulation of any type, all work involving the unloading of materials, fixtures, or furnishings whether crated or uncrated, all mortar and composition mixers of sewer work, track Laborers, Chimney and Silo Laborers working at a height of 1 to 48 feet, all Laborers working on swinging, suspended, or any type or make of scaffolding 1 foot to 48 feet, all Laborers working inside a sphere or any type of make of tank minimum rate, all Laborers working inside a sphere or any type or make of tank from bottom to a height of 48 feet minimum rate, form strippers (any type) Mechanical or motorized buggies, for concrete or masons Employers, the use of skid steer loads and forklifts or any other machinery which replaces the wheelbarrow or buggy, handling multiple concrete duct or any other type of pipe used in Public Utility work unless otherwise specified herein, snapping of Wall ties and removal of rods, drilling of Anchor Bolt Holes, concrete or asphalt clipper type saws and self propelled saws, Shoulder and Grade Laborers, all hydraulic electric and air or any other type of tools, grouting and caulking, carpenter helpers, cleaning lumber, nail pulling, deck hand, dredgehand, shore Laborers, Bankmen on Floating Plant, Tool and Material Checkers, (on a job site requiring a Tool Shanty, said Tool Shanty shall be tended by a Laborer if the Employer determines tending is required), Signalmen and Flagmen on all construction work defined

79

herein, cleaning of debris, removal of trees, concrete curing, temporary concrete protection, regardless of manner or materials used, tuck helpers, Laborers on Apsco, Janitorial Service, Wrecking and Demolition Laborers, all landscaping, laying of sod, planting of trees: $.00

**Paragraph 2. Asbestos Use.** A premium of $1.00 per hour shall be paid to any Laborer required to work with asbestos, who is a certified asbestos Laborer who is licensed by the State of Illinois as an Asbestos Abatement worker. Any equipment necessary to perform work or physical examination required by the Employer will be paid for by the Employer.

### Article 37
### FOREMAN AND GENERAL FOREMAN

Where there are three (3) to six (6) Laborers employed on a job, one Laborer shall be a working Foreman; where there are seven (7) or more Laborers employed on a job, one (1) Laborer shall be a non-working Foreman. The Employer may select a working or a non-working Foreman from the group of Laborers to supervise in the above mentioned. The Employer may advance the working Foreman to a non-working Foreman if he so desires.

This Agreement shall not include the supervisory forces classed as clerical employees; timekeepers, superintendents, master mechanics or general labor foreman. In the event that the Employer desires to employ a General Labor Foreman who is a member of the Union his wages shall not be less than stipulated herein.

A General Labor Foreman is considered as such when he issues orders to one or more Labor Foreman. In the event that the Employer desires to employ a Union Member who issues orders to one or more General Labor Foremen his wages shall not be less than as stipulated herein.

80

## Article 38
### SHIFT WORK

Paragraph 1. All employees working the 4:00 P.M. to 12:00 Midnight shift and the 12:00 Midnight to 8:00 A.M. shift where shift work is involved shall receive an additional fifty (50¢) cents per hour above their regular wage rate.

Paragraph 2. No shift work will be allowed for periods of less than 5 days unless it is imperative; in that event, all work done before and after regular working hours (8:00 A.M. to 4:30 P.M.) shall be paid as overtime.

Paragraph 3. Where two twelve (12) hour shifts are used, an eating period of one-half hour shall be allowed each shift without loss of pay. Time and one-half (1.5) the regular hourly wage shall be paid for the first two and one half (2.5) hours after the eighth hour, and double time shall be paid for all hours worked thereafter. A paid twenty (20) minute break shall be provided during the four (4) hour overtime.

## Article 39
### OTHER PAY RATES
### BUILDING CONSTRUCTION AND
### HEAVY AND HIGHWAY

Paragraph 1. Reporting Time. It is agreed that when a Laborer is called by the Employer Monday through Friday or an employee already employed, reports for work on a job site or place designated by the Employer, and is not put to work at his regular starting time (8:00 A.M.) due to any reason except inclement weather, i.e., Acts of God, lightning, tornadoes, fire, etc., or for any other reason and is sent home, he shall receive not less than four (4) hours pay, unless such Employee is notified two (2) hours before starting time that no work is available for him. If the Laborers are sent home, that day from job site, the Employer must notify all members or the Steward of said action.

**Paragraph 2. Waiting Time.** It is agreed that when a Laborer is called or a regular employee reports for work at his regular starting time (8:00 A.M.) and the Employer is unable to put him to work due to any reason except inclement weather, i.e., Acts of God, lightning, tornadoes, fire, etc., or for any other reason, and the Employer desires that the Employee wait on the site of the project to be available, his waiting time shall not be less than four (4) hours and he shall be paid at his regular rate of pay. In the event that the Employee waits more than four (4) hours, all additional time shall be paid on multiples of one (1) hour. Employees must remain on job site to receive this pay and be available for work.

**Paragraph 3. Pay at Highest Rate Classification.** Due to various wage classifications as set forth herein, it is agreed that when an employee is required to work at more than one (1) classification in any one day, his wage rate shall be paid at the highest rate classification for that day.

**Paragraph 4. Call-In Pay.** It is agreed when a new employee is called or an employee already employed covered by this Agreement reports for work and for whom any work is provided, regardless of the time he works, shall receive the equivalent of not less than four (4) hours pay at his regular rate of pay for that day. Further, an employee who works more than four (4) hours in any day shall receive the equivalent of not less than eight (8) hours pay.

Employees who perform any work and then are prevented from completing a day's work, due to inclement weather only they shall receive a minimum of four (4) hours pay an employee who works more than four (4) hours and less than six (6) hours shall receive not less than six (6) hours pay an employee who works more than six (6) hours and less than eight (8) hours shall receive not less than eight (8) hours pay.

**Paragraph 5. Call Off.** The Employer will be excused from paying show-up time because of weather,

82

provided that he has notified the Employee by telephone or has required, in writing, that the Employee call before he departs from home. The Employer must provide a definite and available phone number and must post this provision on each job site.

If the above provisions are not complied with, the Employer will be required to pay two (2) hours show-up time to any Employee who appears on the job and cannot work because of the weather. This provision applies to the Contract in total.

**WORKING CONDITIONS APPLICABLE
TO LAKE COUNTY**

The following additional rules and conditions shall apply to building/mason and road/sewer work performed in Lake County, IL.

### Article 40
### SHIFT WORK

**Section A.** When it is necessary that the Employer use more than one shift for a period of three (3) or more consecutive days, the Local Union's Business Manager shall be notified twenty-four (24) hours in advance of the effective date of the starting of such multiple shift operations. In cases where the multiple shift operations are to run greater than five (5) consecutive days, a pre-job conference shall take place between the Business Manager of Local 152 or his representative and the Employer before such shift work will be allowed. In the event permissible shift work does not fulfill the requirements as stated above, except for conditions beyond the Employers control, time worked will revert to premium wages for the second and third shift.

**Section B.** On Multiple shift arrangements, the work week shall start at 8:00 a.m. Monday, and continue until 7:59 a.m. Saturday. In no event shall regular working hours of different shifts overlap.

**Section C.** When three (3) eight (8) hour shifts are used, the Employees on the first shift shall receive eight (8) hours' pay for eight (8) hours worked. Employees on the second shift shall receive eight (8) hours' pay for seven and one-half (7½) hours worked. Employees on the third shift shall receive eight (8) hours' pay for seven (7) hours worked. On all three shifts one-half hour shall be allowed for eating period. Employees on the second shift shall receive eight (8) hours pay under this section even if they are permitted to leave after seven and one-half (7½) hours and Employees on the third shift shall receive eight (8) hours pay under this section even if they are permitted to

84

leave after seven (7) hours, it shall be a violation of this agreement if an employee does not receive eight (8) hours pay. Employees who work eight (8) hours on a shift without receiving a one-half hour eating period shall receive, in addition to the eight (8) hours pay as provided in this Section, one (1) hour's pay at the applicable premium rate. Any work done in excess of eight (8) hours on the first shift, and in excess of seven and one-half (7½) hours on the second and seven (7) hours on the third shifts shall be paid wages at the rate of double time.

**Section D.** When two twelve (12) hour shifts are used, an eating period of one-half hour shall be allowed each shift without deductions in pay and all time in excess of eight (8) hours shall be paid at the regular overtime rates, that is to say, and two and one-half (2½) hours immediately following the first eight (8) hours shall be paid for at the rate of time and one-half, and double time thereafter. Employees who work one of two twelve (12) hours shift without receiving a one-half hour eating period shall receive, in addition to the twelve (12) hours pay as provided in this Section, one-half hour's pay at the applicable premium rate.

**Section E.** When two eight (8) hour or two ten (10) hour shifts are used, an eating period of one-half (½) hour shall be allowed, but not paid for.

**Section F.** On Saturday, other than single time shift, shift work shall start at 8:00 a.m. and the first ten (10) hours of each shift shall be paid for at the rate of time and one-half, and thereafter double time shall be paid; however, under no conditions shall more than ten (10) hours be worked at the rate of time and one-half on any one shift.

The parties hereby agree to the terms of this Agreement by their execution hereof.


**CHICAGO AREA INDEPENDENT
CONSTRUCTION ASSOCIATION**

By: _____

By: _____


**CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY**

By: _____

By: _Joseph V Healy_____

86

## SIDE LETTER AGREEMENTS

**Side Letter #1**

The Construction and General Laborers' District Council of Chicago and Vicinity and its affiliated locals ("Union") and the Chicago Area Independent Construction Association ("CAICA") determined that it is necessary to expand the branches of work covered by this Agreement in Articles addressing the laborers' scope of work to cover work in the renewable energy sector, including but not limited to work performed in the solar industry, wind industry, hydrogen industry, and geothermal power plants, and in electric vehicle charging stations.

The parties agree that the scope of work covered by this Agreement shall also include but not be limited to construction, site surveying, the installation of solar panel foundations and posts, installation of solar panel racking system, forming, stripping of forms, backfilling and compaction of subsoil and/or topsoil at completed solar panel foundations, installation of filter cloth for access road construction, vegetation management and weed control, dust control, installation and maintenance, offloading of solar panel modules in yard, offloading, distribution and unwrapping of solar panel modules in field, removal of packing material, wrapping and debris, placing solar panel modules on racking system, trench excavation and backfill for D.C cables to Inverter, trench excavation and backfill for A.C cables to Transformer, installation of inverter foundations, and the unloading, stockpiling, handling, distribution, and placing of batteries in battery storage facilities to point of installation.

The parties further agree to seek recognition of such work and its rates of pay under the Davis-Bacon and Related Acts, as amended, and the Illinois Prevailing Wage Act.

**CHICAGO AREA INDEPENDENT
CONSTRUCTION ASSOCIATION**

By: _____

By: _____

**CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY**

By: _____

By: _____

**Side Letter #2**

Grievances alleging a violation of Article 1 of this Agreement shall be initiated with the designated company official and may be processed under the grievance procedure contained herein or advanced directly to arbitration at the discretion of the Union. Such grievances shall be subject to the same forty-five (45) day time limitation as provided under Article 11. In the event the Union elects to proceed directly to arbitration over a grievance concerning a violation of Article 1 of this Agreement, said grievance must be referred to an arbitrator within thirty (30) days from the date of filing. The parties to the grievance may agree to extend the time in which the grievance is to be referred to an arbitrator by written mutual agreement. If the Union does not timely elect to proceed directly to arbitration of the grievance, the grievance shall be heard by the Joint Grievance Committee and the process set forth in paragraphs 2 and 3 of Article 11 shall apply.

**CHICAGO AREA INDEPENDENT CONSTRUCTION ASSOCIATION**

By: _____

By: _____

**CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY**

By: _____

By: _____

89

**ADDENDUM**

**CONSTRUCTION INDUSTRY SERVICE
CORPORATION JOINT LABOR-MANAGEMENT
UNIFORM DRUG/ALCOHOL ABUSE PROGRAM**

**I. Policy Statement**

The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. (Company Name), and the signatory unions seek to protect people and property, and to provide a safe working environment. The purpose of the following program is to establish and maintain a drug free, alcohol free, safe, health work environment for all of its employees.

**II. Definitions**

a. **Company Premises** - The term "Company Premises" as used in this policy includes all property, facilities, land, buildings, structures, automobiles, trucks and other vehicles owned, leased or used by the company. Construction job sites for which the company has responsibility are included.

b. **Prohibited Items & Substances** - Prohibited substances include illegal drugs (including controlled substances, look alike drugs and designer drugs), alcohol beverages, and drug paraphernalia in the possession of or being used by an employee on the job.

c. **Employee** - Individuals, who perform work for (Company Name), including, but not limited to, management, supervision, engineering, craft workers and clerical personnel.

d. **Accident** - Any event resulting in injury to a person or property to which an employee, or contractor/contractor's employee, contributed as a direct or indirect cause.

e. **Incident** - An event which has all the attributes of an accident, except that no harm was caused to person or property.

f. **Reasonable Cause** - Reasonable cause shall be defined as excessive tardiness, excessive absenteeism, and erratic behavior such as noticeable imbalance, incoherence, and disorientation.

**III. Confidentiality**

a. All parties to this policy and program have only the interest of employees in mind, therefore, encourage any employee with a substance abuse problem to come forward and voluntarily accept our assistance in dealing with the illness. An employee assistance program will provide guidance and direction for you during your recovery period. If you volunteer for help, the company will make every reasonable effort to return you to work upon your recovery. The company will also take action to assure that your illness is handled in a confidential manner.

b. All actions taken under this policy and program will be confidential and disclosed only to those with a "need to know".

c. When a test is required, the specimen will be identified by a code number, not by name, to insure confidentiality of the donor. Each specimen container will be properly labeled and made tamper proof. The donor must witness this procedure.

d. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

e. The handling and transportation of such specimen will be properly documented through the strict chain of custody procedures.

**IV. Rules - Disciplinary Actions - Grievance Procedures**

1. *Rules* - All employees must report to work in a physical condition that will enable them to perform their jobs in a safe and efficient manner. Employees shall not:

a. Use, possess, dispense or receive prohibited substances on or at the job site; or

91

b. report to work with any measurable amount of prohibited substances in their systems.

2. *Discipline* - When the company has reasonable cause to believe an employee is under the influence of a prohibited substance, for reasons of safety, the employee may be suspended until test results are available. If no test results are received after three (3) working days, the employee, if available, shall be returned to work with back pay. If the test results prove negative, the employee shall be reinstated with back pay. In all other cases:

a. Applicants testing positive for drug use will not be hired.

b. Employees who have not voluntarily come forward, and who test positive for drug use, will be terminated.

c. Employees who refuse to cooperate with testing procedures will be terminated.

d. Employees found in possession of drugs or drug paraphernalia will be terminated.

e. Employees found selling or distributing drugs will be terminated.

f. Employees found under the influence of alcohol while on duty, or while operating a company vehicle, will be subject to termination.

3. *Prescription Drugs* - Employees using prescription medication which may impair the performance of job duties, either mental or motor functions, must immediately inform their supervisors of such prescription drug use. For the safety of all employees, the company will consult with you and your physician to determine if a re-assignment of duties is necessary. The company will attempt to accommodate your needs by making any appropriate re-assignment. However, if a re-assignment is not possible, you will be placed on temporary medical leave until released as fit for duty by a prescribed physician.

92

4. *Grievance* - All aspects of this policy and program shall be subject to the grievance procedure contained in the applicable collective bargaining agreement.

**V. Drug/Alcohol Testing**

The parties to this policy and program agree that under certain circumstances, the company will find it necessary to conduct drug and alcohol testing. While "random" testing is not necessary for the proper operations of this policy and program, it may be necessary to require testing under the following conditions:

a. A pre-employment drug and alcohol test may be administered to all applicants for employment. Employees recalled to work by an Employer, and employees referred to an Employer by the Union who are requested to be tested, shall be compensated at their regular hourly rate of pay for the time required in such testing;

b. A test may be administered in the event a supervisor has a reasonable cause to believe that the employee has reported to work under the influence, or is or has been under the influence while on the job; or has violated this drug policy. During the process of establishing reasonable cause for testing, the employee has the right to request his on-site representative to be present;

c. Testing may be required if an employee is involved in a workplace accident/incident or if there is a workplace injury;

d. Testing may be required as part of a follow-up to counseling or rehabilitation for substance abuse, for up to a one (1) year period.

Each employee will be required to sign a consent and chain of custody form, assuring proper documentation and accuracy. If an employee refuses to sign a consent form authorizing the test, ongoing employment by the company will be terminated.

Drug testing will be conducted by an independent accredited laboratory (National Institute on Drug Abuse

93

and/or College of American Pathology), and may consist of either blood or urine tests, or both as required. Blood tests will be utilized for post accident investigation only.

The company will bear the costs of all testing procedures.

### VI. Rehabilitation and Employee Assistance Program

Employees are encouraged to seek help for a drug or alcohol problem before it deteriorates into a disciplinary matter. If an employee voluntarily notifies supervision that he or she may have a substance abuse problem, the company will assist in locating a suitable employee assistance program for treatment, and will counsel the employee regarding medical benefits available under the company or union health and welfare/insurance program.

If treatment necessitates time away from work, the company shall provide for the employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An employee who successfully completes a rehabilitation program shall be reinstated to his/her former employment status, if work for which he/she is qualified exists.

Employees returning to work after successfully completing the rehabilitation program will be subject to drug tests without prior notice for a period of one year. A positive test will then result in disciplinary action as previously outlined in this policy and program.

94

# RESTATED AGREEMENT

### AND

# DECLARATION OF TRUST

#### CREATING

# LABORERS' PENSION FUND

With Amendments Through
May 31, 2002

**EXHIBIT A-3**

# TABLE OF CONTENTS

ARTICLE                                                                       PAGE

**I**     **CERTAIN DEFINITIONS** ................................. 2
- Pension Fund ........................................ 2
- Employer ........................................... 2
- Employee .......................................... 5
- Trustees ........................................... 7
- Pension Plan ....................................... 7
- Contributions ...................................... 7
- Benefits ........................................... 7
- Written Agreement .................................. 7
- ERISA ............................................. 8
- Collective Bargaining Agreement or Participation Agreement .......... 8
- Covered Employment ................................ 8
- Participant ......................................... 8
- Pensioner .......................................... 9
- Trust Agreement .................................... 9
- Trustees ........................................... 9
- Union ............................................. 9

**II**    **GENERAL PURPOSES OF PENSION FUND** ................. 9

**III**   **OPERATION AND ADMINISTRATION OF PENSION FUND** .... 10
- The Board of Trustees ............................... 10
- Employer Trustees .................................. 10
- Union Trustees ..................................... 11
- Acceptance of Trusteeship ........................... 12
- Jointly Appointed Arbitrator ......................... 12
- Term of Trustees ................................... 13

**IV**   **RELATING TO THE TRUSTEES** ........................ 13
- General Powers ..................................... 13
- Appointment of Investment Managers .................. 18
- Duty of Trustee Re: Assets Managed by Investment Manager ........ 18
- Allocation of Trustee Responsibilities. ................. 19
- Insurance .......................................... 19
- Compensation and Expenses .......................... 19

V    MANNER OF ACTING BY TRUSTEES . . . . . . . . . . . . . . . . . . . . . . 20
     In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     Record of Trustees' Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
     Disbursement of Trust Funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
     Execution of Notices and Documents . . . . . . . . . . . . . . . . . . . . . . 22

VI    RELATING TO THE PENSION PLAN . . . . . . . . . . . . . . . . . . . . . . 22
     In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
     Provisions of Pension Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
     Operation of Pension Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VII   FUNDING PENSION PLAN BENEFITS . . . . . . . . . . . . . . . . . . . 24
     In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
     Default in Payment of Contributions . . . . . . . . . . . . . . . . . . . . . . 25
     Report on Contributions and Production of Records . . . . . . . . . . . 27

VIII   FILING CLAIMS AND REVIEW OF DENIAL OF CLAIMS . . . . . . 28
     Filing of Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
     Adjudication of Claims and Appeals . . . . . . . . . . . . . . . . . . . . . . 29

IX    DUTY TO COOPERATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

X     MISCELLANEOUS PROVISION . . . . . . . . . . . . . . . . . . . . . . . . 30
     Vested Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
     Encumbrance of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
     Payments to Persons Under Disability . . . . . . . . . . . . . . . . . . . . . 31
     Situs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     Construction of Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     Notification of Trustees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
     Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

XI    CHANGE OF TRUSTEE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
     Resignation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
     Removal of Trustee and Appointment of Successor Trustee . . . . . . 33
     Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

XII   AMENDMENT AND TERMINATION . . . . . . . . . . . . . . . . . . . . 35
     Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
     Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
     Notification of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# RESTATED AGREEMENT AND DECLARATION OF TRUST
## LABORER'S PENSION FUND

THE AGREEMENT AND DECLARATION OF TRUST creating the LABORERS' PENSION FUND, originally made and entered into the 1st day of June, 1963, was amended from time to time thereafter and was amended and restated as of January 1, 1976, and amended by substituting for it this Agreement by and between the CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, A.F.L.-C.I.O., representing its affiliated Local Unions and the members thereof (the "Union") and the BUILDERS' ASSOCIATION OF CHICAGO, UNDERGROUND CONTRACTORS ASSOCIATION, MASON CONTRACTORS' ASSOCIATION OF COOK COUNTY, ILLINOIS ROAD BUILDERS' ASSOCIATION, CONCRETE CONTRACTORS' ASSOCIATION OF GREATER CHICAGO, EMPLOYING PLASTERERS' ASSOCIATION OF GREATER CHICAGO, and LAKE COUNTY CONTRACTORS ASSOCIATION and all other employer associations (the "Associations") who were parties to collective bargaining agreements with the Union or, its local affiliates, and with representatives of this Trust, for and on behalf of themselves and their respective members and other employers in the building and construction trades and related industries who are included in the term "Employers" (as defined in Section 2 of ARTICLE I) and agreed to be bound by this Agreement or who are otherwise so bound as provided as set forth in Section 2 of ARTICLE I;

Whereas, the Trust Agreement has been amended from time to time since 1976 and the Board of Trustees has agreed to restate the Trust Agreement with amendments adopted through May 31, 2002;

Now therefore, pursuant to their authority under Article XII, the Board of Trustees hereby amends and restates the Trust Agreement to read as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

Unless the context or subject matter otherwise requires, the following definitions shall govern in this Agreement.

Section 1. PENSION FUND. The term "Pension Fund" means the Laborers' Pension Fund, a trust fund previously established and administered under the terms of this Agreement and includes all property of every kind held by the Trustees hereunder. The assets of the Pension Fund are to be used for the purposes generally described in Section 302 (c) of the Labor Management Relations Act of 1947, as amended by the applicable provisions of ERISA (as defined in Section 9 next below).

Section 2 EMPLOYER The term "Employer" as used herein shall mean any Employer who:

(a) Now or hereafter is a party to a Collective Bargaining Agreement with the Union, or any of its local affiliates, requiring periodic contributions to the

-2-

Pension Fund or who in the past has been a party to such a Collective Bargaining Agreement, if such agreement has not been terminated by its terms or by operation of law;

(b) Is a party to any memorandum of understanding or memorandum of agreement or similar instrument with the Union, or any of its local affiliates, which by its terms incorporates by reference a complete Collective Bargaining Agreement which requires the parties thereto to make contributions to the Pension Fund;

(c) In writing adopts and agrees to be bound by the terms and provisions of this Agreement as the same may be amended or modified from time to time, or

(d) Is a party to any written instrument which evidences an agreement to be bound by the provisions of this Agreement, including but not limited to, a contribution report form listing the employees on whose behalf contributions are remitted and provisions expressly binding such Employer to the Agreement or otherwise evidencing such Employer's intention to be so bound by the making of such contributions;

(e) By any course of conduct, including but not limited to, oral representations to Employees, representatives of the Union, Trustees, attorneys or other persons, ratifies or accepts the provisions of any Collective Bargaining Agreement which requires contributions to the Pension Fund or accepts any other

written instrument which binds such Employer to make contributions to the Pension Fund, and by which the Employer is estopped to deny such obligation;

(f) Is a member of any of the associations named in Article III ("Associations"), or hereafter becomes a member of any of the Associations, named herein or who was a member at any time when representatives of said Associations commenced negotiations of a Collective Bargaining Agreement on behalf of its members whether or not said membership is held current at all times; or

(g) Is a member of any other multi-employer bargaining unit, or hereafter becomes a member of any of said multi-employer bargaining unit, which has a Collective Bargaining Agreement with the Union.

The term "Employer" shall also mean the Union, for the purpose of providing benefits hereunder for the eligible Employees of the Union for whom the Union contributes to the Pension Fund.

The term "Employer" shall also mean the Board of Trustees and the boards of trustees of any funds sponsored by the Union that contribute to the Pension Fund for the purpose of providing benefits hereunder for eligible Employees of the Trust or fund.

A person or entity that has become an Employer under this Agreement pursuant to a Collective Bargaining Agreement or other written agreement with the Union shall continue

as such until it is no longer obligated pursuant to such a Written Agreement (as defined in Section 8 next below) or by the National Labor Relations Act or other legally enforceable obligation to make contributions to the Pension Fund.

Section 3.    EMPLOYEE.  The term "Employee" as used herein shall mean any of the following persons without regard to race, color, creed, national origin, religion or union membership.

(a)    Any person covered by a Collective Bargaining Agreement between an Employer and the Union or any of its local affiliates who is engaged in employment with respect to which the Employer is obligated by the Collective Bargaining Agreement to make contributions to the Pension Fund;

(b)    Any person employed by an Employer who performs work within the jurisdiction of the Union as said jurisdiction is set forth in any applicable Collective Bargaining Agreement or by any custom or practice in the geographic area within which the Employer operates and his Employees perform work;

(c)    Any person on whose behalf an Employer has made contributions to the Pension Fund and has reported same on a standard report form which contains a provision binding said Employer to the provisions of this Agreement or otherwise evidencing said Employer's intent to be so bound.

(d)     Any person employed by an Employer who has signed any memorandum of understanding incorporating by reference the provisions of any applicable Collective Bargaining Agreement or the provisions of this Agreement where such person is covered by such an agreement which incorporates this agreement by reference or both;

(e)     Any person who is not covered by a Collective Bargaining Agreement but on whose behalf his Employer is otherwise obligated to make contributions to the Pension Fund in accordance with the provisions of this Agreement who performs work which would be work performed by members of a bargaining unit recognized by the Employer or certified by the National Labor Relations Board if said person's Employer were a party to any of the standard collective bargaining agreements by and between the Union and any of the aforementioned Associations; or

(f)     Any Employee in a certified or recognized collective bargaining unit represented by the Union.

The term "Employee" shall also mean all eligible persons employed by the Union, on whose behalf the Union shall make payments to the Pension Fund at the times and at the rate of payment equal to that made by any other Employer who is a party to this Agreement.

The term "Employee" shall also mean all eligible persons employed by the Trust or a fund sponsored by the Union on whose behalf the Board of Trustees or trustees of said

-6-

fund shall make payments to the Pension Fund, at the times and at the rate of payment equal to that made by any other Employer who is a party to this Agreement.

Section 4.    TRUSTEES.    Subject to the provisions of this Agreement, the term "Trustees" shall include the Union  Trustees, the Employer  Trustees (all as described in ARTICLE III) and their successors designated and appointed in accordance with the terms of this Agreement who shall, collectively, serve as the members of the "Board of Trustees" (as described in ARTICLE III) hereunder.

Section 5.    PENSION PLAN.    The term "Pension Plan" shall mean the program of pension benefits (as described in ARTICLE VI) established by the Trustees.

Section 6.    CONTRIBUTIONS.    The term "Contributions" shall mean the monies paid to the Pension Fund by Employers on behalf of Employees pursuant to applicable Written Agreements (as defined in Section 8 next below) or as otherwise required hereby, which shall be held by the Trustees for the purposes set forth herein.

Section 7.    BENEFITS.    The term "Benefits" shall mean payments, whether from the principal or income, or both, of the Pension Fund for the benefit of Employees, their families and dependants, for pensions on retirement, disability or death of Employees.

Section 8.    WRITTEN AGREEMENT.    The term "Written Agreement" shall mean any agreement in writing which specifies the detailed basis on which contributions shall be made to the Fund together with any modification, amendment or renewals thereof, including but not limited to Collective Bargaining Agreements, Participation Agreements, memoranda

-7-

of understanding which incorporate by reference Collective Bargaining Agreements or this Agreement, report forms in accordance with which contributions are made and which obligate the Employer to the provisions of this Agreement, or any other agreement obligating the Employer signatory thereto to participate in or be bound by this Agreement and/or the Pension Plan established pursuant hereto.

Section 9. ERISA. The term "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

Section 10. COLLECTIVE BARGAINING AGREEMENT OR PARTICIPATION AGREEMENT. "Collective Bargaining Agreement" or "Participation Agreement" means a written agreement between the Union and an Employer or an association of Employers or a Participation Agreement between the Board of Trustees and an Employer which requires contributions to the Fund.

Section 11. COVERED EMPLOYMENT. "Covered Employment" means employment for which an Employer is obligated to contribute to the Pension Plan or employment with Employers prior to the establishment of the Pension Plan which, in the reasonable judgment of the Trustees, would have required contributions to the Pension Plan had the Pension Plan been in existence at the time of such employment.

Section 12. PARTICIPANT. "Participant" means a Pensioner or an Employee who meets the requirements for participation in the Plan or a former Employee who has acquired a right to a pension under the Pension Plan.

-8-

Section 13.  PENSIONER.  "Pensioner" means an Employee awarded a pension in accordance with the terms of the Pension Plan.

Section 14.  TRUST AGREEMENT.  "Trust Agreement" means this Restated Agreement and Declaration of Trust establishing the Laborers' Pension Fund, dated originally as of June 1, 1963, restated as of January 1, 1976, as amended and as restated herein.

Section 15.  TRUSTEES.  "Trustees" means the Board of Trustees as established and constituted in accordance with this Trust Agreement.

Section 16.  UNION.  "Union" means the Construction and General Laborers' District Council of Chicago and Vicinity and all the local unions now or hereafter affiliated therewith.

## ARTICLE II

## GENERAL PURPOSES OF PENSION FUND

The Pension Fund shall be used for the exclusive purpose of: (a) providing retirement income to Employees and/or income benefits to the beneficiaries or families of Employees in the event of death or disability of Employees as decided by the Trustees; and (b) for defraying reasonable expenses of administering and operating the Pension Plan in accordance with this Agreement.  Under no circumstances may the assets of the Pension Fund revert to any Employer or the Union, provided, however, that nothing in this

Agreement shall prevent the Trustees from returning to an Employer a contribution which is made by a mistake of fact provided such amount is returned by the Trustees to such Employer within one (1) year after payment of the contribution.

ARTICLE III

OPERATION AND ADMINISTRATION OF PENSION FUND

Section 1. THE BOARD OF TRUSTEES. Except as otherwise specifically provided, the Pension Fund shall be operated and administered by a Board of Trustees whose membership shall consist of six persons appointed as Trustees by the Associations (known as the "Employer Trustees") as provided in Section 2 next below and six persons appointed as Trustees by the Union (known as the "Union Trustees") as provided in Section 3 next below. The Association-appointed Trustees and the Union-appointed Trustees, may jointly appoint a person to act as a "Jointly Appointed Arbitrator ," as provided in Section 5 next below.

Section 2. EMPLOYER TRUSTEES. The current Employer Trustees are the following persons appointed by the Associations of Employers indicated:

(a) CHARLES COHEN, appointed by The Underground Contractors' Association;

(a) SAM VINCI, appointed by the Mason Contractors' Association of Greater Chicago;

-10-

(b)    ROBERT J. MADDEN and WAYNE E. HEALY, appointed by the Illinois Road Builders' Association; and

(c)    GARY LUNDSBERG, appointed by The Concrete Contractors Association of Greater Chicago.

(d)    ROGER T. VIGNOCCHI, appointed by the Lake County Contractors' Association.

Association-appointed Trustees must be appointed from the ranks of contributing Employers within the Associations' membership. A contributing Employer shall be defined as an Employer who is actively engaged in commerce and employs a minimum of two (2) laborers performing bargaining unit work for whom contributions are made, six months of every calendar year.

Failure of any Association to appoint a Trustee(s) within ninety (90) days of the occurrence of a vacancy shall allow the remaining Employer Associations to increase the number of their appointments, to be agreed upon by the remaining Associations within their own ranks or to invite a non-participating Employer Association to make appointment.

In the case of a non-participating Association, a majority of the sitting Trustees, both Employer and Union Trustees, will be required to enable the invitation of a new Association.

Section 3.    UNION TRUSTEES.    The current Union-appointed Trustees are JOSEPH COCONATO, JAMES P. CONNOLLY, J. MICHAEL LAZZARETTO, TOD MASTERS, FRANK RILEY and JEFF ZIEMANN.

-11-

Section 4.    ACCEPTANCE OF TRUSTEESHIP.    The Employer Trustees and, the Union Trustees have accepted their trusteeship hereunder.

Section 5.    JOINTLY APPOINTED ARBITRATOR.    Pursuant to applicable statutes and pursuant to the terms of this Agreement, a deadlock on a motion may arise. In such event, the Motion may be withdrawn and no further action need be required to be taken. If said Motion is not withdrawn, and the deadlock remains, then in the case of a deadlock, the Trustees shall meet for the purpose of agreeing upon a Jointly Appointed Arbitrator to break such deadlock by deciding the dispute in question. In the event of the inability of the Trustees to agree upon the selection of such Jointly Appointed Arbitrator within a reasonable time, then, on the petition of either group of Trustees, the District Court of the United States where the Fund maintains its principal office shall appoint an impartial Arbitrator . Such impartial Arbitrator shall immediately proceed to hear the dispute between the Trustees and decide such dispute, and the decision and award of such Arbitrator shall be final and binding upon the parties. The reasonable compensation of such Arbitrator and the costs and expenses (including, without limitation, attorneys' and reporter fees) incidental to any proceedings instituted to break a deadlock shall be paid by the Trust Fund.

The impartial Arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement and Declaration of Trust or the Plan and the term of said impartial Arbitrator shall end upon a decision resolving any deadlock.

-12-

Section 6.    TERM OF TRUSTEES.  Subject to the provisions of Article XI, the term of the Jointly Appointed Arbitrator  shall end upon resolving of the deadlock.  The Union  and Employer  Trustees shall serve for a term of three (3) calendar years.

## ARTICLE IV

## RELATING TO THE TRUSTEES

Section 1.    GENERAL POWERS.  The Trustees shall have the following powers, rights and duties in addition to those provided elsewhere in this Agreement or by law:

(a)    To exercise full discretionary authority to formulate the Pension Plan and to promulgate  the Plan's rules and regulations and procedures, including procedures for collection of Employer contributions

(b)    To exercise full discretionary authority to construe and apply  the provisions of this instrument and any amendment to it and the terms of the Pension Plan and any rules or procedures adopted for the administration of the Plan.  The Trustees have full discretionary authority to modify and  interpret the Pension Plan, all Plan documents, procedures, and the terms of the Trust Agreement. Their interpretation will be given the maximum deference permitted by law for the exercise of such full discretionary authority, and it will be binding for all involved persons.  The construction adopted by the Trustees shall be

-13-

binding upon the Union , any Association, all Employers, all Employees and all Participants and beneficiaries who may be covered under the Plan.

(c)  Full discretionary authority to enter into any and all contracts and agreements for carrying out the terms of this Agreement and for the administration of the Trust Estate and Pension Plan and to do all acts as they, in their discretion, may deem necessary and advisable.

(d)  Full discretionary authority to establish and accumulate as part of the Trust Estate a reserve or reserves adequate, in the opinion of the Trustees, to carry out the purposes of this Agreement.

(e)  To pay out of the Pension Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Pension Fund or any money, property or securities forming a part thereof.

(f)  To receive contributions or payments from any source whatsoever to the extent permitted by law.

(g)  To have the exclusive authority to invest and reinvest the assets of the Pension Fund in property of any kind, real or personal, including retirement income, annuity or other individual contracts and group contracts issued by any life insurance company authorized to do business in the State of Illinois, but, excluding, however, any securities issued by an Employer hereunder.

-14-

(h)    In their discretion and to the extent they deem it wise, beneficial or necessary to appoint a bank or banks or trust company or trust companies to be designated as corporate trustee or custodian, and to enter into and execute a trust agreement or trust agreements with such bank or banks or trust company or trust companies, to provide for the investment and reinvestment of assets of the Pension Fund, with such other provisions incorporated therein as may be deemed desirable in the Trustees' sole discretion for the proper management of the Pension Fund and upon such execution to convey and transfer to such corporate trustee or custodian all or any portion of the assets of the Pension Fund.

(i)    To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or appropriate for the advantageous management, investment and distribution of the Pension Fund and to carry out the purposes of the Plan. The Trustees may delegate authority to an investment consultant, investment managers, corporate trustee or custodian to manage, invest and monitor the performance of managers and to take appropriate action concerning any such investments, including the voting of proxies on securities.

(j)    To enter into a reciprocal agreement with any other pension fund relating to the contributions to be made by an Employer for any covered Employee

during periods when such Employee is engaged in performing work in the geographical area in which such other pension fund is operative and to provide for the transfer of contributions to reciprocal pension funds on behalf of participants in such funds.

(k) To exercise full discretionary authority to compromise, arbitrate, settle, adjust or release any suit or legal proceeding, claim, debt, damage action or undertaking due or owing from or to the Pension Fund on such terms and conditions as the Trustees may deem advisable.

(l) To appoint an "Administrator" who may be delegated all of the rights, duties and obligations of an "administrator" under the applicable provisions of ERISA.

(m) To retain in cash (pending investment, reinvestment and payment of benefits) any portion of the Pension Fund and to deposit cash in any depositary (including the banking department of any bank acting as a corporate Trustee hereunder).

(n) To establish and review periodically (but at least annually) a written funding policy for the investment of assets of the Pension Fund and review an annual actuarial valuation concerning Fund liabilities and assets.

(o) To keep a written account showing the net worth of the Pension Fund, all investments, receipts, disbursements and other transactions made by the

-16-

Trustees and any agents of the Trustees, which accounts will be audited annually as provided herein and the annual report will be available for inspection at all times by the Union and the Employers at the principal office of the Pension Fund. All accounts of the Trustees will be kept in the manner determined by the Trustees upon advice of the Trustees' independent public accounting firm. ~~If~~ during the term of this Agreement, the Department of Labor issues regulations under ERISA regarding the valuation of securities or other assets for purposes of the reports required by ERISA, the Trustees shall use such valuation methods for purposes of the annual report described in this paragraph.

(p) To lease or purchase such premises, materials, supplies and equipment, and to employ legal counsel, investment counsel and accounting, actuarial, clerical or other agents or employees as the Trustees deem necessary or desirable.

(q) To merge the Pension Plan or consolidate it with another plan in accordance with the terms of ERISA and, in so doing, to transfer the Fund assets and administration of the Pension Plan to the trustees under such other plan, all as provided in the Pension Plan, or to accept the transfer of assets and liabilities from a fund to be merged into this Plan.

Section 2.    APPOINTMENT OF INVESTMENT MANAGERS.

Notwithstanding any other provision of this Agreement, the Trustees may appoint an Investment Consultant to advise the Trustees on the allocation of investments, to assist in the selection of Investment Managers and custodians, to monitor the performance of Investment Managers and custodians, to vote proxies of the Trustees on securities and to represent the Trustees in such matters and one or more Investment Managers (as defined in Section 3(38) of ERISA) who shall have the power to manage, acquire, or dispose of specific portions of the Fund's assets as the Trustees shall determine and to act on behalf of the Trustees with respect thereto, subject to the following:

(a)    Any direction given to the Trustees by an Investment Manager shall be given in writing or given orally and confirmed in writing as soon thereafter as is practicable.

(b)    The indicia of ownership of the assets of the Pension Fund shall be held by the Trustees (or a custodian appointed by them) at all times.

Section 3.    DUTY OF TRUSTEE RE: ASSETS MANAGED BY INVESTMENT MANAGERS. Notwithstanding any other provision of this Agreement, , the Trustees shall adopt an investment policy, which shall be provided to an Investment Manager and, with respect to the assets of the Pension Fund that an Investment Manager has been appointed to manage. shall  follow the direction of the Investment Manager and shall not be liable to anyone:

-18-

(a)     For any act or omission of the Investment Manager with respect to such assets:

(b)     For failing to act with respect to such assets absent direction from the Investment Manager; or

(c)     For failing to review the day to day actions of the Investment Managers as to such assets.

Section 4.     ALLOCATION OF TRUSTEE RESPONSIBILITIES  The Trustees are specifically authorized to allocate among themselves any and all of the responsibilities, obligations and duties imposed on them by this Agreement, in which event, to the extent permitted by law, a Trustee to whom certain responsibilities, obligations or duties have not been allocated shall not be liable either individually or as a Trustee for any loss resulting to the Pension Fund arising from the acts or omissions on the part of another Trustee to whom such responsibilities, obligations or duties have been allocated.

Section 5.     INSURANCE.  The Trustees are specifically authorized to purchase insurance for themselves, the Plan and any other fiduciary under the Plan to indemnify the insureds against liability or losses occurring by reason of any act or omission of the insureds, provided, however, that any contract providing such insurance must contain provisions permitting recourse by the insurer against the insured.

Section 6.     COMPENSATION AND EXPENSES.  The Trustees shall not receive compensation  from the Pension Fund for services rendered hereunder but  shall be reimbursed for expenses actually and properly incurred in connection with the performance

-19-

of their responsibilities. The Trustees are authorized to pay from the Pension Fund all of the Trustees' reasonable expenses, taxes and charges (including fees of persons employed by them in accordance with Section 1, paragraph (p) of this Article) incurred in connection with the collection, administration, management, investment, distribution and protection of the Pension Fund, including, without limitation, attendance at meetings and other functions of the Board of Trustees or its committees or while on business of the Board of Trustees, attendance at institutes and educational conferences, seminars or workshops for or on behalf of the Fund.

## ARTICLE V

## MANNER OF ACTING BY TRUSTEES

Section 1.     IN GENERAL. The Trustees shall act by a majority of the Trustees by meeting, or by the unanimous written consent of the Trustees filed without meeting, subject to the following:

(a)     Meetings of the Trustees shall be held at such times and place as is agreed by the Trustees  and may be called on five (5) days' advance written notice by a majority of the Trustees or at any time, without notice, by the unanimous written consent of the Trustees.  The Trustees may agree on the use of conference calls to conduct meetings and telefacsimiles and e-mail to give

notice of consent to any action proposed to be taken by the Trustees or Administrator.

(b)    Two Employer Trustees and two Union Trustees shall constitute a quorum for any meeting.

(c)    Each Employer Trustee and Union Trustee, shall have one (1) vote on any matter brought before a meeting and, in his absence, such vote may be cast by another Trustee appointed by the Employers or the Union, as the case may be.

(d)    To the extent permitted by law, a Trustee absent from a meeting shall not be liable or responsible for any action taken or omitted to be taken at that meeting with respect to any matter.

The certificate of one Employer Trustee and one Union Trustee or of the Administrator that the Board has taken or authorized any action shall be conclusive in favor of any person relying on the certificate.

Section 2.    RECORD OF TRUSTEES' ACTIONS. The Trustees may elect, from among their number, a Secretary to serve for a term of three (3) calendar years or until a successor has been duly elected. The Administrator , or in his absence a person appointed by the Trustees , shall prepare a draft of the minutes of each meeting of the Board of Trustees and provide a copy thereof to each of the Trustees as soon as practicable after the meeting is held. The Trustees will review and approve minutes.

-21-

Section 3.    DISBURSEMENT OF TRUST FUNDS. Any disbursement from the Pension Fund shall be by check signed by both a Union Trustee and an Employer Trustee who have been duly designated by the Union Trustees and the Employer Trustees, respectively, or checks may be signed by the Administrator on any matters designated by the Board of Trustees. The Administrator may be authorized to pay any service providers in accordance with contracts approved by the Trustees.

Section 4.    EXECUTION OF NOTICES AND DOCUMENTS. Except as specifically provided in Section 3 next above, the Board of Trustees may designate any equal number of Union Trustees and Employer Trustees to jointly execute, in writing, on behalf of the Board of Trustees, any notice or document, which executed notice or document shall be conclusive in favor of any person relying thereon.


## ARTICLE VI

## RELATING TO THE PENSION PLAN

Section 1.    IN GENERAL. The Trustees shall establish and maintain a written Pension Plan which shall at all times be in the form of a plan intended to meet the requirements of Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code").

Section 2.    PROVISIONS OF PENSION PLAN.    Subject to the applicable provisions of the Code and ERISA, the Pension Plan established and maintained by the Trustees shall generally provide:

(a)    Benefits for Employees and their beneficiaries in amounts and for the duration determined by the Trustees, based on their estimates of the benefits that can be provided from the Pension Fund without undue depletion or excessive accumulation;

(b)    The requirements for eligibility for benefits as determined by the Trustees;

(c)    For the collection of Employer contributions; (d)For claims and appeals procedures for Participants; and

(e)    For the amendment of the Plan by the Trustees; a copy of any such amendment shall be filed with the minutes of the Board of Trustees.

Section 3.    OPERATION OF PENSION PLAN.    With respect to the operation of the Pension Plan, the Trustees shall have the following rights, powers and duties in addition to those provided to them elsewhere in this Agreement, the Pension Plan, or by law:

(a)    To adopt such rules of procedure and regulations as in their opinion may be necessary for the proper administration of the Pension Plan and as are consistent with the terms of this Agreement and the Pension Plan.

-23-

(b)     To enforce the provisions of the Pension Plan and the rules and regulations adopted by the Trustees in a uniform manner with respect to individuals similarly situated.

(c)     To determine questions arising under the Pension Plan or this Agreement, including the power to determine the rights of Employees and their Beneficiaries, and their respective benefits, and to remedy ambiguities, inconsistencies or omissions.

## ARTICLE VII

## FUNDING PENSION PLAN BENEFITS

Section I.     IN GENERAL.   In order to fund the benefits provided under the Pension Plan, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees at the times required by that agreement.  The rate of contributions shall be determined by the applicable Collective Bargaining Agreement or Participation Agreement, together with any amendments, supplements or modifications thereto.  Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be the same as the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union which covers Employees performing similar work.  No

-24-

Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the provisions of a Collective Bargaining Agreement or Participation Agreement and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer has entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the

-25-

liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10%, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments owed by an Employer pursuant to an installment agreement, shall bear interest up to the prime rate of interest plus two points charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority to delegate the collection of contributions to a Collection Committee, which, in its discretion, may assess a lesser or greater amount or waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Fund. The Collection Committee may include trustees of the Laborers' Welfare Fund as members of the Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including court fees, audit fees, investigative costs, etc. The term "reasonable attorneys' fees" as used herein shall mean all

-26-

attorneys' fees in the amounts for which the Trustees become legally obligated including recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority, in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees, in lieu of any cash deposit, a bond in an amount not less than Five Thousand Dollars ($5,000.00) or in an amount consistent with the terms of the current collective bargaining agreements. In the event an Employer is repeatedly delinquent in its contribution payments to the Pension Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current collective bargaining agreements, in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3.   REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such

other information as the Trustees may reasonably require in connection with the administration of the Trust and Pension Plan. The Trustees may at any time have an audit made by an independent certified public accountant or its representatives of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures developed and communicated by the Administrator from the beginning of such Employer's participation in the Pension Fund forward unless given written authorization by the Administrator upon request to destroy said record. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ARTICLE VIII

### FILING CLAIMS AND REVIEW OF DENIALS OF CLAIM

Section 1.   FILING OF A CLAIM.  Claims for the payment of any benefits provided by the Pension Plan shall be filed, in writing, in accordance with the Rules and Regulations set forth in Article 7 of the Pension Plan.

-28-

<u>Section 2.</u>   <u>ADJUDICATION   OF   CLAIMS   AND   APPEALS</u>.

The Trustees shall have the authority to adopt procedures for the review of claims and appeals of claims denied in whole or in part in accordance with ERISA and regulations adopted pursuant to ERISA. The Trustees may delegate authority to decide claims to a Pension Committee comprised of Trustees and an Appeal Committee comprised of other Trustees. The procedures may be changed from time to time at the discretion of the Board of Trustees. The current procedures for claims and appeals are set forth in Article 7 of the Pension Plan.   The Trustees and/or the Pension Committee and Appeals Committee have full discretionary authority to determine eligibility for benefits under the Plan and to interpret the Plan, all Plan documents, rules, procedures, and the terms of the Trust Agreement. Their decisions and interpretations will be given the maximum deference permitted by law for the exercise of such full discretionary authority. They will be binding upon all involved persons.

## ARTICLE IX

## DUTY TO COOPERATE

All of the Trustees and all directors, officers, employees or other representatives of any Employer Association or Union party to this Agreement shall be required to assist and cooperate with authorized representatives of the Pension Fund, its attorneys, auditors, or

other authorized representatives of the Pension Fund, its attorneys, auditors, or other authorized representatives in the prosecution of claims for or against the Pension Fund.

Specifically, an Employer shall provide to the Board of Trustees on request in the course of any audit deemed necessary or advisable by the Trustees the records set forth in the Policy for Retention and Production of Employer Records attached hereto as Addendum A. Furthermore, any Employer who is unable to produce adequate records to enable Trustees to perform the audit, shall be deemed to have authorized the Board of Trustees to contact the Internal Revenue Service and the Illinois Department of Revenue with permission to obtain all relevant information which may have been filed with said Agency by such Employer.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

Section 1.    VESTED RIGHTS.  No Employee or any person claiming by or through such Employee, including his family, dependents, beneficiary and/or legal representative, shall have any right, title or interest in or to the Pension Fund or any property of the Pension Fund or any part thereof except as may be specifically determined by the Trustees and required by ERISA.

Section 2.    ENCUMBRANCE OF BENEFITS. No monies, property or equity, of any nature whatsoever, in the Fund, or policies or benefits or monies payable therefrom,

shall be subject in any manner by an Employee or person claiming through such employee to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void. The Fund shall not in any manner be liable for, or subject to the debts, contracts, liabilities, engagements or torts of any person entitled to benefits hereunder. Notwithstanding the foregoing, the benefits will be paid in accordance with any Qualified Domestic Relations Order as defined in Section 206(d)(3) of ERISA.

Section 3.    PAYMENTS TO PERSONS UNDER DISABILITY.    In case any benefit payments hereunder become payable to a person under legal disability, or to a person not adjudicated incompetent but, by reason of mental or physical disability, in the opinion of the Board, who is unable to administer properly such payments, then such payments may be paid out by the Board for the benefit of such person in such of the following ways as it thinks best, and the Board shall have no duty or obligation to see that the payments are used or applied for the purpose or purposes for which paid:

(d)    Directly to any such person;

(e)    To the legally appointed guardian or conservator of such person;

(f)    To any spouse, parent, brother or sister of such person for his welfare, support and maintenance;

(g)    By the Board using such payments directly for the support, maintenance and welfare of any such person.

-31-

Section 4.    SITUS.  The State of Illinois, shall be deemed the situs of the Trust Fund created hereunder.  All questions pertaining to validity, construction and administration shall be determined in accordance with the laws of the State of Illinois to the extent that such laws are not preempted by the laws of the United States of America. Jurisdiction and venue for all litigation under Federal statutes shall be in the Federal District Court for the Northern District of Illinois.

Section 5.    CONSTRUCTION OF TERMS.  Where the context admits in this Agreement, words in the masculine gender shall include the feminine and neuter genders, the plural shall include the singular and the singular shall include the plural.

Section 6.    NOTIFICATION OF TRUSTEES.  The address of each of the Trustees shall be that provided to the Administrator by the Trustee. . Any change of address shall be effected by written notice to the Administrator.

Section 7.    SEVERABILITY.  All provisions of this Agreement are intended to comply with the applicable provisions of ERISA, the Labor Management Relations Act of 1947, as amended, the Labor-Management Reporting and Disclosure Act of 1959, as amended, the Internal Revenue Code of 1986, as amended, and all other applicable laws, rules and regulations.  However, should any provision of this Agreement or of the Pension Plan or rules and regulations adopted thereunder or in any Collective Bargaining Agreement or Participation Agreement be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the provisions herein and therein contained unless such

-32-

illegality shall make impossible or impractical the functioning of the Trust and the Pension Plan, and in such case the appropriate parties shall immediately adopt a new provision to replace the illegal and/or invalid provision.

Section 8.   COUNTERPARTS.  This Agreement may be executed in two or more counterparts, any one of which will be an original without reference to the others.

## ARTICLE XI

## CHANGE OF TRUSTEE

Section 1.   RESIGNATION.  A Trustee may resign at any time by giving thirty (30) days advance written notice to the entity that appointed him and to the Board of Trustees.  Notice to the Board of Trustees shall be mailed to it, by certified mail, at the office of the Board.

Section 2.   REMOVAL OF TRUSTEE AND APPOINTMENT OF SUCCESSOR TRUSTEE.  A Union Trustee may be removed by the Union effective on receipt by the Board of Trustees of written notice of removal from the President/Secretary-Treasurer of the Union. The Union shall appoint a successor Trustee which appointment shall be effective on receipt of written notice by the Board of Trustees of the appointment from the President/Secretary-Treasurer of the Union and of a written acceptance of his appointment from the individual appointed as successor Trustee. An Employer Trustee may be removed by the Association that appointed him effective on receipt by the Board of Trustees of

written notice of removal from the President of that Association. The removing Association shall appoint a successor Trustee which appointment shall be effective on receipt of written notice by the Board of Trustees of the appointment from the President of that Association and of a written acceptance of his appointment from the individual appointed as successor Trustee. The Jointly Appointed Arbitrator may be removed at any time by majority vote of the Board of Trustees and a successor Jointly Appointed Arbitrator may be appointed by it. The appointment of a successor Jointly Appointed Arbitrator shall be effective on receipt by the Board of Trustees of a written acceptance of his appointment from the person appointed as successor. No successor Trustee shall be personally liable for any act or failure to act of a predecessor Trustee.

Section 3. VACANCIES. If a vacancy in the Board of Trustees exists, the remaining Trustees shall have the same powers as the full Board until the vacancy is filled, subject to the quorum requirements set forth in Section 1 of Article V and the following:

(a)     If there is a vacancy in the number of Union Trustees, then, with respect to any matter before the Board of Trustees, one Union Trustee (selected by the Union Trustees then acting) shall cast an additional vote for each existing vacancy in the number of Union Trustees.

(b)     If there is a vacancy in the number of Employer Trustees, then, with respect to any matter before the Board of Trustees. one Employer Trustee (selected

by the Employer Trustees then acting) shall cast an additional vote for each existing vacancy in the number of Employer Trustees.

It is the intention of the parties to this Agreement that any matter or action coming before the Board of Trustees be acted upon by an equal number of Union Trustees and Employer Trustees.

## ARTICLE XII

## AMENDMENT AND TERMINATION

Section 1.     AMENDMENT. The Board of Trustees has full discretionary authority to amend this Agreement from time to time, except as follows:

(a)     In no event shall an amendment result in an alteration of the basic principles of this Agreement.

(b)     In no event shall an amendment result in a conflict with any Collective Bargaining Agreement as such agreement affects contributions to the Trustees or with any other agreements previously entered into by the Board of Trustees.

(c)     No amendment shall result in the repayment or reversion to any Employer of any portion of the Trust Estate.

Any amendment shall be in writing and shall be effective as of the date designated by the Board of Trustees. The Administrator shall distribute a copy of each amendment to each

-35-

Trustee and shall attach a copy thereof to the minutes of the meeting of the Board of Trustees at which it is adopted. The Board of Trustees shall notify all necessary parties and shall execute any instrument necessary in connection with the amendment.

Section 2.    TERMINATION.    This Agreement may be terminated by written instrument executed by:

(a)    All of the Trustees when there is no longer a Collective Bargaining Agreement or Participation Agreement or other obligation requiring contributions to the Pension Fund in effect between any Employer and the Union or the Trustees; or

(b)    By all of the Trustees. Immediately prior to the termination of this Agreement the Board of Trustees shall amend the Pension Plan to provide for the allocation of the Pension Fund in a manner consistent with the requirements of Title IV of ERISA. After segregating an amount sufficient to meet the administrative and other expenses relating to the Pension Fund, the Pension Plan and this Agreement, the Trustees shall allocate the remaining portion of the Pension Fund in accordance with the amended Pension Plan. All necessary provisions of this Agreement shall continue in effect until the assets of the Pension fund allocable to Employees and Beneficiaries under the Pension Plan, as amended, have been distributed or applied by the Trustees in accordance with the Pension Plan.

Section 3.   NOTIFICATION OF TERMINATION.   The Board of Trustees shall notify the Union, each Employer and all persons entitled to benefits under the Pension Plan of the termination of this Trust Agreement within the time required by law.

IN WITNESS WHEREOF, the Administrator, pursuant to the authority delegated to him by the Board of Trustees on May 13, 2002, has executed this Agreement on this __28__ day of May, 2002.

James Jorgensen, Administrator
Date: 5/28/2002

IN WITNESS WHEREOF, the Trustees have executed this Agreement on the dates indicated.

Charles Cohen
Date: July 8 02

Joseph Coconato
Date: 7-8-02

Wayne E. Healy
Date: 7/8/02

James P. Connolly
Date: 7/8/02

Gary Lundsberg
Date: 7/8/02

J. Michael Lazzaretto
Date: 7/8/02

-37-

Robert J. Madden
Date: 7-8-02

Tod Masters
Date: 7/8/02

Roger T. Vignocchi
Date: 7-8-02

Frank Riley
Date: 7-8-02

Sam Vinci
Date: July 8 2002

Jeff Ziemann
Date: 7-8-02

C:\EIC\LABORERS\AMENDMENTS\LabPen Trust Clean.wpd

-38-

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1.    Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2.    Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3.    Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4.    Cash disbursement journals and general ledgers.

5.    Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6.    Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7.    Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8.    Daily time records filed by employees or supervisors.

9.    Source documents and lists of job codes and equipment codes.

10.    Certified payrolls for public sector jobs where such payrolls are required.

11.    Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

## LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

## LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

# AMENDMENT TO THE
## RESTATED AGREEMENT AND DECLARATION OF TRUST
## CREATING LABORERS' PENSION FUND

WHEREAS, Article XII of the Restated Agreement and Declaration of Trust ("Trust Agreement") of the Laborer's Pension Fund (the "Fund") provides that the Board of Trustees have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching

themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

## I.

The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

## II.

The following is added as Section (4) to Article VII, "Funding Pension Plan Benefits":

"Section 4. ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a)     EMPLOYER OWNED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)     EMPLOYER OPERATED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c) <u>PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.</u> The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund. The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section. Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable. Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d) <u>MISCELLANEOUS PROVISIONS.</u> The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer."

<u>III.</u>

<u>Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.</u>

3

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

| | | | |
|---|---|---|---|
| *(signature)* | 9-18-06 | *(signature)* | 9/13/06 |
| CHARLES COHEN | DATE | JOSEPH COCONATO | DATE |
| *(signature)* | 9/18/06 | *(signature)* | 9/18/06 |
| ALAN ESCHE | DATE | JAMES P. CONNOLLY | DATE |
| *(signature)* | 9/18/06 | *(signature)* | 9/18/06 |
| ROBERT G. KRUG | DATE | J. MICHAEL LAZZARETTO | DATE |
| *(signature)* | 9/18/06 | *(signature)* | 9/18/06 |
| RICHARD E. GRABOWSKI | DATE | FRANK RILEY | DATE |
| *(signature)* | 9/18/06 | *(signature)* | 9/18/06 |
| DAVID H. LORIG | DATE | LARRY WRIGHT | DATE |
| *(signature)* | 9/18/06 | *(signature)* | 9-18-06 |
| GARY LUNDSBERG | DATE | JEFF ZIEMANN | DATE |

4

# RESTATED AGREEMENT AND DECLARATION OF TRUST OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

Restated through
July 1, 2003

1

Exhibit A-4

<u>TABLE OF CONTENTS</u>

<u>ARTICLE</u>    <u>PAGE</u>

I - Certain Definitions .....................................................................................

    Section 1 - Welfare Fund ....................................................................

    Section 2 - Employer ...........................................................................

    Section 3 - Employee ..........................................................................

    Section 4 - Trustees.............................................................................

    Section 5 - Contributions ....................................................................

    Section 6 - Benefits ............................................................................

    Section 7 - Written Agreement ...........................................................

    Section 8 - ERISA ..............................................................................

    Section 9 - Collective Bargaining Agreement or Participation Agreement .....................

    Section 10 - Covered Employment .....................................................

    Section 11 - Participant.......................................................................

    Section 12 - Trust Agreement .............................................................

    Section 13 - Trustees..........................................................................

    Section 14 - Council and Union...........................................................

II - General Purposes of Welfare Fund ...........................................................

III - Operation and Administration of Welfare Fund .......................................

    Section 1 - The Board of Trustees .....................................................

    Section 2 - Employer Trustees ...........................................................

    Section 3 - Union Trustees .................................................................

    Section 4 - Acceptance of Trusteeship................................................

    Section 5 - Jointly Appointed Arbitrator .............................................

    Section 6 - Term of Trustees...............................................................

    Section 7 - Additional Trustees ..........................................................

IV - Relating to the Trustees ...........................................................................

    Section 1 - General Powers.................................................................

    Section 2 - Appointment of Investment Managers ..............................

    Section 3 - Duty of Trustee Re: Assets Managed by Investment Manager....................

    Section 4 - Allocation of Trustee Responsibilities .............................

    Section 5 - Insurance ..........................................................................

    Section 6 - Compensation and Expenses .............................................

V - Manner of Acting by Trustees ...................................................................

    Section 1 - In General .........................................................................

    Section 2 - Record of Trustees Actions ..............................................

    Section 3 - Administrative Personnel ..................................................

    Section 4 - Disbursement of Welfare Fund..........................................

    Section 5 - Execution of Notices and Documents ...............................

VI - Employer Contributions ....................................................................................
    Section 1 - In General ....................................................................................
    Section 2 - Default in Payment of Contributions...........................................
    Section 3 - Report on Contributions and Production of Records ..................

VII - Filing Claims and Review of Denial of Claim .................................................
    Section 1 - Filing of a Claim.........................................................................
    Section 2 - Adjudication of Claims and Appeals...........................................

VIII - Duty to Cooperate ..........................................................................................

IX - Miscellaneous Provisions ..................................................................................
    Section 1 - Vested Rights...............................................................................
    Section 2 - Encumbrance of Benefits.............................................................
    Section 3 - Payments to Persons Under Legal Disability................................
    Section 4 - Situs ............................................................................................
    Section 5 - Construction of Terms .................................................................
    Section 6 - Notification of Trustees ..............................................................
    Section 7 - Severability.................................................................................
    Section 8 - Counterparts................................................................................

X - Change of Trustee................................................................................................
    Section 1 - Resignation .................................................................................
    Section 2 - Removal of Trustee and Appointment of Successor Trustee .......

XI - Amendment and Termination..............................................................................
    Section 1 - Amendment ................................................................................
    Section 2 - Termination .................................................................................
    Section 3 - Notification of Termination.........................................................

# RESTATED AGREEMENT AND
# DECLARATION OF TRUST OF
# THE HEALTH AND WELFARE DEPARTMENT
# OF THE
# CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL
# OF
# CHICAGO AND VICINITY

THE AGREEMENT AND DECLARATION OF TRUST creating Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, also known as the "Laborers' Welfare Fund" ("Welfare Fund"), originally made and entered into the 1st day of June, 1950, was amended from time to time thereafter and is hereby further amended and restated, effective as of July 1, 2003, by substituting for it this Restated Agreement and Declaration of Trust between CONSTRUCTION GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, A.F.L.-C.I.O., (the "Council") representing its affiliated local unions (the "Unions") and the members thereof (collectively "the Union") and BUILDERS' ASSOCIATION OF GREATER CHICAGO, UNDERGROUND CONTRACTORS ASSOCIATION, MASON CONTRACTORS' ASSOCIATION OF COOK COUNTY, ILLINOIS ROAD AND TRANSPORTATION BUILDERS' ASSOCIATION, CONCRETE CONTRACTORS' ASSOCIATION OF GREATER CHICAGO, EMPLOYING PLASTERERS' ASSOCIATION OF GREATER CHICAGO, and LAKE COUNTY CONTRACTORS ASSOCIATION and all other employer associations (the "Associations") who were parties to collective bargaining agreements with the Union, with representatives of this Trust, for and on behalf of themselves and their respective members and other employers in the building and construction trades and related industries who are included in the term "Employers" (as defined in Section 2 of ARTICLE I of this Agreement) and agreed to be bound by this Agreement or who are otherwise so bound as provided as set forth in Section 2 of ARTICLE I of this Agreement;

WHEREAS, the Trust Agreement has been amended from time to time and the Board of Trustees has agreed to restate the Trust Agreement with amendments adopted through April 1, 2003;

NOW, THEREFORE, pursuant to their authority under Article XI, the Board of Trustees hereby amends and restates the Trust Agreement to read as follows:

## ARTICLE I
## CERTAIN DEFINITIONS

Unless the context or subject matter otherwise requires, the following definitions shall govern in this Agreement.

Section 1.   WELFARE FUND.   The term "Welfare Fund" means the trust fund, previously established and administered under the terms of this Agreement and includes all property of every kind held by the Trustees hereunder. The assets of the Welfare Fund are to be

4

used for the purposes generally described in Section 302(c) of the Labor Management Relations Act of 1947, as amended by the applicable provisions of ERISA (as defined in Section 8 next below).

Section 2. EMPLOYER. The term "Employer" as used herein shall mean any Employer who:

(a) Now or hereafter is a party to a Collective Bargaining Agreement with the Union, requiring periodic contributions to the Welfare Fund or who in the past has been a party to such a Collective Bargaining Agreement, if such agreement has not been terminated by its terms or by operation of law;

(b) Is a party to any memorandum of understanding or memorandum of agreement or similar instrument with the Unions, which by its terms incorporates by reference a complete Collective Bargaining Agreement which requires the parties thereto to make contributions to the Welfare Fund;

(c) In writing adopts and agrees to be bound by the terms and provisions of this Agreement as the same may be amended or modified from time to time;

(d) Is a party to any written instrument which evidences an agreement to be bound by the provisions of this Agreement, including but not limited to, a contribution report form listing the employees on whose behalf contributions are remitted and provisions expressly binding such Employer to the Agreement or otherwise evidencing such Employer's intention to be so bound by the making of such contributions;

(e) By any course of conduct, including but not limited to, oral representations to Employees, representatives of the Union, Trustees, attorneys or other persons, ratifies or accepts the provisions of any Collective Bargaining Agreement which requires contributions to the Welfare Fund continued hereby or of this Agreement itself, or of any other written instrument which binds such Employer to make contributions to the Welfare Fund, and by which the Employer is estopped to deny such obligation;

(f) Is a member of any of the associations named in Article III ("Association"), or hereafter becomes a member of any of the Associations, named herein or who was a member at any time when representatives of said Associations commenced negotiations of a Collective Bargaining Agreement on behalf of its members whether or not said membership is held current at all times; or

(g) Is a member of any other multi-employer bargaining units, or hereafter becomes a member of any of said multi-employer bargaining units, which has a Collective Bargaining Agreement with the Council or Unions.

The term "Employer," shall also mean the Union, for the purpose of providing benefits hereunder for the eligible Employees of the Council and Unions for whom the Council or Unions contribute to the Welfare Fund.

The term "Employer" shall also mean the Board of Trustees of this Fund and the boards of trustees of other funds sponsored by the Union, namely, the Laborers' Pension Fund; the Chicagoland Laborers' Training and Apprentice Fund, Laborers-Employers Cooperative

Education and Trust; and Laborers' District Council Laborers-Management Cooperation Committee for the purpose of providing benefits for the eligible employees of such funds for whom contributions are made to the Welfare Fund.

The term "Employer" shall also mean, for the purpose of providing benefits hereunder for its eligible Employees, an Association which is party to a Collective Bargaining Agreement with the Union whereunder it is agreed that the Employer members of such Association shall make Employer contributions to the Welfare Fund. An Association shall be permitted to contribute provided that the Trustees approve such participation, the Association and Trustees sign a Participation Agreement and the Association makes timely contributions on behalf of all eligible employees.

A person or entity that has become an Employer under this Agreement pursuant to a Collective Bargaining Agreement or other written agreement with the Union shall continue as such until it is no longer obligated pursuant to such Written Agreement (as defined in Section 7 next below) or by the National Labor Relations Act or other legally enforceable obligation to make contributions to the Welfare Fund.

Section 3. EMPLOYEE. The term "Employee," as used herein, shall mean any of the following persons without regard to race, color, creed, national origin, religion or union membership.

(a) Any person covered by a Collective Bargaining Agreement between an Employer and the Union who is engaged in employment with respect to which the Employer is obligated by the Collective Bargaining Agreement to make contributions to the Welfare Fund;

(b) Any person employed by an Employer who performs work within the jurisdiction of the Council as said jurisdiction is set forth in any applicable Collective Bargaining Agreement or by any custom or practice in the geographic area within which the Employer operates and his Employees perform work;

(c) Any person on whose behalf an Employer has made contributions to the Welfare Fund and has reported same on a standard report form which contains a provision binding said Employer to the provisions of this Agreement or otherwise evidencing said Employer's intent to be so bound.

(d) Any person employed by an Employer who has signed any memorandum of understanding incorporating by reference the provisions of any applicable Collective Bargaining Agreement or the provisions of this Agreement where such person is covered by an agreement which incorporates this Agreement by reference or both;

(e) Any person who is not covered by a Collective Bargaining Agreement but on whose behalf his Employer is otherwise obligated to make contributions to the Welfare Fund in accordance with the provisions of this Agreement who performs work which would be work performed by members of a bargaining unit recognized by the Employer or certified by the National Labor Relations Board if said person's Employer were a party to any of the standard Collective Bargaining Agreements by and between the Union and any of the aforementioned

Associations; or

(f)    Any Employee in a certified or recognized collective bargaining unit represented by the Union.

The term "Employee" shall also mean all eligible persons employed by the Union, on whose behalf the Union shall make payments to the Welfare Fund at the times and at the rate of payment equal to that made by any other Employer who is a party to this Agreement.

The term "Employee" shall also mean all eligible persons employed by the Trust or a fund sponsored by the Union, with the approval of the Trustees in either case, on whose behalf the Board of Trustees or trustees of said fund shall make payments to the Welfare Fund, at the times and at the rate of payment not less than that made by any other Employer who is a party to this Agreement.

The term "Employee" shall also mean all eligible persons employed by an Association of Employers on whose behalf the Association shall make payments to the Welfare Fund at the times and at the rate of payment not less than that made by any other Employer which is a party to this Agreement.

Section 4.  TRUSTEES.  Subject to the provisions of this Agreement, the term "Trustees" shall include the Union Trustees, the Employer Trustees and their successors designated and appointed in accordance with the terms of this Agreement who shall, collectively, serve as the members of the "Board of Trustees" (as described in ARTICLE III) hereunder.

Section 5.  CONTRIBUTIONS.  The term "Contributions" shall mean the monies paid to the Welfare Fund by Employers on behalf of Employees pursuant to applicable Written Agreements or as otherwise required hereby, which shall be held by the Trustees for the purposes set forth herein.

Section 6.  BENEFITS.  The term "Benefits" shall mean payments, whether from the principal or income, or both, of the Welfare Fund for the benefit of Employees, their families and dependents, such as medical, surgical, hospital care, dental, vision, prescription drug, life, sickness and disability benefits.

Section 7.  WRITTEN AGREEMENT.  The term "Written Agreement" shall mean any agreement in writing which specifies the detailed basis on which contributions shall be made to the Welfare Fund together with any modification, amendment or renewals thereof, including but not limited to Collective Bargaining Agreements, Participation Agreements, memoranda of understanding which incorporate by reference Collective Bargaining Agreements or this Agreement, report forms in accordance with which contributions are made and which obligate the Employer to the provisions of this Agreement, or any other agreement obligating the Employer signatory thereto to participate in or be bound by this Agreement.

Section 8.  ERISA.  The term "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

Section 9.   COLLECTIVE BARGAINING AGREEMENT OR PARTICIPATION AGREEMENT.  "Collective Bargaining Agreement" or "Participation Agreement" means a written agreement between the Union and an Employer or an Association of Employers or a Participation Agreement between the Board of Trustees and an Employer, which requires contributions to the Welfare Fund.

Section 10.  COVERED EMPLOYMENT.  "Covered Employment" means employment for which an Employer is obligated to contribute to the Welfare Fund.

Section 11.   PARTICIPANT.   "Participant" means an Employee who meets the requirements for participation in the Plan or a former Employee, Spouse or Dependent who is eligible for Benefits.

Section 12.  TRUST AGREEMENT.  "Trust Agreement" means this Restated Agreement and Declaration of Trust establishing the Laborers' Welfare Fund.

Section 13.   TRUSTEES.  "Trustees" means the Board of Trustees as established and constituted in accordance with this Trust Agreement.

Section 14.   COUNCIL AND UNION.  "Council" means the Construction and General Laborers' District Council of Chicago and Vicinity and "Union" means, collectively the Council and all of the local unions now or hereafter affiliated therewith.


# ARTICLE II
# GENERAL PURPOSES OF WELFARE FUND

The Welfare Fund shall be used for the exclusive purposes of:
(a)    Providing welfare benefits to eligible Employees and their families and dependents, which benefits, to the extent possible shall include:
1.  medical, surgical and hospital care;
2.  death benefit payments;
3.  dental, vision and prescription drug benefits; and
4.  disability, accident and sickness benefits; and
(b)    For defraying reasonable expenses of administering and operating the welfare benefit program.


Provisions for rendering such benefits described in (a) next above and other related welfare purposes shall be made from time to time by the Trustees, either on an insured or self-insured basis, and such payments and provisions, limitations and conditions for benefits shall be scheduled and prescribed in writing as the Trustees shall determine from time to time.  All benefit programs inaugurated by the Trustees shall be subject to the applicable limitations of law and shall not be inaugurated unless the Trustees have conducted a thorough investigation and have thereby determined that the proposed benefit program is actuarially sound and financially

8

and administratively practicable, and provided such benefit program requires adjustment of all claims, other than death benefits, through competent adjusters selected by the Administrator and Fund staff (as described in Article III of this Agreement).

# ARTICLE III
## OPERATION AND ADMINISTRATION OF WELFARE FUND

Section 1. THE BOARD OF TRUSTEES. Except as otherwise specifically provided, the Welfare Fund shall be operated and administered by a Board of Trustees whose membership shall consist of six persons appointed as Trustees by Associations (known as the "Employer Trustees") as provided in Section 2 next below and six persons appointed as Trustees by the Council (known as the "Union Trustees") as provided in Section 3 next below. The Employer Trustees and the Union Trustees may jointly appoint a person to act as a "Jointly Appointed Arbitrator," as provided in Section 5 next below.

Employer Trustees must be appointed from the ranks of contributing Employers within the Associations' membership.

Section 2. EMPLOYER TRUSTEES. The Employer Trustees shall be the following persons appointed by the entity indicated:
  (a)  Charles Cohen, appointed by the Underground Contractors' Association;
  (b)  Sam Vinci, appointed by the Mason Contractors Association of Greater Chicago;
  (c)  Charles J. Gallagher and David Lorig, appointed by the Illinois Road and Transportation Builders Association;
  (d)  Dennis Martin, appointed by the Concrete Contractors Association of Greater Chicago; and
  (e)  Roger Vignocchi, appointed by the Lake County Contractors' Association.

Section 3. UNION TRUSTEES. The Union Trustees shall be James P. Connolly, Randy Dalton, Martin T. Flanagan, Liberato Naimoli, Scott Pavlis and Frank Riley.

Section 4. ACCEPTANCE OF TRUSTEESHIP. The Employer Trustees, the Union Trustees have accepted their trusteeship hereunder.

Section 5. JOINTLY APPOINTED ARBITRATOR. Pursuant to applicable statutes and pursuant to the terms of this Agreement, a deadlock on a motion may arise. In such event, the Motion may be withdrawn and no further action need be required to be taken. If said Motion is not withdrawn, and the deadlock remains, then in the case of a deadlock, the Trustees shall meet for the purpose of agreeing upon a Jointly Appointed Arbitrator to break such deadlock by deciding the dispute in question. In the event of the inability of the Trustees to agree upon the selection of such Jointly Appointed Arbitrator within a reasonable time, then, on the petition of either the Union Trustees or the Employer Trustees, the Federal District Court of the United States where the Fund maintains its principal office shall appoint an impartial Arbitrator. Such impartial Arbitrator shall immediately proceed to hear the dispute between the Trustees and

9

decide such dispute, and the decision and award of such Arbitrator shall be final and binding upon the parties. The reasonable compensation of such Arbitrator and the costs and expenses (including, without limitation, attorneys' and reporter fees) incidental to any proceedings instituted to break a deadlock shall be paid by the Trust Fund.

Section 6. TERM OF TRUSTEES AND JOINTLY APPOINTED ARBITRTOR. Subject to the provisions of Article XI of this Agreement, the term of the Jointly Appointed Arbitrator shall end upon resolving the deadlock. Each Union and Employer Trustee shall serve for a term of three (3) calendar years.

Section 7. ADDITIONAL TRUSTEES. The parties to this Agreement reserve the right to change the number of Trustees; provided, however, that there shall always be an equal number of Union Trustees and Employer Trustees.

## ARTICLE IV
## RELATING TO THE TRUSTEES

Section 1. GENERAL POWERS. The Trustees shall have the following powers, rights and duties in addition to those provided elsewhere in this Agreement or by law.

- (a) To exercise full discretionary authority to construe the provisions of this Trust Agreement and any amendment to it. The Trustees have full discretionary authority to interpret the Welfare Benefit Plan, and Plan documents, rules, regulations, and procedures, including procedures for collection of Employer Contributions;

- (b) To exercise full discretionary authority to formulate, promulgate, construe and apply the provisions of this Trust Agreement and any amendments and the Plan's rules and regulations. The Trustees have full discretionary authority to modify and interpret the Welfare Fund's documents, rules and procedures. Their interpretation will be given the maximum deference permitted by law for the exercise of such full discretionary authority, and it will be binding for all involved persons. The action adopted by the Trustees shall be binding upon the Union, any Association, all Employers, all Employees and all Participants and beneficiaries who may be covered under the Plan;

- (c) To exercise full discretionary authority to enter into any and all contracts and agreements for carrying out the terms of this Agreement and for the administration of the Welfare Fund and to do all acts as they, in their discretion, may deem necessary and advisable;

- (d) To exercise full discretionary authority to establish and accumulate as part of the Welfare Fund's assets a reserve or reserves adequate, in the opinion of the Trustees, to carry out the purposes of this Agreement;

- (e) To pay out of the Welfare Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Welfare Fund or any money, property or securities forming a part thereof;

(f)    To receive contributions or payments from any source whatsoever to the extent permitted by law;

(g)    To exercise full discretionary authority to invest and reinvest the assets of the Welfare Fund in property of any kind, real or personal, including group contracts issued by any life insurance company authorized to do business in the State of Illinois, but, excluding, however, any securities issued by an Employer hereunder;

(h)    To exercise full discretionary authority to appoint a bank or banks or trust company or trust companies to be designated as corporate trustee or custodian, and to enter into and execute a trust agreement or trust agreements with such bank or banks or trust company or trust companies, to provide for the investment and reinvestment of assets of the Welfare Fund, with such other provisions incorporated therein as may be deemed desirable in the Trustees' sole discretion for the proper management of the Welfare Fund and upon such execution to convey and transfer to such corporate trustee or custodian all or any portion of the assets of the Welfare Fund;

(h)    To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or appropriate for the advantageous management, investment and distribution of the Welfare Fund and to carry out its purposes. The Trustees may delegate authority to an investment consultant, investment managers, corporate trustee or custodian to manage, invest and monitor the performance of managers and to take appropriate action concerning any such investments, including the voting of proxies on securities;

(i)    To cause the books and accounts of the Welfare Fund to be audited, at least annually, by a Certified Public Accountant, to furnish a copy of such audit to each Trustee and the Council, and to make a copy of any such audit available for inspection by authorized persons, during business hours, at the office of the Welfare Fund;

(k)    To enter into a reciprocal agreement with any other welfare fund relating to the contributions to be made by an Employer for any covered Employee during periods when such Employee is engaged in performing work in the geographical area in which such other welfare fund is operative and to provide for the transfer of contributions to reciprocal welfare funds on behalf of participants in such funds;

(l)    To exercise full discretionary authority to compromise, arbitrate, settle, adjust or release any suit or legal proceeding, claim, debt, damage action or undertaking due or owing from or to the Welfare Fund on such terms and conditions as the Trustees may deem advisable;

(m)    To appoint an "Administrator" who may be delegated all of the rights, duties and obligations of an "administrator" under the applicable provisions of ERISA;

(n)    To retain in cash (pending investment, reinvestment and payment of benefits) any portion of the Welfare Fund and to deposit cash in any banking institution as a depositary;

(o)    To establish and review periodically (but at least annually) a written funding policy for the investment of assets of the Welfare Fund and review an annual report concerning the Fund's liabilities and assets;

(p)     To keep a written account showing the net worth of the Welfare Fund, all investments, receipts, disbursements and other transactions made by the Trustees and any agents of the Trustees, which accounts will be audited annually as provided above. If, during the term of this Agreement, the Department of Labor issues regulations under ERISA regarding the valuation of securities or other assets for purposes of the reports required by ERISA, the Trustees shall use such valuation methods for purposes of the annual report described in this paragraph; and

(q)     To lease or purchase such premises, materials, supplies and equipment, and to employ legal counsel, investment counsel and accounting, actuarial, clerical or other agents or employees as the Trustees deem necessary or desirable.

Section 2.   APPOINTMENT OF INVESTMENT MANAGERS.   Notwithstanding any other provision of this Agreement, the Trustees may appoint an Investment Consultant to advise the Trustees on the allocation of investments, to assist in the selection of Investment Managers and custodians, to monitor the performance of Investment Managers and custodians, to vote proxies of the Trustees on securities and to represent the Trustees in such matters and one or more Investment Managers (as defined in Section 3(38) of ERISA) who shall have the power to manage, acquire, or dispose of specific portions of the Fund's assets as the Trustees shall determine and to act on behalf of the Trustees with respect thereto, subject to the following:

(a)     Any direction given to the Trustees by an Investment Manager shall be given in writing or given orally and confirmed in writing as soon thereafter as is practicable; and

(b)     The indicia of ownership of the assets of the Welfare Fund shall be held by the Trustees (or a custodian appointed by them) at all times.

Section 3.   DUTY OF TRUSTEES RE: ASSETS MANAGED BY INVESTMENT MANAGERS.   Notwithstanding any other provision of this Agreement, the Trustees shall adopt an investment policy, which shall be provided to an Investment Manager and, with respect to the assets of the Welfare Fund that an Investment Manager has been appointed to manage, the Trustees shall follow the direction of the Investment Manager and shall not be liable to anyone:

(a)     For any act or omission of the Investment Manager with respect to such assets;

(b)     For failing to act with respect to such assets absent direction from the Investment Manager; or

(c)     For failing to review the day to day actions of the Investment Managers as to such assets.

Section 4.   ALLOCATION OF TRUSTEE RESPONSIBILITIES.   The Trustees are specifically authorized to allocate among themselves any and all of the responsibilities, obligations and duties imposed on them by this Agreement, in which event, to the extent permitted by law, a Trustee to whom certain responsibilities, obligations or duties have not been allocated shall not be liable either individually or as a Trustee for any loss resulting to the Welfare Fund arising from the acts or omissions on the part of another Trustee to whom such responsibilities, obligations or duties have been allocated.

Section 5.  INSURANCE.  The Trustees are specifically authorized to purchase insurance for themselves and any other fiduciary through the Agreement to indemnify the insured against liability or losses occurring by reason of any act or omission of the insured, provided, however, that any contract providing such insurance must contain provisions permitting recourse by the insurer against the insured.

Section 6.  COMPENSATION AND EXPENSES.  The Trustees shall not receive any compensation from the Welfare Fund for services rendered hereunder, but shall be reimbursed for reasonable expenses actually and properly incurred in connection with the performance of their responsibilities.  The Trustees are authorized to pay from the Welfare Fund all of the Trustees' reasonable expenses, taxes and charges (including fees of persons employed by them in accordance with Section 1, paragraph (o) of this Article) incurred in connection with the collection, administration, management, investment, distribution and protection of the Welfare Fund, including without limitation, attendance at meetings and other functions of the Board of Trustees or its committees or while on business of the Board of Trustees, attendance at institutes and educational conferences, seminars or workshops for or on behalf of the Fund.

## ARTICLE V
## MANNER OF ACTING BY TRUSTEES

Section 1.  IN GENERAL.  The Trustees shall act by a majority of the Trustees by meeting, or by unanimous written consent of the Trustees without meeting, subject to the following:

(a)  Meetings of the Trustees shall be held at such times and place as is agreed by the Trustees and may be called on five (5) days' advance written notice by a majority of the Trustees or at any time, without notice, by the unanimous written consent of the Trustees. The Trustees may agree on the use of conference calls to conduct meetings and telefacsimiles and e-mail to give notice of consent to any action proposed to be taken by the Trustees or Administrator;

(b)  Two Employer Trustees and two Union Trustees shall constitute a quorum for any meeting of the Trustees;

(c)  Each Employer Trustee and Union Trustee, shall have one (1) vote on any matter brought before a meeting and, in his absence, such vote may be cast by another Trustee appointed by the Employers or the Union, as the case may be;

(d)  If a vacancy in the Board of Trustees exists, the remaining Trustees shall have the same powers as the full Board of Trustees until the vacancy is filled, subject to the following:

(i)  If there is a vacancy in the number of Union Trustees, then, with respect to any matter coming before the Board of Trustees, one Union Trustee (selected by the Union Trustees then acting) shall cast an additional vote for each existing vacancy in the number of Union Trustees.

(ii)  If there is a vacancy in the number of Employer Trustees, then, with respect to any matter coming before the Board of Trustees, one Employer Trustee (selected by the Employer Trustees then acting) shall cast an additional vote

for each existing vacancy in the number of Employer Trustees.

(e) It is the intention of the parties to this Agreement that any matter or action coming before the Board of Trustees be subject to the action of an equal number (actual or weighted) of Union Trustees and Employer Trustees;

(f) If a Trustee is absent from a meeting of the Board of Trustees, he may, but need not, cast a vote on any matter by written instrument filed with or telegram addressed to the Board of Trustees; and

(g) If a Trustee is absent from any meeting, then, to the extent permitted by law, he shall not be liable for any matter considered at that meeting on which he has not case a vote as provided by the foregoing sentence.

The certificate of one Employer Trustee and one Union Trustee or of the Administrator that the Board of Trustees has taken or authorized any action shall be conclusive in favor of any person relying on the certificate.

Section 2. RECORD OF TRUSTEES ACTIONS. The Trustees may select a Secretary to serve for a term of three (3) calendar years or until a successor has been duly elected. The Administrator, or in his absence a person appointed by the Trustees, shall prepare a draft of the minutes of each meeting and provide a copy to the Trustees as soon as practicable after the meeting is held. The Trustees will review and approve the minutes.

The Administrator shall act as the Fund's executive officer, with full power of administration under the general direction of the Trustees. The Trustees are specifically authorized to delegate to the Administrator any of the powers vested in the Trustees by this Agreement.

Section 3. ADMINISTRATIVE PERSONNEL. The Board of Trustees shall appoint the Administrator, actuary, Fund Counsel, auditor and such other managerial and legal and administrative staff as they deem reasonably necessary for the efficient administration of the Trust, and may delegate the appointment of Fund personnel to the Administrator.

Section 4. DISBURSEMENT OF WELFARE FUND. The Administrator, or any other Welfare Fund employee designated by the Trustees, may sign checks for any disbursement from the Welfare Fund approved by the Trustees.

Section 5. EXECUTION OF NOTICES AND DOCUMENTS. Except as specifically provided in Section 4 next above, the Board of Trustees may designate any equal number of Union Trustees and Employer Trustees to jointly execute, in writing, on behalf of the Board of Trustees, any notice or document, which executed notice or document shall be conclusive in favor of any person relying thereon.

14

## ARTICLE VI
## EMPLOYER CONTRIBUTIONS

Section 1. IN GENERAL. In order to fund the Benefits provided for by this Agreement, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the times required by that agreement. The rate of contributions shall be determined by the applicable Collective Bargaining Agreements or Participation Agreements, together with any amendments, supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work. No Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Welfare

Fund. The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit fees and investigative costs. The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject. In the event an Employer is repeatedly delinquent in its contribution payments to the Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust. The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ARTICLE VII
## FILING CLAIMS AND REVIEW OF DENIAL OF CLAIM

Section 1. FILING OF A CLAIM. Claims for the payment of any Benefits shall be filed, in writing, via common carrier, U.S. mail or electronic mail, in accordance with the Rules and Regulations of the Welfare Fund.

Section 2. ADJUDICATION OF CLAIMS AND APPEALS. The Trustees shall have the authority to adopt procedures for the review of claims and appeals of claims denied in whole or in part in accordance with ERISA and regulations adopted pursuant to ERISA. The Trustees have delegated authority to decide claims to the Claims Department and to decide appeals to the Claims Committee of the Board of Trustees. The procedures may be changed from time to time at the discretion of the Board of Trustees. The current procedures for claims and appeals are set forth in the Summary Plan Description of the Welfare Fund.

The Trustees and/or the Claims Committee have full discretionary authority to determine eligibility for Benefits under the Plan and to interpret the Plan, all Plan documents, rules, procedures, and the terms of the Trust Agreement. Their decisions and interpretations will be given the maximum deference permitted by law for the exercise of such full discretionary authority, they will be binding upon all involved persons.

## ARTICLE VIII
## DUTY TO COOPERATE

All of the Trustees and all directors, officers, employees or other representatives of any Employer Association or Council party to this agreement shall be required to assist and cooperate with authorized representatives of the Welfare Fund, its attorneys, auditors, or other authorized representatives in the prosecution of claims for or against the Welfare Fund.

Specifically, an Employer shall provide to the Board of Trustees on request in the course of any audit deemed necessary or advisable by the Trustees the records set forth in the Policy for Retention and Production of Employer Records attached hereto as Addendum A.

Furthermore, any Employer who is unable to produce adequate records to enable Trustees to perform the audit, shall be deemed to have authorized the Board of Trustees to contact the Internal Revenue Service and the Illinois Department of Revenue with permission to obtain all relevant information which may have been filed with said governmental agencies by such Employer.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

Section 1. VESTED RIGHTS. No Employee or any person claiming by or through such

Employee, including his family, dependents, beneficiary and/or legal representative, shall have any right, title or interest in or to the Welfare Fund or any property of the Welfare Fund or any part thereof except as may be specifically determined by the Trustees and required by ERISA.

Section 2. ENCUMBRANCE OF BENEFITS. No monies, property or equity, of any nature whatsoever, in the Fund, or policies or benefits or monies payable therefrom, shall be subject in any manner by an Employee or person claiming through such Employee to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void. The Fund shall not in any manner be liable for, or subject to the debts, contracts, liabilities, engagements or torts of any person entitled to Benefits hereunder. Notwithstanding the foregoing, Benefits will be paid in accordance with any Qualified Medical Child Support Order as defined in Section 609 of ERISA.

Section 3. PAYMENTS TO PERSONS UNDER LEGAL DISABILITY. In case any Benefit payments hereunder become payable to a person under legal disability, or to a person not adjudicated incompetent but, by reason of mental or physical disability, in the opinion of the Board of Trustees, who is unable to administer properly such payments, then such payments may be paid out by the Board of Trustees for the benefit of such person in such of the following ways as it thinks best, and the Board of Trustees shall have no duty or obligation to see that the payments are used or applied for the purpose or purposes for which paid:

(a)     Directly to any such person;

(b)     To the legally appointed guardian or conservator of such person;

(c)     To any spouse, parent, brother or sister of such person for his welfare, support and maintenance; or

(d)     By the Board of Trustees using such payments directly for the support, maintenance and welfare of any such person.

Section 4. SITUS. The State of Illinois shall be deemed the situs of the Welfare Fund created hereunder. All questions pertaining to validity, construction and administration shall be determined in accordance with the laws of the State of Illinois to the extent that such laws are not preempted by the laws of the United States of America. Jurisdiction and venue for all litigation under Federal statutes shall be in the Federal District Court for the Northern District of Illinois

Section 5. CONSTRUCTION OF TERMS. Where the context admits in this Agreement, words in the masculine gender shall include the feminine and neuter genders, the plural shall include the singular and the singular shall include the plural.

Section 6. NOTIFICATION OF TRUSTEES. The address of each of the Trustees shall be provided to the Administrator by the Trustee. Any change of address shall be effected by written notice to the Administrator.

Section 7. SEVERABILITY. All provisions of this Agreement are intended to comply with the applicable provisions of ERISA, the Labor Management Relations Act of 1947, as amended, the Labor-Management Reporting and Disclosure Act of 1959, as amended, and all

other applicable laws, rules and regulations. However, should any provision of this Agreement or any Collective Bargaining Agreement or Participation Agreement be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the provisions herein and therein contained unless such illegality shall make impossible or impractical the functioning of the Trust, and in such case the appropriate parties shall immediately adopt a new provision to replace the illegal and/or invalid provision.

Section 8. COUNTERPARTS. This Agreement may be executed in two or more counterparts, any one of which will be an original without reference to the others.

## ARTICLE X
## CHANGE OF TRUSTEE

Section 1. RESIGNATION. A Trustee may resign at any time by giving thirty-(30) days' advance written notice to the entity that appointed him and to the Board of Trustees. Notice to the Board of Trustees shall be mailed to it, by certified mail, at the office of the Welfare Fund.

Section 2. REMOVAL OF TRUSTEE AND APPOINTMENT OF SUCCESSOR TRUSTEE. A Union Trustee may be removed by the Council effective on receipt by the Board of Trustees of written notice of removal from the President/Secretary/Treasurer and Business Manager of the Council. The Council shall appoint a successor Trustee which appointment shall be effective on receipt of written notice by the Board of Trustees of the appointment from the President/Secretary/Treasurer of the Council and of a written acceptance of his appointment from the individual appointed as successor Trustee. An Employer Trustee may be removed by the Association that appointed him effective on receipt by the Board of Trustees of written notice of removal from the President of that Association. The removing Association shall appoint a successor Trustee which appointment shall be effective on receipt of written notice by the Board of Trustees of the appointment from the President of that Association and of a written acceptance of his appointment from the individual appointed as successor-Trustee. The Jointly Appointed Arbitrator may be removed at any time by majority vote of the Board of Trustees and a successor Jointly Appointed Arbitrator may be appointed by it. The appointment of a successor Jointly Appointed Arbitrator shall be effective on receipt by the Board of Trustees of a written acceptance of his appointment from the person appointed as successor. No successor Trustee shall be personally liable for any act or failure to act of a predecessor Trustee.

## ARTICLE XI
## AMENDMENT AND TERMINATION

Section 1. AMENDMENT. The Board of Trustees has full discretionary authority to amend this Agreement from time to time, except as follows:

    (a)    In no event shall an amendment result in an alteration of the basic principles of this Agreement.

(b)     No amendment shall result in the repayment or reversion to any Employer of any portion of the Welfare Fund.

Any amendment shall be in writing and shall be effective as of the date designated by the Board of Trustees. The Administrator shall distribute a copy of each amendment to each Trustee and shall attach a copy thereof to the minutes of the meeting of the Board of Trustees at which it is adopted. The Board of Trustees shall notify all necessary parties and shall execute any instrument necessary in connection with the amendment.

Section 2. TERMINATION. This Agreement may be terminated by written instrument executed by:

(a)     All of the Trustees when there is no longer a Collective Bargaining Agreement or Participation Agreement requiring contributions to the Welfare Fund in effect between any Employer and the Union or the Trustees; or

(b)     All of the Associations set forth in Article III, Section 2 of this Agreement (and as it may be amended from time to time) and the Union. All necessary provisions of this Agreement shall continue in effect until all assets of the Welfare Fund allocable to Employees and beneficiaries have been distributed or applied by the Trustees.

Section 3. NOTIFICATION OF TERMINATION. The Board of Trustees shall notify the Council, each Employer and all persons entitled to Benefits under the Welfare Fund of the termination of this Trust Agreement within the time required by law.

IN WITNESS WHEREOF, the Trustees have executed this Restated Agreement and Declaration of Trust on the dates indicated.

Charles J. Gallagher

Date _____5-11-04_____

James P. Connolly

Date _____5/11/04_____

David H. Lorig

Date _____5/11/04_____

Randy Dalton

Date _____5-11-04_____

Dennis Martin

Date _____5/11/04_____

Martin Flanagan

Date _____5/11/04_____

Tim J. Scully

Date _____5/11/04_____

Liberato Naimoli

Date _____5/11/04_____

Roger T. Vignocchi

Date _____5/11/04_____

Scott Pavlis

Date _____5/11/04_____

Sam Vinci

Date _____5-11-04_____

Frank Riley

Date _____5/11/04_____

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1.   Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2.   Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3.   Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4.   Cash disbursement journals and general ledgers.

5.   Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6.   Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7.   Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8.   Daily time records filed by employees or supervisors.

9.   Source documents and lists of job codes and equipment codes.

10.   Certified payrolls for public sector jobs where such payrolls are required.

11.   Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

May-09-2007 12:25pm From-Laborers Pen & Wel Funds T-551 P.005/005 F-615

AMENDMENT TO THE
RESTATED AGREEMENT AND DECLARATION OF TRUST
OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND
GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

WHEREAS, Article XI of the Restated Agreement and Declaration of Trust ("Trust Agreement") provides that the Board of Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Fund") have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

1

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

I.

**The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":**

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

II.

**The following is added as Section (4) to Article VI, "Employer Contributions":**

"Section 4.  ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a)    EMPLOYER OWNED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part,  by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)    EMPLOYER OPERATED BY DEADBEAT EMPLOYER.  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

2

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c)     PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.  The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund. The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section.  Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable.  Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d)     MISCELLANEOUS PROVISIONS.  The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

## III.

Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.

**IN WITNESS WHEREOF**, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

| | |
|---|---|
| **CHARLES J. GALLAGHER**  DATE | **JAMES P. CONNOLLY**  9/19/06  DATE |
| **ALAN ESCHE**  9/19/06  DATE | **RANDY DALTON**  9/19/06  DATE |
| **RICHARD E. GRABOWSKI**  9/19/06  DATE | **MARTIN FLANAGAN**  9-19-06  DATE |
| **DAVID H. LORIG**  9/19/06  DATE | **LIBERATO NAIMOLI**  9/19/06  DATE |
| **DENNIS MARTIN**  9/19/06  DATE | **SCOTT PAVLIS**  9/19/06  DATE |
| **TIM J. SCULLY**  9/19/06  DATE | **FRANK RILEY**  9/19/06  DATE |

# AGREEMENT
# AND
# DECLARATION OF TRUST
# OF THE
# CHICAGO LABORERS'
# DISTRICT COUNCIL
# RETIREE HEALTH AND
# WELFARE FUND

Effective as of
June 1, 2014

Exhibit A-5

## TABLE OF CONTENTS

**ARTICLE I  CERTAIN DEFINITIONS** ................................................................................. 1

Section 1.  RETIREE WELFARE FUND. ............................................................................. 1

Section 2.  EMPLOYER ........................................................................................................ 1

Section 3.  EMPLOYEE ......................................................................................................... 3

Section 4.  TRUSTEES ........................................................................................................... 4

Section 5.  CONTRIBUTIONS .............................................................................................. 4

Section 6.  BENEFITS ............................................................................................................ 4

Section 7.  WRITTEN AGREEMENT .................................................................................... 4

Section 8.  ERISA ................................................................................................................... 4

Section 9.  COLLECTIVE BARGAINING AGREEMENT OR PARTICIPATION AGREEMENT ..... 4

Section 10.  COVERED EMPLOYMENT ............................................................................. 5

Section 11.  PARTICIPANT .................................................................................................. 5

Section 12.  TRUST AGREEMENT ...................................................................................... 5

Section 13.  TRUSTEES ........................................................................................................ 5

Section 14.  COUNCIL AND UNION ................................................................................... 5

**ARTICLE II  GENERAL PURPOSES OF RETIREE WELFARE FUND** ........................... 5

**ARTICLE III  OPERATION AND ADMINISTRATION OF RETIREE WELFARE FUND** ........... 6

Section 1.  THE BOARD OF TRUSTEES .............................................................................. 6

Section 2.  EMPLOYER TRUSTEES ..................................................................................... 6

Section 3.  UNION TRUSTEES .............................................................................................. 6

Section 4.  ACCEPTANCE OF TRUSTEESHIP .................................................................... 6

Section 5.  JOINTLY APPOINTED ARBITRATOR .............................................................. 6

Section 6.  TERM OF TRUSTEES AND JOINTLY APPOINTED ARBITRATOR ................. 7

Section 7.  ADDITIONAL TRUSTEES .................................................................................. 7

**ARTICLE IV  RELATING TO THE TRUSTEES** ................................................................. 7

i

Section 1. GENERAL POWERS ................................................................................. 7

Section 2. APPOINTMENT OF INVESTMENT MANAGERS ............................................. 9

Section 3. DUTY OF TRUSTEES RE: ASSETS MANAGED BY INVESTMENT MANAGERS ....... 9

Section 4. ALLOCATION OF TRUSTEE RESPONSIBILITIES ........................................... 9

Section 5. INSURANCE ........................................................................................ 9

Section 6. COMPENSATION AND EXPENSES ............................................................ 10

**ARTICLE V  MANNER OF ACTING BY TRUSTEES** ................................................ 10

Section 1. IN GENERAL ...................................................................................... 10

Section 2. RECORD OF TRUSTEES ACTIONS .......................................................... 11

Section 3. ADMINISTRATIVE PERSONNEL ............................................................. 11

Section 4. DISBURSEMENT OF RETIREE WELFARE FUND ........................................ 11

Section 5. EXECUTION OF NOTICES AND DOCUMENTS ........................................... 11

**ARTICLE VI  EMPLOYER CONTRIBUTIONS** ....................................................... 11

Section 1. IN GENERAL ...................................................................................... 11

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS .......................................... 12

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS ................. 13

Section 4. ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS ..................... 14

**ARTICLE VII  FILING CLAIMS AND REVIEW OF DENIAL OF CLAIM** ..................... 15

Section 1. FILING OF A CLAIM ............................................................................ 15

Section 2. ADJUDICATION OF CLAIMS AND APPEALS ............................................. 15

**ARTICLE VIII  DUTY TO COOPERATE** ............................................................. 15

**ARTICLE IX  MISCELLANEOUS PROVISIONS** ................................................... 16

Section 1. VESTED RIGHTS ................................................................................ 16

Section 2. ENCUMBRANCE OF BENEFITS ............................................................. 16

Section 3. PAYMENTS TO PERSONS UNDER LEGAL DISABILITY ............................... 16

Section 4. SITUS ............................................................................................... 16

Section 5. CONSTRUCTION OF TERMS ................................................................ 17

Section 6. NOTIFICATION OF TRUSTEES ........................................................... 17

Section 7. SEVERABILITY ..................................................................................... 17

Section 8. COUNTERPARTS ................................................................................... 17

**ARTICLE X  CHANGE OF TRUSTEE** ................................................................... 17

Section 1. RESIGNATION ....................................................................................... 17

Section 2. REMOVAL OF TRUSTEE AND APPOINTMENT OF SUCCESSOR TRUSTEE............ 17

**ARTICLE XI  AMENDMENT AND TERMINATION** ............................................. 18

Section 1. AMENDMENT ......................................................................................... 18

Section 2. TERMINATION ....................................................................................... 18

Section 3. NOTIFICATION OF TERMINATION .................................................... 18

**AGREEMENT AND**
**DECLARATION OF TRUST OF**
**THE CHICAGO LABORERS' DISTRICT COUNCIL**
**RETIREE HEALTH AND WELFARE FUND**

THIS AGREEMENT AND DECLARATION OF TRUST creating the Chicago Laborers' District Council Retiree Health and Welfare Fund, is made and entered into the 1st day of June, 2014, between CONSTRUCTION GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, A.F.L.-C.I.O., (the "Council") representing its affiliated local unions (the "Unions") and the members thereof (collectively "the Union") and UNDERGROUND CONTRACTORS ASSOCIATION, MASON CONTRACTORS' ASSOCIATION OF GREATER CHICAGO, ILLINOIS ROAD AND TRANSPORTATION BUILDERS' ASSOCIATION, CONCRETE CONTRACTORS' ASSOCIATION OF GREATER CHICAGO, and LAKE COUNTY CONTRACTORS ASSOCIATION and all other employer associations (the "Associations") who were parties to collective bargaining agreements with the Union, with representatives of this Trust, for and on behalf of themselves and their respective members  and other employers in the building and construction trades and related industries who are included in the term "Employers" (as defined in Section 2 of ARTICLE I of this Agreement) and agreed to be bound by this Agreement or who are otherwise so bound as provided as set forth in Section 2 of ARTICLE I of this Agreement;

NOW, THEREFORE, the parties to the Trust Agreement hereby agree that the Trust Agreement shall provide as follows:

**ARTICLE I**
**CERTAIN DEFINITIONS**

Unless the context or subject matter otherwise requires, the following definitions shall govern in this Agreement.

Section 1. RETIREE WELFARE FUND. The term "Retiree Welfare Fund" means the trust fund, established and administered under the terms of this Agreement and includes all property of every kind held by the Trustees hereunder. The assets of the Retiree Welfare Fund are to be used for the purposes generally described in Section 302(c) of the Labor Management Relations Act of 1947, as amended by the applicable provisions of ERISA (as defined in Section 8 next below).

Section 2. EMPLOYER. The term "Employer" as used herein shall mean any Employer who:

(a)   Now or hereafter is a party to a Collective Bargaining Agreement with the Union, requiring periodic contributions to the Retiree Welfare Fund or who in the past has been a party to such a Collective Bargaining Agreement, if such agreement has not been terminated by its terms or by operation of law;

(b)   Is a party to any memorandum of understanding or memorandum of agreement or similar instrument with the Unions, which by its terms incorporates by reference a

complete Collective Bargaining Agreement which requires the parties thereto to make contributions to the Retiree Welfare Fund;

(c)    In writing adopts and agrees to be bound by the terms and provisions of this Agreement as the same may be amended or modified from time to time;

(d)    Is a party to any written instrument which evidences an agreement to be bound by the provisions of this Agreement, including but not limited to, a contribution report form listing the employees on whose behalf contributions are remitted and provisions expressly binding such Employer to the Agreement or otherwise evidencing such Employer's intention to be so bound by the making of such contributions;

(e)    By any course of conduct, including but not limited to, oral representations to Employees, representatives of the Union, Trustees, attorneys or other persons, ratifies or accepts the provisions of any Collective Bargaining Agreement which requires contributions to the Retiree Welfare Fund continued hereby or of this Agreement itself, or of any other written instrument which binds such Employer to make contributions to the Retiree Welfare Fund, and by which the Employer is estopped to deny such obligation;

(f)    Is a member of any of the associations named in Article III ("Association"), or hereafter becomes a member of any of the Associations, named herein or who was a member at any time when representatives of said Associations commenced negotiations of a Collective Bargaining Agreement on behalf of its members whether or not said membership is held current at all times; or

(g)    Is a member of any other multi-employer bargaining units, or hereafter becomes a member of any of said multi-employer bargaining units, which has a Collective Bargaining Agreement with the Council or Unions.

The term "Employer," shall also mean the Union, for the purpose of providing benefits hereunder for the eligible Employees of the Council and Unions for whom the Council or Unions contribute to the Retiree Welfare Fund.

The term "Employer" shall also mean the Board of Trustees of this Fund and the boards of trustees of other funds sponsored by the Union, namely, the Laborers' Pension Fund; the Chicagoland Laborers' Training and Apprentice Fund, Laborers-Employers Cooperative Education and Trust; and Laborers' District Council Laborers-Management Cooperation Committee for the purpose of providing benefits for the eligible employees of such funds for whom contributions are made to the Retiree Welfare Fund.

The term "Employer" shall also mean, for the purpose of providing benefits hereunder for its eligible Employees, an Association which is party to a Collective Bargaining Agreement with the Union whereunder it is agreed that the Employer members of such Association shall make Employer contributions to the Retiree Welfare Fund. An Association shall be permitted to contribute provided that the Trustees approve such participation, the Association and Trustees sign a Participation Agreement and the Association makes timely contributions on behalf of all eligible employees.

A person or entity that has become an Employer under this Agreement pursuant to a

Collective Bargaining Agreement or other written agreement with the Union shall continue as such until it is no longer obligated pursuant to such Written Agreement (as defined in Section 7 next below) or by the National Labor Relations Act or other legally enforceable obligation to make contributions to the Retiree Welfare Fund.

A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Retiree Welfare Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Retiree Welfare Fund. For purposes of this Section, substantial liability shall not be less than $30,000.

Section 3. EMPLOYEE. The term "Employee," as used herein, shall mean any of the following persons without regard to race, color, creed, national origin, religion or union membership.

    (a)    Any person covered by a Collective Bargaining Agreement between an Employer and the Union who is engaged in employment with respect to which the Employer is obligated by the Collective Bargaining Agreement to make contributions to the Retiree Welfare Fund;

    (b)    Any person employed by an Employer who performs work within the jurisdiction of the Council as said jurisdiction is set forth in any applicable Collective Bargaining Agreement or by any custom or practice in the geographic area within which the Employer operates and his Employees perform work;

    (c)    Any person on whose behalf an Employer has made contributions to the Retiree Welfare Fund and has reported same on a standard report form which contains a provision binding said Employer to the provisions of this Agreement or otherwise evidencing said Employer's intent to be so bound.

    (d)    Any person employed by an Employer who has signed any memorandum of understanding incorporating by reference the provisions of any applicable Collective Bargaining Agreement or the provisions of this Agreement where such person is covered by an agreement which incorporates this Agreement by reference or both;

    (e)    Any person who is not covered by a Collective Bargaining Agreement but on whose behalf his Employer is otherwise obligated to make contributions to the Retiree Welfare Fund in accordance with the provisions of this Agreement who performs work which would be work performed by members of a bargaining unit recognized by the Employer or certified by the National Labor Relations Board if said person's Employer were a party to any of the standard Collective Bargaining Agreements by and between the Union and any of the aforementioned Associations; or

    (f)    Any Employee in a certified or recognized collective bargaining unit represented by the Union.

The term "Employee" shall also mean all eligible persons employed by the Union, on whose behalf the Union shall make payments to the Retiree Welfare Fund at the times and at the

rate of payment equal to that made by any other Employer who is a party to this Agreement.

The term "Employee" shall also mean all eligible persons employed by the Trust or a fund sponsored by the Union, with the approval of the Trustees in either case, on whose behalf the Board of Trustees or trustees of said fund shall make payments to the Retiree Welfare Fund, at the times and at the rate of payment not less than that made by any other Employer who is a party to this Agreement.

The term "Employee" shall also mean all eligible persons employed by an Association of Employers on whose behalf the Association shall make payments to the Retiree Welfare Fund at the times and at the rate of payment not less than that made by any other Employer which is a party to this Agreement.

Section 4. TRUSTEES. Subject to the provisions of this Agreement, the term "Trustees" shall include the Union Trustees, the Employer Trustees and their successors designated and appointed in accordance with the terms of this Agreement who shall, collectively, serve as the members of the "Board of Trustees" (as described in ARTICLE III) hereunder.

Section 5. CONTRIBUTIONS. The term "Contributions" shall mean the monies paid to the Retiree Welfare Fund by Employers on behalf of Employees pursuant to applicable Written Agreements or as otherwise required hereby, which shall be held by the Trustees for the purposes set forth herein.

Section 6. BENEFITS. The term "Benefits" shall mean payments, whether from the principal or income, or both, of the Retiree Welfare Fund for the benefit of Employees, their families and dependents, such as medical, surgical, hospital care, dental, vision, prescription drug, life, sickness and disability benefits.

Section 7. WRITTEN AGREEMENT. The term "Written Agreement" shall mean any agreement in writing which specifies the detailed basis on which contributions shall be made to the Retiree Welfare Fund together with any modification, amendment or renewals thereof, including but not limited to Collective Bargaining Agreements, Participation Agreements, memoranda of understanding which incorporate by reference Collective Bargaining Agreements or this Agreement, report forms in accordance with which contributions are made and which obligate the Employer to the provisions of this Agreement, or any other agreement obligating the Employer signatory thereto to participate in or be bound by this Agreement.

Section 8. ERISA. The term "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

Section 9. COLLECTIVE BARGAINING AGREEMENT OR PARTICIPATION AGREEMENT. "Collective Bargaining Agreement" or "Participation Agreement" means a written agreement between the Union and an Employer or an Association of Employers or a Participation Agreement between the Board of Trustees and an Employer which requires contributions to the Retiree Welfare Fund.

4

Section 10.  COVERED EMPLOYMENT.  "Covered Employment" means employment for which an Employer is obligated to contribute to the Retiree Welfare Fund.

Section 11.  PARTICIPANT.  "Participant" means an Employee who meets the requirements for participation in the retiree plans of benefits or a former Employee, Spouse or Dependent who is eligible for benefits thereunder.

Section 12.  TRUST AGREEMENT.  "Trust Agreement" means this Agreement and Declaration of Trust establishing the Laborers' Retiree Welfare Fund.

Section 13.  TRUSTEES.  "Trustees" means the Board of Trustees as established and constituted in accordance with this Trust Agreement.

Section 14.  COUNCIL AND UNION.  "Council" means the Construction and General Laborers' District Council of Chicago and Vicinity and "Union" means, collectively the Council and all of the local unions now or hereafter affiliated therewith.

## ARTICLE II
## GENERAL PURPOSES OF RETIREE WELFARE FUND

The Retiree Welfare Fund shall be used for the exclusive purposes of:
(a)  Providing retiree welfare benefits to eligible Employees and their families and dependents, which benefits, to the extent possible shall include:
   1.  medical, surgical and hospital care;
   2.  death benefit payments;
   3.  dental, vision and prescription drug benefits; and
   4.  disability, accident and sickness benefits; and
(b)  For defraying reasonable expenses of administering and operating the retiree welfare benefit program.

Provisions for rendering such benefits described in (a) next above and other related retiree welfare purposes shall be made from time to time by the Trustees, either on an insured or self-insured basis, and such payments and provisions, limitations and conditions for benefits shall be scheduled and prescribed in writing as the Trustees shall determine from time to time. All benefit programs inaugurated by the Trustees shall be subject to the applicable limitations of law and shall not be inaugurated unless the Trustees have conducted a thorough investigation and have thereby determined that the proposed benefit program is actuarially sound and financially and administratively practicable, and provided such benefit program requires adjustment of all claims, other than death benefits, through competent adjusters selected by the Administrator and Fund staff (as described in Article III of this Agreement).

## ARTICLE III
## OPERATION AND ADMINISTRATION OF RETIREE WELFARE FUND

Section 1.  THE BOARD OF TRUSTEES.  Except as otherwise specifically provided, the Retiree Welfare Fund shall be operated and administered by a Board of Trustees whose membership shall consist of six persons appointed as Trustees by Associations (known as the "Employer Trustees") as provided in Section 2 next below and six persons appointed as Trustees by the Council (known as the "Union Trustees") as provided in Section 3 next below.  The Employer Trustees and the Union Trustees may jointly appoint a person to act as a "Jointly Appointed Arbitrator," as provided in Section 5 next below.

An Association-appointed Trustee must be a full-time employee of a contributing Employer within the Associations' membership that has employed an average of five (5) or more laborers performing bargaining unit work for whom contributions have been made per month in each of the previous three (3) calendar years.

Section 2.  EMPLOYER TRUSTEES.  The Employer Trustees shall be the following persons appointed by the entity indicated:
- (a)  Julie Chamberlin, appointed by the Underground Contractors' Association;
- (b)  Clifton M. Horn, appointed by the Mason Contractors Association of Greater Chicago;
- (c)  Charles J. Gallagher and David H. Lorig, appointed by the Illinois Road and Transportation Builders Association;
- (d)  Dennis P. Martin, appointed by the Concrete Contractors Association of Greater Chicago; and
- (e)  Anthony J. Riccardi, appointed by the Lake County Contractors' Association.

Section 3.  UNION TRUSTEES.  The Union Trustees shall be James P. Connolly, Charles V. Loverde, III, Martin T. Flanagan, Antonio S. Castro, Scott Pavlis and Richard Kuczkowski.

Section 4.  ACCEPTANCE OF TRUSTEESHIP.  The Employer Trustees and the Union Trustees have accepted their trusteeship hereunder.

Section 5.  JOINTLY APPOINTED ARBITRATOR.  Pursuant to applicable statutes and pursuant to the terms of this Agreement, a deadlock on a motion may arise.  In such event, the Motion may be withdrawn and no further action need be required to be taken.  If said Motion is not withdrawn, and the deadlock remains, then in the case of a deadlock, the Trustees shall meet for the purpose of agreeing upon a Jointly Appointed Arbitrator to break such deadlock by deciding the dispute in question.  In the event of the inability of the Trustees to agree upon the selection of such Jointly Appointed Arbitrator within a reasonable time, then, on the petition of either the Union Trustees or the Employer Trustees, the Federal District Court of the United States where the Fund maintains its principal office shall appoint an impartial Arbitrator.  Such impartial Arbitrator shall immediately proceed to hear the dispute between the Trustees and decide such dispute, and the decision and award of such Arbitrator shall be final and binding upon the parties.  The reasonable compensation of such Arbitrator and the costs and expenses

6

(including, without limitation, attorneys' and reporter fees) incidental to any proceedings instituted to break a deadlock shall be paid by the Trust Fund.

Section 6. TERM OF TRUSTEES AND JOINTLY APPOINTED ARBITRATOR. Subject to the provisions of Article XI of this Agreement, the term of the Jointly Appointed Arbitrator shall end upon resolving the deadlock. Each Union and Employer Trustee shall serve for a term of three (3) calendar years.

Section 7. ADDITIONAL TRUSTEES. The parties to this Agreement reserve the right to change the number of Trustees; provided, however, that there shall always be an equal number of Union Trustees and Employer Trustees.

## ARTICLE IV
## RELATING TO THE TRUSTEES

Section 1. GENERAL POWERS. The Trustees shall have the following powers, rights and duties in addition to those provided elsewhere in this Agreement or by law.

(a) To exercise full discretionary authority to construe the provisions of this Trust Agreement and any amendment to it. The Trustees have full discretionary authority to interpret the retiree welfare plans of benefit, and retiree plan documents, rules, regulations, and procedures, including procedures for collection of Employer Contributions;

(b) To exercise full discretionary authority to formulate, promulgate, construe and apply the provisions of this Trust Agreement and any amendments and the retiree plan's rules and regulations. The Trustees have full discretionary authority to modify and interpret the Retiree Welfare Fund's documents, rules and procedures. Their interpretation will be given the maximum deference permitted by law for the exercise of such full discretionary authority, and it will be binding for all involved persons. The action adopted by the Trustees shall be binding upon the Union, any Association, all Employers, all Employees and all Participants and beneficiaries who may be covered under the Plan;

(c) To exercise full discretionary authority to enter into any and all contracts and agreements for carrying out the terms of this Agreement and for the administration of the Retiree Welfare Fund and to do all acts as they, in their discretion, may deem necessary and advisable;

(d) To exercise full discretionary authority to establish and accumulate as part of the Retiree Welfare Fund's assets a reserve or reserves adequate, in the opinion of the Trustees, to carry out the purposes of this Agreement;

(e) To pay out of the Retiree Welfare Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Retiree Welfare Fund or any money, property or securities forming a part thereof;

(f) To receive contributions or payments from any source whatsoever to the extent permitted by law;

(g) To exercise full discretionary authority to invest and reinvest the assets of the

Retiree Welfare Fund in property of any kind, real or personal, including group contracts issued by any life insurance company authorized to do business in the State of Illinois, but, excluding, however, any securities issued by an Employer hereunder;

(h)    To exercise full discretionary authority to appoint a bank or banks or trust company or trust companies to be designated as corporate trustee or custodian, and to enter into and execute a trust agreement or trust agreements with such bank or banks or trust company or trust companies, to provide for the investment and reinvestment of assets of the Retiree Welfare Fund, with such other provisions incorporated therein as may be deemed desirable in the Trustees' sole discretion for the proper management of the Retiree Welfare Fund and upon such execution to convey and transfer to such corporate trustee or custodian all or any portion of the assets of the Retiree Welfare Fund;

(i)    To do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or appropriate for the advantageous management, investment and distribution of the Retiree Welfare Fund and to carry out its purposes. The Trustees may delegate authority to an investment consultant, investment managers, corporate trustee or custodian to manage, invest and monitor the performance of managers and to take appropriate action concerning any such investments, including the voting of proxies on securities;

(j)    To cause the books and accounts of the Retiree Welfare Fund to be audited, at least annually, by a Certified Public Accountant, to furnish a copy of such audit to each Trustee and the Council, and to make a copy of any such audit available for inspection by authorized persons, during business hours, at the office of the Retiree Welfare Fund;

(k)    To enter into a reciprocal agreement with any other welfare fund relating to the contributions to be made by an Employer for any covered Employee during periods when such Employee is engaged in performing work in the geographical area in which such other welfare fund is operative and to provide for the transfer of contributions to reciprocal welfare funds on behalf of participants in such funds;

(l)    To exercise full discretionary authority to compromise, arbitrate, settle, adjust or release any suit or legal proceeding, claim, debt, damage action or undertaking due or owing from or to the Retiree Welfare Fund on such terms and conditions as the Trustees may deem advisable;

(m)    To appoint an "Administrator" who may be delegated all of the rights, duties and obligations of an "administrator" under the applicable provisions of ERISA;

(n)    To retain in cash (pending investment, reinvestment and payment of benefits) any portion of the Retiree Welfare Fund and to deposit cash in any banking institution as a depositary;

(o)    To establish and review periodically (but at least annually) a written funding policy for the investment of assets of the Retiree Welfare Fund and review an annual report concerning the Fund's liabilities and assets;

(p)    To keep a written account showing the net worth of the Retiree Welfare Fund, all investments, receipts, disbursements and other transactions made by the Trustees and any agents of the Trustees, which accounts will be audited annually as

provided above. If, during the term of this Agreement, the Department of Labor issues regulations under ERISA regarding the valuation of securities or other assets for purposes of the reports required by ERISA, the Trustees shall use such valuation methods for purposes of the annual report described in this paragraph; and

(q)     To lease or purchase such premises, materials, supplies and equipment, and to employ legal counsel, investment counsel and accounting, actuarial, clerical or other agents or employees as the Trustees deem necessary or desirable.

Section 2.   APPOINTMENT OF INVESTMENT MANAGERS.   Notwithstanding any other provision of this Agreement, the Trustees may appoint an Investment Consultant to advise the Trustees on the allocation of investments, to assist in the selection of Investment Managers and custodians, to monitor the performance of Investment Managers and custodians, to vote proxies of the Trustees on securities and to represent the Trustees in such matters and one or more Investment Managers (as defined in Section 3(38) of ERISA) who shall have the power to manage, acquire, or dispose of specific portions of the Fund's assets as the Trustees shall determine and to act on behalf of the Trustees with respect thereto, subject to the following:

(a)     Any direction given to the Trustees by an Investment Manager shall be given in writing or given orally and confirmed in writing as soon thereafter as is practicable; and

(b)     The indicia of ownership of the assets of the Retiree Welfare Fund shall be held by the Trustees (or a custodian appointed by them) at all times.

Section 3.   DUTY OF TRUSTEES RE: ASSETS MANAGED BY INVESTMENT MANAGERS.   Notwithstanding any other provision of this Agreement, the Trustees shall adopt an investment policy, which shall be provided to an Investment Manager and, with respect to the assets of the Retiree Welfare Fund that an Investment Manager has been appointed to manage, the Trustees shall follow the direction of the Investment Manager and shall not be liable to anyone:

(a)     For any act or omission of the Investment Manager with respect to such assets;

(b)     For failing to act with respect to such assets absent direction from the Investment Manager; or

(c)     For failing to review the day to day actions of the Investment Managers as to such assets.

Section 4.   ALLOCATION OF TRUSTEE RESPONSIBILITIES.   The Trustees are specifically authorized to allocate among themselves any and all of the responsibilities, obligations and duties imposed on them by this Agreement, in which event, to the extent permitted by law, a Trustee to whom certain responsibilities, obligations or duties have not been allocated shall not be liable either individually or as a Trustee for any loss resulting to the Retiree Welfare Fund arising from the acts or omissions on the part of another Trustee to whom such responsibilities, obligations or duties have been allocated.

Section 5. INSURANCE.   The Trustees are specifically authorized to purchase insurance for themselves and any other fiduciary through the Agreement to indemnify the insured against liability or losses occurring by reason of any act or omission of the insured, provided, however,

that any contract providing such insurance must contain provisions permitting recourse by the insurer against the insured.

Section 6.  COMPENSATION AND EXPENSES.  The Trustees shall not receive any compensation from the Retiree Welfare Fund for services rendered hereunder, but shall be reimbursed for reasonable expenses actually and properly incurred in connection with the performance of their responsibilities.  The Trustees are authorized to pay from the Retiree Welfare Fund all of the Trustees' reasonable expenses, taxes and charges (including fees of persons employed by them in accordance with Section 1, paragraph (o) of this Article) incurred in connection with the collection, administration, management, investment, distribution and protection of the Retiree Welfare Fund, including without limitation, attendance at meetings and other functions of the Board of Trustees or its committees or while on business of the Board of Trustees, attendance at institutes and educational conferences, seminars or workshops for or on behalf of the Fund.


**ARTICLE V**
**MANNER OF ACTING BY TRUSTEES**

Section 1.  IN GENERAL.  The Trustees shall act by a majority of the Trustees by meeting, or by unanimous written consent of the Trustees without meeting, subject to the following:

(a)  Meetings of the Trustees shall be held at such times and place as is agreed by the Trustees and may be called on five (5) days' advance written notice by a majority of the Trustees or at any time, without notice, by the unanimous written consent of the Trustees.  The Trustees may agree on the use of conference calls to conduct meetings and telefacsimiles and e-mail to give notice of consent to any action proposed to be taken by the Trustees or Administrator;

(b)  Two Employer Trustees and two Union Trustees shall constitute a quorum for any meeting of the Trustees;

(c)  Each Employer Trustee and Union Trustee, shall have one (1) vote on any matter brought before a meeting and, in his absence, such vote may be cast by another Trustee appointed by the Employers or the Union, as the case may be;

(d)  If a vacancy in the Board of Trustees exists, the remaining Trustees shall have the same powers as the full Board of Trustees until the vacancy is filled, subject to the following:

(i)  If there is a vacancy in the number of Union Trustees, then, with respect to any matter coming before the Board of Trustees, one Union Trustee (selected by the Union Trustees then acting) shall cast an additional vote for each existing vacancy in the number of Union Trustees.

(ii)  If there is a vacancy in the number of Employer Trustees, then, with respect to any matter coming before the Board of Trustees, one Employer Trustee (selected by the Employer Trustees then acting) shall cast an additional vote for each existing vacancy in the number of Employer Trustees.

It is the intention of the parties to this Agreement that any matter or action coming before the Board of Trustees be subject to the action of an equal number (actual or

weighted) of Union Trustees and Employer Trustees;

(e)    If a Trustee is absent from a meeting of the Board of Trustees, he may, but need not, cast a vote on any matter by written instrument filed with or telegram addressed to the Board of Trustees; and

(f)    If a Trustee is absent from any meeting, then, to the extent permitted by law, he shall not be liable for any matter considered at that meeting on which he has not case a vote as provided by the foregoing sentence.

The certificate of one Employer Trustee and one Union Trustee or of the Administrator that the Board of Trustees has taken or authorized any action shall be conclusive in favor of any person relying on the certificate.

Section 2.  RECORD OF TRUSTEES ACTIONS.  The Trustees may select a Secretary to serve for a term of three (3) calendar years or until a successor has been duly elected. The Administrator, or in his absence a person appointed by the Trustees, shall prepare a draft of the minutes of each meeting and provide a copy to the Trustees as soon as practicable after the meeting is held.  The Trustees will review and approve the minutes.

The Administrator shall act as the Fund's executive officer, with full power of administration under the general direction of the Trustees.  The Trustees are specifically authorized to delegate to the Administrator any of the powers vested in the Trustees by this Agreement.

Section 3.  ADMINISTRATIVE PERSONNEL.  The Board of Trustees shall appoint the Administrator, actuary, Fund Counsel, auditor and such other managerial and legal and administrative staff as they deem reasonably necessary for the efficient administration of the Trust, and may delegate the appointment of Fund personnel to the Administrator.

Section 4.  DISBURSEMENT OF RETIREE WELFARE FUND.  The Administrator, or any other Retiree Welfare Fund employee designated by the Trustees, may sign checks for any disbursement from the Retiree Welfare Fund approved by the Trustees.

Section 5.  EXECUTION OF NOTICES AND DOCUMENTS.  Except as specifically provided in Section 4 next above, the Board of Trustees may designate any equal number of Union Trustees and Employer Trustees to jointly execute, in writing, on behalf of the Board of Trustees, any notice or document, which executed notice or document shall be conclusive in favor of any person relying thereon.

## ARTICLE VI
## EMPLOYER CONTRIBUTIONS

Section 1.  IN GENERAL.  In order to fund the retiree benefits provided for by this Agreement, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the times required by that agreement.  The rate of contributions shall be determined by the applicable

Collective Bargaining Agreements or Participation Agreements, together with any amendments, supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work. No Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

      Section 2.   DEFAULT IN PAYMENT OF CONTRIBUTIONS.  Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Retiree Welfare Fund. The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

      In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit

fees and investigative costs. The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject. In the event an Employer is repeatedly delinquent in its contribution payments to the Retiree Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust. The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

Section 4.  ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a) EMPLOYER OWNED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employers and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b) EMPLOYER OPERATED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c) PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION. The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund. The Notice will provide the Employers with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provision of subsection (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section. Any Employers, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable. Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d) <u>MISCELLANEOUS PROVISIONS.</u> The bond reference in the Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer.

**ARTICLE VII**
**FILING CLAIMS AND REVIEW OF DENIAL OF CLAIM**

Section 1. <u>FILING OF A CLAIM.</u> Claims for the payment of any retiree benefits shall be filed, in writing, via common carrier, U.S. mail or electronic mail, in accordance with the Rules and Regulations of the Retiree Welfare Fund.

Section 2. <u>ADJUDICATION OF CLAIMS AND APPEALS.</u> The Trustees shall have the authority to adopt procedures for the review of claims and appeals of claims denied in whole or in part in accordance with ERISA and regulations adopted pursuant to ERISA. The Trustees have delegated authority to decide claims to the Claims Department and to decide appeals to the Claims Committee of the Board of Trustees. The procedures may be changed from time to time at the discretion of the Board of Trustees. The current procedures for claims and appeals are set forth in the Summary Plan Description of the Retiree Welfare Fund.

The Trustees and/or the Claims Committee have full discretionary authority to determine eligibility for Benefits under the Plan and to interpret the Plan, all Plan documents, rules, procedures, and the terms of the Trust Agreement. Their decisions and interpretations will be given the maximum deference permitted by law for the exercise of such full discretionary authority, they will be binding upon all involved persons.

**ARTICLE VIII**
**DUTY TO COOPERATE**

All of the Trustees and all directors, officers, employees or other representatives of any Employer Association or Council party to this agreement shall be required to assist and cooperate with authorized representatives of the Retiree Welfare Fund, its attorneys, auditors, or other authorized representatives in the prosecution of claims for or against the Retiree Welfare Fund.

Specifically, an Employer shall provide to the Board of Trustees on request in the course of any audit deemed necessary or advisable by the Trustees the records set forth in the Policy for Retention and Production of Employer Records attached hereto as Addendum A.

Furthermore, any Employer who is unable to produce adequate records to enable Trustees to perform the audit, shall be deemed to have authorized the Board of Trustees to contact the Internal Revenue Service and the Illinois Department of Revenue with permission to obtain all relevant information which may have been filed with said governmental agencies by such Employer.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

**Section 1. VESTED RIGHTS.** No Employee or any person claiming by or through such Employee, including his family, dependents, beneficiary and/or legal representative, shall have any right, title or interest in or to the Retiree Welfare Fund or any property of the Retiree Welfare Fund or any part thereof except as may be specifically determined by the Trustees and required by ERISA.

**Section 2. ENCUMBRANCE OF BENEFITS.** No monies, property or equity, of any nature whatsoever, in the Fund, or policies or benefits or monies payable therefrom, shall be subject in any manner by an Employee or person claiming through such Employee to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void. The Fund shall not in any manner be liable for, or subject to the debts, contracts, liabilities, engagements or torts of any person entitled to retiree benefits hereunder. Notwithstanding the foregoing, retiree benefits will be paid in accordance with any Qualified Medical Child Support Order as defined in Section 609 of ERISA.

**Section 3. PAYMENTS TO PERSONS UNDER LEGAL DISABILITY.** In case any Benefit payments hereunder become payable to a person under legal disability, or to a person not adjudicated incompetent but, by reason of mental or physical disability, in the opinion of the Board of Trustees, who is unable to administer properly such payments, then such payments may be paid out by the Board of Trustees for the benefit of such person in such of the following ways as it thinks best, and the Board of Trustees shall have no duty or obligation to see that the payments are used or applied for the purpose or purposes for which paid:
- (a) Directly to any such person;
- (b) To the legally appointed guardian or conservator of such person;
- (c) To any spouse, parent, brother or sister of such person for his welfare, support and maintenance; or
- (d) By the Board of Trustees using such payments directly for the support, maintenance and welfare of any such person.

**Section 4. SITUS.** The State of Illinois shall be deemed the situs of the Retiree Welfare Fund created hereunder. All questions pertaining to validity, construction and administration shall be determined in accordance with the laws of the State of Illinois to the extent that such laws are not preempted by the laws of the United States of America. Jurisdiction and venue for all litigation under Federal statutes shall be in the Federal District Court for the Northern District of Illinois

     Section 5.  <u>CONSTRUCTION OF TERMS.</u>  Where the context admits in this Agreement, words in the masculine gender shall include the feminine and neuter genders, the plural shall include the singular and the singular shall include the plural.

     Section 6.  <u>NOTIFICATION OF TRUSTEES.</u>  The address of each of the Trustees shall be provided to the Administrator by the Trustee.  Any change of address shall be effected by written notice to the Administrator.

     Section 7.  <u>SEVERABILITY.</u>  All provisions of this Agreement are intended to comply with the applicable provisions of ERISA, the Labor Management Relations Act of 1947, as amended, the Labor-Management Reporting and Disclosure Act of 1959, as amended, and all other applicable laws, rules and regulations.  However, should any provision of this Agreement or any Collective Bargaining Agreement or Participation Agreement be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the provisions herein and therein contained unless such illegality shall make impossible or impractical the functioning of the Trust, and in such case the appropriate parties shall immediately adopt a new provision to replace the illegal and/or invalid provision.

     Section 8.  <u>COUNTERPARTS.</u>  This Agreement may be executed in two or more counterparts, any one of which will be an original without reference to the others.

**<u>ARTICLE X</u>**
**<u>CHANGE OF TRUSTEE</u>**

     Section 1.  <u>RESIGNATION.</u>  A Trustee may resign at any time by giving thirty-(30) days' advance written notice to the entity that appointed him and to the Board of Trustees. Notice to the Board of Trustees shall be mailed to it, by certified mail, at the office of the Retiree Welfare Fund.

     Section 2.  <u>REMOVAL OF TRUSTEE AND APPOINTMENT OF SUCCESSOR TRUSTEE.</u>  A Union Trustee may be removed by the Council effective on receipt by the Board of Trustees of written notice of removal from the President, Secretary-Treasurer and Business Manager of the Council.  The Council shall appoint a successor Trustee which appointment shall be effective on receipt of written notice by the Board of Trustees of the appointment from the President, Secretary-Treasurer and Business Manager of the Council and of a written acceptance of his appointment from the individual appointed as successor Trustee.  An Employer Trustee may be removed by the Association that appointed him effective on receipt by the Board of Trustees of written notice of removal from the President of that Association.  The removing Association shall appoint a successor Trustee which appointment shall be effective on receipt of written notice by the Board of Trustees of the appointment from the President of that Association and of a written acceptance of his appointment from the individual appointed as successor-Trustee.  The Jointly Appointed Arbitrator may be removed at any time by majority vote of the Board of Trustees and a successor Jointly Appointed Arbitrator may be appointed by it.  The appointment of a successor Jointly Appointed Arbitrator shall be effective on receipt by the

17

Board of Trustees of a written acceptance of his appointment from the person appointed as successor. No successor Trustee shall be personally liable for any act or failure to act of a predecessor Trustee.

## ARTICLE XI
## AMENDMENT AND TERMINATION

Section 1. AMENDMENT. The Board of Trustees has full discretionary authority to amend this Agreement from time to time, except as follows:

(a) In no event shall an amendment result in an alteration of the basic principles of this Agreement.

(b) No amendment shall result in the repayment or reversion to any Employer of any portion of the Retiree Welfare Fund.

Any amendment shall be in writing and shall be effective as of the date designated by the Board of Trustees. The Administrator shall distribute a copy of each amendment to each Trustee and shall attach a copy thereof to the minutes of the meeting of the Board of Trustees at which it is adopted. The Board of Trustees shall notify all necessary parties and shall execute any instrument necessary in connection with the amendment.

Section 2. TERMINATION. This Agreement may be terminated by written instrument executed by:

(a) All of the Trustees when there is no longer a Collective Bargaining Agreement or Participation Agreement requiring contributions to the Retiree Welfare Fund in effect between any Employer and the Union or the Trustees; or

(b) All of the Associations set forth in Article III, Section 2 of this Agreement (and as it may be amended from time to time) and the Union. All necessary provisions of this Agreement shall continue in effect until all assets of the Retiree Welfare Fund allocable to Employees and beneficiaries have been distributed or applied by the Trustees.

Section 3. NOTIFICATION OF TERMINATION. The Board of Trustees shall notify the Council, each Employer and all persons entitled to Benefits under the Retiree Welfare Fund of the termination of this Trust Agreement within the time required by law.

IN WITNESS WHEREOF, the Associations, the Council and the Trustees have executed this Agreement and Declaration of Trust on the dates indicated to be effective as of June 1, 2014.

(TWO SIGNATURE PAGES FOLLOW)

EMPLOYER TRUSTEES:

Julie Chamberlin

Date   5-12-14

Charles J. Gallagher

Date   5-12-14

Clifton M. Horn

Date   5-12-14

David H. Lorig

Date   5/12/14

Dennis P. Martin

Date   5/12/14

Anthony J. Riccardi

Date   5/12/14

UNION TRUSTEES:

Antonio S. Castro

Date   05-12-14

James P. Connolly

Date   5-12-14

Martin T. Flanagan

Date   5-12-14

Richard Kuczkowski

Date   5-12-14

Charles V. Loverde, III

Date   5-12-14

Scott Pavlis

Date   5-12-14

AGREEMENT AND DECLARATION OF TRUST
ESTABLISHING
THE CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY
TRAINING TRUST FUND

THIS AGREEMENT AND DECLARATION OF TRUST, made and entered into as of the 1st day of June, 1986 by and between THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, A.F.L.-C.I.O., representing its affiliated Local Unions and the members thereof (the "Council") and the BUILDERS' ASSOCIATION OF CHICAGO, the UNDERGROUND CONTRACTORS ASSOCIATION, and the ILLINOIS ROAD BUILDERS' ASSOCIATION, and all other employer associations (the "Associations") who have hereto bargained or may hereafter bargain or enter into collective bargaining agreements or other agreements with the Union, its local affiliates, or with representatives of this Trust, for and on behalf of themselves and their respective members who by virtue of their said membership or otherwise are parties to collective bargaining agreements with the Union or any of its local affiliates or are parties to this Agreement or are otherwise bound to the provisions hereof as hereinafter provided, and other employers in the building and construction industry who may not be members of any association but who are included in the term "Employers" (as defined in Section 2 of ARTICLE I) and agree to be bound by this Agreement or who are otherwise so bound as provided as set forth in Section 2 of ARTICLE I;

WITNESSETH:

(1)  The Employers are parties to a collective bargaining agreement, or supplements thereto, with the Council which requires

Exhibit A-6

Employer contributions of a certain sum per hour per Employee to a training fund provided in a program to be created for participating employees and established by this trust agreement.

(2)  the parties have agreed that such contributions shall be payable to and be deposited in the Trust Fund created and established by this Trust Agreement.

NOW, THEREFORE, in consideration of the premises and in order to establish and provide for the maintenance of said Trust Fund to be known as "THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY TRAINING TRUST FUND" hereinafter referred to as the "Trust Fund," it is mutually understood and agreed as follows.

## ARTICLE I

### Definitions

Unless the context or subject matter otherwise requires, the following definitions shall govern in this Trust Agreement.

### Section 1.  WRITTEN AGREEMENT

The term "Written Agreement" shall mean any agreement in writing which specifies the detailed basis on which contributions shall be made to this Trust together with any modification, amendment or renewals thereof, including but not limited to Collective Bargaining Agreements, memoranda of understanding which incorporate by reference Collective Bargaining Agreements or this Agreement, report forms in accordance with which contributions are made and which obligate the Employer to the provisions of this Agreement, or any other agreement obligating the Employer signatory thereto to participate in or be bound by this Agreement.

## Section 2.  EMPLOYER

The term "Employer" as used herein shall mean any Employer who:

(a) now or hereafter is a party to a Collective Bargaining Agreement with the Council, or any of its local affiliates, requiring periodic contributions to the Fund or who in the past has been a party to such a Collective Bargaining Agreement, if such agreement has not been terminated by its terms or by operation by law;

(b) is a party to any memorandum of understanding or memorandum of agreement or similar instrument with the Union, or any of its local affiliates, which by its terms incorporates by reference a complete Collective Bargaining Agreement which requires the parties therto to make contributions to the Fund.

(c) in writing adopts and agrees to be bound by the terms and provisions of this Agreement as the same may be amended or modified from time to time, or

(d) is a party to any written instrument which evidences an agreement to be bound by the provisions of this Agreement, including but not limited to, a contribution report form listing the employees on whose behalf contributions are remitted and provisions expressly binding such Employer to the Agreement or otherwise evidencing such Employer's intention to be so bound by the making of such contributions;

(e) by any course of conduct, including but

-3-

not limited to, oral representations to Employees, representatives of the Council, Trustees, attorneys or other persons, ratifies or accepts the provisions of any Collective Bargaining Agreement which requires contributions to the Fund continued hereby or of this Agreement itself, or of any other written instrument which binds such Employer to make contributions to the Fund, or is estopped to deny such obligation;

(f)  is a member of any of the Associations, or hereafter becomes a member of any of the Associations, named herein or who was a member at any time when representatives of said Associations commenced negotiations of the current Collective Bargaining Agreement on behalf of its members whether or not said membership is held current at all times; or

(g)  is a member of any other multi-employer bargaining unit, or hereafter becomes a member of any of said multi-employer bargaining units, which has a Collective Bargaining Agreement with the council, whether formalized or existing solely as a matter of custom and practice.

The term "Employer" shall also mean the Council, for the purpose of providing benefits hereunder for the eligible Employees of the Council for whom the Council is obligated to contribute to the Trust Estate.

The term "Employer" shall also mean the Board of Trustees for the purpose of providing benefits hereunder for the eligible

Employees of the Trust for whom the Trust shall make contributions to the Fund.

A person or entity that has become an Employer under this Agreement shall continue as such until it is no longer obligated pursuant to a Written Agreement or other legally enforceable obligation to make contributions to the Fund.

Section 3. EMPLOYEE. The term "Employee," as used herein, shall mean any of the following persons without regard to race, color, creed, national origin, religion or union membership.

(a) any person covered by a Collective Bargaining Agreement between an Employer and the Council or any of its local affiliates who is engaged in employment with respect to which the Employer is obligated by the Collective Bargaining Agreement to make contributions to the Fund.

(b) any person employed by an Employer who performs work within the jurisdiction of the Council as said jurisdiction is set forth in any applicable Collective Bargaining Agreement or by any custom or practice in the geographic area within which the Employer operates and his Employees perform work;

(c) any person on whose behalf an Employer has made contributions to the Fund and has reported same on a standard report form which contains a provision binding said Employer to the provisions of this Agreement or otherwise evidencing said Employer's intent to be so bound.

-5-

(d) any person employed by an Employer who has signed any memorandum of understanding incorporating by reference the provisions of any applicable Collective Bargaining Agreement or the provisions of this Agreement where such person is covered by such agreements to incorporate by reference or both;

(e) any person who is not covered by a Collective Bargaining Agreement but on whose behalf his Employer is otherwise obligated to make contributions to the Fund in accordance with the provisions of this Agreement who performs work which would be work performed by members of a bargaining unit recognized by the Employer or certified by the National Labor Relations Board if said person's Employer were a party to any of the standard Collective Bargaining Agreements by and between the Council and any of the aforementioned Assocations; or

(f) any Employee in a certified or recognized collective bargaining unit represented by the Council.

The term "Employee" shall also mean all eligible persons employed by the Council, on whose behalf the Council shall make payments to the Fund at the times and at the rate of payment equal to that made by any other Employer who is a party to this Agreement.

The term "Employee" shall also mean all eligible persons employed by the Trust on whose behalf the Board of Trustees shall make payments to the Fund, out of the assets of that Fund at the times and at the rate of payment equal to that made by any other

Employer who is a party to this Agreement.

Section 4.  FUND.  The term "Fund" as used herein means the trust estate of the CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY TRAINING TRUST FUND, which shall consist of properties or interest therein, all investments made and held by the Trustees and the income therefrom, all monies received by the Trustees as Employer contributions made and held by the Trustees for the uses, purposes and trusts set forth in this Agreement.  Whenever the term "Fund" is used in this Trust Agreement, and with particular reference to Article IV, Section 11 herein, the same shall be limited to "Funds" that have been determined to be Exempt Organizations pursuant to Section 501(c) and its subparts of the Internal Revenue Code.

Section 5.  TRAINING PROGRAM.  The term "Training Program" as herein used means the Plan or Program, or both, created and directed by the Trustees of the Fund, and any modification, amendment, extension or renewal of said Plan or Program.

Section 6.  TRUSTEES.  The term "Trustees" as used herein means the Trustees as designated in Section 1, Article III of this Agreement, together with their successors designated in the manner as hereinafter provided.

ARTICLE II

Creation, Purpose and Applications of the Trust Fund

Section 1.  The fiscal year of this Fund shall be from June 1, through May 31.

Section 2.  There is hereby created the CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

TRAINING TRUST FUND, and the Council and the Employers do hereby accept and agree to be bound by the provisions of this Agreement and Declaration of Trust. The scope of any such education and training program shall be within the sole discretion of the Trustees.

Section 3. This Trust Fund is created for the benefit of the construction industry and to help meet its manpower needs by providing and maintaining training or retraining programs for the benefit of the employees, or persons who wish to become employees, for the purpose of performing work which falls within the jurisdiction of the Council as set forth in the written collective bargaining agreements, and to devise and implement such programs as may be necessary from time to time to fulfill said objectives.

Section 4. Neither the Employers, any signatory association, any individual Employers, the Council, any employee or trainee nor any person shall have any right, title or interest in the Fund other than as specifically provided in this Agreement, and no part of the Fund shall revert to the Employers nor any signatory association, nor any individual Employer. Neither the Fund nor any contributions to the Fund shall be in any manner liable for or subject to the debts, contracts or liabilities of the Employers, any signatory association, any individual Employer, the Council, a beneficiary, nor any employee. No part of the Fund, nor any benefits payable in accordance with the Training Program shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge by any person.

Section 5. Neither the Employers, the Council nor any

signatory association, nor any officers, agent, employee or committee member of the Employers, or of any signatory association shall be liable to make contributions to the Fund or be under any other liability to the Fund or with respect to the Training Program, except to the extent that he may be an individual Employer required to make contributions to the Fund with respect to his or its own individual or joint venture operations, or to the extent he may incur liability as a Trustee, as hereinafter provided. The liability of any individual Employer to the Fund, or with respect to the Training Program shall be limited to the payments required by any written agreement with respect to his or its individual or joint venture operations, and in no event shall he or it be liable or responsible for any portion of the contributions due from other individual Employers with respect to the operations of such Employers. The individual Employers shall not be required to make any further payments or contributions to the cost of the operations of the Fund or of the Training Program, except as provided in Section 8 of this Article.

Section 6. Neither the Employers, any signatory association, any individual Employer, the Council, nor any employee shall be liable or responsible for any debts, liabilities or obligations of the Fund or the Trustees.

Section 7. Contributions to the Fund shall be due and payable to the principal office of the Fund and shall be made in regular monthly installments except as otherwise herein provided in Section 9 of this Article II. Each contribution to the Fund shall be made promptly, and in any event on or before the 10th day

of the calendar month in which it becomes due and payable. Each monthly contribution shall include all payments which have accrued in the interim for work performed up to the close of the Employer's payroll period ending closest to the last day of the preceding calendar month. Each monthly contribution shall be accompanied by a report in a form prescribed by the Board of Trustees.

Section 8. The parties recognize and acknowledge that the regular and prompt payment of Employer contributions and reports to the Fund are essential to the maintenance of the Fund and that it would be extremely difficult, if not, impracticable, to fix the actual expense and damage to the Fund and to the Training Program which would result from the failure of an Employer to pay such monthly contributions in full within the time provided above. Therefore, if any Employer is delinquent in remitting its contributions within the time specified in Section 7 of this Article, the amount of damage to the Fund and Training Program resulting from failure to make reports or pay contributions within the time above specified shall be presumed to be the sum of ten percent (10%) of the amount of the contribution due for each delinquent report or contribution. This amount shall be added as liquidated damages upon the day immediately following the date on which the report or the contribution or contributions become delinquent. Delinquent contributions and penalties shall also bear interest at a rate up to the prime rate of interest as recog- nized by the First National Bank of Chicago or such other lawful amount as determined by the Trustees from the due date until

delinquency is totally satisfied. The Trustees, however, in their discretion, for good cause (Trustees shall have sole right to determine what shall constitute good cause) shall have the right and power to waive all or any part of any sums due the Fund as liquidated damages. Failure by any Employer to make the required payments hereunder shall be deemed a breach of the written agreement by the Employer and be subject to economic action by the Council in addition to the other remedies as provided herein. The Trustees may, at their option, also take legal action to collect all delinquent amounts owing to the Fund, and parties agree that if the delinquent account of any Employer is referred to an attorney for collection, such Employer shall immediately become liable for a reasonable sum for the attorneys' fee together with an amount equal to all costs incurred by the Trustees in commencing or prosecuting legal action in any Court. In such legal action, venue shall be laid at Cook County, Illinois, as the Fund is administered in such county.

Section 9. In the case of certain Employers who have defaulted on payments in the past, or who otherwise give the Trustees reasonable cause to feel insecure as to future contributions, the Trustees shall have the power to require a bond for the payment of contributions.

## ARTICLE III

### Board of Trustees

Section 1. Except as otherwise specifically provided, the Fund shall be operated and administered by a Board of Trustees whose membership shall consist of three persons appointed as trustees by the Association (known as the "Association Appointed

Trustees") as provided in Section 2 next below and three persons appointed as Trustees by the Council (known as the "Council Appointed Trustees") as provided in Section 3 next below.

Section 2.  <u>ASSOCIATION APPOINTED TRUSTEES.</u>  The Association Appointed Trustees shall be the following persons appointed by the entity indicated:

      (a)  WILLIAM B. BARNARD, appointed by the Builders' Association of Chicago;

      (b)  GERARD KENNY, appointed by The Underground Contractors' Association; and

      (c)  JOSEPH PALUMBO, appointed by the Illinois Road Builders Association.

Section 3.  <u>COUNCIL APPOINTED TRUSTEES</u>  The Council Appointed Trustees shall be:

      (a)  ERNEST KUMEROW, Laborers' District Council of Chicago and Vicinity;

      (b)  VAL LAZZARETTO, Laborers' Local No. 152; and

      (c)  FRANK ZIEMANN, Laborers' Local No. 6.

Section 4.  <u>ACCEPTANCE OF TRUSTEES.</u>  The Association Appointed Trustees, the Council Appointed Trustees and each of them by affixing their respective signatures to this Agreement accept their trusteeship hereunder.

Section 5.  <u>TERM OF TRUSTEES.</u>  Subject to the provisions of this Article, each of the Council Appointed and Association Appointed Trustees shall serve for a term of three (3) calendar years.

SECTION 6. ADDITIONAL TRUSTEES. The parties to this
Agreement reserve the right to increase the number of Trustees;
provided, however, that there shall always be an equal number of
Council Appointed Trustees and Association Appointed Trustees
authorized.

SECTION 7. Each Trustee shall serve until termination of
his appointment, his death or his resignation.

SECTION 8. A Trustee may resign at any time by serving
written notice of such resignation upon the Chairman and the
Secretary Treasurer of the Board of Trustees and upon the
Employers or the Council said Trustees represents.

SECTION 9. Any Trustee who resigns or whose appointment has
been terminated shall forthwith turn over to the Chairman or
Secretary-Treasurer of the Board of Trustees at the principal
office of the Fund any and all records, books, documents, monies
and other property in his possession or under his control which
belong to the Fund or which were received by him in his capacity
as Trustee.

SECTION 10. The appointment of any Employer Trustee may be
terminated at any time, for any reason, by an instrument in
writing signed by the Association and served on the Trustee, the
Chairman and Secretary-Treasurer of the Board of Trustees; and the
Council Trustees may be terminated at any time, for any reason, by
an instrument in writing and bearing the Council Seal, signed by
the President or Secretary of the Local Union said Trustee
represents and served on said Trustee, the Chairman and
Secretary-Treasurer of the Board of Trustees.

**Section 11.**  If any Employer Trustee dies, resigns, or has his appointment terminated, a successor Trustee shall be appointed forthwith by an instrument in writing signed by the Employer Association.  If any Council Trustee dies, resigns or has his appointment terminated, a successor Trustee shall be appointed forthwith by an instrument in writing, bearing the Council Seal and signed by the President or Secretary of the Local Union said Trustee represented.  Any successor Trustee so appointed shall sign this Agreement or duplicate thereof, and such signature shall constitute his acceptance of office and agreement to act under and be subject to all the terms and conditions of this Trust Agreement.

**Section 12.**  The powers of the remaining Trustees to act as herein provided shall not be impaired or limited in any way pending the designation of a successor to fill any vacancy.

**Section 13.**  The Trustees shall serve without compensation from the Trust Fund except for reimbursement of reasonable expenses incurred under specific authority granted by the Board of Trustees from time to time as such expenses are incurred by said Trustees.

## ARTICLE IV

## Functions and Powers of the Board of Trustees

**Section 1.**  The Trustees shall have the power and duty to administer the Fund and to supervise the administration and maintenance of the Training Program; provided further, that, in the Trustees' sole discretion, they may employ or designate an administrator or other persons to whom may be delegated duties and

responsibilities in connection with the administration of said Program. The Board shall devote all the assets of the Fund to the purpose of educating and training persons or employees who are covered or may be covered by written collective bargaining agreements to the end that an adequate supply of skilled persons are available to cover the jobs of the Employers. The extent and type of such program and the courses or training offered shall lie within the exclusive jurisidiction of the Trustees.

Section 2. The Board of Trustees shall have the power to construe all ambiguous or doubtful provisions of this Agreement and the terms used herein, and any construction adopted by the Board of Trustees in good faith shall be binding upon the Council, employees, the signatory Employer (association or individuals), and Program personnel.

Section 3. The Board of Trustees shall collect and receive all contributions due to the Fund, and shall promptly deposit such contributions in a special Trust Fund account or accounts established in reputable, Federally-insured banks and/or savings and loan institutions, located in the State of Illinois.

Section 4. The Board of Trustees shall have the power to demand and enforce the prompt payment of contributions to the Fund, and the payment of reimbursement for expenses and damages due to delinquencies as hereinabove provided. The Trustees may take such steps, including the institution and prosecution of, or the intervention in any procedures at law, in equity or bank-ruptcy, as may be desirable to accomplish the collection of such contributions.

**Section 5.** The Board of Trustees shall use the monies available in the Fund to provide the creation and maintenance of the Program.

**Section 6.** The Board of Trustees shall have the following powers:

A. To pay out of the Fund the reasonable and necessary expenses incurred in the establishment of the Fund and the Training Program.

B. To establish and accumulate such reserve funds as may be deemed adequate to provide for administration expenses and other obligations of the Fund, including the maintenance of the Program.

C. To employ such executive, consultant, administrative, clerical, secretarial and legal personnel and other employees and assistants as may be necessary in connection with the administration of the Fund; to pay the compensation and necessary expenses of such personnel and assistants and the costs of office space, furnishings, supplies and services, and other essentials required for the proper administration of the Fund.

D. To incur and pay out of the Fund any other expenses necessary to the proper administration of the same or the Program and to enter into all contracts which in the discretion of the Trustees are deemed necessary and suited to the Program. All such contracts shall be executed in the name of the Fund.

E. To compromise, settle, or release claims or demands in favor or against the Fund on such terms and conditions as the Board may deem desirable.

F. To invest and reinvest such portion of the Fund as is not

required for current expenditures and charges in such institutions or interest-bearing investments as are legal for investment of Trust Funds under the laws of the State of Illinois.

G. **Investment Manager.** In the event that the Board of Trustees appoints an investment manager to invest all or any of the assets of the Trust Fund, the investment manager shall have all the powers granted to the Trustees with respect to the assets of the Trust Fund, and the Board of Trustees and any Corporate Trustee (unless the Corporate Trustee is the investment manager) shall be relieved of all liability with respect to the management and investment of such assets so long as any such investment manager is retained. For the purposes of this paragraph the term "investment manager" shall mean any party that:

(1) is registered as an investment broker under the Investment Advisors Act of 1940, is a bank, or is an insurance company qualified to manage, acquire and dispose of plan assets under the laws of more than one state;

(2) acknowledges in writing that it is a fiduciary with respect to the CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY TRAINING TRUST FUND; and

(3) is granted the power to manage, acquire or dispose of any asset of the Trust Fund pursuant to this section.

**Section 7.** The Trustees may adopt and promulgate such rules and regulations not inconsistent with the terms hereof as may in their discretion, be proper or necessary for the sound and

efficient administration of the Fund.

Section 8.  The Board of Trustees shall procure fidelity bonds for each Trustee or other person authorized to receive, handle, deal with or draw upon the monies in the Fund for any purpose whatsoever as may be required by law, said bonds to be in such reasonable amount and to be obtained from such duly authorized surety company as the Board shall determine.  The cost of the premiums on such bonds shall be paid out of the Fund.  The Trustees may also, as the need may arise, procure and maintain in force adequate public liability insurance covering premises occupied by the Trust and motor vehicles, if any, operating in the course of Trust affairs.  The cost of such insurance shall also be paid out of the Fund.

Section 9.  All Employers and signatory associations participating in or making contributions to the Fund shall make such reports and statements to the Trustees with respect to the amount and calculations of any and all contributions, or with respect to any other matter pertinent to the establishment, maintenance and administration of the Program and Fund as the Trustees may deem necessary or desirable.  The Trustees may, at reasonable times and during normal business hours, audit or cause the audit or inspection of the records of any Employers, signatory association, individual Employers, or any employees which may be pertinent in connection with said contributions and/or reports and insofar as may be necessary to accomplish the purposes of this Trust Agreement.  In the event such audit shall disclose that any Employer is in default in the payment of his contributions to the

Fund, or if such audit shall be made by reason of the failure of any Employer to submit reports as required by the Trustees, the individual Employer shall, upon demand, pay the Fund the actual cost of such audit.

Section 10. The books of account and records of the Board of Trustees, including the books of account and records pertaining to the Fund shall be audited at least once each year by a qualified certified public accountant to be selected by the Board. The Board shall also make all other reports required by law. A statement of the result of the annual audit shall be available for inspection by interested persons at the principal office of the Fund and at such other suitable places as the Board may designate from time to time. Copies of such statement shall also be delivered upon request to the Employer, the Council and each Trustee within a reasonable time after said statement is prepared and a copy of such statement shall, at all times, be available for inspection by interested persons at the principal offices of the Fund.

Section 11. Compatible with equitable principles and to the extent that sound accounting practices permit, the Board may coordinate its activities in the administration of the Fund with the administrative activities of the governing Board or Boards of any other Fund or Funds established or to be established for employees in the construction industry and any other industry that may from time to time be a signatory to a collective bargaining agreement with the Council, to such extent and upon such terms as may be deemed necessary or desirable by the Board, including

entrance into and performance of agreements or arrangements with any such Board or Boards providing for reciprocity, or transfer or exchange of monies between or among funds of the same type, or upon such terms as the Board may determine are for the best interests of the administration of the Fund.

### ARTICLE V

### Procedure of Board of Trustees

**Section 1.** The Board of Trustees shall determine the time and place for regular periodic meetings of the Board, but not less than annually. Either the Chairman or the Secretary-Treasurer or any two (2) members of the Board may call a special meeting of the Board, provided written notice is given to all other Trustees of the time and place of such meeting at least five (5) days before the date set for the meeting. Any meeting at which all Trustees are present in person shall be a valid meeting without the giving of any notice.

**Section 2.** The Trustees shall annually elect a Chairman and a Secretary-Treasurer one of whom shall be a Union Trustee and the other of whom shall be an Employer Trustee. The Chairman and Secretary-Treasurer shall be elected from among the Trustees by majority vote of the Trustees.

**Section 3.** All meetings of the Board shall be held in Chicago, Illinois unless another place is designated from time to time by the Board.

**Section 4.** The Secretary-Treasurer shall keep minutes or records of all meetings, proceedings and acts of the Board. Such minutes need not be verbatim.

<u>Section 5.</u>  The Chairman shall preside over all meetings of the Board except in his absence the Secretary-Treasurer shall preside.

<u>Section 6.</u>  In all meetings of the Trustees there shall be at least three (3) Trustees including at least one (1) Trustee from the Association Appointed Trustees and at least one (1) Trustee from the Council Appointed Trustees present before a quorum can be established to transact business.  At any meeting of the Board of Trustees the number of votes of Employer appointed Trustees and the number of votes of Council Trustees shall always be equal. If, at a meeting of the Trustees, there are fewer Employer Trustees present than Council Trustees, or if there are fewer Council Trustees present than Employer Trustees, the number of votes for the side with the fewer number of Trustees present shall be increased in order that each side has an equal number of votes. Such votes shall be referred to as "equalizing votes" and shall be cast as follows:

The manner in which such "equalizing votes" are cast shall be decided by a majority vote of the Trustees from that side who are present.  In the event of a tie vote by such side in deciding how to cast such "equal- izing votes", such "equalizing votes" shall be deemed to have abstained from voting.  Such "equalizing votes" are for the purpose of providing equal Employer and Council Trustee voting at meetings of the Trustees con- sistent with Section 302 of the Labor-Management Relations Act and in no event shall such "equalizing

vote" be considered to have been cast by the Trustee absent. A Trustee abstaining from voting is deemed to have voted, and his vote may not be cast by another Trustee.

Section 7. All action by the Trustees shall be by a majority decision of the Trustees present, and such majority vote shall govern not only this Article, but any portion of this Agreement and Declaration of Trust which refers to action by the Trustees. In the event any matter presented for decision cannot be decided because of a tie vote, or because of the lack of a quorum at two (2) consecutive meetings, the matter may then be submitted to arbitration as provided hereinafter.

Section 8. Upon any matter which may properly come before the Board of Trustees, the Board may act in writing without a meeting, provided such action has the written concurrence of all the Trustees.

ARTICLE VI

General Provisions Applicable to Trustees

Section 1. No party who has verified that he or it is dealing with the duly-appointed Trustees, or any of them, shall be obligated to see the application of any monies or property of the Fund, or see that the terms of this Agreement have been complied with, or to inquire as to the necessity or expediency of any act of the Trustees. Each instrument executed by the Board of Trustees or by its direction shall be conclusive in favor of every person who relies upon it, that (a) at the time of the delivery of the instrument this Trust Agreement was in full force and effect,

(b) the instrument was executed in accordance with the terms and conditions of this Agreement, (c) the Board was duly authorized to execute the instrument or direct its execution.

Section 2. The duties, responsibilities, liabilities and disabilities of any Trustee under this Agreement shall be determined solely by the express provisions of this Agreement and no further duties, responsibilities, liabilities or disabilities shall be impaired or imposed.

Section 3. The Trustees may delegate only ministerial powers or duties to regularly chosen agents or employees. No Trustee shall incur any liability for simple negligence, oversight, or carelessness in connection with the performance of his duties as such Trustee. The Trustee serving on the Board of Trustees shall not be personally liable by virtue of any instrument executed by the Board of Trustees or on its behalf in connection with the administration of the Trust, or for any mistake of judgment made by the Board of Trustees or any of the Trustees, or by anyone employed by the Employer or the Council, or for any loss unless resulting from any individual Trustee's own gross negligence or willful misconduct in connection with the administration of the Trust. The Board of Trustees and the Trustees constituting it shall be indemnified by the Fund against any judgment and/or settlement, as well as any expenses reasonably incured by it or them in connection with any action to which it or they may be a party by reason of its or their duties in the administration of the Trust. The foregoing right of indemnification shall be in addition to any other rights to which the Trustees constituting

the Board of Trustees may be entitled as a matter of law. Irrespective of the other provisions of this Paragraph, no fiduciary shall be relieved from any responsibility or liability for any responsibility, obligation, or duty under Title I, Subtitle B, Part 4 of ERISA.

Section 4. Neither the Employers, any signatory association, the individual Employers nor the Council shall be responsible or liable for:

A. the validity of this Trust Agreement or the activities of the Training Program;

B. the form, validity, sufficiency or effect of any contract which may be entered into;

C. any delay occasioned by any restriction or provision in this Trust Agreement, the rules and regulations of the Board of Trustees issued hereunder, any contract entered into in the course of the administration of the Fund, or by any other proper procedure in such administration; provided, however, that this clause shall not excuse any violation of any written agreement.

D. the making or retention of any deposit or investment of the Fund, or any portion thereof, or the disposition of any such investment, or the failure to make any investment of the Fund, or any portion thereof, or any loss or diminution of the Fund, except as to the particular person involved, such loss as may be due to the gross neglect or willful misconduct of such person.

Section 5. Neither the Employers, nor signatory association nor any individual Employer nor the Council shall be liable in any respect for any of the obligations or acts of the Trustees because

such Trustees are in any way associated with any such Employers, signatory association, individual Employer or Council.

Section 6. TITLE TO PROPERTY. Title to all property held hereunder shall vest in any sucessor Trustee and the other Trustees then acting from time to time pursuant to the provisions hereof without the execution or filing of any further instruments.

Section 7. BONDING. The Trustees acting under this Plan shall be required to furnish bond for the faithful performance of their duties in the amount and to the extent as set forth by the Department of Labor Regulations as amended from time to time.

ARTICLE VII

Arbitration

Section 1. Any deadlock arising with reference to the administration of the Fund shall be referred to an impartial arbitrator chosen by joint action of the Employer's Trustees and the Council Trustees.

Section 2. If the impartial arbitrator cannot be agreed upon within ten (10) days, or within such further time as the Trustees may allow for such purpose of mutual agreement, then the presiding Judge of the United States District for the Northern District of Illinois, Eastern Division, shall be called upon to name the impartial arbitrator. The matter in dispute shall be submitted to the impartial arbitrator in writing and in making his decision, said impartial arbitrator shall be bound by the provisions of this Agreement. If the Trustees cannot jointly agree upon a statement of the matter at issue, each group of Trustees, Employers or Council, shall submit to the impartial arbitrator in writing, its

version of the facts and of the issue in dispute. The decision of the impartial arbitrator shall be rendered in writing within ten (10) days after the submission of the dispute and shall bind all parties.

Section 3. The expenses of any such arbitration, including any necessary court proceedings to secure the appointment of an arbitrator or the enforcement of the arbitration award (including the fee of the arbitrator and the reasonable attorneys' fees of the parties) shall be a proper charge against the Fund.

Section 4. No matter in connection with the interpretation or enforcement of any written agreement shall be subject to arbitration under this Article. No matter which is subject to arbitration under this Article shall be subject to the grievance procedure or any other arbitration procedure or any other arbitration procedures provided in any written agreement.

ARTICLE VIII

General Provisions

Section 1. Subject to the provisions of the written agreements, the rights and duties of all the parties, including the Employers, the signatory associations, the individual Employers, the Council, the employees and their dependents, and the Trustees shall be governed by the provisions of this Agreement and any contracts procured or executed pursuant to this Agreement.

Section 2. Any notice required to be given under the terms of this Agreement shall be deemed to have been duly served if delivered personally to the person to be notified in writing, or if mailed in a sealed envelope, postage prepaid to such person, at

:ir last known address as shown in the records of the Fund, or

sent by telegram to such person at said last known address.

Section 3. This Agreement shall be binding upon and inure to

: benefit of all Employers who are now or hereafter may become

bers of any signatory Association, and their heirs, executors,

inistrators, successors, purchasers and assigns of the

loyers; any signatory association; any individual Employer; the

ncil; and the Trustees. Any individual Employer whose

bership is terminated in the Employer's Association or in any

gnatory association shall, if continuing in the construction

dustry in the areas coverd by the Council jurisdiction

mediately sign acceptance of this Trust Agreement as an

dividual Employer, provided such individual Employer remains or

comes a party to a written agreement with the Council.

Section 4. All questions pertaining to this Agreement, the

nd, or the Training Program and their validity, administration

d construction, shall be determined in accordance with the laws

the State of Illinois and with the pertinent laws of the United

ates.

Section 5. If any provision of this Trust Agreement the

aining Program, the rules and regulations made pursuant thereto,

any step in the adminstration of the Fund or the Training

ogram is held to be illegal or invalid for any reason, such

legality or invalidity shall not affect remaining portions of

is Agreement, the Program or the rules and regulations, unless

ch illegality or invalidity prevents accomplishment of the ob-

ctives and purposes of this Agreement and Program. In the event

of any such holding or determination, the parties will immediately commence negotiations to remedy any such defect.

Section 6. All facts and all matters of record shall be made available and open to examination and inspection of all the Trustees and of each group of Trustees equally at all times; and no favoritism of one group over the other with reference to any fact of administration shall be permitted at any time. Except to the extent necessary for the proper adminstration of the Fund or of the Training Program, all books, records, papers, reports, documents or other information obtained with respect to the Fund or the Program shall be confidential and shall not be made public or used for any other purpose.

Section 7. It is the intent and purpose of the parties that contributions to the Fund shall be at all times deductible by the individual Employers for income tax purposes in the taxable year when paid and that the Trust created hereby shall be at all times tax exempt. Application for the qualification of the Trust created by this Trust Agreement under Section 501(c)(5) of the Internal Revenue Code shall be made as soon as practicable and the Board of Trustees shall do whatever is necessary to assure such qualification as soon as possible. If any administrative or judicial ruling holds that any provision of this Trust Agreement prevents or defeats the qualifications of the Trust as herein provided, or any other objectives stated in this Section, either under presently existing laws or regulations or any laws or regulations hereinafter enacted or adopted, or if for any other reason it shall be necessary or desirable to amend this Trust

Agreement to accomplish any such objectives, the parties shall forthwith enter into negotiations with regard to the amendment of this Trust Agreement in such respect as may be necessary to accomplish such qualification or other objective, consistent with the other objectives or purposes of this Trust Agreement, and any such amendment shall be effective, insofar as practicable, as of the effective date of this Trust Agreement or as of the effective date of any such law or regulationss hereafter enacted or adopted as the case may require.

Section 8.  In any action or proceeding affecting the Fund or the Trust hereby established, it shall be necessary to join as parties only the Trustees, and none of the Employers, signatory Associations, individual Employers, Council, Employee, or any other person shall be entitled to notice of any such proceeding or to service of process herein.  Any final judgment entered in any such action or proceeding shall be binding upon all of the above-named parties so long as judgment does not attempt to purport to impose any personal liability upon or against any party not joined or not served in any action or proceeding.

ARTICLE IX

Amendment and Termination

Section 1.  AMENDMENT  This Agreement may be amended from time to time by the Board of Trustees, except as follows:

    (a)  In no event shall an amendment result in an alteration of the basic principles of this Agreement.

    (b)  In no event shall an amendment result in a conflict with any Collective Bargaining Agreement with the

Council as such agreement affects contributions to the Trustees or with any other agreements previously entered into by the Board of Trustees.

(c) No amendment shall result in the repayment or reversion to any Employer of any protion of the Fund. Any amendment shall be in writing and shall be effective as of the date designated by the Board of Trustees. The Secretary of the Board of Trustees shall distribute a copy of each amendment to each Trustee and shall attach a copy thereof to the minutes of the meeting of the Board of Trustees at which it is adopted. The Board of Trustees shall notify all necessary parties and shall execute any instrument necessary in connection with the amendment.

Section 2. TERMINATION. This Agreement may be terminated by written instrument executed by:

(a) all of the trustees when there is no longer a Written Agreement or other obligation requiring contributions to the Fund in effect between any Employer and the Council or the Trustees; or

(b) by all of the parties to this Agreement. All necessary provisions of this Agreement shall continue in effect until any assets of the Trust Estate allocable to Employees and Beneficiaries have been distributed or applied by the Trustees.

**Section 3.   NOTIFICATION OF TERMINATION.**   The Board of Trustees shall notify the Council, each Employer and all persons entitled to benefits through this Agreement of the termination of this Agreement within the time required by law.

ARTICLE X

Recordation of Agreement

It shall be the duty of the Trustees to record this Agreement in the office of the Recorder of Deeds of Cook County, Illinois, within fifteen (15) days after the execution thereof, and thereafter to record any future amendments thereto within fifteen (15) days after any such amendment is adopted in accordance with the terms hereof.

IN WITNESS WHEREOF, the Associations of Employers and the Council, by their duly authorized representatives have executed this Agreement and the Trustees have affixed their hands and seals on the day and year first above written.

APPROVED AND ACCEPTED:

Council Appointed Trustees:

Frank Ziemann, Local 6
5300 Milwaukee Avenue
Chicago, Illinois  60630

Val Lazzaretto, Local 152
409 Temple Avenue
Highland Park, Illinois  60035

Ernest Kumerow, Laborers' District
   Council
6121 West Diversey
Chicago, Illinois  60639

Association Appointed Trustees:

UNDERGROUND CONTRACTORS' ASSOCIATION

By: _____
    Gerald Kenny
    Kenny Construction Co.
    250 Northgate Highway
    Wheeling, Illinois  60090

ILLINOIS ROAD BUILDERS' ASSOCIATION

By: _____
    Joseph Palumbo
    Leininger Mid-States Paving Co.
    323 South Center Street
    Hillside, Illinois  60162

BUILDERS' ASSOCIATION OF CHICAGO

By: _____
    William B. Barnard
    H. B. Barnard Company
    176 West Adams
    Chicago, Illinois  60603

AMENDMENT TO
AMENDED AGREEMENT AND DECLARATION OF TRUST
OF
DISTRICT COUNCIL OF CHICAGO AND VICINITY
TRAINING AND APPRENTICE TRUST FUND

The Trustees of the Laborers' Training and Apprentice Trust Fund, pursuant to Article IX, hereby amend the Agreement and Declaration of Trust creating the Training and Apprentice Trust Fund ("Trust Agreement"), originally made and entered into the 1st day of June, 1986 as follows:

WHEREAS the Trustees of the Welfare Fund by Resolution adopted December 14, 199 9 agreed to delegate authority to the Laborers' Pension and Welfare Funds to collect contributions in accordance with the policies and procedures followed by those funds in collecting their own contributions;

NOW THEREFORE, it is agreed that Article II, Section 8, 4th sentence shall be amended to read:

> Delinquent contributions and penalties shall also bear interest from date contributions were due until the delinquency is totally satisfied at the prime plus 2 points rate of interest as charged by a bank selected by the Laborers' Pension and Welfare Funds and as determined from time to time by the Administrator of said funds, or such other lawful amount the Trustees hereafter may determine.

NOW THEREFORE, it is also agreed that Article II, Section 8, 2nd last sentence shall be amended to read:

> Such legal action shall be brought in the Federal District Court for the Northern District of Illinois, Eastern Division.

IN WITNESS WHEREOF, the Trustees hereby approve this Amendment as of the date and year indicated.  This Amendment shall take effect immediately.

DATED: _March 15, 2000_

UNION APPOINTED TRUSTEES:                    EMPLOYER APPOINTED TRUSTEES:

J. MICHAEL LAZZARETTO                         ROBERT J. MADDEN

FRANK RILEY                                   DAVID H. LORIG

LIBERATO NAIMOLI                              DON HENDERSON

JOSEPH A. MANN                                DAVID DIPAOLO

JAMES P. CONNOLLY                             GERALD KENNY

MARTIN FLANAGAN

C:\EIC\LABORERS\AMENDMENTS\TRAINING.001.wpd

2

AGREEMENT AND DECLARATION OF TRUST

FOR THE CHICAGO AREA

LABORERS-EMPLOYERS COOPERATION

AND EDUCATION TRUST


ORIGINALLY ADOPTED JUNE 1, 1998

AMENDED AND RESTATED MAY 8, 2002

AMENDED AND RESTATED FEBRUARY 16, 2005


**Exhibit A-7**

This Agreement and Declaration of Trust is made effective June 1, 1998 by, between and among the Construction and General Laborers' District Council of Chicago and Vicinity, Laborers' International Union of North America, AFL-CIO ("District Council" or "LIUNA"), the employers of laborers who now or hereafter execute this instrument ("Employers"), and the individuals who herein or hereafter agree to serve as Trustees of the Trust established by and maintained pursuant to this instrument.

## WITNESSETH:

**WHEREAS,** the District Council is a labor organization comprised of affiliated local unions that represent laborers employed in the construction industry, which includes building, residential, heavy highway, wrecking and pipeline construction trades as well as environmental trades (e.g., asbestos and lead abatement and hazardous waste and radiation removal); and

**WHEREAS,** the Employers operate businesses in the construction industry that employ laborers; and

**WHEREAS,** the construction industry must confront many competitive and technical challenges including the need to increase the work opportunities for union construction, LIUNA and the Employers, the increasingly hazardous nature of the work, the need for specially-trained laborers, the extent of government regulation, and the necessity to protect public health and safety; and

**WHEREAS,** these challenges are of mutual concern to LIUNA and the Employers but are not susceptible to effective resolution through the collective bargaining process; and

**WHEREAS,** federal law provides for the establishment of a joint labor-management cooperation trust for the purposes described in this instrument; and

**WHEREAS,** LIUNA and the Employers have agreed to establish a joint labor-management cooperation trust for such purposes;

**NOW THEREFORE,** in consideration of the foregoing representations as well as the mutual promises and obligations herein, it is mutually understood and agreed as follows:

**1.01 GENERALLY:** Unless the context or subject matter otherwise requires, the definitions set forth in this Article shall govern the interpretation of this instrument.

**1.02 District Council/LIUNA:** The terms " District Council" and "LIUNA" shall mean the Construction and General Laborers' District Council of Chicago and Vicinity, Laborers' International Union of North America, AFL-CIO.

**1.03  TRUST:**  The term "Trust" shall mean the Chicago Area Laborers-Employers Cooperation and Education Trust established by and maintained pursuant to this instrument.

**1.04  TRUST AGREEMENT:**  The term "Trust Agreement" shall mean this Agreement and Declaration of Trust, including any and all amendments thereto.

**1.05  TRUSTEE:**  The term "Trustee" shall mean one of the individuals hereby or hereafter appointed in accordance with this Trust Agreement to hold the Trust's assets in trust and to administer the Trust as fiduciaries.

**1.06  BOARD OF TRUSTEES:**  The terms "Board of Trustees" and "Board" shall mean the body comprised of all the Trustees.

**1.07  INDUSTRY:**  The term "Industry" shall mean the construction industry, including traditional markets and environmental markets.

**1.08  EMPLOYER:**  The term "Employer" shall mean an employer of laborers, or an association of employers of laborers, which is or becomes signatory to this Trust Agreement or otherwise adopts it, and which is accepted for participation in this Trust by or for the Board of Trustees.

**1.09  PARTICIPATING ENTITY:**  The term "Participating Entity" shall mean an Employer, a labor-management cooperation organization, an employee benefit plan, a local union affiliated with the District Council, or any other entity for which the District Council is or becomes signatory to this Trust Agreement, or otherwise adopts this Trust Agreement, and which is accepted for participation in this Trust by the Board of Trustees.

## ARTICLE II
### Declaration of Trust and Purposes

**2.01  DECLARATION OF TRUST:**  LIUNA and the Employers do hereby declare that a trust known as the "Chicago Area Laborers-Employers Cooperation and Education Trust" has been established and is maintained for the purposes permitted by this Trust Agreement and applicable law.

**2.02  GENERAL PURPOSES:**  The general purposes and objects of the Trust shall be as follows:

a)  To improve communications between LIUNA and Employers, and provide a forum for discussion of matters of mutual interest;

b)  To identify and expand work opportunities for laborers and Employers;

c)  To improve efficiency in the operations and economic competitiveness of the Industry;

2

d)      To establish and maintain mechanisms for monitoring and enforcing compliance with government laws, rules, regulations and standards governing or affecting the Industry;

e)      To inform and petition governmental officials concerning issues affecting the Industry;

f)      To sponsor seminars, programs, conferences and meetings concerning issues affecting the Industry;

g)      To communicate with the public about issues of concern to the Industry;

h)      To facilitate the exchange of information among LIUNA and Employers concerning projects, contracts, events, trends and all other matters affecting the Industry;

i)      To establish standards for practices within the Industry;

j)      To study and otherwise facilitate resolution of problems and matters affecting the Industry, including the availability, cost and conditions of liability insurance and any other types of insurance;

k)      To establish alliances with other organizations, trusts, programs and groups to advance mutual interests relating to the Industry;

l)      To encourage and assist in the establishment and maintenance of local and regional labor-management cooperation committees and trusts for one or more of the purposes of this Trust;

m)      To encourage free collective bargaining between LIUNA and its affiliates and Employers in the Industry;

n)      To solicit or otherwise raise funds to finance the Trust's activities from any and all lawful sources, including Employers, employee benefits plans, labor-management cooperation organizations, employee organizations, private foundations, other charitable entities, and governmental bodies;

o)      To develop programs that advance the health and safety of laborers employed in the Industry and their families, as well as the health and safety of the public affected by the Industry;

p)      To conduct research, perform studies, collect information, develop procedures and otherwise act to minimize the hazards of the Industry;

q)      To promote and assist quality training programs for laborers employed or to be employed in the Industry; and

r)     To otherwise implement the purposes and provisions of the Labor Management Cooperation Act of 1978 (Public Law 95-524).

**2.03     LIMITATIONS:**  The Trust shall be a non-profit trust. No net earnings of the Trust shall inure to the benefit of any Trustee, Employer, Participating Entity, LIUNA or any other individual or entity, except to the extent permitted under applicable law.

**2.04     LEGAL STATUS:**  This Trust is intended as a labor-management committee within the meaning of Section 302(c)(9) of the Labor Management Relations ("Taft-Hartley") Act so as to permit Employer contributions. It is further intended that the Trust qualify as a tax-exempt trust under section 501 (c) of the Internal Revenue Code and other applicable tax law.

**ARTICLE III**
**Trustees**

**3.01     ROLE OF TRUSTEES:**  The administration, management and operation of the Trust shall be exclusively the right and responsibility of the Board of Trustees.

**3.02     COMPOSITION AND APPOINTMENT OF THE BOARD:**  The Board of Trustees shall be composed of not fewer than four (4) Trustees, and shall have equal numbers of Union Trustees and Employer Trustees.  Union Trustees shall be appointed by the District Council. Employer Trustees shall be appointed by the Employer that the Employer Trustee represents; provided however, that no more than one Employer Trustee shall be associated with any one Employer so as to encourage broader involvement by Employers.

**3.03     ACCEPTANCE OF TRUSTEESHIP:**  A Trustees appointed in accordance with this Trust Agreement shall be vested with all property, rights, powers and duties of a Trustee hereunder immediately upon signing a written acceptance and consent to serve as a Trustee which incorporates and is affixed to the Trust Agreement, without necessity of any formal conveyance or other instrument of title.  A successor or additional Trustee shall have no responsibility or liability for acts or omissions of the Trustees before he or she assumed office as a Trustee.

**3.04     TERM OF TRUSTEES:**  Each Trustee shall serve until his or her effective resignation, disqualification, removal, disability or death.

**3.05     RESIGNATION:**  Any Trustee may resign by a written instrument executed for that purpose and delivered to the remaining Trustees and, if a Union Trustee, to the District Council.

**3.06     REMOVAL:**  A Trustee will be automatically removed from his or her position of Trustee in the event of two successive unexcused absences in any 12 month period.  Any Union Trustee may be removed at any time from his or her position as Trustee, with or without cause, by the District Council.  Any Employer Trustee may be removed at any time from his or

her position as Trustee, with or without cause, by the Employer which the Trustee represents. Notwithstanding the foregoing, any Trustee may be removed at any time, with or without cause, by majority vote of all Trustees.

**3.07 VACANCIES:** No vacancy or vacancies on the Board of Trustees shall impair the power of the remaining Trustees to administer, manage and operate the Trust pending the filling of such vacancy or vacancies.

**3.08 QUALIFICATIONS:** An individual may serve as a Trustee while also serving as an officer, employee or Trustee of LIUNA or of an Employer. No individual shall serve as an Employer Trustee unless he or she is affiliated with an Employer that is party to a collective bargaining agreement with LIUNA or one of its affiliates.

**3.09 COMPENSATION AND EXPENSES:** Except as expressly authorized herein, the Union Trustees and the Employer Trustees shall receive no compensation for their services as Trustees. All Trustees may be reimbursed from Trust assets for reasonable and actual expenses incurred in connection with their services to the Trust.

**ARTICLE IV**
**Powers, Rights and Duties of Trustees**

**4.01 GENERAL POWERS:** The Board of Trustees is hereby vested with all authority and powers necessary or appropriate to carry out the purposes of the Trust, including but not limited to full authority and power;

a) To lease, or purchase or obtain such lands, premises, materials, supplies, equipment, insurance, goods and services as the Board deems necessary or appropriate, and to pay reasonable compensation, costs or expenses therefor from the Trust;

b) To hire, employ, retain or contract with persons or organizations to provide such administrative, clerical, technical, professional, legal, accounting, actuarial and other assistance as the Board deems necessary or appropriate, and to pay reasonable compensation, costs or expenses therefor from the Trust;

c) To determine, in the Board's discretion, the priorities and timetables for carrying out the purposes of the Trust;

d) To develop and implement such programs, plans, services, goods and materials as the Board deems necessary or appropriate for carrying out the purposes of the Trust;

e) To delegate to any employees, agents, professionals, or service providers such powers and duties as the Board considers necessary or appropriate;

f) To enter into on behalf of the Trust such contracts or agreements as the Board considers necessary or appropriate;

5

g)      To solicit, raise and receive contributions, grants, gifts, dues, assessments, and any other payments or property from any lawful source whatsoever, including Employers, employee benefit plans, labor management cooperation organizations, governmental bodies, private foundations, other charitable entities, the District Council, and the Laborers' International Union of North America and its affiliates;

h)      To establish and accumulate as part of the Trust such reserve or reserves as the Board considers necessary or appropriate to carry out the purposes of the Trust and to meet the requirements of applicable law;

i)      To invest and reinvest the Trust in any type of prudent investments not expressly prohibited by applicable law, to take any and all action with respect to holding, buying, selling, and exchanging such investments in the name of the Board or in the name of its nominee as it considers appropriate, and to authorize any bank, trust company, insurance company or investment manager to commingle any monies deposited with it in a pooled investment account administered or managed by it;

j)      To hold uninvested cash, without liability for interest thereon, in such sums as the Board deems necessary or appropriate for meeting the cash needs of the Trust;

k)      To pay out of the Trust such real and personal property taxes, income taxes, and other taxes of any kind as may be lawfully imposed or assessed upon the Trust with respect to any of its property;

l)      To compromise, settle, arbitrate, and release claims or demands in favor of or against the Trust or Trustees on such terms and conditions as the Board deems necessary or appropriate;

m)      To initiate on behalf of the Trust such lawsuits and other legal proceedings as the Board deems necessary or appropriate, to defend lawsuits or other legal proceedings brought against the Trust or the Trustees and to pay the cost and expenses thereof, including attorneys' fees, out of the Trust to the extent not prohibited by applicable law;

n)      To contract or subcontract with any employee benefit plan, the District Council and any of its affiliates. The Laborers' International Union of North America and any of its affiliates, any other Labor-Management Committee operating under Section 302(c)(9) of the Labor Management Relations Act, and any Employer for such goods, services, premises, equipment, personnel, offices or supplies as the Board deems necessary or appropriate, and to pay reasonable compensation, costs and expenses therefore, to the extent not prohibited by applicable law;

o)      To promote the Trust and to take such other actions as the Board deems necessary or appropriate to attract interest in the Trust's purposes and activities;

6

p)  To, in the Board's discretion, accept or reject or expel any Participating Entity from participation in the Trust;

q)  To adopt such policies, procedures, rules, regulations, or by-laws as the Board deems necessary or appropriate and which shall be binding on all parties dealing with the Trust;

r)  To interpret this Trust Agreement and all policies, procedures, rules, regulations and any by-laws adopted by the Board and to bind all parties dealing with the Trust by such interpretations;

s)  To determine all questions arising in the Trust's administration, management or operations, which determinations shall bind all parties dealing with the Trust;

t)  To negotiate, obtain, purchase and maintain such policies or contracts of insurance as the Board deems necessary or appropriate, or to pay or provide for the payment of premiums therefor from the Trust;

u)  To borrow money in the name of the Trust on such terms and conditions, and from whatever lawful source, as the Board may consider necessary or appropriate;

v)  To establish and finance from Trust assets such other trusts and tax exempt organizations as the Board deems necessary or appropriate;

w)  To seek the advice, opinion, or direction of an appropriate court or the appropriate government body on any matter pertaining to the administration of the Trust; and

x)  To do all acts, whether or not expressly authorized herein, which the Board deems necessary or appropriate consistent with applicable law.

**4.02  ALLOCATION AND DELEGATION OF FIDUCIARY RESPONSIBILI-TIES:**  The Board of Trustees may allocate such fiduciary responsibilities and administrative duties to one or more Trustees, to committees of Trustees, or to other persons as it may deem appropriate or necessary consistent with applicable law.

**4.03  EXECUTIVE DIRECTOR:**  The Board of Trustees is empowered to appoint, hire or contract for the services of an Executive Director.  The Board shall delegate to the Executive Director the powers and authority necessary for the day-to-day management and administration of the Trust as it considers appropriate for the efficient operation of the Trust. The Executive Director shall report periodically or as the Board may order about the status of the Trust's affairs and the Executive Director's activities.  The Executive Director shall serve at the will of the Board and may be removed by it with or without cause at any time subject only to any reasonable contract or arrangement between the Trust and the Executive Director.

**4.04  ADMINISTRATIVE OFFICES:**  The Board of Trustees shall establish one or more administrative offices for the Trust and shall staff such office(s) in such manner as it deems

necessary or appropriate, either with Trust employees or by contracting with another organization.

### 4.05 ALLOCATION AND DELEGATION OF INVESTMENT FUNCTIONS:

a)     The Board of Trustees shall appoint and retain a qualified investment manager or managers, who may be business organizations or individuals, and to delegate to such investment manager(s) full authority to manage, acquire and dispose of such assets of the Trust as the Board shall specify, subject to the requirements of applicable law.  The investment manager(s) shall report to the Board and the Investment Committee on a regular basis and as ordered by the Board as to activities, investments, holdings, acquisitions and disposal of assets.

b)     The Board of Trustees shall appoint at least one Union Trustee and one Employee Trustee to an Investment Committee.  The Investment Committee shall oversee the activities of the investment manager(s) and report and advise the Board from time to time regarding the status of the assets of the Trust.

c)     No Trustee, including Investment Committee members, shall be liable for the acts or omissions of such investment manager(s) or be under any obligation to invest or otherwise manage any of the Trust which is subject to the management of such investment manager(s).

d)     In connection with any allocation or delegation of investment functions or responsibility, the Board may, from time to time, adopt appropriate investment policies or guidelines.

### 4.06 DEPOSIT AND WITHDRAWAL OF FUNDS:

a)     All monies received by or on behalf of the Trust hereunder shall be deposited in such bank or banks as the Board of Trustees may designate for that propose, and all withdrawals of monies from such account or accounts shall be made only by checks, drafts, or other recognized written method of transmitting money signed by such Trustees as are authorized in writing by the Board to sign.

b)     The Board of Trustees may, in its discretion, designate and authorize its Executive Director or other employees, or an agent of the Trust to sign checks or otherwise draw upon such separate and specific bank account or accounts as the Board may establish or designate for this purpose.  The Board may, in its discretion, limit the amount and number of such checks or draws as it considers appropriate.

### 4.07 EXECUTION OF DOCUMENTS:  Except as provided otherwise herein, the Board of Trustees may authorize the Chairman of the Board, the Vice Chairman of the Board, or the Executive Director to execute any notice, document, certification or other instrument in writing, and all persons, partnerships, corporations, associations, and other entities may rely thereupon that such notice or instrument has been duly authorized and is binding on the Trust and the Board.

**4.08    BOOKS OF ACCOUNT:** The Board of Trustees shall cause to be kept true and accurate books of account and records of all Trust transactions, which shall be audited at least annually by an independent certified public accountant selected by the Board. A statement of the audit results shall be available for inspection by all Participating Entities in the Trust at the Trust's principal administrative office. The fiscal year shall be that which is designated and adopted by the Board as the fiscal year of the Trust.

**4.09    RIGHT TO INFORMATION:** The Board of Trustees is empowered and entitled to demand and promptly obtain from any Employer or Participating Entity, and from any other person or organization dealing with the Trust, such documents or information as the Board deems necessary or appropriate for the administration of the Trust, but the Board shall make no other or further use of such documents or information. The Board is further empowered to provide information to such persons or organizations as it deems necessary or appropriate to carry out the purposes of the Trust, giving due regard for the privacy of medical and health information, and confidential business information obtained from Employers.

**4.10    SURETY OR FIDELITY BONDS:** To the extent required by applicable law or as otherwise deemed necessary or appropriate by the Board of Trustees, the Trustees, as well as employees and agents of the Trust engaged in handling assets of the Trust, shall be bonded by a duly authorized surety company, and the cost of such bonding shall be payable from the Trust.

**4.11    ERRORS & OMISSIONS INSURANCE:** The Board of Trustees may in its discretion obtain and maintain contracts or policies of insurance, to the extent permitted by law, to insure themselves, the Trust as such as well as employees or agents of the Trustees and the Trust, while engaged in business and related activities for and on behalf of the Trust: (1) with respect to liability to the Trust and others as a result of acts, errors or omissions of such Trustees, employees, or agents, respectively, provided such insurance contract or policy shall permit recourse by the insurer against the Trustees and other covered persons if required by law; and (2) with respect to injuries received or property damages suffered by them. The cost of the premiums for such policies or contracts of insurance shall be paid out of the Trust.

**4.12    PERSONAL LIABILITY:** To the full extent permitted by applicable law:

a)    Neither the District Council, nor any Employer, nor any Participating Entity, nor any of their officers or representatives shall be responsible or liable in any respect for any of the acts or omissions or obligations of the Trust or the Trustees, individually or collectively.

b)    Neither the District Council, nor any Employer, nor any Participating Entity, nor any Trustee shall be responsible or liable for:

(1)    The validity of this Trust Agreement or of any Trust program;

(2)    The form, validity, sufficiency or effect of any contract or policy which may be entered into;

9

(3)     Any delay occasioned by any restrictions or provisions in this Trust Agreement, in rules adopted by the Board, in any contract or policy procured in the course of administration of the Trust, or in any collective bargaining agreement or other agreements; and

(4)     The payment of any sums beyond those received by the Board of Trustees.

c)     Neither the Board of Trustees nor the Trust shall be bound by any representation about the Trust or any program of the Trust, other than those representations contained in this Trust Agreement or official written communications from the Board of Trustees.

d)     No Trustee shall be liable or responsible for his or her own acts or omissions or for any act or omissions of any other fiduciary or person; except for his or her own acts or omissions determined by a court to be willful misconduct, or as otherwise required by law. The Trust shall indemnify (through insurance or otherwise) each Trustee against any and all claims, losses, damages, expenses and liabilities arising from any action or omission, and shall assume the cost of defending same, except to the extent that the Trustee is found personally liable under the preceding sentence.

e)     Neither the Trustees nor the Trust shall assume any responsibility for the oversight, carelessness, inadvertent error, or any other act or omissions, or for any misstatement or misrepresentation made, by any agent or employee of any insurance company, bank, trust company, investment manager, service provider, Employer, Participating Entity or the District Council; further, the liability of the Trustees and Trust hereunder shall be specially limited to the receipt of any sum or sums which may come into their hands pursuant to the terms of this Trust Agreement.

f)     The Trustees shall not be liable for the proper application of any part of the Trust or for any other liabilities arising in connection with the administration or operation of the Trust, except as herein provided.

g)     The Trustees shall be fully protected in acting upon any instrument, certificate or paper believed by them to be genuine and to be signed or presented by the proper person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same statement therein contained.

h)     The Trustees may from time to time consult with the Trust's legal counsel, accountant, consultants, actuaries or other professionals, and shall be fully protected in acting in reasonable reliance upon such advice.

i)     The Trustees shall be fully protected in reliance on information, data, statistics or analyses furnished by persons performing such functions for the Trust.

j)     The Trustees, employees and agents of the Trust shall have no liability for acting in compliance with a provision of the Trust Agreement or of any Trust program which is subsequently found to be unlawful.

## ARTICLE V
## Board Officers and Meetings

**5.01 OFFICERS:** The District Council shall appoint a Chairman of the Board of Trustees. The Chairman shall convene and preside over meetings of the Board of Trustees. The Board of Trustees may appoint such other officers as it deems appropriate.

**5.02 MEETINGS:** Meetings of the Board of Trustees shall be held at such times and at such places, or by such means, as the Chairman or a majority of the Trustees may agree upon. Such meetings may be called upon five (5) days written notice to all Trustees, except that a meeting may be held at any time without notice if all the Trustees consent. The Board shall meet not less often than twice each year. Meetings may be conducted in person or thought telephonic or other electronic means which permit discussion among the Trustees; provided, however, that preference shall be given to face-to-face meetings.

**5.03 QUORUM:** No actions shall be taken at a meeting of the Board of Trustees unless a quorum, equal to two (2) Union Trustees, and two (2) Employer Trustees, is present.

**5.04 MINUTES OF MEETINGS:** The Board shall keep written minutes of all meetings, but such minutes need not be verbatim. Copies of the minutes shall be sent to all Trustees and to such others as the Board directs.

**5.05 ACTION BY BOARD:** Except as otherwise provided herein, all action by the Trustees shall be taken at Board meetings and by simple majority vote of the Trustees in attendance and voting. Each Trustee shall have one (1) vote.

**5.06 ACTION BY BOARD WITHOUT MEETING:** Action may be taken by the Board of Trustees in writing without a meeting, provided that all the Trustees concur in the taking of such action without a meeting.

**5.07 DEADLOCK:** In the event that any matter considered by the Board of Trustees cannot be decided because of a tie vote, the Board shall invoke the procedures of the Labor Arbitration Rules of the American Arbitration Association for the appointment of an arbitrator to resolve the deadlock. The cost and expense incidental to any arbitration proceeding, including the arbitrator's fees and attorneys' fees, shall be payable from the Trust.

## ARTICLE VI
## Participation and Contributions

**6.01 PARTICIPATION:** Participation in the Trust shall be open to all employers in the Industry which employ laborers represented by LIUNA or its affiliates, to associations of such employers, to regional or local labor-management cooperation organizations in the Industry sponsored by LIUNA or its affiliates, to employee benefit plans sponsored by LIUNA or its

11

affiliates which cover laborers employed in the Industry or to any other entity which becomes signatory to this Trust Agreement or otherwise adopts it; subject to the absolute discretion of the Board of Trustees to accept, reject or expel from participation in the Trust. The Board is empowered to condition participation on execution of such participation agreements or forms as the Board may promulgate, and on such other conditions as the Board deems necessary or appropriate. A Participating Entity may terminate its participation in the Trust by submitting a written notice of such action to the Board at any time, except to the extent that the Participating Entity is bound by a collective bargaining agreement, a participation agreement, or some other agreement requiring participation in the Trust. Termination of participation shall not excuse any Participating Entity from indebtedness to the Trust for all contributions and other payments due for the period before the effective date of the termination. The Board is empowered to deem the purported termination of a Participating Entity ineffective until such time as all indebtedness to the Trust by the Participating Entity is satisfied.

**6.02 CONTRIBUTIONS:** Participating Entities in the Trust shall pay into the Trust contributions in such amount, as specified by collective bargaining agreement, participation agreement or other written agreement and as the Board of Trustees shall determine from time to time. Contribution shall be submitted on a monthly basis and specifically by the tenth (10th) day of the first month following the month during which the contributions accrued or as otherwise required by the Board of Trustees. Unpaid contributions will be deemed delinquent on the 20th day of the first month following the month during which contributions accrued or such other date as determined by the Board.

**6.03 DEFAULT IN PAYMENT:** Participating Entities that fail to make any of the contributions or other payments owed the Trust when due may be expelled, at the Board's discretion, from participating in the Trust. In addition to any other remedies to which the Trust or the Board of Trustees is entitled, any Participating Entity which fails to pay contributions as set forth in Section 6.02 above, or other payments owed within thirty (30) days of when due, shall be liable to the Trust for the delinquent contributions, interest at the rate of prime interest plus two percent (2%) (as determined by the Administrator of the Laborers' Pension Fund and the Health and Welfare Department of the District Council) per month compounded monthly from the date of the delinquency through the date of payment, ten percent (10%) liquidated damages on the delinquent contributions, as well as for all expenses of collection incurred by the Fund, including audit fees, attorneys' fees and court costs. The Board is empowered to institute proceedings at law or equity, and to take any other action, to collect contributions and all other payments due.

**6.04 CONTRIBUTION REPORT:** Participating Entities shall submit to the Trust such written reports or documents as the Board of Trustees may deem necessary or appropriate to collect and substantiate contributions.

**6.05 AUDITS:** Participating Entities, at the request of the Board of Trustees, shall submit to an audit by a certified public accountant or accountancy firm of the appropriate records of the Participating Entity to verify that the correct amount of contributions or of other payment due has been or will be paid. Participating Entities who refuse to submit to an audit on request

shall be liable to the Trust for all audit costs incurred by the Fund, as well as all attorneys' fees and court costs incurred by the Fund to enforce this Section.

**6.06    CORPUS OF TRUST:**  The corpus of the Trust shall consist of all contributions and other payments received from Participating Entities, and the investment earnings thereon if any, together with all monies or other property received by the Trust from any and all other lawful sources.

**ARTICLE VII**
**Amendments & Termination**

**7.01    AMENDMENT BY BOARD:**  This Trust Agreement may be amended, in whole or in part, at any time by the Board of Trustees by a duly executed written instrument; provided that no amendment shall violate applicable law or alter the fundamental purpose of the Trust; and provided further that no amendment shall permit the net earnings of the Trust to inure to the benefit of any Trustee, Employer, Participating Entity, LIUNA, or any other individual or organization, except to the extent permitted by applicable laws.  Any such amendment shall be deemed a part of this Trust Agreement and shall be binding on the Board, the Participating Entities, LIUNA and all other parties dealing with the Trust.  The Board is empowered to fix such effective date for an amendment as it deems necessary or appropriate.

**7.02    TERMINATION OF TRUST:**  This Trust Agreement and the Trust may be terminated at any time by the Board of Trustees or by the District Council; provided that such action shall be confirmed by a duly executed written instrument; and provided further that no termination by the Board shall be effective until written notice is delivered to the District Council's principal office; and provided further that no termination by the District Council shall be effective until written notice is delivered to each Trustee.

**7.03    PROCEDURE OF TERMINATION:**  In the event of termination of the Trust, the Board of Trustees shall first apply the Trust assets exclusively to pay or provide for the payment of any and all proper obligations of the Trust, and then shall distribute or apply any remaining assets of the Trust to such labor-management organization or organizations organized and operated exclusively for such purposes as shall at the time qualify as exempt under Section 501(c)(5) of the Internal Revenue Code, as determined by the Board of Trustees.  The Board is empowered to take any and all action necessary or appropriate to effectuate the termination and final distribution of assets and to conclude the Trust's affairs.  The Trustees shall continue to serve as such until the Trust's affairs are concluded.

**7.04    MERGER:**  The Board of Trustees may merge the Trust with or into another trust or other tax-exempt entity with the same fundamental purpose as the Trust to implement the Labor-Management Cooperation Act; provided that such action is not prohibited by applicable law; and provided further that written notice of such a merger agreement shall be given to the Board of Trustees and the District Council.

**7.05   NO INUREMENT:**  Under no circumstances, including termination or merger, shall the Trust inure to the benefit of any Trustee, Employer, Participating Entity, LIUNA or any other individual or organization, except to the extent permitted by applicable provisions of the Internal Revenue Code and all other applicable laws.

## ARTICLE VIII
### Miscellaneous

**8.01   SITUS:**  The situs of the Trust and principal administrative office shall be in the City of Chicago, Illinois or such other location as the offices of the District Council are situated.

**8.02   GOVERNING LAW:**  All questions pertaining to the validity, construction and administration of the Trust not governed by federal law or the laws of other countries as appropriate shall be governed by the law of Illinois.

**8.03   SEVERABILITY & SAVINGS:**  The provisions of this Trust Agreement shall be interpreted in a manner consistent with applicable law.  If any provision of this Trust Agreement should be declared invalid or unenforceable or inoperative by any competent governmental authority, the Board of Trustees shall suspend the operation of such provision and shall substitute in its stead a provision which will meet the objections to validity and which is consistent with the purposes of the Trust.  Such a determination that certain provisions of this Trust Agreement are invalid or inoperative or unenforceable by operation of law shall not affect the continued validity and operation of the remaining provisions of this Trust Agreement.

**8.04   LIMITATION OF RIGHTS:**  No individual or entity, save the Board of Trustees, shall have any interest, right or ownership in the Trust or its assets.  The obligations of the Trust shall be payable only from the assets of the Trust.

**8.05   MID-AMERICA REGIONAL BARGAINING ASSOCIATION (MARBA), OTHER EMPLOYERS OR EMPLOYER ASSOCIATIONS:**  Should employers represented for purposes of collective bargaining by MARBA contribute to LECET in an amount equal to the contribution rate per hour worked by other participating Employers, then an additional Board of Trustee position shall be established for MARBA and an additional Board of Trustee position for the District Council, provided that the additional Trustees execute a written acceptance of this Trust Agreement.  The Board of Trustees may further expand the number of Trustees to permit representation by any other employer or employer associations for which contributions are made to LECET on behalf of its employees; provided that there are equal number of Employer and Union Trustees.

**8.06   EXECUTION OR ADOPTION:**  This Trust Agreement may be signed or executed by an Employer, Participating Entity, or Trustee on separate sheets attached to the Trust Agreement.  This Trust Agreement may also be adopted by express reference in a collective bargaining agreement or other written agreement accepted by the Board of Trustees.

14

**IN WITNESS THEREOF,** and to acknowledge their agreement to and acceptance of the terms and obligations of this Trust Agreement, the undersigned do cause this instrument to be duly executed.

**FOR THE EMPLOYERS:**

Gary A. Lundsberg
FOR: **Concrete Contractors
Association of Greater Chicago**

Date  2/16/05


Robert Duermit
FOR: **Illinois Environmental
Contractors' Association**

Date


William Moore
FOR: **Chicago Demolition
Contractors' Association**

Date


James M. Cassidy
FOR: **G.D.C.N.I./C.A.W.C.C.:**

Date  2/16/05


Tana Gray
FOR: **Contractors' Association of Will
and Grundy Counties**

Date  2-16-05


Paul Hellermann
FOR: **Mid-America Regional
Bargaining Association**

Date

**FOR THE EMPLOYERS:**

Gary A. Lundsberg
FOR: **Concrete Contractors**
**Association of Greater Chicago**

Date 2/16/05

Robert Duermit
FOR: **Illinois Environmental**
**Contractors' Association**

Date

William Moore
FOR: **Chicago Demolition**
**Contractors' Association**

Date 07-06-05

James M. Cassidy
FOR: **G.D.C.N.I./C.A.W.C.C.:**

Date 2/16/05

Tana Gray
FOR: **Contractors' Association of Will**
**and Grundy Counties**

Date 2-16-05

Paul Hellermann
FOR: **Mid-America Regional**
**Bargaining Association**

Date

**FOR THE EMPLOYERS:**

Gary A. Lundsberg
FOR: **Concrete Contractors
Association of Greater Chicago**

Date 2/16/05

Robert Duermit
FOR: **Illinois Environmental
Contractors' Association**

Date

William Moore
FOR: **Chicago Demolition
Contractors' Association**

Date

James M. Cassidy
FOR: **G.D.C.N.I./C.A.W.C.C.:**

Date 2/16/05

Tana Gray
FOR: **Contractors' Association of Will
and Grundy Counties**

Date 2-16-05

Paul Hellermann
FOR: **Mid-America Regional
Bargaining Association**

Date July 5, 2005

## FOR THE DISTRICT COUNCIL:

Gordon Anderson

FEBRUARY 16, 2005
Date

James Connolly

2-16-05
Date

Liberato Naimoli

Date

Frank Riley

2/6/05
Date

**FOR THE DISTRICT COUNCIL:**

_____
Gordon Anderson

_____
James Connolly

_____
Liberato Naimoli

_____
Frank Riley

FEBRUARY 16, 2005
_____
Date

2-16-05
_____
Date

7-5-05
_____
Date

2/16/05
_____
Date

### AMENDED AND RESTATED
### AGREEMENT AND DECLARATION OF TRUST
### FOR THE LABORERS' DISTRICT COUNCIL
### LABOR-MANAGEMENT COOPERATION COMMITTEE

This Agreement and Declaration of Trust made effective June 1, 2001 amended and restated as of November 25, 2003 and _____ ⊬22-08 _____ by, between and among the Construction and General Laborers' District Council of Chicago and Vicinity affiliated with the Laborers' International Union of North America, AFL-CIO ("District Council" or "LDC") and the employers of laborers who now or hereafter execute this instrument or agree to be bound by its terms, pursuant to a collective bargaining agreement, and the persons who agree to serve as trustees of the trust established by this agreement.

WITNESSETH:

Whereas, the District Council is a labor organization representing persons employed in the construction industry, quarry industry, industrial pipe plants, governmental agencies and other industries ("Construction Industries"); and

Whereas, businesses in the Construction Industries employ unionized workers; and

Whereas, the Construction Industries confront many competitive and technical challenges from other employers that do not provide comparable wages, benefits and working conditions for their employees; and

Whereas, the challenges of providing good wages, benefits and working conditions to employees in a competitive marketplace are of concern to the District Council and the Construction Industries but are not, or may not be, susceptible in all cases to resolution in the collective bargaining process; and

Whereas, the Labor-Management Cooperation Act of 1978, 29 U.S.C §175. et. seq. ("LMCA") provides for the establishment of labor-management trusts and committees for the purposes set forth in this agreement; and

NOW THEREFORE, it is mutually understood and agreed as follows:

### ARTICLE 1

### PURPOSES

1.01   DECLARATION OF TRUST:   The District Council and the employers do hereby declare that a Trust (as defined below) has been established and shall be maintained for the purposes set forth in this Trust Agreement and the Labor-Management Cooperation Act that shall be known as the Laborers' District Council Labor-Management Cooperation Committee.

1.02   PURPOSES: The purposes of the Trust may include any of the following:

**Exhibit A-8**

a)  To improve communications between the District Council and the Construction Industries, and provide a forum for discussion of matters of mutual interest;

b)  To provide the District Council and the Construction Industries with opportunities to study and implement new approaches to achieving organizational effectiveness;

c)  To assist the District Council, employees, and Construction Industries in solving problems of mutual concern not susceptible to resolution in the collective bargaining process;

d)  To study and explore ways of eliminating problems which reduce the competitiveness and inhibit the development in the Construction Industries, and to foster market recovery efforts;

e)  To develop rules and procedures with the approval of the District Council to preserve work opportunities for employees and Contributing Entities (as defined in Article 2);

f)  To identify and expand work opportunities for employees and the Construction Industries;

g)  To obtain governmental and philanthropic assistance for work recovery and work preservation projects as warranted;

h)  To promote communications among the District Council, employees represented by the Union (as defined below) and the Construction Industries in order to enhance placement opportunities for employees with special skills and to meet the needs of the Construction Industries for employees with special qualifications;

i)  To enhance the involvement of workers in decisions that affect their employment;

j)  To expand and improve working relationships between employees and the Construction Industry; and

k)  To encourage free collective bargaining by establishing and maintaining communication between the Construction Industries, the Union and employees.

It is the intent of the Board of Trustees that the purposes of this Trust be consistent with those of a labor-management cooperation committee and not an employee welfare benefit plan within the meaning of Title I of ERISA. The purposes set forth above shall be interpreted in light of this intent and any purpose found to be inconsistent with this intent shall be deleted.

1.03  NON-PROFIT TRUST:  The Trust shall be a non-profit.  No net earnings of the Trust shall inure to the benefit of any Trustee (as defined below), Contributing Entity, employee or the District Council or any other individual or entity, except to the extent permitted under applicable law.

- 2 -

1.04  LEGAL STATUS:  This Trust is intended to be a labor-management cooperation committee within the meaning of Section 302(c)(9) of the Labor Management Relations Act so as to permit employer contributions.  It is further intended that the Trust qualify under Section 501(c) of the Internal Revenue Code and related tax laws so as to maintain at all times the full tax deductibility of all contributions to this Trust.

## ARTICLE 2

## DEFINITIONS

2.01  DEFINITIONS:  The definitions set forth in this Article 2 shall govern the interpretation of this agreement, unless the context otherwise requires.

2.02  AGREEMENT:  The term "Agreement" shall mean this Agreement and Declaration of Trust.

2.03  BOARD OF TRUSTEES AND BOARD:  The terms "Board of Trustees" and "Board" shall mean the body comprised of the Trustees and set forth in this Agreement.

2.04  CONTRIBUTING ENTITY:  The term "Contributing Entity" or "Contributing Entities" shall mean any entity that makes contributions to this Trust, subject to a collective bargaining agreement requiring contributions to this Trust, and which is accepted for participation in this Trust by the Board of Trustees.

2.05  INDUSTRY:  The term "Industry" shall mean an industry in which employees represented by the District Council are employed by Contributors Entities .

2.06  DISTRICT COUNCIL or LDC:  The term "District Council" or "LDC" shall mean the Construction and General Laborers' District Council of Chicago and Vicinity of the Laborers' International Union of North America, AFL-CIO.

2.07  TRUST AGREEMENT:  The terms "Trust" and "Trust Agreement" shall mean the trust established by this Agreement and Declaration of Trust, including any amendments, known as the Laborers' District Council Labor-Management Cooperation Committee.

2.08  TRUSTEE:  The terms "Trustee" shall mean one of the individuals hereby or hereafter appointed in accordance with this Agreement to hold the assets in trust and to administer the Trust.

2.09  UNION:  The term "Union" shall mean the District Council.

## ARTICLE 3

### ADMINISTRATION OF TRUST

3.01   ADMINISTRATION:   The administration of the Trust shall be the right and responsibility of the Board of Trustees as described below.

3.02   APPOINTMENT OF THE BOARD:   The individuals who serve as Trustees shall be appointed by the Business Manager of the District Council.

3.03   TRUSTEES:   The persons listed in Appendix A are designated and appointed under this Agreement as Trustees, and are vested with all of the property, rights, powers and obligations of this Agreement.

3.04   ACCEPTANCE OF TRUSTEESHIP:   Each Trustee shall consent in writing to serve as a Trustee by affixing his or her signature to Appendix A attached to this Agreement or by signing a written acceptance of appointment as a Trustee.   A successor or additional Trustee appointed in accordance with Agreement shall be vested with all property, rights, powers and duties of a Trustee immediately upon signing a written acceptance of appointment without the necessity of any formal conveyance or other instrument of title.   A successor or additional Trustee shall have no responsibility or liability for the acts or omissions of the Trustees before he or she accepted appointment as a Trustee.

3.05   TERM OF TRUSTEE:   Each Trustee shall serve until his or her resignation, removal or death.

3.06   RESIGNATION:   A Trustee may resign by submitting a written resignation and delivering it to the Board and to the District Council.

3.07   REMOVAL:   A Trustee may be removed at any time by the Business Manager of the District Council.

3.08   VACANCIES/VOTING:   No vacancy on the Board of Trustees shall impair the power of the remaining Trustees to administer, manage and operate the Trust.

3.09   QUALIFICATIONS:   A person may serve as a Trustee while also serving as an officer or employee of the District Council, or a Contributing Entity.

3.10   COMPENSATION AND EXPENSES:   Full time employees of the Union or a Contributing Entity shall receive no compensation for their services as Trustees.   The Board of Trustees may authorize the payment of compensation to any Trustee who is not a full-time employee of the Union or a Contributing Entity.   Trustees may be reimbursed from Trust assets for reasonable expenses incurred in connection with their services to the Trust, including expenses incurred in connection with educational conferences.   The Trust may employ persons on a shared basis with the Union or a Contributing Entity's employee benefit fund and allocate the costs of such employment between the employing entities.

- 4 -

ARTICLE 4

POWERS, RIGHTS AND DUTIES OF TRUSTEES

4.01   GENERAL POWERS:  The Board of Trustees is hereby vested with all authority and powers necessary or appropriate to carry out the purposes of the Trust, including but not limited to full authority and power:

a)   To lease, purchase or accept ownership of property, land, equipment, goods and services and to pay reasonable compensation costs or expenses therefore from the Trust;

b)   To employ or contract with persons or organizations to provide administrative, clerical, technical, professional, legal, accounting, actuarial or other assistance as the Board deems necessary and to pay reasonable compensation, costs or expenses therefore from the Trust;

c)   To determine the activities, priorities and resources to be used for carrying out purposes of the Trust; .

d)   To delegate to any employee, agent, professional or service provider such powers and duties as the Board deems appropriate;

e)   To enter into agreements deemed necessary or appropriate;

f)   To receive contributions and to raise funds from other sources for carrying out purposes of this Agreement;

g)   To maintain such reserves as the Board deems appropriate;

h)   To invest the assets of the Trust, to take all actions deemed appropriate to hold, buy, sell and exchange investments in the name of the Trust or a nominee, and to authorize a bank, trust company, insurance company or investment manager to hold monies on behalf of the Trust in any separate or commingled account or pooled investment in accordance with any directive or investment policy of the Trust;

i)   To hold uninvested cash, without liability for interest thereon, in such sum as the Board deems appropriate for meeting the needs of the Trust;

j)   To pay such real and employment taxes as may be lawfully imposed or assessed upon the Trust with respect to any property or the employment of employees;

k)   To compromise, settle, arbitrate, litigate and release claims or demands in favor of or against the Trust or Trustees as the Board deems appropriate and to pay the costs thereof, including attorney's fees to the extent not prohibited by law;

l)  To contract with any employee benefit plan or the District Council or any service provider for employee benefits, goods, services, premises, equipment, personnel, offices or supplies as the Board deems appropriate, and to pay reasonable compensation, costs and expenses therefore, to the extent permitted by law, provided that such payments do not violate the provisions of Section 302(c) of the Labor Management Relations Act;

m)  To reject or expel any Contributing Entity from participation in the Trust;

n)  To adopt such policies, procedures, rules, regulations or bylaws as the Board deems appropriate, which shall be binding on all parties dealing with the Trust;

o)  To interpret this Agreement and all policies, procedures, rules, regulations and bylaws adopted by the Board and to bind all parties dealing with the Trust by such interpretations;

p)  To borrow money in the name of the Trust on such terms and conditions, and from any lawful source, as the Board deems appropriate;

q)  To establish and finance from Trust assets such other trust and tax-exempt organizations as the Board deems appropriate;

r)  To do all acts, whether or not expressly authorized herein, which the Board deems necessary or appropriate.

4.02  ALLOCATION AND DELEGATION OF RESPONSIBILITIES:  The Board may allocate such responsibilities and administrative duties to one or more Trustees, to subcommittees, or to other persons as it deems appropriate.

4.03  ADMINISTRATOR: The Trust is empowered to hire or contract with an Administrator to perform such duties as the Board may consider appropriate. The Board may delegate powers and authority of the Board to the Administrator as it considers appropriate. The Administrator shall report to the Board as determined by the Board and shall serve at the will of the Board. The Trust may, but need not, enter into a contract of employment with the Administrator.

4.04 OFFICE: The Board shall establish an office for the Trust and may establish additional offices as it deems appropriate. The Board may staff such office or offices as the Board deems appropriate.

4.05  DELEGATION OF INVESTMENT AUTHORITY:  The Board is empowered to delegate investment authority to one or more qualified investment managers to manage, acquire and dispose of trust assets in accordance with policies of the Trust. No Trustee shall be liable for the acts or omissions of the investment manager or be under any obligation to invest or otherwise manage any asset which is subject to the management of an appointed investment manager. The Board may from time to time adopt and modify investment policies and may delegate the responsibility for investment management to an Investment Subcommittee.

- 6 -

4.06  DEPOSIT AND WITHDRAWAL OF FUNDS:  Monies shall be deposited and withdrawn from the bank or banks designated by the Board, and all withdrawals shall be made by checks, drafts, or other accepted method of transmitting money as authorized by the Board. The Trust may authorize its Administrator, employees or other agent to sign checks or otherwise transfer funds, for approved purposes up to a maximum amount approved by the Trustees, otherwise all actions shall require the signatures of two Trustees.  The Trust may limit the amount or the number of checks or withdrawals.

4.07  EXECUTION OF DOCUMENTS:  The Trust may authorize its Chairman or any one or more of the Trustees to execute any notice, document, certification or other instrument in writing, and all persons, partnerships, corporations, associations and other entities may rely upon the fact that such notice or instrument has been duly authorized and is binding on the Trust and its Board.

4.08  BOOKS OF ACCOUNT:  The Board shall cause to be kept true and accurate books of account and records of all Trust transactions, which shall be audited at least annually by an independent certified public accountant selected by the Board.

4.09  RIGHT TO INFORMATION:  The Board is empowered and entitled to demand and promptly obtain from any Contributing Entity and from any other person or organization dealing with the Trust, such information, including documents, as the Board deems necessary or appropriate for the administration of the Trust.  The Board is further empowered to provide information to such persons or organizations as is necessary or appropriate to carry out the purposes of the Trust, giving due regard for the privacy of medical and health information and business information related to competitive practices.

4.10  SURETY OR FIDELITY BONDS:  To the extent required by law or as otherwise deemed appropriate by the Board, the Trustees, as well as employees and agents of the Trust engaged in handling assets of the Trust, shall be bonded by a duly authorized surety company, and the cost of such bonding shall be paid from the Trust.

4.11  ERRORS AND OMISSIONS INSURANCE:  The Board may in its discretion obtain and maintain contracts or policies of insurance, to the extent permitted by law, to insure themselves, the Trust, as well as employees or agents of the Trustees and the Trust, while engaged in business and related activities for and on behalf of the Trust:  (1) with respect to liability to the Trust and others as a result of acts, errors or omissions of the Trustees, employees, or agents, respectively; and (2) with respect to injuries received or property damages suffered by them. The cost of the premiums for such policies or contracts of insurance shall be paid out of the Trust.  A Trustee may purchase, at his or her own expense, a rider to such policies or contract or a separate contract or policy to insure against recourse by the insurer.

4.12  PERSONAL LIABILITY:  To the full extent permitted by applicable law:

a)  Neither the Union, nor any Contributing Entity nor any association of employers, nor any of their officers or representatives shall be responsible or liable in any respect for any of the acts or omissions of the Trustees or the obligations of the Trust, individually or collectively.

- 7 -

Neither the Union nor any Contributing Entity nor any Trustee shall be responsible or liable for the validity of this Trust Agreement or the form, validity, sufficiency or effect of any contract or policy entered into by the Trust nor for any delay occasioned by any restrictions or provisions of the Trust, in rules adopted by the Board of Trustees, in any contract or policy procured by the Trust, or in any collective bargaining agreement. Neither the Union nor any Contributing Entity or Trustee shall be liable for the payment of any sums beyond those received by the Trust.

b) Neither the Trustees nor the Trust shall be bound by any representation about the Trust or any program of the Trust, other than those representations contained in this Agreement or official written communications from the Trustees or from the Administrator.

c). No Trustee shall be liable or responsible for his or her own acts or omissions or for any act or omission of any other Trustee; except for willful misconduct, or as otherwise required by law. The Trust shall be authorized to obtain liability and other insurance to protect the Trust and each Trustee against any and all claims, losses, damages, expenses and liabilities arising from any act or omission, and shall assume the cost of defending same, except to the extent that the Trustee is found personally liable under the preceding sentence.

d) The Trustees shall be fully protected in acting upon any instrument, certificate or paper believed by them to be genuine and to be signed or presented by the proper person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same statement therein contained.

e) The Trustees may consult with legal counsel, accountants, consultants, actuaries or other professionals, and shall be fully protected in acting in reliance on such advice.

f) The Trustees, employees and agents of the Trust shall have no liability for acting in compliance with a provision of this Agreement which is subsequently found to be unlawful.

## ARTICLE 5

## BOARD OF TRUSTEES

5.01 OFFICERS: The Business Manager of the District Council shall appoint a Chairman of the Board of Trustees. The Chairman shall convene and preside over meetings of the Board. The Board may appoint such other officers as it deems appropriate.

5.02 MEETINGS: Meetings of the Board of Trustees shall be held at such times and places, or by conference call or other such means as the Chairman or a majority of the Trustees may agree upon. Such meetings may be called upon five days notice to all Trustees in writing or by E-mail, except that the meeting may be held at any time without notice if all Trustees consent. The Board of Trustees shall meet not less often than twice each year. The meetings may be conducted in person or by telephone or other electronic means which permit discussion among the Trustees; provided, however, that preference shall be given to face-to-face meetings.

5.03   QUORUM:  A majority of the Trustees then in office shall constitute a quorum.  No action shall be taken at a meeting of the Board of Trustees unless a quorum is present.

5.04   MINUTES OF MEETINGS:  The Board shall keep written minutes of all meetings, but such minutes need not be verbatim.  Copies of the minutes shall be provided to all Trustees and to such others as the Board directs.

5.05   ACTION BY BOARD:  Except as otherwise provided herein, all action by the Trustees shall be taken at Board meetings and by simple majority vote of the Trustees in attendance and voting.  Each Trustee shall have one vote.

5.06   ACTION BY BOARD WITHOUT MEETING:  Action may be taken by the Board in writing without a meeting, provided that all the Trustees concur in the taking of such action without a meeting.

5.07   DEADLOCK:  In the event that any administrative matter considered by the Board cannot be decided because of a tie vote, any Trustee may request the appointment of an arbitrator, to resolve the issue.  If the Board cannot agree by majority vote on the selection of an arbitrator, the Chairman shall invoke the procedures of the labor Arbitration Rules of the American Arbitration Association for the appointment of an arbitrator to resolve the deadlock. The cost and expense incidental to any court petition or any arbitration proceeding, including the arbitrator's fees and attorney's fees incurred by the Trustees, shall be payable from the Trust.

## ARTICLE 6

## PARTICIPATION AND CONTRIBUTIONS

6.01   PARTICIPATION:  Participation in the Trust and its programs shall be open to all employers in an Industry, to associations of such employers, to other labor-management cooperation organizations in an Industry sponsored by the District Council, to employee benefit plans sponsored by the District Council or to any other entity which the Trustees permit to become signatory to this Agreement.  The Board is empowered to condition participation or continued participation on execution of such agreements as the Board may stipulate, and on such other conditions as the Board deems appropriate.  Such a participating organization may terminate its participation by submitting a written notice of such action to the Board at any time, except to the extent that an organization is bound by the terms of the collective bargaining agreement or some other agreement requiring a term of participation in the Trust.  Termination of participation shall not excuse any organization from indebtedness to the Trust for all contributions and other payments due.

6.02   CONTRIBUTIONS:  A Contributing Entity shall pay into the Trust contributions in such amounts as are specified by the collective bargaining agreement, participation agreement or other written agreement with the District Council or the Board.  Contributions shall be submitted within the time required by the collective bargaining agreement or other agreement or, if none, by the tenth day of the second month following the month in which the contributions accrued.

6.03 DEFAULT IN PAYMENT: In addition to any other remedies to which the Trust is entitled, any Contributing Entity which fails to pay contributions owed within the time required by the collective bargaining agreement or, if none is specified, within 30 days of when the contribution was due, shall be liable to the Trust for interest at the rate of prime plus two points compounded monthly from the due date through the date of payment, 10 percent liquidated damages on the delinquent contributions, and all expenses of collection incurred by the Trust, including auditor's fees, attorney's fees and court costs. The Trustees are empowered to institute legal proceedings on behalf of the Trust, and to take any other action to collect contributions and all other payments due. The Trustees may delegate to a third party the authority to collect contributions owed to this Fund and to do so under the policies and procedures followed by the Trustees for the collection of a Contributing Entity's payments owed under labor contracts of the District Council.

6.04 CONTRIBUTION REPORT: A Contributing Entity shall submit to the Trust or its collection agent such written reports and documents as the Board may deem necessary or appropriate to collect and determine the accuracy of contributions.

6.05 AUDITS: A Contributing Entity shall submit to an audit by a certified public accountant or firm of accountants selected by the Board or by its collection agent and shall provide the records requested by the Trust or auditor to verify the correct amount of contributions owed and the amounts paid. A Contributing Entity that fails to submit to an audit upon request or is found to be delinquent shall be liable for all costs of collection and the costs of the audit.

6.06 CORPUS OF TRUST: The corpus of the Trust shall consist of all contributions and other payments received from Contributing Entities and other participating organizations, the investment earnings thereon if any, together with all moneys or other property received by the Trust from any and all lawful sources.

6.07 INDEMNIFICATION: The Trust agrees to defend and hold harmless the Contributing Entities represented by the Mid-America Regional Bargaining Association as regards the creation, implementation and operation of this Trust, other than the obligation to contribute the designated amounts to the Trust. Such indemnity and hold harmless agreement shall include the payment of all reasonable costs and attorney's fees actually incurred on behalf of such Contributing Entities. Any such Contributing Entity shall give prompt notice to the fund of any claims asserted or suits filed that are subject to indemnification.

ARTICLE 7

AMENDMENT AND TERMINATION

7.01    AMENDMENT:  This Agreement may be amended, in whole or in part, at any time by the Board by a duly executed written instrument; provided that no amendment shall violate applicable law or alter the fundamental purposes of the Trust or change or eliminate the indemnification set forth in Section 6.07.  Any such amendment shall be deemed a part of this Agreement and shall be binding upon the Board, and all other parties dealing with the Trust. The Board is empowered to fix the effective date for any amendment as it deems appropriate.

7.02    TERMINATION OF TRUST:  This Agreement and the Trust may be terminated at any time by the Board of Trustees; provided that such action shall be confirmed by a duly executed written instrument; and provided further that no termination by the Board shall be effective until written notice is delivered to the principal office of the District Council; and provided further that no termination by the Board shall be effective until written notice is delivered to each Trustee.

7.03    PROCEDURE FOR TERMINATION:  In the event of termination, the Board of Trustees shall first apply the Trust assets to pay or provide for the payment of any and all proper obligations of the Trust, and then shall distribute or apply any remaining assets of the Trust in a manner that the Board, in its sole discretion, deems consistent with the purposes of the Trust and which is not prohibited by law including transfer of the assets to another labor-management organization exempt under Section 501(c)(5)of the Internal Revenue Code.  The Board is empowered to take any and all action necessary or appropriate to effectuate the termination and final distribution of assets and to conclude the Trust's affairs.  The Trustees shall continue to serve as such until the Trust's affairs are concluded.

7.04    MERGER:  The Board of Trustees may merge the Trust with or into another trust or tax-exempt entity with the same fundamental purposes as the Trust; provided that such action is not prohibited by law; and provided further that written notice of such merger agreement shall be given to each of the Trustees and the District Council and that the merged fund shall assume all of the responsibilities and liabilities of the Trust including the indemnification responsibilities set forth in Section 6.07 of this Trust.

7.05    NO INUREMENT:  Under no circumstances, including termination or merger, shall the Trust inure to the benefit of any Contributing Entity, the District Council or any other individual or organization, except to the extent permitted by applicable provisions of the Internal Revenue Code and other applicable laws.

ARTICLE 8

MISCELLANEOUS

8.01 SITUS: The situs of the Trust and principal administrative office shall be in the offices of the District Council in Burr Ridge, Illinois, or such other location as the Trustees may determine.

8.02 GOVERNING LAW: All questions pertaining to the validity, construction and administration of the Trust not governed by federal law shall be governed by the law of Illinois.

8.03 SEVERABILITY AND SAVINGS: The provisions of this Agreement shall be interpreted in a manner consistent with applicable law. If any provision of this Agreement should be declared invalid or unenforceable or inoperative by any competent governmental authority, the Board shall suspend the operation of such provision and shall substitute in its stead a provision which will meet the objections to validity and which is consistent with the purposes of the Trust. Such a determination that certain provisions of this Agreement are invalid or inoperative or unenforceable by operation of law shall not affect the remaining provisions of this Agreement.

8.04 LIMITATION OF RIGHTS: No individual or entity, save the Board, shall have any interest, right or ownership in the Trust or its assets. The obligations of the Trust shall be payable only from the assets of the Trust.

8.05 PARTICIPATION OF EMPLOYERS IN ADDITIONAL INDUSTRIES: Should employers in other industries agree to contribute to this Trust, the Board may expand the programs of this Trust, expand the definition of Industry and, with the District Council's approval may increase the number of Trustees to permit representation of such employers on the Board.

8.06 EXECUTION OR ADOPTION: This Agreement may be signed by a Contributing Entity or Trustee on separate sheets. This Agreement may also be adopted by express reference in a collective bargaining agreement, participation agreement or other written agreement accepted by the Board.

8.07 TERM: The term of this Agreement shall begin as of the receipt of contributions from a Contributing Entity and continue until termination by the Board of Trustees.

- 12 -

**LABORERS' PENSION & WELFARE FUNDS**

REVISED
AUDIT

EMPLOYER    T-CAT ENTERPRISES INC                        CODE    035885

FOLLOWING ARE THE FIGURES OWED BY THE ABOVE MENTIONED CONTRACTOR AS A RESULT OF THE AUDIT

| 5-5-21-3-31-22 ADDITIONAL HOURS | HOURS | WELFARE | RATE | RETIREE WELFARE | RATE | PENSION | RATE | TRAINING FUND | RATE | DUES | LDCLMCC | RATE | CAICA | RATE | LECET | RATE | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6-1-21-5-31-22 | 200.00 | 2,260.00 | 11.30 | 1,050.00 | 5.25 | 2,942.00 | 14.71 | 180.00 | 0.90 | 721.13 | 34.00 | 0.17 | 16.00 | 0.08 | 14.00 | 0.07 | 7,217.13 |
| 6-1-21-3-31-22 | 81.00 | 915.30 | 11.30 | 425.25 | 5.25 | 1,191.51 | 14.71 | 72.90 | 0.90 | - | - | | - | | - | | 2,604.96 |
| | | - | | - | | - | | - | | | - | | - | | - | | - |
| | | - | | - | | - | | - | | | - | | - | | - | | - |
| | | - | | - | | - | | - | | | - | | - | | - | | - |
| MEN NOT | | - | | - | | - | | - | | | - | | - | | - | | - |
| REPORTED | | - | | - | | - | | - | | | - | | - | | - | | - |
| | | - | | - | | - | | - | | | - | | - | | - | | - |
| | | - | | - | | - | | - | | | - | | - | | - | | - |
| | | - | | - | | - | | - | | | - | | - | | - | | - |
| | | - | | - | | - | | - | | | - | | - | | - | | - |
| | | - | | - | | - | | - | | | - | | - | | - | | - |
| SUBTOTAL | 281.00 | 3,175.30 | | 1,475.25 | | 4,133.51 | | 252.90 | | 721.13 | 34.00 | | 16.00 | | 14.00 | | 9,822.09 |
| 10% LIQUIDATED DAMAGES | | | | | | | | | | 72.11 | 3.40 | | 1.60 | | 1.40 | | 78.51 |
| 20% LIQUIDATED DAMAGES | | 635.06 | | 295.05 | | 826.70 | | 50.58 | | | | | | | | | 1,807.39 |
| AUDIT COSTS | | 525.11 | | 524.95 | | 524.94 | | | | | | | | | | | 1,575.00 |
| ATTORNEY FEES | | | | | | | | | | | | | | | | | - |
| ACCUM. LIQUIDATED DAMAGES | | 6,712.68 | | 2,407.88 | | 10,775.41 | | | | - | | | | | | | 19,895.97 |
| ACCUM. INTEREST | | 1,497.62 | | 695.80 | | 1,949.56 | | 119.28 | | | 16.17 | | 7.61 | | 6.66 | | 4,292.70 |
| TOTAL DUE | | 12,545.77 | | 5,398.93 | | 18,210.12 | | 422.76 | | 793.24 | 53.57 | | 25.21 | | 22.06 | | 37,471.66 |

**Exhibit A-9**

# RICHARD J. WOLF AND COMPANY, INC.

Post Office Box 591
Palos Park, Illinois 60464
(708) 923-0909
Fax (708) 923-0910



January 14, 2025

Board of Trustees
Pension and Welfare Funds of Construction and General
Laborers' District Council of Chicago and Vicinity
11465 Cermak Road
Westchester, Illinois 60154

RE: T-Cat Enterprises Inc. (35885) - revision

We have applied certain procedures, as discussed below, to the payroll records of
T-Cat Enterprises Inc., a contributing employer to the Pension and Welfare Funds of
Construction and General Laborers' District Council of Chicago and Vicinity, for the
period May 5, 2021 to March 31, 2022. The purpose of our inspection was to determine
the accuracy of the employer's monthly contributions to the Trust Funds for the given
period. The accuracy of the payroll records and reporting to the Funds is the
responsibility of the [Employer].

The exceptions to employer contributions noted are detailed on the accompanying
schedule. This was not a review of amounts owed for withdrawal liability under the
Multi-employer Pension Plan Amendments Act.

| FUND | AMOUNT |
|------|--------|
| WELFARE | $ 3,175.30 |
| RET WELFARE | $ 1,475.25 |
| PENSION | $ 4,133.51 |
| TRAINING | $ 252.90 |
| LECET | $ 14.00 |
| LMCC | $ 34.00 |
| CAICA | $ 16.00 |
| DUES | $ 721.13 |
| Sub Total | $ 9,822.09 |
| Laborers' Pension and Welfare Funds – Accumulated LD's | $11,989.79 |
| TOTAL | $21,811.88 |

We have also examined the employer's current wage and fringe benefit bond by The Gray Insurance Co., in the amount of $5,000.00 covering the period from 6/10/2021 through 6/10/2022.

The Scope of this engagement was limited to records made available by the employer and would not necessarily disclose all exceptions in employer contributions to the Trust Funds. Any compensation paid to employees not disclosed to us or made part of the written records was not determinable by us and was not included in our review. Further, our procedures did not extend to any financial statements of the contributing employer and were substantially less in scope than an audit of the financial statements of the contributing employer, the objective of which is the expression of an opinion on the contributing employer's financial statements. Accordingly, no such opinion is expressed.

The findings of this audit report should not be construed as an endorsement or ratification of any of the Employer's contribution practices. The findings are based solely on those documents that the Employer provided to the auditors. This firm has not been retained to provide, and does not provide, any interpretation of advice concerning any terms of the collective bargaining agreement between the Employer and the Union of the terms of the Funds' respective Agreement and Declarations of Trust. All questions concerning the Employer's contribution practices, or any contributions or benefits-related issue, should be directed to the Union or the Fund office. No failure to note an exception to any of the employer's contribution practices should be construed as a ratification of such practice or waiver of the Union or the Funds' ability to challenge such practice in the future.

These findings are not based on observation of employees doing actual work.

RICHARD J. WOLF AND COMPANY, INC.

1/14/2025
JAP

# LABORERS DISTRICT COUNCIL OF CHICAGO – CAICA ASSOCIATION

## T-CAT ENTERPRISE INC #35885

### ADDITIONAL HOURS and/or WORK DUES   6/21 – 5/22

**YEAR:  6/21  to  5/22**

| S.S.# | Flags | Type | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRANKEY, CHRISTOPHER | # | Hours | - | 200.00 | - | - | - | - | - | - | - | - | - | - | 200.00 |
| XXX-XX-XXXX | | Gross $ | - | 19,230.00 | - | - | - | - | - | - | - | - | - | - | $ 19,230.00 |

**TOTAL HOURS**

| | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 200.00 | | | | | | | | | | | 200.00 |

**TOTAL GROSS $**

| | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ | - | $ 19,230.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 19,230.00 |

**Amount Due To Funds:**

| | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WELFARE | $ - | $ 2,260.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,260.00 |
| RET WELFARE | $ - | $ 1,050.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,050.00 |
| PENSION | $ - | $ 2,942.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 2,942.00 |
| TRAINING | $ - | $ 180.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 180.00 |
| LECET | $ - | $ 14.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 14.00 |
| LMCC | $ - | $ 34.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 34.00 |
| CAICA | $ - | $ 16.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 16.00 |
| DUES | $ - | $ 721.13 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | 721.13 |
| TOTAL | $ - | $ 7,217.13 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 7,217.13 |

| Rates: | 6/1/21 | to | 5/31/22 |
|---|---|---|---|
| WELFARE | 11.30 | LMCC | 0.17 |
| PENSION | 14.71 | CAICA | 0.08 |
| TRAINING | 0.90 | DUES | 3.75% |
| LECET | 0.07 | RET WEL | 5.25 |
| SCALE | 45.90 | | |

LABORERS DISTRICT COUNCIL OF CHICAGO – CAICA ASSOCIATION

T-CAT ENTERPRISE INC #35885

ADDITIONAL HOURS - WELFARE - RET WELFARE - PENSION - TRAINING  6/21 - 5/22

YEAR:  6/21  to  5/22

| S.S.# | Flags | Type | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRANKEY, CHRISTOPHER XXX-XX-XXXX | # | Hours | - | - | 40.50 | - | - | - | - | - | - | - | - | - | 40.50 |
| | | Gross $ | - | - | - | - | - | - | - | - | - | - | - | - | $ - |
| KAZUMURA, JEFFERY XXX-XX-XXXX | # | Hours | - | - | 40.50 | - | - | - | - | - | - | - | - | - | 40.50 |
| | | Gross $ | - | - | - | - | - | - | - | - | - | - | - | - | $ - |

| | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL HOURS | - | - | 81.00 | - | - | - | - | - | - | - | - | - | 81.00 |
| TOTAL GROSS $ | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

Amount Due To Funds:

| | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WELFARE | $ - | $ - | $ 915.30 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 915.30 |
| RET WELFARE | $ - | $ - | $ 425.25 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 425.25 |
| PENSION | $ - | $ - | $ 1,191.51 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,191.51 |
| TRAINING | $ - | $ - | $ 72.90 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 72.90 |
| TOTAL | $ - | $ - | $ 2,604.96 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,604.96 |

| Rates: | 6/1/21 | to | 5/31/22 | |
|---|---|---|---|---|
| WELFARE | 11.30 | | | |
| PENSION | 14.71 | | | |
| TRAINING | 0.90 | | RET WEL | 5.25 |
| SCALE | 45.90 | | | |

1/14/2025
JAP

# LABORERS DISTRICT COUNCIL OF CHICAGO -- CAICA ASSOCIATION

T-CAT ENTERPRISE INC #35885

RICHARD J. WOLF AND COMPANY, INC.

## SUMMARY REPORT TOTAL

|  | ADDITIONAL | UNREPORTED | TOTAL |
|---|---|---|---|
| WELFARE | $ 3,175.30 | $ - | $ 3,175.30 |
| RET WELFARE | $ 1,475.25 | $ - | $ 1,475.25 |
| PENSION | $ 4,133.51 | $ - | $ 4,133.51 |
| TRAINING | $ 252.90 | $ - | $ 252.90 |
| LECET | $ 14.00 | $ - | $ 14.00 |
| LMCC | $ 34.00 | $ - | $ 34.00 |
| CAICA | $ 16.00 | $ - | $ 16.00 |
| DUES | $ 721.13 | $ - | $ 721.13 |
| TOTAL | $ 9,822.09 | $ - | $ 9,822.09 |

## AUDIT COST – Laborers Pension & Welfare Funds

## T-CAT Enterprise Inc. (35885)

| Date billed | Amount |
|---|---|
| 9/27/23 | $1,365.00 |
| 1/14/25 (revision) | $ 210.00 |




# Chicago & Vicinity Laborers' District Council

**Health & Welfare Fund • Retiree Health & Welfare Fund • Pension Fund**

**LiUNA!**
*Feel the Power*

**11465 W. Cermak Road, Westchester, IL 60154-5768 | www.chicagolaborersfunds.com**
**Toll Free:** (866) 906-0200 • **Telephone:** (708) 562-0200

T CAT ENTERPRISE, INC.
997 READING DRIVE
BARTLETT, IL 60103-0000

September 12, 2025
Contractor #  035885

## Statement of Account

Dear Employer:
Please review the information listed below.  Should you have any questions, or need clarification, please contact the
Funds' Accounting Department at 708-562-0200 ext. 520.

## Liquidated Damages

According to our records, the following work report(s) were submitted late.  Pursuant to the Funds' Collection
Policies and Procedures, liquidated damages have been assessed.

| Transaction Number | Transaction Type | Work Month | Payment Received Date | Calculated Amount | Ld Assessed % | Assessed Lds |
|---|---|---|---|---|---|---|
| 4492571 | Work Report | 07/2023 | 09/26/2023 | $14,035.01 | 10% | $1,366.15 |
| 4516297 | Work Report | 08/2023 | 11/01/2023 | $14,359.83 | 10% | $1,397.76 |
| 4553768 | Work Report | 09/2023 | 12/27/2023 | $36,908.16 | 10% | $1,796.28 |
| 4553772 | Work Report | 10/2023 | 12/27/2023 | $10,940.80 | 10% | $532.48 |
| 4596468 | Work Report | 11/2023 | 04/25/2024 | $5,470.40 | 10% | $532.48 |
| 4597979 | Work Report | 12/2023 | 04/25/2024 | $6,838.00 | 10% | $665.60 |
| 4649093 | Work Report | 01/2024 | 04/25/2024 | $5,470.40 | 10% | $532.48 |
| 4730837 | Work Report | 02/2024 | 09/23/2024 | $5,470.40 | 10% | $532.48 |
| 4730839 | Work Report | 03/2024 | 10/22/2024 | $13,676.00 | 10% | $665.60 |
| 4730841 | Work Report | 04/2024 | 10/22/2024 | $10,940.80 | 10% | $532.48 |
| 4730843 | Work Report | 05/2024 | 11/19/2024 | $6,838.00 | 10% | $665.60 |
| 4730845 | Work Report | 06/2024 | 12/10/2024 | $5,686.40 | 10% | $554.08 |
| 4753688 | Work Report | 07/2024 | 12/10/2024 | $5,686.40 | 10% | $554.08 |
| 4776338 | Work Report | 08/2024 | 12/10/2024 | $5,686.40 | 10% | $518.54 |
| 4799479 | Work Report | 09/2024 | 12/18/2024 | $5,686.40 | 10% | $554.08 |
| 4822863 | Work Report | 10/2024 | 12/18/2024 | $5,686.40 | 10% | $554.08 |
| 4868483 | Work Report | 12/2024 | 03/07/2025 | $5,686.40 | 10% | $568.64 |
| 4891591 | Work Report | 01/2025 | 04/04/2025 | $7,108.00 | 10% | $692.60 |
| 4914977 | Work Report | 02/2025 | 06/04/2025 | $5,686.40 | 10% | $554.08 |
| 4937786 | Work Report | 03/2025 | 06/04/2025 | $5,686.40 | 20% | $1,137.28 |
| 4961770 | Work Report | 04/2025 | 06/24/2025 | $5,686.40 | 20% | $851.84 |

**Employer Participants:** Builders' Association, Employing Plasterers' Association, Underground Contractors' Association, Mason Contractors' Association, Concrete Contractors' Association, Wrecking Contractors, Concrete Products Employers, Lake County Illinois Employers, Illinois Road Builders Association, Bridge and Highway Structural Builders; i.e. all those who employ Laborers Engaged in the Building and Construction Industry.

**Exhibit A-10**

| Transaction Number | Transaction Type | Work Month | Payment Received Date | Calculated Amount | Ld Assessed % | Assessed Lds |
|---|---|---|---|---|---|---|
| 5007445 | Work Report | 06/2025 | | $5,910.40 | 20% | $1,182.08 |
| 5030267 | Work Report | 07/2025 | | $5,910.40 | 20% | $1,182.08 |
| 5030302 | Work Report | 08/2025 | | $8,865.60 | 20% | $1,773.12 |

Total Liquidated Damages: $19,895.97

**Payments can be made online at https://chilabprodess.v3locity.com/ or by check.**

**For payments made by check:**
Checks should be made payable to: **Laborers' Pension & Welfare Funds**
Remit payment to:

**U.S. mail send to:**
Laborers' Pension & Welfare Funds
33367 Treasury Center
Chicago, IL 60694-3300

**Courier and messenger deliveries send to:**
Xerox c/o BMO Harris
LBX 33367
141 W. Jackson Blvd/Suite 1000
Chicago, IL 60604

**Employer Participants:** Builders' Association, Employing Plasterers' Association, Underground Contractors' Association, Mason Contractors' Association, Concrete Contractors' Association, Wrecking Contractors, Concrete Products Employers, Lake County Illinois Employers, Illinois Road Builders Association, Bridge and Highway Structural Builders; i.e. all those who employ Laborers Engaged in the Building and Construction Industry.



# CHICAGO & VICINITY LABORERS' DISTRICT COUNCIL BENEFIT FUNDS
## HISTORICAL WORK REPORT

| | | | |
|---|---|---|---|
| **Employer Name:** | 035885 - T CAT ENTERPRISE, INC. | **Report type:** | Regular |
| **Billing Entity Name:** | 035885 - T-CAT ENTERPRISE, INC. | **Report Received Date:** | 07/07/2025 |
| **Report Period:** | 06/01/2025 To 06/30/2025 | **Paid Date:** | |
| | | **Report Source:** | ESS - Coupon |
| | | **Transaction Number:** | 4970251 |

| SSN | Name | Start Date | Stop Date | Hours | Local No. |
|---|---|---|---|---|---|
| XXX-XX | KAZUMURA, JEFFERY A | 06/01/2025 | 06/30/2025 | 160 | 0152 |
| | Total: | | | 160 | |

**Financial Summary**

| Fund Name | Due Calculated | Amount Paid | Amount Owed |
|---|---|---|---|
| H&W | $2,000.00 | $0.00 | $2,000.00 |
| Retiree Welfare | $931.20 | $0.00 | $931.20 |
| Pension | $2,833.60 | $0.00 | $2,833.60 |
| Training | $145.60 | $0.00 | $145.60 |
| **Totals** | $5,910.40 | $0.00 | $5,910.40 |



# CHICAGO & VICINITY LABORERS' DISTRICT COUNCIL BENEFIT FUNDS
## HISTORICAL WORK REPORT

| | | | |
|---|---|---|---|
| **Employer Name:** | 035885 - T CAT ENTERPRISE,  INC. | **Report type:** | Regular |
| **Billing Entity Name:** | 035885 - T-CAT ENTERPRISE,  INC. | **Report Received Date:** | 08/07/2025 |
| **Report Period:** | 07/01/2025 To 07/31/2025 | **Paid Date:** | |
| | | **Report Source:** | ESS - Coupon |
| | | **Transaction Number:** | 5005820 |

| SSN | Name | Start Date | Stop Date | Hours | Local No. |
|---|---|---|---|---|---|
| XXX-XX | KAZUMURA, JEFFERY A | 07/01/2025 | 07/31/2025 | 160 | 0152 |
| | Total: | | | 160 | |

**Financial Summary**

| Fund Name | Due Calculated | Amount Paid | Amount Owed |
|---|---|---|---|
| H&W | $2,000.00 | $0.00 | $2,000.00 |
| Retiree Welfare | $931.20 | $0.00 | $931.20 |
| Pension | $2,833.60 | $0.00 | $2,833.60 |
| Training | $145.60 | $0.00 | $145.60 |
| **Totals** | $5,910.40 | $0.00 | $5,910.40 |



# CHICAGO & VICINITY LABORERS' DISTRICT COUNCIL BENEFIT FUNDS
## HISTORICAL WORK REPORT

| | | | |
|---|---|---|---|
| **Employer Name:** | 035885 - T CAT ENTERPRISE, INC. | **Report type:** | Regular |
| **Billing Entity Name:** | 035885 - T-CAT ENTERPRISE, INC. | **Report Received Date:** | 09/08/2025 |
| **Report Period:** | 08/01/2025 To 08/31/2025 | **Paid Date:** | |
| | | **Report Source:** | ESS - Coupon |
| | | **Transaction Number:** | 5029001 |

| SSN | Name | Start Date | Stop Date | Hours | Local No. |
|---|---|---|---|---|---|
| XXX-XX | KAZUMURA, JEFFERY A | 08/01/2025 | 08/31/2025 | 240 | 0152 |
| | Total: | | | 240 | |

**Financial Summary**

| Fund Name | Due Calculated | Amount Paid | Amount Owed |
|---|---|---|---|
| H&W | $3,000.00 | $0.00 | $3,000.00 |
| Retiree Welfare | $1,396.80 | $0.00 | $1,396.80 |
| Pension | $4,250.40 | $0.00 | $4,250.40 |
| Training | $218.40 | $0.00 | $218.40 |
| **Totals** | $8,865.60 | $0.00 | $8,865.60 |

Page 1 of 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL PENSION FUND,** | ) | |
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL WELFARE FUND,** | ) | |
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL RETIREE HEALTH** | ) | |
| **AND WELFARE FUND, and CATHERINE** | ) | |
| **WENSKUS, not individually but as** | ) | |
| **Administrator of the Funds,** | ) | **Case No. 25 C 4665** |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Honorable John F. Kness** |
| | ) | |
| **T CAT ENTERPRISE, INC.,** | ) | **Magistrate Judge McShain** |
| **an Illinois corporate entity,** | ) | |
| **Defendant.** | ) | |

## DECLARATION OF SARA S. SCHUMANN

I, Sara S. Schumann, declare and state as follows:

1.      I am the Laborers' Funds' Counsel for Plaintiffs Chicago & Vicinity Laborers' District Council Pension Fund, Welfare Fund, Retiree Welfare Fund and Catherine Wenskus, in her capacity as Administrator of the Funds (collectively the "Funds"). I received a Bachelor of Arts Degree from Northeastern Illinois University in 2007 and a Juris Doctor Degree from Illinois Institute of Technology, Chicago-Kent College of Law in December 2010. I was admitted to the bar of the State of Illinois in May 2011 and to the bar of the United States District Court for the Northern District of Illinois in May 2011. From April 2011 to January 2019, I practiced labor and employment law as an associate at the law firm of Allison, Slutsky & Kennedy, P.C. In January 2019, I became Funds Counsel for the Funds. This Declaration is submitted in support of the Laborers' Funds' Motion for Entry of Default Judgment in Sum Certain.

**Exhibit B**

2.      Based on the foregoing, $265.00 represents a fair and reasonable market rate for Sara Stewart Schumann's in-house legal services to the Funds in this matter.

3.      Shareholders of the law firms of Allison, Slutsky & Kennedy, out-of-house collection counsel for the Funds, bill the Funds at a rate of $265.00 per hour for shareholders, $220.00 per hour for associates, and $120.00 per hour for paralegals.  Declarant, as in-house counsel for Funds, has first-hand knowledge that the foregoing hourly rates have been found reasonable and have been awarded by many courts in collection proceedings.

4.      Patrick T. Wallace received a Bachelor of Arts Degree from the University of Illinois at Urbana-Champaign in 1992 and a Juris Doctor Degree from the University of DePaul College of Law in 1995.  He was admitted to the bar of the State of Illinois in November 1995 and to the bar of the United States District Court for the Northern District of Illinois in December 1995. He has also been admitted to the bar of the United States District Court for the Central District of Illinois.  He was admitted to the Trial Bar of the Northern District of Illinois on September 20, 2000.  From November 1995 to August 2000, he practiced labor and employment law as an associate at the law firm of Katz, Friedman, Eagle, Eisenstein & Johnson (formerly Katz, Friedman, Schur & Eagle). In September 2000, he became Funds Counsel for the Funds.

5.      Based on the foregoing, $265.00 represents a fair and reasonable market rate for my in-house legal services to the Funds in this matter.

6.      Amy Carollo, in-house counsel for the Funds, received a Bachelor of Arts Degree from Illinois State University in 2000, Masters of Science from University of Illinois at Chicago in 2002 and a Juris Doctor from Chicago-Kent College of Law in 2005.  She was admitted to the bar of the State of Illinois in November of 2005 and to the bar of the United States District Court

2

for the Northern District in January 2006. In March 2006, she became in-house counsel for the Funds.

7.      Based on the foregoing, $265.00 represents a fair and reasonable market rate for Amy Carollo's in-house legal services to the Funds in this matter.

8.      G. Ryan Liska, in-house counsel for the Funds, received a Bachelor of Arts Degree from University of Iowa in 1997 and a Juris Doctor from John Marshall Law School in 2002. He was admitted to the bar of the State of Illinois in November of 2002 and to the bar of the United States District Court for the Northern District in December of 2002. In March 2006, he was admitted to the bar of the United States District Court for the Central District of Illinois. From 2002 to September 2016 he practiced labor and employment law at various law firms. In October of 2016, he became in-house counsel for the Funds.

9.      Based on the foregoing, $265.00 represents a fair and reasonable market rate for G. Ryan Liska's in-house legal services to the Funds in this matter.

10.      Exhibit B-1 attached hereto sets forth the time expended to date by Funds' Counsel on this matter. The undersigned has reviewed the time entries for accuracy and has struck any duplicative entries. As set forth in that Exhibit, we have expended 43.60 hours totaling $11,554.00 in attorneys' fees and $490.00 in expenses totaling $12,044.00.

I, the undersigned, certify under penalty of perjury that the foregoing is true and correct.


Date:   September 15. 2025                          /s/Sara S. Schumann
                                                   Sara S. Schumann
                                                   ARDC # IL 6305044


3

Laborers Pension and Welfare Funds
11465 Cermak Rd.
Westchester, IL 60154

Invoice submitted to:
T Cat

September 15, 2025

Invoice #10474

Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 11/4/2024 | SSS | Work on resolving delinquency, emails and call w/S. Gore, J. Gilleran | 1.00 265.00/hr | 265.00 |
| 11/5/2024 | SSS | Follow up email w/S. Gore and J. Trumbull | 0.50 265.00/hr | 132.50 |
| 11/6/2024 | SSS | Calls w/S. Gore in re J. Trumbull and Company's failure to provide evidence or pay for audit nor evidence of bond | 0.50 265.00/hr | 132.50 |
| 11/7/2024 | SSS | Calls w/J. Gilleran | 0.10 265.00/hr | 26.50 |
| 11/12/2024 | SSS | Draft lawsuit, emails w/S. Gore and J. Trumbull | 1.50 265.00/hr | 397.50 |
| 11/18/2024 | SSS | Emails w/J. Trumbull, S. Gore, J. Gilleran and A. Grossi in re payment | 0.70 265.00/hr | 185.50 |
| 12/3/2024 | SSS | Emails w/J. Trumbull and S. Gore | 0.30 265.00/hr | 79.50 |
| 12/5/2024 | SSS | Emails and call w/J. Trumbull and S. Gore | 0.50 265.00/hr | 132.50 |
| 12/9/2024 | SSS | Draft memo for payment, calls and emails w/J. Gilleran, J. Trumbull and S. Gore | 1.00 265.00/hr | 265.00 |
| 12/10/2024 | SSS | Calls and emails w/A. Franz, A. Connolly, J. Gilleran, J. Trumbull and S. Gore | 1.00 265.00/hr | 265.00 |

**Exhibit B-1**

T Cat

Page     2

| Date | | Description | Hrs/Rate | Amount |
|---|---|---|---|---|
| 12/27/2024 | SSS | Emails w/M. Flanagan, J. Trumball and S. Gore | 0.50<br>265.00/hr | 132.50 |
| 1/6/2025 | SSS | Work on scheduling conference at LDC w/M. Flanagan, S. Gore, J. Trumbull, J. Barrera, JVB and C. Kilbride | 0.50<br>265.00/hr | 132.50 |
| 1/7/2025 | SSS | Review delinquency at dues fund, emails w/M. Flanagan, S. Gore, J. Trumbull and C. Kilbride | 0.50<br>265.00/hr | 132.50 |
| 1/8/2025 | SSS | Prepare for conference at DC, review audit and Company's challenge docs, review delinquency status, update LD ledger, emails w/J. Gilleran | 1.70<br>265.00/hr | 450.50 |
| 1/9/2025 | SSS | In person conference at DC w/J. Trumbull, S. Gore, M. Flanagan and C. Kilbride, call w/J. Polehonki for audit revision, emails w/C. Kilbride, draft affidavit of indemnification for J. Trumbull | 4.50<br>265.00/hr | 1,192.50 |
| 1/10/2025 | SSS | Draft affidavit for J. Trumbull, emails w/S. Gore and J. Trumbull | 1.00<br>265.00/hr | 265.00 |
| 1/14/2025 | SSS | Review audit and LD ledger for revised audit, email w/J. Gilleran | 1.00<br>265.00/hr | 265.00 |
| 1/16/2025 | SSS | Draft demand letter, review revised audit, emails w/C. Kilbride, J. Gilleran, J. Trumbull and S. Gore | 1.80<br>265.00/hr | 477.00 |
| 1/17/2025 | SSS | Review revised audit and summary, draft demand letter and send to S. Gore and J. Trumbull and J. Gilleran | 1.80<br>265.00/hr | 477.00 |
| 2/5/2025 | SSS | Work on settlement, review status in V3 and prior letter demand for revised audit, review affidavit and indemnification agreement, emails w/S. Gore and J. Trumbull | 1.50<br>265.00/hr | 397.50 |
| 2/20/2025 | SSS | Renew demand as to revised audit, review V3 payment status, emails and call w/S. Gore, emails w/A. Franz, A. Connolly and J. Trumbull | 0.50<br>265.00/hr | 132.50 |
| 2/21/2025 | SSS | Work on pending audit and settlement, emails w/S. Gore, J. Trumbull | 0.30<br>265.00/hr | 79.50 |
| 2/25/2025 | SSS | Calls and email w/S. Gore and J. Trumbull | 0.50<br>265.00/hr | 132.50 |
| 3/3/2025 | SSS | Emails w/J. Trumbull and S. Gore in re new lawsuit imminent | 0.10<br>265.00/hr | 26.50 |
| 3/4/2025 | SSS | Review delinquency, conf. call and emails w/J. Trumbull and S. Gore, emails w/J. Gilleran, A. Franz and A. Connolly | 1.00<br>265.00/hr | 265.00 |
| 3/10/2025 | SSS | Work on payments needed to date, emails w/J. Trumbull, S. Gore, A. Trumbull and M. Denk | 0.50<br>265.00/hr | 132.50 |

T Cat                                                                                          Page     3

| | | Hrs/Rate | Amount |
|---|---|---|---|
| 3/26/2025 SSS | Work on audit collection and monthly delinquency, call and email w/S. Gore, emails w/J. Trumbull, A. Franz and A. Connolly | 1.50 265.00/hr | 397.50 |
| 3/28/2025 SSS | Review V3 status, draft final demand letter | 1.20 265.00/hr | 318.00 |
| 4/1/2025 SSS | Emails and call w/S. Gore, emails w/J. Trumbull | 0.30 265.00/hr | 79.50 |
| 4/2/2025 SSS | Emails and call w/S. Gore | 0.50 265.00/hr | 132.50 |
| 4/3/2025 SSS | Emails and call w/S. Gore and J. Gilleran in re payments | 0.20 265.00/hr | 53.00 |
| 4/6/2025 SSS | Review payment of Jan25 report, call and texts w/R. Liska, emails w/S. Gore and J. Trumbull, call w/D. Panzo | 1.00 265.00/hr | 265.00 |
| 4/9/2025 SSS | Update LDC on current demand and other issues, emails w/C. Kilbride and J. Barrera | 0.30 265.00/hr | 79.50 |
| 4/21/2025 SSS | Follow-up emails w/S. Gore and J. Trumbull | 0.50 265.00/hr | 132.50 |
| 4/27/2025 SSS | Call and email w/S. Gore and J. Trumbull | 0.50 265.00/hr | 132.50 |
| 4/28/2025 SSS | Draft complaint, emails w/S. Gore, J. Trumbull, J. Gilleran, A. Franz, C. Kilbride and J. Barrera | 1.50 265.00/hr | 397.50 |
| 4/29/2025 SSS | Revise draft complaint, review prepared exhibits and filing, emails and call w/S. Gore and T. Maciel, emails w/A. Franz | 1.50 265.00/hr | 397.50 |
| 5/1/2025 SSS | Work on service, call and emails w/T. Maciel | 0.20 265.00/hr | 53.00 |
| 5/15/2025 SSS | Review status in V3, follow up on service, email and text w/T. Maciel | 0.20 265.00/hr | 53.00 |
| 5/16/2025 SSS | Work on service, email and call w/T. Maciel | 0.20 265.00/hr | 53.00 |
| 5/20/2025 SSS | Work on service, emails w/T. Maciel, S. Gore and J. Trumbull | 0.70 265.00/hr | 185.50 |
| 5/29/2025 SSS | Work on service, emails w/T. Maciel, research Sec of State status | 0.50 265.00/hr | 132.50 |
| 6/2/2025 SSS | Work on service and conf. call w/M. Flanagan and C. Kilbride, emails w/T. Maciel | 0.70 265.00/hr | 185.50 |

T Cat                                                                                                                Page      4

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 6/3/2025 | SSS | Review alleged payment, calls and emails w/S. Gore and J. Trumbull in re issues w/payment going to MOE and wrong made payable | 0.80 265.00/hr | 212.00 |
| 6/9/2025 | SSS | Work on settling delinquency, emails w/J. Trumbull and S. Gore | 0.50 265.00/hr | 132.50 |
| 6/10/2025 | SSS | Call w/S. Gore in re April balance payment needed today | 0.30 265.00/hr | 79.50 |
| 6/15/2025 | SSS | Follow up on affidavit of service and filing on docket, emails w/J. Trumbull, M. Denk, S. Gore | 0.50 265.00/hr | 132.50 |
| 6/25/2025 | SSS | Draft updated demand letter, emails w/J. Trumbull and S. Gore, review payment in V3 | 0.70 265.00/hr | 185.50 |
| 7/10/2025 | SSS | Emails w/S. Gore and J. Trumbull | 0.30 265.00/hr | 79.50 |
| 7/17/2025 | SSS | Email to J. Trumbull and S. Gore, update quarterly report | 0.30 265.00/hr | 79.50 |
| 7/18/2025 | SSS | Draft initial status report for the court, emails w/S. Gore, J. Trumbull and text and call T. Maciel | 1.50 265.00/hr | 397.50 |
| 7/30/2025 | SSS | Prepare for court hearing, emails w/S. Gore and T. Trumbull | 0.50 265.00/hr | 132.50 |
| 8/6/2025 | SSS | Review Court order and email w/S. Gore and J. Trumbull | 0.50 265.00/hr | 132.50 |
| 8/12/2025 | SSS | Review V3, email w/S. Gore and J. Trumbull | 0.70 265.00/hr | 185.50 |
| 8/14/2025 | SSS | Draft motion for default, review V3 for failure to pay June Report, emails w/S. Gore, J. Trumbull, A. Grossi and J. Gilleran | 0.70 265.00/hr | 185.50 |

|  | | | |
|---|---|---|---|
| For professional services rendered | | 43.60 | $11,554.00 |
| Additional Charges : | | | |
| 4/29/2025 Filing fee. | | | 405.00 |
| 5/22/2025 Personal Service of Summons and Complaint | | | 85.00 |
| Total additional charges | | | $490.00 |
| Total amount of this bill | | | $12,044.00 |

T Cat

Page     5

| | Amount |
|---|---|
| Balance due | $12,044.00 |

### Timekeeper Summary

| Name | Hours | Rate | Amount |
|---|---|---|---|
| Sara S. Schumann | 43.60 | 265.00 | $11,554.00 |